**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| HUMAN RIGHTS FIRST, | Civil Action No. 1:20-cv-3764 (TSC) |
| *Plaintiff*, | |
| v. | |
| CHAD F. WOLF, *et al.*, | |
| *Defendants*. | |

## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Pursuant to Federal Rule of Civil Procedure 65 and Civil Local Rule 65.1, Plaintiff Human Rights First hereby moves the Court to issue a preliminary injunction, enjoining implementation or enforcement of the rule announced in the Federal Register entitled, "Procedures for Asylum and Withholding of Removal; Credible Fear and Reasonable Fear Review," 85 Fed. Reg. 80,274 (Dec. 11, 2020).  The rule is currently scheduled to go into effect on **January 11, 2021**.  In the alternative, Plaintiff requests a stay of implementation of the rule pursuant to 5 U.S.C. § 705.

In support of this motion, Plaintiff relies upon the attached memorandum of points and authorities and accompanying exhibits.  Plaintiff requests a hearing and attaches a proposed order.

Dated: December 22, 2020                    Respectfully submitted,


   /s/  Ana C. Reyes
Ana C. Reyes (D.C. Bar No. 477354)
Melinda K. Johnson (D.C. Bar No. 1620229)
Emma J. Nino[*]
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, NW
Washington, DC 20005
Tel: (202) 434-5000
Fax: (202) 434-5029
areyes@wc.com

---

[*] Practice supervised by D.C. Bar members pursuant to D.C. Court of Appeals Rule 49(c)(8), and certification to practice pursuant to LCvR 83.2(g) to be submitted.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

HUMAN RIGHTS FIRST,

          *Plaintiff,*

  v.

CHAD F. WOLF, *et al.*,

          *Defendants.*

Civil Action No. 1:20-cv-3764 (TSC)

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
<u>PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION</u>**

Ana C. Reyes (D.C. Bar No. 477354)
Melinda K. Johnson (D.C. Bar No. 1620229)
Emma J. Nino[*]
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
Tel: (202) 434-5000
Fax: (202) 434-5029
areyes@wc.com

---

[*] Certification to practice pursuant to LCvR 83.2(g) to be submitted; practice supervised by D.C. Bar members pursuant to D.C. Court of Appeals Rule 49(c)(8).

**<u>TABLE OF CONTENTS</u>**

INTRODUCTION ...................................................................................................................1

    A.      The Existing Refugee Framework ...........................................................3

          1.      The Refugee Act .........................................................................3

          2.      The Illegal Immigration Reform and Immigrant Responsibility Act .........4

    B.      The Rule.....................................................................................6

ARGUMENT ......................................................................................................................10

I.    Plaintiff Is Likely to Succeed on the Merits ...............................................10

    A.      Plaintiff Has Standing ....................................................................10

    B.      The Rule Is *Ultra Vires* ................................................................12

          1.      The Acting Secretary of DHS Promulgated the Rule Without Authority ....................................................................................12

          2.      The Agencies Exceeded the Scope of Their Authority.............................16

          3.      The INA Cannot Be Read to Allow the Agencies to Limit Asylum at Will.........................................................................................19

          4.      Congress Did Not Expressly Delegate to the Agencies the Power to Abrogate Asylum .......................................................................20

    C.      The Rule Is Arbitrary and Capricious ...................................................22

          1.      The Agencies Ignored Serious Concerns Expressed in Comments...........23

          2.      The Agencies Failed to Weigh the Rule's Costs and Benefits .................27

          3.      The Agencies Do Not Support the Rule's Purported Rationales..............28

          4.      The Agencies Do Not Address an Important Aspect of the Problem:  The Costs to the Economy and Fisc of Reduced Asylum Grants ........................................................................................29

          5.      The Agencies Failed to Explore Any Alternatives ...................................30

          6.      The Agencies Failed to Provide Sufficient Time for Comments or for the Rule to go into Effect ..........................................................31

    D.      Individual Provisions of the Rule Violate the INA and APA..............................32

          1.      Multiple Provisions Violate the Plain Text of the INA .............................32

          2.      Multiple Provisions Are Arbitrary and Capricious for Lack of Justification .................................................................................36

          3.      Multiple Provisions Undermine the Agencies' Purported Goals...............39

i

II.     The Other Preliminary Injunction Factors Are Readily Met ...........................................41

        A.      The Rule Inflicts Irreparable Harm on Plaintiff........................................................41

        B.      The Balance of Equities and Public Interest Weigh in Favor of an
                Injunction ........................................................................................................................42

III.    The Court Should Enjoin the Entire Rule .........................................................................43

IV.     Nationwide Injunctive Relief Is Warranted .....................................................................44

CONCLUSION..............................................................................................................................45

# TABLE OF AUTHORITIES

Page

**CASES**

*A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935) ...................................19

*Aid Ass'n for Lutherans v. U.S. Postal Serv.*, 321 F.3d 1166 (D.C. Cir. 2003)........................32

*Altera Corp. & Subsidiaries v. Comm'r*, 926 F.3d 1061 (9th Cir. 2019) .................................37

*Am. Soc'y for the Prevention of Cruelty to Animals v. Feld Entm't Inc.*,
    659 F.3d 13 (D.C. Cir. 2011)...............................................................................................11

*Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914 (D.C. Cir. 2017)...........................24

*Arizona v. United States*, 567 U.S. 387 (2002).........................................................................19

*Ass'n of Civilian Technicians, Mont. Air Chapter No. 29 v. Fed. Labor
    Relations Auth.*, 22 F.3d 1150 (D.C. Cir.1994).................................................................34

*Batalla Vidal v. Wolf*,
    Nos. 16-cv-4756, 17-cv-5228, 2020 WL 6695076 (E.D.N.Y. Nov. 14,
    2020) .......................................................................................................................13, 14, 15

*Bowen v. Am. Hosp. Ass'n*, 476 U.S. 610 (1986) ......................................................................29

*Brown v. Plata*, 563 U.S. 493 (2011).........................................................................................44

*Casa de Md., Inc. v. Wolf*,
    No. 8:20-cv-02118, 2020 WL 5500165 (D. Md. Sept. 11, 2020).........................13, 14, 31

*Colo. River Indian Tribes v. Nat'l Indian Gaming Comm'n*,
    466 F.3d 134 (D.C. Cir. 2006)...........................................................................................16

*Consumers Union of U.S., Inc. v. F.T.C.*, 801 F.2d 417 (D.C. Cir. 1986)................................29

*Cook v. Food & Drug Admin.*, 733 F.3d 1 (D.C. Cir. 2013) .....................................................34

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891 (2020) ....................22

*Dep't of Homeland Sec. v. Thuraissigiam*, 140 S. Ct. 1959 (2020) ...........................................7

*District of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1 (D.D.C. 2020)................42, 44

*E. Bay Sanctuary Covenant v. Barr*, 964 F.3d 832 (9th Cir. 2020)................................. *passim*

*Equal Rights Ctr. v. Post Props., Inc.*, 633 F.3d 1136 (D.C. Cir. 2011) ..................................11

*Fedunyak v. Gonzales*, 477 F.3d 1126 (9th Cir. 2007).............................................................36

*Fiallo v. Bell*, 430 U.S. 787 (1977)...........................................................................................20

*Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*,
    529 U.S. 120 (2000)............................................................................................................20

*Galvan v. Press*, 347 U.S. 522 (1954) ......................................................................................19

*Garcia v. Sessions*, 856 F.3d 272 (1st Cir. 2017) .....................................................................33

iii

Cases—continued:

*Garcia-Ramos v. Immigration & Naturalization Serv.*,
   775 F.2d 1370 (9th Cir. 1985) ....................................................36

*Getty v. Fed. Sav. & Loan Ins. Corp.*, 805 F.2d 1050 (D.C. Cir. 1986) ....................................24

*Glossip v. Gross*, 576 U.S. 863 (2015) ................................................................10

*Gomez v. Trump*, -- F. Supp. 3d ---, 2020 WL 5367010 (D.D.C. Sept. 4, 2020) ....................44

*Grace v. Barr*, 965 F.3d 883 (D.C. Cir. 2020)...................................................... *passim*

*Gresham v. Azar*, 950 F.3d 93 (D.C. Cir. 2020).........................................................22

*Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*,
   920 F.3d 1 (D.C. Cir. 2019).........................................................42

*Gundy v. United States*, 139 S. Ct. 2116 (2019)........................................................20

*Gustafson v. Alloyd Co.*, 513 U.S. 561 (1995).........................................................16

*Harmon v. Thornburgh*, 878 F.2d 484 (D.C. Cir. 1989) .........................................44

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982).........................................12

*Hu v. Holder*, 652 F.3d 1011 (9th Cir. 2011) .......................................................36

*Immigrant Legal Res. Ctr. v. Wolf*,
   No. 20-cv-05883, 2020 WL 5798269 (N.D. Cal. Sept. 29, 2020)........................15

*Innovation Law Lab v. Wolf*, 951 F.3d 1073 (9th Cir. 2020)........................................44

*INS v. Cardoza-Fonseca*, 480 U.S. 421 (1987) .............................................. *passim*

*J.E.M. Ag Supply, Inc. v. Pioneer Hi-Bred Int'l, Inc.*, 534 U.S. 124 (2001) ...........................15

*Kiakombua v. Wolf*,
   No. 19-cv-1872, 2020 WL 6392824 (D.D.C. Oct. 31, 2020) ..............................8

*King v. Burwell*, 576 U.S. 473 (2015) .....................................................................22

*Kingdomware Techs., Inc. v. United States*, 136 S. Ct. 1969 (2016) ............................34

*Landon v. Plasencia*, 459 U.S. 21 (1982)...............................................................43

*League of Women Voters of U.S. v. Newby*, 838 F.3d 1 (D.C. Cir. 2016)................................42

*Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26 (1998) ........................34

*Liuksila v. Turner*, No. 16-cv-00229, 2018 WL 6621339 (D.D.C. Dec. 18,
   2018) ..............................................................................42

*Lopez v. Davis*, 531 U.S. 230 (2001) ...................................................................34

*Make The Rd. N.Y. v. Wolf*, 962 F.3d 612 (D.C. Cir. 2020) ......................................23

*Maryland v. King*, 567 U.S. 1301 (2012) ...............................................................42

*Match–E–Be–Nash–She–Wish Band of Pottawatomi Indians v. Patchak*,
   567 U.S. 209 (2012)................................................................12

iv

Cases—continued:

*MD/DC/DE Broads. Ass'n v. FCC*, 236 F.3d 13 (D.C. Cir. 2001)...........................................43

*Me. Cmty. Health Options v. United States*, 140 S. Ct. 1308, 1320 (2020) ............................34

*Michigan v. E.P.A.*, 576 U.S. 743 (2015) ..............................................................................22

*Mistretta v. United States*, 488 U.S. 361 (1989)...............................................................19, 20

*Motor Vehicle Mfr. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983)........................................................................................................22, 37

*Murphy v. Smith*, 138 S. Ct. 784 (2018) ...............................................................................34

*Murray v. Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64 (1804) .......................................33

*N.L.R.B. v. SW Gen., Inc.*, 137 S. Ct. 929, 932 (2017)..........................................................14

*N.Y. Stock Exch. LLC v. Sec. & Exch. Comm'n*, 962 F.3d 541 (D.C. Cir. 2020) ....................16

*Nat. Res. Def. Council v. EPA*, 489 F.3d 1250 (D.C. Cir. 2007)............................................43

*Nat. Res. Def. Council v. Wheeler*, 955 F.3d 68 (D.C. Cir. 2020)..........................................23

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644 (2007) ................................34

*Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399 (D.C. Cir.
    1998) ...............................................................................................................................44

*New York v. U.S. Dep't of Health & Human Servs.*,
    414 F. Supp. 3d 475 (S.D.N.Y. 2019) .............................................................................43

*Nken v. Holder*, 556 U.S. 418 (2009) ...................................................................................42

*Nw. Immigrant Rights Project v. U.S. Citizenship & Immigration Servs.*,
    No. 19-cv-3283, 2020 WL 5995206, at *4 (D.D.C. Oct. 8, 2020) ............................. *passim*

*O.A. v. Trump*, 404 F. Supp. 3d 109 (D.D.C. 2019) ..............................................................18

*Orion Rsrvs. Ltd. P'ship v. Salazar*, 553 F.3d 697 (D.C. Cir. 2009)........................................32

*P.J.E.S. v. Wolf*, No. 1:20-cv-2245, 2020 WL 5793305 (D.D.C. Sept. 25, 2020).....................42

*Physicians for Soc. Resp. v. Wheeler*, 956 F.3d 634 (D.C. Cir. 2020) ....................................23

*Saldarriaga v. Gonzales*, 402 F.3d 461 (4th Cir. 2005) .........................................................26

*Sw. Airlines Co. v. Fed. Energy Regul. Comm'n*, 926 F.3d 851 (D.C. Cir. 2019) ....................23

*Texas v. United States*, 809 F.3d 1348 (5th Cir. 2015)..........................................................45

*United States v. Ali*, 718 F.3d 929 (D.C. Cir. 2013) ..............................................................33

*Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302 (2014) ........................................................20

*Washington v. Trump*, 847 F.3d 1151 (9th Cir. 2017)...........................................................45

*Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Servs.*,
    -- F. Supp. 3d --, 2020 WL 5232076 (D.D.C. Sept. 2, 2020) .............................................44

*Zadvydas v. Davis*, 533 U.S. 678 (2001) ...............................................................................20

## CONSTITUTIONAL PROVISIONS, STATUTES, LEGISLATIVE MATERIALS, AND REGULATIONS

U.S. Const. art. I, § 8 ................................................................................19

Administrative Procedure Act ("APA"), 5 U.S.C. § 500 *et seq.* ........................................ *passim*
    § 705 ................................................................................10, 45
    § 706 ................................................................................ *passim*
    § 801 ................................................................................32

Federal Vacancies Reform Act ("FVRA"), 5 U.S.C. § 3345 *et seq.* .....................13, 14, 15, 16
    § 3345 ................................................................................15
    § 3346 ................................................................................14
    § 3347 ................................................................................14
    § 3348 ................................................................................14

Homeland Security Act ("HSA"), 6 U.S.C. § 101 *et seq.* ................................................14, 15
    § 113 ................................................................................15

Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et seq.*................................ *passim*
    § 1101 ................................................................................4, 36
    § 1103 ................................................................................16
    § 1158 ................................................................................ *passim*
    § 1225 ................................................................................5
    § 1229a ................................................................................34, 35

Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"),
    Pub. L. No. 104–208, 110 Stat. 3009 (1996) ................................................ *passim*

Immigration Control and Financial Responsibility Act of 1996,
    142 Cong. Rec. S3282 (daily ed. Apr. 15, 1996)................................................35

Refugee Act of 1980, Pub. L. 96-212, 94 Stat. 102................................................ *passim*
    Art. 25 ................................................................................35

8 C.F.R.
    § 208.30 ................................................................................5
    § 1208.13 ................................................................................9
    § 1240.10 ................................................................................35
    § 1240.11 ................................................................................35

76 C.F.R. § 3821 ................................................................................31

Asylum Procedures, 65 Fed. Reg. 76,121 (Dec. 6, 2000) ................................................25

Procedures for Asylum and Withholding of Removal; Credible Fear and
    Reasonable Fear Interview, 85 Fed. Reg. 36,264 (June 15, 2020) ..............................6, 7, 26

Procedures for Asylum and Withholding of Removal; Credible Fear and
    Reasonable Fear Interview, 85 Fed. Reg. 80,274 (Dec. 11, 2020) .............................. *passim*

126 Cong. Rec. 1519 (1980)................................................................................4

142 Cong. Rec. 25,347 (1996)................................................................................6

H.R. Rep. No. 104–469, pt. 1 (1996)................................................................................5, 18

H.R. Rep. No. 104–828 (1996) ........................................................................4, 5, 18

## OTHER AUTHORITIES

American Bar Association, Comment Letter on Proposed Rule (July 15, 2020),
    https://beta.regulations.gov/comment/EOIR-2020-0003-84797 .........................................27

American Gateways, Comment Letter on Proposed Rule (July 15, 2020),
    https://beta.regulations.gov/comment/EOIR-2020-0003-5991 ..........................................26

American Immigration Council and American Immigration Lawyers
    Association, Comment Letter on Proposed Rule, 5 (July 15, 2020),
    https://beta.regulations.gov/comment/EOIR-2020-0003-6023 ..........................................26

Amnesty International, Comment Letter on Proposed Rule (July 15, 2020),
    https://beta.regulations.gov/comment/EOIR-2020-0003-4760 ..........................................26

Asylum Seeker Advocacy Project, Comment Letter on Proposed Rule (July 15,
    2020), https://beta.regulations.gov/comment/EOIR-2020-0003-6043 ...............................26

Ayuda Legal, Comment Letter on Proposed Rule (July 15, 2020),
    https://beta.regulations.gov/comment/EOIR-2020-0003-6076 ....................................25, 26

Delegation Order 00106: Amendment to the Order of Succession for the
    Secretary of Homeland Secrurity (Nov. 8, 2019) .................................................................13

Executive Order 12866:  Regulatory Planning and Review (Sept. 30, 1993) .........................32

Executive Order 13753: Amending the Order of Succession in the Department
    of Homeland Security (Dec. 9, 2016) .................................................................................13

Immigration Equality, Comment Letter on Proposed Rule (July 15, 2020),
    https://beta.regulations.gov/comment/EOIR-2020-0003-85541 ........................................26

Innovation Law Lab, Comment Letter on Proposed Rule (July 15, 2020),
    https://beta.regulations.gov/comment/EOIR-2020-0003-6022 ..........................................26

National Citizen & Immigration Servs. Council 119, Comment Letter on
    Proposed Rule (July 15, 2020),
    https://beta.regulations.gov/comment/EOIR-2020-0003-6096 ..........................................29

National Immigrant Justice Ctr., Comment Letter on Proposed Rule (July 15,
    2020), https://beta.regulations.gov/comment/EOIR-2020-0003-77333 .............................27

*Political*, Definition, Merriam-Webster, https://www.merriam-
    webster.com/dictionary/political.........................................................................................36

Roundtable of Former Immigration Judges, Comment Letter on Proposed Rule
    (July 13, 2020), https://beta.regulations.gov/comment/EOIR-2020-0003-
    4734 ....................................................................................................................................29

Tahirih Justice Ctr., Comment Letter on Proposed Rule (July 15, 2020)
    https://beta.regulations.gov/comment/EOIR-2020-0003-4756 ..........................................26

UNHCR, Comment Letter on Proposed Rule (July 15, 2020),
      https://beta.regulations.gov/comment/EOIR-2020-0003-5471 ..........................................25

United Nations Protocol Relating to the Status of Refugees (the "Protocol"),
      19 U.S.T. 6223 (Oct. 4, 1967) .............................................................................3, 4, 24, 25

United Nations Convention Relating to the Status of Refugees (the
      "Convention"), 189 U.N.T.S. 137 (July 28, 1951) ...................................................... *passim*

U.S. Gov't Accountability Off., B-331605, Dep't of Homeland Sec: Legality of
      Service of Acting Secretary of Homeland Security & Service of Senior
      Official Performing the Duties of Deputy Secretary of Homeland Security
      (2020), https://www.gao.gov/assets/710/708830.pdf ........................................................14

## INTRODUCTION

For four years, the Trump Administration has waged a frontal attack on our country's protections for refugees.  It has published anti-asylum regulation after anti-asylum regulation, almost all of which courts have enjoined as unlawful.[1]  This case concerns the Administration's latest and most dramatic salvo—an attempt to abrogate the refugee protections of the Immigration and Nationality Act ("INA") in their entirety through agency rulemaking.

More than four decades ago, Congress codified protections for refugees.  In the Refugee Act of 1980, Pub. L. 96-212, 94 Stat. 102, which amended the INA, Congress declared that "it is the historic policy of the United States to respond to the urgent needs of persons subject to persecution in their homelands."  *Id.* § 101(a).  Congress passed the Act to create a system that ensures refugees would not be subject to *refoulement*; that is, not returned to countries where they could face persecution, torture, or death.  In the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), which also amended the INA, Congress reconfirmed that preventing *refoulement* is a critical aspect of our nation's immigration laws.

Now, in the fading twilight of its term, the Trump Administration makes a last-ditch effort to make these protections obsolete.  It has published a rule that attacks the refugee protection scheme in its entirety entitled, "Procedures for Asylum and Withholding of Removal; Credible Fear and Reasonable Fear Review," 85 Fed. Reg. 80,274 (the "Rule").  The Rule makes each stage of the U.S. asylum process significantly harder to clear procedurally.  It also makes nearly every existing element of a refugee claim more difficult to satisfy.  It limits precedent immigration judges ("IJs") can consider and evidence asylum applicants can submit.  It creates numerous bars to

---

[1] *See* Complaint for Declaratory and Injunctive Relief ("Compl.") ¶¶ 40–48 (describing Trump Administration immigration actions); *id.* ¶ 6 n.5 (citing cases enjoining Trump Administration unlawful regulations regarding asylum and immigration).

asylum that have nothing to do with the merit of a claim.  By design, it ensures that individuals will be subject to the very *refoulement* Congress expressly passed the Refugee Act to prevent.

The Rule is unlawful, and Plaintiff Human Rights First sues to enjoin it.  *See infra* Part I.A. To start, the putative acting secretary of the Department of Homeland Security ("DHS") did not have valid authority to issue the Rule.  *See infra* Part I.B.1.  Second, Congress did not, and cannot, delegate to the Executive the power to foreclose refugee protection in the United States.  *See infra* Part I.B.2–4.  Third, the Agencies conducted a master-class on how to violate the APA, with the rulemaking process that led to the Rule violating nearly every principle of reasoned decision-making.  *See infra* Part I.C.  Fourth, various provisions of the Rule contravene express statutory language or are unsupported.  *See infra* Part I.D.

Injunctive relief is needed.  Human Rights First is already having to expend substantial resources in anticipation of the Rule potentially going into effect.  And if it does goes into effect, HRF will be able to assist substantially fewer individuals, severely impairing both its ability to fulfill its mission and its financial health.  Moreover, many refugees will certainly be returned to their home countries to face the very persecution Congress passed the Refugee Act and parts of IIRIRA to prevent.  Most individuals who are today eligible for asylum would most likely not be granted any protection if they file after the Rule's effective date, January 11, 2021.  The Government, in contrast, would face no harm in adhering to a system that has been in place since 1997 and that complies with the law.

The Court should preliminarily enjoin the Rule's implementation and ultimately set it aside.  In the alternative, the Court should stay the implementation and effective date of the Rule pending final adjudication of this matter.

## BACKGROUND

### A.     The Existing Refugee Framework

#### 1.      The Refugee Act

The Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102 (codified at 8 U.S.C. §§ 1157–
59 (1980)), is a landmark piece of legislation that amended the Immigration and Nationality Act
("INA"), 8 U.S.C. § 1101 *et seq.*, to establish the contemporary asylum system in the United States.
Congress enacted the Refugee Act of 1980 to "bring United States refugee law into conformance"
with international law, as outlined under the United Nations Convention Relating to the Status of
Refugees ("the Convention") and the 1967 United Nations Protocol Relating to the Status of
Refugees (the "Protocol").   *INS v. Cardoza-Fonseca*, 480 U.S. 421, 436–37 (1987).   The
"motivation for the enactment of the Refugee Act" was the Protocol, *id.* at 424, "to which the
United States has been bound since 1968," *id.* at 432–33.

Central to the Refugee Act's commitment to refugee protection is the obligation of States
not to expel or return a person to territories where his or her life or freedom would be threatened.
This principle constitutes the cornerstone of international refugee protection and is expressed
squarely in Article 33 of the 1951 Convention, which states:

> No Contracting State shall expel or return ('*refouler*') a refugee in any manner
> whatsoever to the frontiers of territories where his [or her] life or freedom would
> be threatened on account of his [or her] race, religion, nationality, membership of
> a particular social group or political opinion.

Convention & Protocol Relating to the Status of Refugees, art. 33, July 28, 1951, 189 U.N.T.S.
2545.  This principle constitutes an essential and binding component of international refugee

protection[2] and is reflected in the asylum system that Congress created.[3]  *See* Ex. A, Declaration of James C. Hathaway ("Hathaway Decl.") ¶ 15.[4]

To establish eligibility for asylum in the United States, a noncitizen must establish that he or she is "a refugee within the meaning of [8 U.S.C.] section 1101(a)(42)(A)."  8 U.S.C. § 1158(b)(1)(A); *see also id.* § 1158(b)(1)(B)(i).  Reflecting Congress's desire to have U.S. law conform to international refugee law, a refugee is defined in the Refugee Act as it is in Article 33 of the Convention, *i.e.*, as "any person who is outside any country of such person's nationality . . .and who is unable or unwilling to return to . . . that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion."  *Id.* § 1101(a)(42)(A).  Critically, the definition of "refugee" does not require a showing of certain harm, but only a "well-founded fear of persecution."  *Cardoza-Fonseca*, 480 U.S. at 440.

## 2.    The Illegal Immigration Reform and Immigrant Responsibility Act

In the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. 104–208, 110 Stat. 3009–546, Congress established a comprehensive scheme for distinguishing between inadmissible noncitizens with potentially valid asylum claims and those not claiming asylum and "who indisputably have no authorization to be admitted to the United States."  H.R.

---

[2] Article 42(1) of the 1951 Convention and Article VII(1) of the 1967 Protocol, list Article 33 as one of the provisions of the 1951 Convention to which no reservations are permitted.

[3] The Act represents:  "one of the most important pieces of humanitarian legislation ever enacted by a United States Congress" wherein "the United States once again . . . demonstrated its concern for . . . the persecuted peoples who fall victim to tyrannical and oppressive governmental regimes." 126 Cong. Rec. 1519, 1522 (1980).

[4] Professor James C. Hathaway is the Director of the Program in Refugee and Asylum Law at the University of Michigan, the author of two leading treatises on international and comparative refugee law, and the founding editor of *Cambridge Asylum and Migration Studies*.  *See* Ex A, Hathaway Decl. ¶ 6.

Rep. 104–828, 209 (1996) (Conf. Rep.).

As the D.C. Circuit recently highlighted, IIRIRA embodies two "equally important goal[s]": "ensur[ing] efficient removal of aliens with no lawful authorization to remain in the United States" *and* "ensuring that individuals with valid asylum claims are not returned to countries where they could face persecution." *Grace v. Barr*, 965 F.3d 883, 902 (D.C. Cir. 2020). The court held, "[b]oth purposes are evident in the system's design and are confirmed throughout the legislative history . . . ." *Id.* "Under this system, there should be no danger that an alien with a genuine asylum claim will be returned to persecution." H.R. Rep. No. 104–469, pt.1, 158 (1996).

Congress drafted IIRIRA so that changes it made to the removal process would not lead to *refoulement*. To start, newly arriving individuals who lack valid authorization to enter the United States but express an "intention to apply for asylum," or indicate to immigration officers that they "fear [ ] persecution" if returned to their home countries, must be interviewed by trained asylum officers. 8 U.S.C. § 1225(b)(1)(A)(i)–(ii), (b)(1)(E). Asylum officers determine whether an individual's "fear of persecution" is "credible." 8 C.F.R. § 208.30(d), (e). A person who passes the interview is entitled to "a full-blown asylum hearing before an immigration judge, an employee of the [DOJ], and has a right to review by the Board of Immigration Appeals—also housed within DOJ—and then the appropriate circuit court of appeals." *Grace*, 965 F.3d at 887–88. A noncitizen who receives a negative credible-fear determination may also obtain review by an IJ. *Id.*

Moreover, at the initial asylum officer "screening" stage, "[t]he applicant need not show that he or she *is in fact eligible* for asylum." *Id.* at 888 (alteration in original) (citation omitted). Instead, IIRIRA defines "[c]redible fear of persecution" as "a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, that the alien could establish eligibility for asylum under [

U.S.C.] section 1158." Congress made clear that, "[t]he [significant possibility] standard . . . is intended to be a low screening standard for admission into the usual full asylum process." 142 Cong. Rec. 25,347 (1996).

### B.      The Rule

On June 15, 2020, United States Citizenship and Immigration Service, a component of DHS, and the Executive Office for Immigration Review at the Department of Justice jointly issued a notice of proposed rulemaking ("NPRM") entitled "Procedures for Asylum and Withholding of Removal; Credible Fear and Reasonable Fear Review."[5]  The NPRM, published in the midst of the most severe public health crisis in a century, was extraordinarily complex—at over 42 three-column pages, it set forth a complicated web of changes to virtually every aspect of the system Congress erected for the processing and review of asylum applicants and other refugees.  Despite the broad scope and complexity of the proposed changes and the challenges imposed by COVID-19, the Agencies required any comments on the proposed rule to be submitted within 30 days.

On December 11, 2020, Defendants jointly published the final Rule, providing an effective date of January 11, 2021—only 31 days from the date of publication.  The Agencies received approximately 87,000 comments, the vast majority of which were critical of the Rule.  In response, the Agencies made almost no changes.[6]  As promulgated, the Rule makes drastic procedural and substantive changes at every stage of the asylum and withholding-of-removal process—including

---

[5] 85 Fed. Reg. 36,264.

[6] 85 Fed. Reg. at 80,274 ("This final rule makes thirteen non-substantive changes to the regulatory provisions in the final rule, some of which were noted by commenters); *id.* at 80,275 ("In response to issues raised by commenters or to eliminate potential confusion caused by drafting in the NPRM, the Departments are making five additional changes" and listing them).

the credible fear interview, the asylum officer interview, and proceedings before an immigration judge and associated review.  It does so by:[7]

*Limiting Procedures and Relief Currently Available to Refugees.*  Provision 1.1 funnels individuals who pass their credible fear interviews into proceedings (Section 235 proceedings) that the Agencies have admitted provide fewer procedural protections, less administrative review, less judicial review, and less available relief than the type of proceeding the INA requires for all but a few discrete categories of claims (Section 240 proceedings).  *See* NPRM, 85 Fed. Reg. at 36,266.  Provision 2.2 permits IJs to deny asylum claims without any hearing at all.

*Limiting the Precedent and Evidence IJs can consider.*  Provision 1.2 prohibits IJs from considering case law other than precedent from the circuits in which they sit when they review negative credible fear determinations.  Provision 2.7 further constrains an IJ's ability to assess an asylum claim by barring certain types of evidence altogether, including evidence of cultural views that refugees routinely present to establish the basis for fear of persecution.  And not content to tell an IJ what he or she *cannot* consider, Provision 2.9 identifies a broad list of "mandatory" discretionary factors that IJs *must weigh in favor of denying* an application.  Many of these factors have nothing to do with the merits of a claim and instead make relevant innocuous things, such as how someone traveled to the United States.

*Making it More Difficult to Pass the Credible Fear Interview*.  Congress designed the credible fear interview process to be a "screening interview" at which an individual "need not show that he or she *is in fact eligible* for asylum."  *Dep't of Homeland Sec. v. Thuraissigiam*, 140 S. Ct. 1959, 1965 (2020).  That is so because these "often rushed assessments" occur at a stage

---

[7] We identify each provision by the number the Agencies use, 85 Fed. Reg. at 80,276–80,284.  Number 1.3 is merely a technical change as to the numbering of certain regulations.

when the noncitizen is "likely to be more unprepared, more vulnerable, and more wary of government officials than" later in the process. *Kiakombua v. Wolf*, No. 19-cv-1872, 2020 WL 6392824 at *24 (D.D.C. Oct. 31, 2020). Through a variety of mechanisms, the Rule makes it almost impossible for an individual to pass a credible fear interview. Provision 1.4 heightens the long-standing credible fear standards for withholding of removal and relief under the Convention Against Torture ("CAT"). Meanwhile, Provision 1.5 adds a number of bars to asylum that the asylum pre-screening officer must consider during the interview. Currently, the officer is tasked with determining whether there is a significant possibility that the individual has a viable claim, such that he or she should receive further review of the merits of the case. Requiring officers to reach conclusions as to bars at the credible fear interview puts added stress on the system while making it harder for refugees, who are without counsel, to pass the interview.

*Restricting the Definition of Refugee*. The refugee definition has been interpreted by courts in the United States and throughout the world for more than half a century. The Rule redefines individual words within the definition to make it nearly impossible for an individual to satisfy it. These changes are contrary to settled law in the United States and internationally. Provision 2.3 narrows the meaning of particular social groups ("PSGs") by announcing that a number of PSGs currently recognized under the law will no longer be cognizable. Provision 2.4 materially narrows the definition of political opinion to only a "discrete cause related to political control of a state or a unit thereof," *i.e.*, regime change. 85 Fed. Reg. at 80,386, 80,394. Provision 2.5 functionally eliminates the notion of persecution altogether. *Id*. at 80,386, 80,395. And, leaving nothing to chance, Provision 2.6 narrows the scope of the nexus requirement, *i.e.*, demonstrating that the persecution is motivated by a protected ground, by announcing that a specific list of "nexus" scenarios currently recognized under the law will no longer be cognizable.

8

*Making it Harder to Show Protection is Needed in the United States.*  Provision 2.8 broadens the scope of the internal relocation requirement, meaning that it will be harder for an individual to establish that he or she could not escape persecution within their home country.[8]  Provision 2.10 expands the concept of firm resettlement,[9] making it easier to deny asylum on the basis that an individual did not travel directly to the United States.  The Rule also provides for mandatory discretionary denial of asylum in nearly all cases where an applicant's flight to the United States had more than one layover, however short, or where he or she spent more than 14 days in any country of transit.

Varied as they are, these changes have one key element in common:  each is designed to make asylum and other humanitarian protection more difficult to obtain.  An individual has to jump higher hurdles to pass the credible fear screening.  The individual will have a more difficult time obtaining a hearing.  At the hearing, the individual is not permitted to introduce certain types of evidence.  The individual is nonetheless required to meet a new definition of refugee that will substantially narrow that class.  Then the individual is required to clear a staggeringly high bar to show that he or she was or will be persecuted, as the Rule now defines the term.  If the individual can establish a protected ground and persecution under the new definitions, the individual will then face the almost impossible task of establishing nexus between the protected ground and the persecution under the new nexus standard.  And, if somehow an individual is able to clear all of those new procedural and substantive hurdles, then the IJ is required to weigh a number of factors

---

[8] *See* 85 Fed. Reg. at 80,387, 80,388–89, 80,396 and 80,398.  Under the regulations implementing the U.S. asylum system, an asylum applicant is deemed ineligible if she could avoid persecution by relocating to another part of her country of nationality or, if stateless, her country of last habitual residence.  8 C.F.R. § 1208.13 (b)(1)(i)(B), (b)(2)(C)(ii).

[9] *See* 85 Fed. Reg. at 80,388, 80,397.  An asylum applicant is ineligible for asylum if she "was firmly resettled in another country prior to arriving in the United States."  8 U.S.C § 1158(b)(2)(A)(vi).

against the refugee to deny relief except in extraordinary circumstances, including whether she spent more than 14 days in any one country prior to arriving, or passed through multiple countries en route to the United States.  Put succinctly, the Rule ends asylum for all but the very few.

## ARGUMENT

If not enjoined, the Rule will gut the availability of asylum in the United States.  It will effectively serve to bar almost all eligible refugees from obtaining the benefits Congress intended to, and did, grant them through the Refugee Act and IIRIRA.  The Court should issue preliminary injunction enjoining the Rule from going to effect on January 11, 2021.  A preliminary injunction is properly issued where the plaintiff demonstrates "'[1] that [it] is likely to succeed on the merits, [2] that [it] is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in [its] favor, and [4] that an injunction is in the public interest.'"  *Nw. Immigrant Rights Project v. U.S. Citizenship & Immigration Servs.*, No. 19-cv-3283, 2020 WL 5995206, at *4 (D.D.C. Oct. 8, 2020) (quoting *Glossip v. Gross*, 576 U.S. 863, 876 (2015)).  This four-part test also governs the issuance of a stay of implementation under 5 U.S.C. § 705.  *See id.*

Plaintiff readily meets each of these requirements.

## I.     Plaintiff Is Likely to Succeed on the Merits

### A.     Plaintiff Has Standing

Human Rights First is a nonpartisan 501(c)(3) nonprofit international human rights organization that has worked since 1978 to protect refugees' rights.  As an integral part of that mission, HRF operates one of the largest programs for pro bono legal representation of refugees in the nation, working directly and also in partnership with volunteer lawyers at leading law firms to provide representation, without charge, to asylum applicants unable to afford paid counsel.  *See* Ex. B, Declaration of Michael Breen ("Breen Decl.") ¶¶ 3–5.  The Rule directly conflicts with this mission and will frustrate HRF's ability to provide legal services to asylum applicants—a vital

component of HRF's mission and daily activities.  Accordingly, HRF has standing to pursue this challenge.

Like an individual plaintiff, an organization can assert standing on its own behalf on a showing of "actual or threatened injury in fact that is fairly traceable to the alleged illegal action and likely to be redressed by a favorable court decision." *Equal Rights Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1138 (D.C. Cir. 2011).  The test is satisfied if an organization can demonstrate that "the defendant's allegedly unlawful activities injured the plaintiff's interest in promoting its mission," and "the plaintiff used its resources to counteract that injury."  *Am. Soc'y for the Prevention of Cruelty to Animals v. Feld Entm't Inc.*, 659 F.3d 13, 25 (D.C. Cir. 2011).

Human Rights First easily meets this threshold requirement.  The Rule directly frustrates HRF's mission to represent indigent individuals seeking asylum by "effectively eliminat[ing] asylum eligibility for broad swaths of asylum seekers—including most of [its] clients."  Ex. B, Breen Decl. ¶ 11.  Indeed, HRF estimates that more than eighty percent of its clients could face negative consequences from the Rule going into effect.  *Id.*  As a result of stringent standards imposed by the Rule, HRF will need "to spend substantially more time preparing each impacted client for the various steps of their proceedings," severely limiting the number of clients HRF is able to serve.  *Id.* ¶ 16.  The added complexity of securing asylum under the Rule will likewise limit the number of clients HRF is able to place with volunteers at its partnership law firms.  *Id.* ¶ 18.  In turn, these limitations negatively impact HRF's funding, which is tied in part to the number of clients it serves and places with law firms.  *Id.* ¶ 24.

HRF's staff is already having to spend "significant time and resources" to analyze the Rule, as required to provide accurate legal advice to its clients and to prepare training materials for its staff and partner volunteer lawyers.  *Id.* ¶ 12.  Between the date of this filing and the effective date

11

of the Rule, HRF anticipates that its staff will spend "approximately 300 hours analyzing and responding to the Rule's impact on [its] cases." *Id.* ¶ 13. Over the first three months after the Rule takes effect, HRF's staff will be forced to spend "approximately 600 additional hours responding to the Rule's impacts on cases." *Id.*

In sum, the Rule simultaneously imposes additional demands on HRF while diminishing the funding available to it. This injury is far more than a mere "setback to [HRF's] abstract social interests," and is therefore sufficient to confer standing. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982).[10]

### B. The Rule Is *Ultra Vires*

The Agencies' attempt to rewrite U.S. asylum law exceeds statutory and constitutional limitations in every respect. It carries with it sweeping political and economic implications that are the province of Congress, not administrative agencies, to initiate.

### 1. The Acting Secretary of DHS Promulgated the Rule Without Authority

Chad F. Wolf, the putative Acting Secretary of Homeland Security, lacks authority to occupy that role. As a result, Mr. Wolf was ineligible to approve the proposed Rule or to delegate signature authority to Chad Mizelle, the DHS official who signed the final Rule. The promulgation of the Rule was therefore "in excess of . . . authority" and not "in accordance with law,"[11] and the Rule must be enjoined.

---

[10] HRF also meets the requirements for prudential standing, as its asserted interest in representing asylum seekers easily clears the hurdle of falling "within the zone of interests to be protected or regulated by [the INA]." *Match–E–Be–Nash–She–Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012).

[11] 5 U.S.C. § 706(2)(C) and (2)(A).

Tracing "the series of orders that have purported to govern the line of succession at DHS in recent years" is a complex task. *See Nw. Immigrant Rights Project v. U.S. Citizenship & Immigration Servs.*, No. 19-cv-3283, 2020 WL 5995206, at *11 (D.D.C. Oct. 8, 2020). When the most recent Senate-confirmed DHS Secretary, Secretary Kirstjen Nielsen, vacated the office in April 2019, Delegation Order 00106 outlined that in the event of a vacancy, the order of succession was governed by Executive Order 13753.[12] *Batalla Vidal v. Wolf*, Nos. 16-cv-4756 & 17-cv-5228, 2020 WL 6695076, at *2–3 (E.D.N.Y. Nov. 14, 2020). Under that Order, the Director of the Cybersecurity and Infrastructure Security Agency should have assumed the position. Instead, then-Commissioner of U.S. Customs and Border Patrol Kevin McAleenan began to perform the duties of Acting Secretary. *See id.* at *3. Just prior to resigning in November 2019, Mr. McAleenan purported to amend Delegation Order 00106 to change the succession order in the event of vacancy so that Mr. Wolf—then Under-Secretary for Strategy, Policy, and Plans—would be next in line to take over as Acting Secretary. *See id.* But because Mr. McAleenan was not Senate confirmed, he lacked authority to amend the succession order, and Mr. Wolf's assumption of the role was therefore invalid. *See Nw. Immigrant Rights Project*, 2020 WL 5995206, at *24.

Moreover, even if acting officers could validly amend a succession order, Mr. McAleenan had not lawfully assumed the office of Acting Secretary of DHS pursuant to Delegation Order 00106. *See Batalla Vidal*, 2020 WL 6695076, at *8. And even if Mr. McAleenan had been properly in line to serve in the acting role, any authority would have expired in early November— before his purported amendment of the succession order—pursuant to the Federal Vacancies

---

[12] As multiple courts have held, then-Secretary Nielsen's pre-resignation attempt to designate a new order of succession applied, on its own terms, only to succession "in the event of disaster or emergency." *See, e.g.*, *Casa de Md. v. Wolf*, No. 8:20-cv-02118, 2020 WL 5500165, at *21 (D. Md. Sept. 11, 2020).

Reform Act ("FVRA").[13]  *See* 5 U.S.C. § 3346(a)(1) (limiting service of an acting official to "210 days beginning on the date the vacancy occurs").  Likewise, even if Mr. Wolf had properly assumed the acting role in November 2019, his authority would have expired long before his approval of the final Rule.  *Id.*  Thus, Mr. Wolf was not validly serving as acting secretary when he approved the final Rule, and his action has "no force or effect" under the FVRA.  *Id.* § 3348(d)(1).

For good reason, four federal district courts and the Government Accountability Office[14] have already reached the conclusion that Mr. Wolf assumed the Acting DHS Secretary position pursuant to an unlawful order of succession.  Most recently, a court in the Eastern District of New York struck down the Trump Administration's changes to the DACA program as invalid because Wolf was not "lawfully serving" as Acting Secretary.  *See Batalla Vidal*, 2020 WL 6695076, at *1.  This Court, the District of Maryland, and the Northern District of California have held on motions for injunctive relief that plaintiffs were likely to succeed in making the same showing.  *See Nw. Immigrant Rights Project*, 2020 WL 5995206, at *24; *Casa de Md., Inc. v. Wolf*, No. 8:20-

---

[13] The Agencies contend that the FVRA's restrictions are inapplicable to a person serving in an acting capacity pursuant to the Homeland Security Act ("HSA"), which permits the Secretary of Homeland Security to designate an order of succession "notwithstanding" the FVRA.  *See* 85 Fed. Reg. at 80,381 (citing 6 U.S.C. § 113(g)); 5 U.S.C. § 3347(a).  But though the HSA authorizes the Secretary to designate a succession order that conflicts with the FVRA's default order, it does not address the permissible length of an acting official's tenure.  *See* 6 U.S.C. § 113(g).  Thus, there is no conflict between that statute and the FVRA's time restrictions, and therefore no reason to regard the restrictions as ineffective.  *See N.L.R.B. v. SW Gen., Inc*., 137 S. Ct. 929, 932 (2017).

[14] An August 14, 2020, GAO report concluded that Chad Wolf was "named by reference to an invalid order of succession."  U.S. Gov't Accountability Off., B-331605, Dep't of Homeland Sec.:  Legality of Service of Acting Secretary of Homeland Security & Service of Senior Official Performing the Duties of Deputy Secretary of Homeland Security 1 (2020), https://www.gao.gov/ assets/710/708830.pdf.

cv-02118, 2020 WL 5500165, at *23 (D. Md. Sept. 11, 2020); *Immigrant Legal Res. Ctr. v. Wolf*, No. 20-cv-05883, 2020 WL 5798269, at *9 (N.D. Cal. Sept. 29, 2020).

In an implicit acknowledgement of these fatal flaws in Mr. Wolf's authority as acting secretary, the Agencies put forth an alternate theory under which, they contend, Mr. Wolf validly assumed the role on November 14, 2020. *See* 85 Fed. Reg. at 80,381–80,382. Under this alternate theory, if the earlier succession orders were invalid, FEMA Administrator Peter Gaynor would have become eligible to serve as Acting DHS Secretary pursuant to the FVRA on the submission of Mr. Wolf's nomination to the Senate, as the FVRA prohibits a person from serving as an acting officer if the President nominates that person to the same office. *See* 5 U.S.C. § 3345(b)(1)(B). Mr. Gaynor thereafter issued yet another succession order with a goal of putting Wolf next in line for the role he already purported to occupy. The defects in this theory are numerous. First, an acting secretary such as Mr. Gaynor "may not amend [DHS's] succession order under [6 U.S.C.] § 113(g)(2)," rendering Gaynor's attempted alteration equally ineffectual as the earlier attempts. *Nw. Immigrant Rights Project*, 2020 WL 5995206, at *24. Second, the Agencies point to no authority that would permit "a government authority to take administrative action in the alternative," as Mr. Gaynor purported to do. *See Batalla Vidal*, 2020 WL 6695076, at *9. Third, it assumes—contrary to all evidence—that Mr. Wolf validly occupied the role of Acting DHS Secretary prior to his nomination, creating a vacancy in that position only in November 2020. And finally, as Mr. Wolf's nomination remains pending, he is still ineligible to serve as Acting Secretary.[15] The Agencies' haphazard attempts to remedy *post hoc* their basic failure to follow a

---

[15] As discussed *supra*, the HSA supplants the restrictions of the FVRA only to the extent that those statutes conflict. *See J.E.M. Ag. Supply, Inc. v. Pioneer Hi-Bred Int'l, Inc.*, 534 U.S. 124, 143–44 (2001) ("[W]hen two statutes are capable of coexistence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective.").

valid succession order, in addition to the dictates of the FVRA, fundamentally undermine governmental accountability and must be disregarded.

Because Wolf did not have authority to act, the Rule is unlawful and must be enjoined. *See* 5 U.S.C. § 706. In addition, the Rule is void *ab initio* under the FVRA. *See SW Gen.*, 137 S. Ct. at 938 n.2.

### 2.    The Agencies Exceeded the Scope of Their Authority

The Agencies claim in response to Comments that they "are not rewriting statutes." 85 Fed. Reg. at 80,374. In fact, that is precisely what they are doing. The Rule rewrites the INA in numerous ways, as outlined in Parts I.C. & D. However the Agencies characterize their work, the authority they cite for their sweeping action does not bear the Rule's weight.[16]

The Agencies rest their authority to promulgate the Rule primarily on their contention that they are vested with the power to take actions "necessary for carrying out" immigration law. 85 Fed. Reg. at 80,374 (citing 8 U.S.C. §§ 1103(a)(1), (a)(3), (g)(2)). But, of course, "[a]n agency's general rulemaking authority does not mean that the specific rule the agency promulgates is a valid exercise of that authority." *Colo. River Indian Tribes v. Nat'l Indian Gaming Comm'n*, 466 F.3d 134, 139 (D.C. Cir. 2006); *see also N.Y. Stock Exch. LLC v. Sec. & Exch. Comm'n*, 962 F.3d 541, 546 (D.C. Cir. 2020).

A statute must be read "as a symmetrical and coherent regulatory scheme." *Gustafson v. Alloyd Co.*, 513 U.S. 561, 569 (1995). The INA created just such a scheme. The Refugee Act ensures that the United States conformed its asylum system to international law and provided protection from refugees fleeing persecution. And IIRIRA balances two goals: "ensuring that

---

[16] The Agencies of course admit that "[t]he availability of asylum is established by statute, INA 208, 8 U.S.C. § 1158, and an NPRM [notice of proposed rulemaking] cannot alter a statute." 85 Fed. Reg. at 80,284.

individuals with valid asylum claims are *not* returned to countries where they could face persecution," while also ensuring efficient removal of individuals with no lawful authorization and who do not seek asylum. *Grace*, 965 F.3d at 902. The INA's grant of authority to the Agencies to take actions "necessary for carrying out" immigration law cannot be read so broadly as to allow the Agencies, unilaterally, to change asylum law at will and in violation of international law. Yet the Rule does just that. *See infra* Part I.C. & I.D. Nor can it be read to allow the Agencies to upend the INA's balanced scheme by ending refugee protection except in the narrowest of circumstances and thereby ensuring that individuals will be returned to countries to face persecution. Yet the Rule does just that as well. *See id.*

The Agencies admit that their actions will lead to fewer grants of asylum.[17] Glaringly, they refuse to discuss how large that reduction will be, presumably because the Rule will lead to almost all asylum applications being denied. Examples from HRF's own work are instructive. One HRF client was severely beaten and strangled for years by her partner, who also hired a hitman to kill her, while the police refused to protect her. *See* Ex. B, Breen Decl. ¶ 31. Another client is transgender and suffered years of severe physical abuse from numerous people, including military and police officers. *See id.* Another client is a gay man who fled his home country after suffering significant physical, sexual, and verbal abuse by police on account of his sexual orientation. *See id.* Each was found to have a well-founded fear of persecution and granted asylum. *See id.* These same individuals would have faced numerous, near-insurmountable hurdles under the Rule. The Rule's rejection of gender-based and particular social group claims, drastic narrowing of what counts as persecution, dramatic constriction of what constitutes a political opinion, improper exclusion of relevant cultural evidence, and creation of numerous procedural roadblocks would

---

[17] *See* 85 Fed. Reg. at 80,384.

almost certainly have thwarted these meritorious claims.  Indeed, for almost all of the fact patterns that make up the vast majority of asylum application grants, the Rule would require instead that the application be denied.  *See infra* 26 n.24; Compl. ¶ 228 n.227.  Congress granted the Agencies authority to carry out immigration law; it did not authorize them to end asylum as a meaningful form of immigration relief.

The Agencies' reliance on 8 U.S.C. §§ 1158(b)(1)(A) and (b)(2)(A) for authority fares no better.  Although section 1158(b)(1)(A) affords the Secretary and the Attorney General discretion with respect to those who are eligible for asylum on a case-by-case basis, this discretion does not vest the Agencies with authority to promulgate rules broadly denying asylum eligibility to groups of refugees.  *See* 8 U.S.C. § 1158(b)(1)(A); *E. Bay Sanctuary Covenant v. Barr*, 964 F.3d 832, 849 (9th Cir. 2020) ("Discretion to deny asylum to eligible aliens, as in *Cardoza-Fonseca*, is different from discretion to prescribe criteria for asylum eligibility.") (citing *Cardoza-Fonseca*, 480 U.S. at 428 n.6)).  To be sure, section 1158(b)(2)(C) authorizes the Attorney General to establish "limitations and conditions" on asylum "ineligibility" beyond those enacted by Congress so long as they are "consistent with"[18] section 1158.  *See id.*; *see also O.A. v. Trump*, 404 F. Supp. 3d 109, 150 (D.D.C. 2019).  But that grant does not authorize the Agencies to make changes unrelated to ineligibility, such as changing the definition of "refugee" (Provisions 2.3, 2.4, 2.5, and 2.6); changing the credible fear interview process (Provisions 1.4 and 1.5); or making procedural changes to the conduct of asylum hearings or introducing bars to the same (Provisions 1.1, 1.2, 2.1, 2.2, 2.7, 2.9, and 2.10).  Moreover, the Rule is not "consistent with" section 1158:  Section

---

[18] When enacting IIRIRA, Congress went out of its way to insert the "consistent with" language into section 1158(b)(2)(C), adding it to an earlier draft of IIRIRA that had not contained that language.  *Compare* H.R. Rep. No. 104–469, at 80 (1996) *with* H.R. Rep. No. 104–828, at 164 (1996) (Conf. Rep.).

18

1158 protects individuals from being deported to face persecution at home except in the limited circumstances enumerated in section 1158(2)(A), while the Rule is designed to lead to—and if implemented will in fact result in—the deportation of individuals whom the Government knows will face persecution at home.

In the INA, Congress conformed U.S. law to international law, created a system that ensures refugees access to asylum and related relief, and expressly sought to prevent the possibility of *refoulement*. The Rule violates international law, leaves the protections of the asylum system available to only a very few, and ensures that refugees with legitimate claims will be *refouled*. Nothing in the INA delegated to the Agencies the authority to issue a Rule so diametrically opposed to the Congressionally-enacted scheme.

### 3. The INA Cannot Be Read to Allow the Agencies to Limit Asylum at Will

The Rule effectively permits the Agencies to limit asylum however they want. Reading the INA so broadly as to permit the Agencies this amount of power over the admission of noncitizens would be to read the INA to violate the separation of powers. Under the nondelegation doctrine, which is "rooted in the principle of separation of powers that underlies our tripartite system of Government," *Mistretta v. United States*, 488 U.S. 361, 371 (1989), "Congress is not permitted to abdicate or to transfer to others the essential legislative functions with which it is thus vested." *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 529 (1935). And it is Congress—not the Agencies—that is unquestionably vested with legislating concerning the admission of noncitizens. The Constitution entrusts "[p]olicies pertaining to the entry of aliens . . . exclusively to Congress." *Arizona v. United States*, 567 U.S. 387, 409 (2002) (citation omitted); *Galvan v. Press*, 347 U.S. 522, 531 (1954); U.S. Const. art. I, § 8, cls. 3 & 4. Indeed, the Supreme Court has "repeatedly emphasized that 'over no conceivable subject is the legislative power of

19

Congress more complete than it is over' the admission of aliens." *Fiallo v. Bell*, 430 U.S. 787, 792 (1977).  The Executive does not have the power to rewrite Congressional policy as to the admission of noncitizens seeking asylum, which is precisely what the Rule attempts.

The Court can and should avoid a reading of the INA that would call its constitutionality into question.  Indeed, the Supreme Court has "read significant limitations into . . . immigration statutes in order to avoid their constitutional invalidation." *See Zadvydas v. Davis*, 533 U.S. 678, 689 (2001); *see also Mistretta*, 488 U.S. at 374 n.7.  Its recent approach in *Gundy v. United States*, 139 S. Ct. 2116 (2019), is instructive.  Faced with an arguably broad delegation of authority to the Attorney General in the Sex Offender Registration and Notification Act, a plurality of the Court, led by Justice Kagan, read the statute's delegation provision narrowly so as to avoid any question of its Constitutionality.  *Id.* at 2126 (plurality opinion).  In dissent, Justice Gorsuch contended that allowing the Attorney General to improperly re-interpret a criminal statute violates the separation of powers and is an example of "delegation running riot."  *Id.* at 2138 (Gorsuch, J., dissenting) (citation omitted).

Permitting the Agencies to change the asylum system at will would improperly violate the separation of powers and would also be an example of delegation running riot.  The INA cannot, and should not, be read to permit such a result.

### 4.   Congress Did Not Expressly Delegate to the Agencies the Power to Abrogate Asylum

In addition to the fatal problems identified above, the Rule's broad interpretation of the INA's grants of authority runs afoul of the major questions doctrine, which is based on the expectation that Congress speaks clearly when it delegates the power to make "decisions of vast economic and political significance."  *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014); *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 121 (2000) ("[T]he

court must be guided to a degree by common sense as to the manner in which Congress is likely to delegate a policy decision of such economic and political magnitude to an administrative agency.").

The Rule assumes that the Agencies have been delegated the authority to issue regulations that will eviscerate access to asylum for virtually all applicants—in other words, to end refugee protection in the United States.  This decision has massive economic and political ramifications.  The economic cost of just a ten percent reduction in asylum seekers (in the form of reduced applications, reduced grants, or both) from 2019 levels is conservatively estimated at *$8.9 billion*, along with a *net* fiscal loss of *$1.5 billion* over a five-year period.  *See* Ex. C, Declaration of Michael A. Clemens ("Clemens Decl.") ¶¶ 20–21.[19]  Such a reduction would cost the U.S. economy at least $590 million and government coffers a net of at least $100 million annually.  *See id*.  And the Trump Administration's own public attacks on immigration and asylum confirm that admission of refugees into the United States is laden with political significance.  *See* Compl. ¶¶ 40–52.  Moreover, the Rule threatens to put the United States in conflict with its international treaty obligations, and, as a result, out-of-step with its international allies.  *See* Ex. A, Hathaway Decl. ¶ 17.  These weighty consequences only heighten the Rule's political significance.

Congress expressly delegated authority to make decisions about how to administer the asylum system, but it did not expressly delegate the authority to decide whether to *have* an asylum system at all or to reduce its protective effect.  The decision to completely abrogate the asylum system in the United States—as the Rule effectively does—is one of monumental economic and

---

[19] Michael A. Clemens, Ph.D., is the Director of Migration, Displacement, and Humanitarian Policy and a Senior Fellow at the Center for Global Development, as well as a research fellow at the IZA-Institute of Labor Economics in Bonn, Germany, and an Associate Editor of the *Journal of Population Economics*.  *See* Ex. C, Clemens Decl. ¶ 5.

political significance.  If Congress had intended to delegate the authority to make that decision, even assuming *arguendo* that it could, "it surely would have done so expressly."  *King v. Burwell*, 576 U.S. 473, 486 (2015) (citation omitted).  It plainly did not.

### C.    The Rule Is Arbitrary and Capricious

The Rule misinterprets Congress's directives, broadly exceeds the Agencies' regulatory authority, and functionally rewrites legislation to the detriment of countless refugees seeking shelter in this country.  But even if it did not do all of these things, the Rule would still be unlawful because it is unsupported by the administrative record.  Because such arbitrary and capricious rulemaking is forbidden under the APA, the Rule must be set aside.

The APA "sets forth the procedures by which federal agencies are accountable to the public and their actions subject to review by the courts."  *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1905 (2020).   "It requires agencies to engage in 'reasoned decisionmaking' and directs that agency actions be 'set aside' if they are 'arbitrary' or 'capricious.'"  *Id.* (citing *Michigan v. EPA*, 576 U.S. 743, 750 (2015) and 5 U.S.C. § 706(2)(A)). Review of agency action is limited to "the grounds that the agency invoked when it took the action."  *Michigan*, 576 U.S. at 758.

Courts must ensure that the agency has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  *Motor Vehicle Mfr. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  An agency action that "'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise' is arbitrary and capricious."  *Gresham v. Azar*, 950 F.3d 93, 99 (D.C. Cir. 2020) (quoting *State Farm*, 463 U.S. at 43)).

An agency also may not reverse existing policy on a whim.  To be sure, an agency may choose to reverse an existing policy.  As the D.C. Circuit has recently explained, however, "[r]easoned decision-making requires that when departing from precedents or practices, an agency must 'offer a reason to distinguish them or explain its apparent rejection of their approach.'"  *Physicians for Soc. Responsibility v. Wheeler*, 956 F.3d 634, 644 (D.C. Cir. 2020); *see also Sw. Airlines Co. v. Fed. Energy Regul. Comm'n*, 926 F.3d 851, 856 (D.C. Cir. 2019).  "[H]owever the agency justifies its new position, what it may not do is 'gloss[] over or swerve[] from prior precedents without discussion.'"  *Sw. Airlines Co*., 926 F.3d at 856 (alterations in original).

The Agencies violated the APA in numerous ways.  They:  (1) ignored serious concerns expressed in the comments; (2) failed to weigh the Rule's cost and benefits; (3) failed to support the Rule's purported rationales; (4) failed to address an important part of the problem, that the Rule will cost the U.S. economy and fisc; (5) failed to explore any alternatives; and (6) failed to provide sufficient time for the Rule to take effect.

### 1.    The Agencies Ignored Serious Concerns Expressed in Comments

The notice-and-comment process is designed to ensure that an agency engages in reasoned decision-making.  It "obligate[s] the agency to consider and respond to the material comments and concerns that are voiced."  *Make The Rd. N.Y. v. Wolf*, 962 F.3d 612, 634 (D.C. Cir. 2020); *Nat. Res. Def. Council v. Wheeler*, 955 F.3d 68, 85 (D.C. Cir. 2020) ("[T]he entire premise of notice-and-comment requirements is that an agency's decisionmaking may be affected by concerns aired by interested parties through those procedures.").

Concerns raised by the public can alert the agency to "an important aspect of the problem," for the purposes of arbitrary and capricious review. *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 924 (D.C. Cir. 2017).  Thus, where a significant concern is raised, the agency must "adequately analyze the . . . consequences" of its actions.  *Id.* at 932.  It cannot "brush[] aside" important facts, *id.*, or offer "conclusory statements" to prove that it "consider[ed] [the relevant] priorities," *Getty v. Fed. Sav. & Loan Ins. Corp.*, 805 F.2d 1050, 1057 (D.C. Cir. 1986).

Notwithstanding the short time period provided, the Agencies received over 87,000 comments, and the Agencies acknowledge that most opposed the Rule.[20]  Commenters, including hundreds of national and international organizations with decades of experience in the field of refugee assistance and law, raised serious concerns about the negative impact the Rule's restrictions would have on refugees and asylum law in the United States.

Despite the tsunami of serious concerns raised by commenters, the Agencies opted not to address them in any coherent way.  Instead, they offered mostly conclusory statements.  For example, in response to the numerous comments that the Rule violates international law, the Agencies claimed only that the Rule is consistent with the 1967 Protocol and Article 3 of the Convention Against Torture; they offered no support or explanation for this question-begging retort.  85 Fed. Reg. at 80,376.  Indeed, in another portion of their explanations, the Agencies expressly "decline[d] to respond to commenters' general assertions that the rule violates U.S. international treaty obligation."  *Id.* at 80,326.  This was the dismissive non-response, for example, to the United Nations High Commissioner for Refugees' *eighty-two* page comment highlighting with extensive legal and analytical support that virtually every substantive and procedural change

---

[20] 85 Fed. Reg. at 80,284–80,285.

of the Rule violates international law and the United States' obligations under the 1967 Protocol.[21] And UNHCR is no fly-by-night commentator. The Supreme Court has instructed that courts should draw "significant guidance" from UNHCR, as it is the authoritative international body entrusted with enforcing the 1967 Protocol. *Cardoza-Fonseca* at 439 & n.22; *accord* Asylum Procedures, 65 Fed. Reg. 76,121, 76,127 (Dec. 6, 2000). Such dismissiveness would be an APA violation in an ordinary case. Here, where Congress passed the INA specifically to conform U.S. law to international law, the failure to engage on this issue is particularly inexcusable.

But that is not the only example. The Agencies also did not provide any meaningful response to the numerous comments that: "[T]he envisioned rule defines what is 'political' much more narrowly than existing case law or the UN Convention."[22] As examples, the commentators noted that "[t]he leader of a conservation group who is advocating for stronger environmental protections would not be recognized [under the rule], nor would women seeking enfranchisement or rights or LGBTQ individuals advocating for equal rights." *Id.* In response, the Agencies state that political opinion cannot be read so broadly as to include opposition to international criminal organizations, 85 Fed. Reg. 80,325, 80,326, a debatable proposition at best. But even if correct, the Rule limits political opinion far beyond excluding such opposition. The Agencies also claim that the new definition of political opinion does not run afoul of Congressional intent to read the term "refugee" broadly. *Id.* In making this claim, the Agencies do not cite the many cases interpreting the statutory term "political opinion" to encompass beliefs that fall outside the Rule's narrow definition. *See, e.g.*, *infra* 36 n.40. Instead, they reiterate their reliance on *Saldarriaga v.*

---

[21] UNHCR, *Comment Letter on Proposed Rule* (July 15, 2020), https://beta.regulations.gov/comment/EOIR-2020-0003-5471.

[22] *See* Ayuda Legal, *Comment Letter on Proposed Rule*, 24 (July 15, 2020), https://beta.regulations.gov/comment/EOIR-2020-0003-6076. For further examples of similar comments, *see* Compl. ¶ 153 n.136.

*Gonzales*, 402 F.3d 461, 467 (4th Cir. 2005) to support their narrow definition of political opinion, just as they had in the NPRM.  Not only does this naked citation not suffice, it in fact establishes that the Agencies' new definition is too narrow.  Indeed, many commentators highlighted that "[t]he Fourth Circuit in [*Saldarriaga*] expressly held that 'political opinion' reaches a 'cause'— not just control of the state."[23]

The Agencies failed to meaningfully address other key concerns raised by the comments. Just a few additional examples include that:  the Rule would effectively eliminate the possibility of obtaining asylum in the United States;[24] implementation of the Rule would inevitably lead to the *refoulement* of refugees to places where they would be persecuted, tortured, and even killed;[25]

---

[23] Tahirih Justice Center, Comment Letter on Proposed Rule, 36 (July 15, 2020) (quoting *Saldarriaga*, 402 F.3d at 466), https://beta.regulations.gov/comment/EOIR-2020-0003-4756. Other commentators highlighted that *Saldarriaga* not only fails to support the Agencies' new definition of political opinion, it in fact shows that the new definition contravenes the statute.  *See* American Gateways, Comment Letter on Proposed Rule, 38 (July 15, 2020), https://beta. regulations.gov/comment/EOIR-2020-0003-5991; Ayuda Legal, Comment Letter on Proposed Rule, 25 (July 15, 2020), https://beta.regulations.gov/comment/EOIR-2020-0003-6076; Asylum Seeker Advocacy Project, Comment Letter on Proposed Rule, 30 (July 15, 2020), https://beta.regulations.gov/comment/EOIR-2020-0003-6043.

[24] *See* Amnesty International, Comment Letter on Proposed Rule, 3 (July 15, 2020), https://beta.regulations.gov/comment/EOIR-2020-0003-4760 ("Given the numerous new bars to asylum . . . this proposed rule would have the effect of eliminating countless asylum-seekers at a threshold stage, before they ever receive a full and fair consideration of their claim."); American Immigration Council and American Immigration Lawyers Association, Comment Letter on Proposed Rule, 5 (July 15, 2020), https://beta.regulations.gov/comment/EOIR-2020-0003-6023 ("This change would again exclude entire classes of asylum seekers and run counter to the spirit and purpose of asylum law.").  For further examples of similar comments, *see* Compl. ¶ 228 n.227.

[25] *See* Immigration Equality, Comment Letter on Proposed Rule, 15 (July 15, 2020), https://beta.regulations.gov/comment/EOIR-2020-0003-85541 ("Refusing asylum to these refugees would be contrary to long established law and violate the U.S.'s non-refoulement obligations.  The result would be devastating for transgender refugees, including Immigration Equality clients, who face severe persecution around the world."); Innovation Law Lab, Comment Letter on Proposed Rule, 7 (July 15, 2020), https://beta.regulations.gov/comment/EOIR-2020-0003-6022 ("These proposed changes contravene our commitment to protecting asylum seekers and refugees under the Refugee Act and the 1951 UN Refugee Convention, as they will lead to the

and refugees at the border may not speak English or have access to legal representation and cannot be expected to understand the Rule's new requirements.[26]

These comments were thorough and well-supported by facts and law, and the issues they raised are often matters of life-or-death for asylum seekers. The Agencies addressed them, if at all, only summarily in the final rule, in violation of the APA.

### 2.    The Agencies Failed to Weigh the Rule's Costs and Benefits

The Agencies claim, without any support, that changes set forth in the Rule will "increase efficiency"[27] and decrease "processing time."[28] But as the D.C. Circuit recently highlighted in *Grace*, the Executive must respect the INA's careful balancing of processing noncitizens through removal with ensuring that *refoulement* does not occur. The Rule upsets this careful balancing by making changes purportedly designed to promote efficiency without any regard to, much less analysis of, the negative effect this will have on legitimate asylum seekers.

The Agencies claim that they "determined that the need to provide additional clarity to adjudicators; to enhance adjudicatory efficiencies; and to ensure the integrity of proceedings outweighed the potential costs to applicants." 85 Fed. Reg. at 80,372. But nowhere do they identify precisely how they in fact made that determination. Quite the contrary, the Agencies

---

deportation of legitimate asylum-seekers to countries where they will undoubtedly suffer persecution and torture.").

[26] *See* National Immigrant Justice Center, Comment Letter on Proposed Rule, 14, 49 (July 15, 2020) https://beta.regulations.gov/comment/EOIR-2020-0003-77333 ("These additions would entrap unrepresented and vulnerable asylum seekers. Many asylum seekers are not sophisticated litigants, do not speak English, and may have a basic education level. Yet, under the Proposed Rules, they could easily make earnest mistakes or advance claims that will result in a finding of frivolousness"); American Bar Association, Comment Letter on Proposed Rule, 27 (July 15, 2020), https://beta.regulations.gov/comment/EOIR-2020-0003-84797.

[27] 85 Fed. Reg. at 80,372.

[28] *Id.* at 80,371 (quoting proposed Rule, 85 Fed. Reg. at 36,268–71).

appear to concede that they had no quantitative basis to make that determination.  As to the purported efficiency gains, the Agencies blithely claim that "the fact specific nature of asylum applications and the lack of granular data on the facts of every asylum application prevent the Departments from quantifying particular costs." *Id.* at 80,378.  And, of course, unable to quantify costs, the Agencies were unable to identify what cost savings the Rule would create.  Instead, the Agencies claim they used some undefined "qualitative considerations." *Id.*

The other side of the equation is even more opaque.  The Rule's "cost" to an applicant seeking refuge in the United States is having a legitimate claim denied and being sent back to their home country to face persecution and even death.  The Agencies concede that the Rule will lead to fewer asylum grants, but claim that they *cannot* "quantify precisely the expected decrease" in grants. *Id.* at 80,384.  The Agencies claim they cannot assess the expected savings from the Rule (as they cannot calculate current application costs) and also claim they cannot quantify the negative impact of the Rule.  It is difficult to understand how the Agencies determined that such un-assessable savings outweigh such unquantifiable costs.

Accordingly, the fundamental flaw with the Agencies' primary justification for the Rule—that increases in efficiency and clarity will outweigh the costs to asylum seekers—is that they do not provide any *factual basis* for this belief.

### 3.    The Agencies Do Not Support the Rule's Purported Rationales

Even accepting its premise, the Rule's efficiency rationale fails.  The Agencies do not support their contention that the changes will lead to efficiencies.  They provide no analysis of why increased efficiency is needed or to what extent, if any, the changes will lead to it.  Merely stating an expected benefit without any analysis of that benefit is not sufficient under the APA, which at a minimum requires "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consumers Union of U.S., Inc. v. F.T.C.*, 801 F.2d 417, 422

(D.C. Cir. 1986) (citation omitted); *see also Bowen v. Am. Hosp. Ass'n*, 476 U.S. 610, 626 (1986).

Notably, those responsible for adjudicating and processing asylum claims have objected that the Rule will not, in practice, achieve the efficiency the Agencies claim.  The Roundtable of Former Immigration Judges provided a Comment that the Agencies' purported efficiency objective "is [a] false rationale for this proposed change."[29]  That is because, based in their experience, the Rule "does nothing to increase Immigration Court efficiency," and will in fact *decrease* it.[30]  The Asylum Officers' Union concurs that the Rule does not clearly serve efficiency goals, and even if it did, the Rule "does not provide any information on how the new procedures will be applied operationally."[31]  As such, the Union opposed the Rule "in its entirety."[32]  The Agencies failed to address these comments in any meaningful way.

> ### 4. The Agencies Do Not Address an Important Aspect of the Problem: The Costs to the Economy and Fisc of Reduced Asylum Grants

The Agencies action further lack support because they ignored an important problem that their Rule creates:  the negative impact that the Rule will have to the U.S. economy and fisc. Notably, nowhere do the Agencies balance the alleged but unquantified efficiency gains that they hypothesize against the negative impact that having fewer refugees live in the United States will

---

[29] Roundtable of Former Immigration Judges, Comment Letter on Proposed Rule, 15 (July 13, 2020), https://beta.regulations.gov/comment/EOIR-2020-0003-4734; *see also id.* at 7 ("The proposed changes involving the meaning of key issues such as persecution, political opinion, particular social group, and the standards for exercising discretion will complicate [] determinations even more, resulting in an increase in continuances for preparation and lengthier hearings."); *id.* at 24 ("The proposed change in presumption also decreases judicial efficiency by creating a heavy burden on adjudicators who must apply differing standards and burdens, depending on the identity of the persecutor or persecutors in each case.").

[30] *Id.* at 13.

[31] National Citizen and Immigration Services Council 119, Comment Letter on Proposed Rule, 6, 20 (July 15, 2020), https://beta.regulations.gov/comment/EOIR-2020-0003-6096.

[32] *Id.* at 1.

certainly cause.  They claim to have submitted "analysis of the rule's costs and benefits" to the Office and Management and Budget, 85 Fed. Reg. at 80,377, but they provide no additional details.

The Agencies concede that the Rule will lead to fewer grants of asylum, but they altogether ignore that fewer grants meanings fewer refugees living in the United States earning income and paying taxes.  As one study ordered by the Administration itself determined, the taxes paid by refugees and asylees exceed government expenditures on those groups by an average of $2,185 per person per year, meaning that each additional refugee represents a net financial gain for the government.  *See* Ex. C, Attachment B at 10.  And, if anything, this study *underestimated* the fiscal benefits of the presence of refugees and asylees, as it failed to account for their effects on the economy other than through taxes paid directly.  *See id.* at 11.  Considering the indirect benefits as well, the net positive impact of refugees and asylees is considerably greater than even the Administration estimated.  *See* Ex. C, Clemens Decl. ¶ 17.  Even a "very modest decline" in inflows of asylum seekers through, for example, denying applications for asylum, "will result in losses of hundreds of millions of dollars to the economy and the government fisc."  *Id.* ¶ 24.

Economic analysis indicates that a 10 percent reduction in the number of asylum seekers relative to 2019 levels would shrink the U.S. economy by at least $590 million in the first year alone.  *Id.* ¶ 18.  If this reduction were sustained for a second year, it would predictably reduce the size of the economy by $1.2 billion.  *Id.*  At the same time, government coffers would be deprived of $100 annually.  *Id.* ¶ 21.  The cumulative fiscal loss over five years of a 10 percent reduction in asylum seekers would, conservatively, amount to $1.5 billion.  *Id.*  The numbers increase dramatically with higher estimated reductions in asylum seekers and grants.  *Id.* ¶¶ 20–21.

The Agencies entirely fail to grapple with this predictable harmful effect of the Rule.

### 5.      The Agencies Failed to Explore Any Alternatives

At a minimum, the Agencies were required to consider whether alternatives existed so as

to avoid the Rule's negative consequences, not the least of which is the certainty of increased *refoulement*. *See Grace*, 965 F.3d at 902 (agencies' failure to account for how new policy affected statutory mandate to ensure those eligible for asylum are not summarily removed was arbitrary and capricious); *Casa de Md.*, 2020 WL 5500165, at *26 (DHS action related to work authorization for asylum seekers arbitrary and capricious in part because "public comments repeatedly draw the agency's attention to the combined adverse effect of the challenged rules. Yet time and again, the agency sidesteps this fundamental concern."). The Agencies hide behind the blanket statement that "[t]he Departments have considered all comments and looked at alternatives," 85 Fed. Reg. at 80,285, rather than identifying a ***single*** alternative that they considered for any of the provisions within the 128-page, three-columns-per-page final Rule. Such a conclusory statement, without *any* proof of meaningful consideration of *any* alternative, is a violation of the APA.

### 6. The Agencies Failed to Provide Sufficient Time for Comments or for the Rule to go into Effect

As discussed *supra*, the Rule sweeps remarkably broadly: it is designed to transform nearly every aspect of asylum law in the United States. Indeed, the Agencies concede that the Rule is a "significant regulatory action." 85 Fed. Reg. at 80,383. Notwithstanding this concession, the Agencies provided only 30 days for public comment on the proposed rule—a plainly insufficient comment period.[33] The Agencies also short-changed the amount of time needed for the Rule to go into effect. The final Rule was published in the Federal Register on December 11, 2020, and lists an effective date of January 11, 2021. 85 Fed. Reg. at 80,274. This is a violation of the Congressional Review Act, which provides that a "major rule"—including one that has an annual

---

[33] By regulation, to the extent feasible, agencies should provide a period of "at least 60 days" for comments on proposed rules. 76 C.F.R. § 3821 (2011). Executive Order 12866 requires agencies to "afford the public a meaningful opportunity to comment on any proposed regulation, which in most cases should include a comment period of not less than 60 days."

effect on the economy of $100 million or more—may not take effect until 60 calendar days after the rule has been published in the *Federal Register* and submitted to Congress.  5 U.S.C. § 801(a)(3).  The Agencies state that the Office of Information and Regulatory Affairs has determined that the Rule does not meet this threshold, 85 Fed. Reg. at 80,383, but they provide no analysis of the Rule's economic effects.  In fact, "even a two percent reduction in the number of asylum seekers would easily cost the U.S. economy and fisc over $100 million," Ex. C, Clemens Decl. ¶ 25, and the Rule is all but guaranteed to cause a far greater decline in asylum grants.

### D.      Individual Provisions of the Rule Violate the INA and APA

For the reasons stated above, the entire Rule should be enjoined and ultimately set aside, and the Court need not reach whether any individual provision violates the INA and APA.  If the Court does wish to consider the Rule provision-by-provision, however, each provision is independently unlawful for the reasons outlined in Plaintiff's Complaint.  Below, we discuss a subset of the Rule's provisions that exemplify the Agencies' unlawful efforts to subvert Congress's statutory scheme in an arbitrary manner.  Given the import these provisions have to the Rule, they cannot be severed and the Rule as a whole should fail.  *See infra* Part III.

### 1.      Multiple Provisions Violate the Plain Text of the INA

Some Provisions, including Provisions 2.2 (Denying a Hearing), 2.4 (Political Opinion), and 2.10 (Firm Resettlement), directly conflict with the text of the INA.  Regulations must be consistent with the statutes they implement.  *Orion Reserves Ltd. P'ship v. Salazar*, 553 F.3d 697, 703 (D.C. Cir. 2009).  In analyzing conflicts, courts consider the statute's plain text along with regulatory action's impact within the context of an overall statutory scheme, and courts have vacated regulations when they were either in direct contradiction with a statute or so inconsistent with it that they "pervert[ed] the meaning of the statute."  *Aid Ass'n for Lutherans v. U.S. Postal*

*Serv.*, 321 F.3d 1166, 1172, 1175 (D.C. Cir. 2003).[34]

Provision 2.10 (Firm Resettlement) not only perverts the meaning of the statute; it defies common sense. Congress, in the INA, provided that an individual cannot receive asylum if she "*was firmly resettled* in another country prior to arriving in the United States." 8 U.S.C § 1158(b)(2)(A)(vi) (emphasis added). The Rule reinterprets the language "was firmly resettled" to include any individual who "*could have applied* for and obtained any non-permanent but indefinitely renewable legal immigration status in that country." 85 Fed. Reg. at 80,388, 80,397 (emphasis added). In other words, a person who passed through a third country but did not have legal status there would nonetheless be subject to the firm resettlement bar. On its face, this interpretation gives section 1158(b)(2)(A)(vi) a meaning its words plainly cannot bear. A person cannot be resettled in a country, much less "firmly," if she does not have any immigration status in that country.[35] Moreover, § 1158(b)(2)(A)(vi) must not be construed to violate international law, including the United States' obligations under the Refugee Convention. *See Garcia v. Sessions*, 856 F.3d 27, 42 (1st Cir. 2017). But the Agencies' interpretation does just that. *See* Ex. A, Hathaway Decl. ¶¶ 30–31.

Provision 2.2 (Denying a Hearing) creates a similar textual conflict. The INA requires that

---

[34] In addition, where possible, courts are bound to interpret statutory provisions to avoid conflicts with U.S. obligations under international law. *Murray v. Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64, 118 (1804) ("[A]n act of Congress ought never to be construed to violate the law of nations if any other possible construction remains."); *see also United States v. Ali*, 718 F.3d 929, 936 (D.C. Cir. 2013).

[35] The Agencies' explanation for Provision 2.10 is flawed. They write that they have promulgated this change "[d]ue to the increased availability of resettlement opportunities," repeating the statistic that 43 countries have signed the Refugee Convention since 1990. 85 Fed. Reg. at 80,282. But as multiple commenters have pointed out, signing the Refugee Convention is equivalent to having a functioning asylum system for those fleeing persecution. El Salvador and Afghanistan are two such signatories, and neither has an existing humanitarian relief process. *See* Compl. ¶ 202. The Agencies fail to acknowledge these comments, much less offer any rebuttal.

immigration judges "shall" conduct a hearing when deciding admissibility.  *See* 8 U.S.C.
§ 1229a(a)(1).  Yet under Provision 2.2 of the Rule, immigration judges are free to hold no hearings
at all and deny applications for asylum, statutory withholding of removal, and protection under the
CAT regulations anytime an applicant does not establish a prima facie case for relief or protection.
85 Fed. Reg. at 80,397.  Nothing in the statute authorizes immigration judges to make these
decisions without a hearing; to the contrary, the INA dictates that IJs must do the opposite, afford
applicants rights to present and examine evidence (including through an attorney), and otherwise
present his or her case.  For these reasons, Provision 2.2 violates the plain text of the INA.

Section 1229a(a)(1) provides:  "An immigration judge *shall* conduct proceedings for
deciding the inadmissibility or deportability of an alien."  8 U.S.C. § 1229a(a)(1) (emphasis
added).  It also states that "[t]he immigration judge *shall* administer oaths, receive evidence, and
interrogate, examine, and cross-examine the alien and any witnesses."  *Id.* § 1229a(b)(1) (emphasis
added).  The Supreme Court has repeatedly recognized that "shall" is "mandatory" and "normally
creates an obligation impervious to judicial discretion."  *Lexecon Inc. v. Milberg Weiss Bershad*
*Hynes & Lerach*, 523 U.S. 26, 35 (1998); *see also Murphy v. Smith*, 138 S. Ct. 784, 787 (2018)
("[T]he word "shall" usually creates a mandate, not a liberty."); *Lopez v. Davis*, 531 U.S. 230, 241
(2001) (noting Congress's "use of a mandatory 'shall' . . . to impose discretion-less
obligations").[36]  And to the extent that section 1229a could be interpreted to not require a hearing
(which it cannot), that interpretation would conflict with the United States' obligations under Art.
25 of the Refugee Convention.  *See* Ex. A, Hathaway Decl. ¶¶ 52–54 (explaining that denying

---

[36] *See also Me. Cmty. Health Options v. United States*, 140 S. Ct. 1308, 1320 (2020);
*Kingdomware Techs., Inc. v. United States*, 136 S. Ct. 1969, 1977 (2016); *Nat'l Ass'n of Home*
*Builders v. Defs. of Wildlife*, 551 U.S. 644, 661 (2007); *Cook v. Food & Drug Admin.*, 733 F.3d 1,
7 (D.C. Cir. 2013); *Ass'n of Civilian Technicians, Mont. Air Chapter No. 29 v. Fed. Labor*
*Relations Auth.*, 22 F.3d 1150, 1153 (D.C. Cir.1994).

hearings to asylum seekers, including those who are unrepresented, is "clearly at odds with Art. 25's goal of ensuring that refugees are assisted to claim their rights").

Congress did not intend for these proceedings to exist only on paper; indeed, section 1229a repeatedly reinforces the right to a hearing. Section 1229a(b)(4), for example, guarantees that "the alien shall have a reasonable opportunity to examine the evidence against the alien, to present evidence on the alien's own behalf, to cross examine witnesses presented" and requires that "a complete record shall be kept of all testimony and evidence produced at the proceeding." 8 U.S.C. § 1229a(b)(4). These statutes codify the right to a hearing because Congress understood that not providing meaningful procedures like hearings would almost certainly lead to the *refoulement* of refugees with valid claims and a desperate need for protection.[37] Provision 2.2 ignores this Congressional understanding, contradicting the INA's "objective of completing proceedings before the immigration judge" and infringing asylum seekers' rights under current regulations.[38]

In addition, Provision 2.4, which confines "political opinion" to only "an ideal or conviction in support of a discrete cause related to political control of a State or a unit thereof," 85 Fed. Reg. at 80,386 & 80,394, contradicts the plain meaning of that term as it appears in the INA. On its face, a "political opinion" is one "[o]f or relating to government, a government, or the conduct of government" as well as "of, relating to, involving, or involved in politics and especially party politics" and "involving or charged or concerned with acts against a government or a political

---

[37] *See, e.g.*, Immigration Control and Financial Responsibility Act of 1996, 142 Cong. Rec., S3282 (daily ed. Apr. 15, 1996) (Senator Ted Kennedy) (explaining that "[e]xpedited exclusion procedures" that do not afford procedures such as a "hearing" run the risk that the United States will "turn away true refugees").

[38] Despite the Agencies' claims to the contrary, current regulations unambiguously provide for access to a hearing. *See* 8 C.F.R. § 1240.10; 8 C.F.R. § 1240.11.

system."[39]  The plain meaning is thus far broader than the cramped understanding the Agencies

attempt to ascribe to it, which would appear to exclude any opinions not directly related to *control*

*of the government.*[40]  The INA expressly provides that persecution on account of political opinion

is a ground for refugee status, 8 U.S.C. § 1101(a)(42)(A), and there is no basis in the text to carve

out certain types of political opinions from the definition.  But Provision 2.4 does just that, going

so far as to expressly exclude political opinions defined by "disapproval of, disagreement with, or

opposition to criminal, terrorist, gang, guerilla, or other non-state organizations absent" certain

"expressive behavior."  85 Fed. Reg. at 80,386; 80,394.

The Agencies' reinterpretation of "political opinion" is flatly inconsistent with the way that

term is understood in international law.  *See* Ex. A, Hathaway Decl. ¶¶ 39–42.  The exclusion of

opposition to criminal terrorist, gang, guerilla, or other non-state organizations contravenes the

intention of the drafters of the Refugee Convention.  *See id.* ¶ 41.  And by providing that a subset

of political opinion claims are only cognizable if there is "expressive behavior in furtherance of a

cause," 85 Fed. Reg. 80,385, the Rule contradicts the clear language of the Convention, which

refers to "political opinion," not political action, *see* Hathaway Decl. ¶ 42.

### 2.    Multiple Provisions Are Arbitrary and Capricious for Lack of Justification

The Agencies fail to provide facially valid reasons for many of the Rule's Provisions.  In

---

[39]  *See Political*, Merriam-Webster, https://www.merriam-webster.com/dictionary/political.

[40]  The Agencies' definition would exclude beliefs or actions that have already been held to constitute political opinions.  *See, e.g.*, *Garcia-Ramos v. Immigration & Naturalization Serv.*, 775 F.2d 1370, 1374 (9th Cir. 1985) (holding that evidence of membership and activities in persecuted political groups demonstrated political activity); *Hu v. Holder*, 652 F.3d 1011, 1018 (9th Cir. 2011) (holding that participation in a labor union can be political activity); *Fedunyak v. Gonzales*, 477 F.3d 1126, 1129 (9th Cir. 2007) (exposing corruption of high-level official to local police constituted political activity).

particular, Provision 2.7 (Cultural Evidence), Provision 2.8 (Internal Relocation), and Provision 2.9 (Adverse Factors) are unjustified and for this reason alone violate the APA.  "[T]he touchstone of 'arbitrary and capricious' review . . . is 'reasoned decisionmaking.'"  *Altera Corp. & Subsidiaries v. Comm'r*, 926 F.3d 1061, 1080 (9th Cir. 2019) (quoting *State Farm*, 463 U.S. at 52).  Where an agency fails to justify the assumptions underlying its regulatory action, that action is arbitrary and capricious and must be set aside.  *See E. Bay*, 964 F.3d at 849.

In Provision 2.9 of the Rule, the Agencies enumerate three "significant adverse discretionary" factors that an adjudicator *must* consider when determining whether an individual should be afforded relief:  (1) unlawful entry; (2) failure to apply for protection in a country of transit; and (3) use of fraudulent documents to enter the United States.  85 Fed. Reg. at 80,387; 80,396.  Provision 2.9 also lists nine additional factors that, if present, will result in denial except in "extraordinary circumstances."[41]  The Agencies contend that the inclusion of these factors "will better ensure that immigration judges and asylum officers properly consider, in all cases, whether applicants for asylum merit relief."  85 Fed. Reg. at 80,342.  But they fail credibly to articulate how the enumerated factors have any bearing on the merits of an applicant's claim at all, much less how adding the factors will help improve the work IJs already do to assess the merits.

In particular, it is difficult to comprehend how an eligible asylum applicant would be less deserving of protection because she "spent more than 14 days in any one country" or transited

---

[41] 85 Fed. Reg. at 80,388, 80,397.  These include, with limited exceptions:  (1) spending more than 14 days in a country while in transit to the United States; (2) transiting through more than one country en route to the United States; (3) having been convicted of a crime that would render the individual ineligible; (4) spending more than a year in the United States prior to filing for asylum; (5) failing to properly file tax returns; (6) having more than one prior asylum application denied for any reason; (7) having withdrawn or abandoned a prior asylum application; (8) failing to attend an asylum interview; and (9) being subject to a final order of removal, deportation, or exclusion without filing a motion to report or seek asylum based on changed country conditions within one year of those changes.  *Id.* at 80,387–80,388, 80,396–80,397.

through more than one country en route to the United States and did not apply for asylum in those countries. 85 Fed. Reg. at 80,388; 80,397. The Agencies state their belief that "aliens with legitimate claims would not forego the opportunity to seek protection in countries through which they traveled if they had urgent need." *Id.* at 80,352; *see also id.* at 80,346 (expressing the opinion that "aliens who fail to apply for protection in a country through which they transit en route to the United States" are likelier to be "misusing the asylum system"). But, as the Ninth Circuit has repeatedly held, "the failure to apply for asylum in a country through which an alien has traveled has no bearing on the validity of an alien's claim for asylum in the United States." *E. Bay*, 964 F.3d at 852. There are many valid reasons that an applicant may not have sought asylum in third countries, and there is therefore no justification for denying asylum on these grounds.[42]

Provisions 2.7 (Cultural Evidence) and 2.8 (Internal Relocation) are similarly unsupported by valid reasoning. In Provision 2.7, the Agencies seek to ban the submission of cultural evidence in asylum proceedings on the justification that the change will "make clear that pernicious cultural stereotypes have no place" in asylum and withholding proceedings. 85 Fed. Reg. at 80,281. But the Rule offers no evidence of how exactly such evidence promotes stereotypes in a harmful way, nor can the benefit of value-signaling outweigh the harm to applicants in barring the presentation of relevant evidence—such as a country's treatment of women, LBGTQIA+ individuals, or religious or racial minorities—during their cases.

In Provision 2.8, the Agencies offer factors for adjudicators to consider as part of their

---

[42] This Provision also violates the test and spirit of the INA. In section 1158(b)(2), Congress outlined the exceptions to eligibility for asylum and provided that "additional limitations and conditions" must be "consistent with" the section. 8 U.S.C. § 1158(b)(2)(A); (C); *see E. Bay*, 964 F.3d at 849. Though the Agencies term the factors enumerated in Provision 2.9 as "discretionary," the text of the Rule makes plain that the Agencies intend them to function as limitations on eligibility. *See* 85 Fed. Reg. at 80,387, 80, 396. But the Agencies do not attempt to justify these additional limitations as consistent with section 1158.

internal relocation analysis.  85 Fed. Reg. at 80,387, 80,388, 80,396, and 80,398.  But they offer no explanation as to how they decided on these factors, nor reasoning as to their relevance.  Some of the factors, such as "demonstrated ability to relocate to the United States," are arbitrary on their face—every person applying for asylum in the United States has demonstrated an ability to relocate to the United States, so this adverse factor amounts to a thumb on the scale against every asylum applicant.  Other factors, including the size of the country, are unsupported—it is not hard to identify examples of geographically large countries where internal relocation would be unrealistic and/or ineffective as a protection against widespread human rights violations.

### 3.    Multiple Provisions Undermine the Agencies' Purported Goals

The Agencies have failed to offer specific, compelling reasons for the changes memorialized in the Rule.  Instead, in an attempt to rationalize each provision, the Agencies fall back on the same explanations they provide for the Rule as a whole:  efficiency and clarity.  But several of the provisions create new delays and inefficiencies in the process, calling into question the Agencies' efforts in connecting the facts before them with the choices they made.

In Provision 1.5, the Agencies require asylum pre-screening officers to apply statutory eligibility bars during an applicant's credible fear interview, and to deny credible fear where such bars are believed to apply.  The purpose, they say, is to "eliminate unnecessary removal delays." 85 Fed. Reg. at 80,371.  But the Agencies then highlight that the noncitizen can request a review of the mandatory bar determination by an immigration judge.  *Id.* at 80,296.  Thus, it is unclear what delays the Rule is preventing, as review by an immigration judge remains available.  The only thing the Rule appears to do is to *add* work at the credible fear stage, forcing asylum officers to assess another aspect of the asylum problem and immigration judges to make final decisions on complex issues at a brief review hearing rather than on full evidence and testimony.

Similarly, the Agencies claim that Provisions 2.3 and 2.6, which enumerate lists of

presumptively unavailable particular social groups and, separately, the nexuses, will "reduce the amount of time the adjudicators must spend evaluating [these] claims." *Id.* at 80,329. But that rationale does not square with the Agencies' defense in the *Grace* litigation concerning a similar proposed change to the definition of particular social group that "officers must 'analyze each case on its own merits in the context of the society where the claim arises.'" *Grace*, 965 F.3d at 906. Indeed, the D.C. Circuit in that case relied heavily on the government's contention at oral argument that "there is no general rule against such claims, calling it 'crystal clear' that 'none of these groups are categorically barred.' Oral Arg. Rec. 24:03–07." *Id.* (citation omitted). That explanation, the Court held, "is perfectly consistent with the Guidance's instruction to asylum officers . . . that claims be analyzed on a case-by-case basis." *Id.*

The Agencies cannot have it both ways. Either the new Rule *de facto* acts as a categorical bar on particular social group claims and nexus determinations *or* adjudicators indeed must conduct a case-by-case analysis of each claim taking into account *all* arguments or evidence related to the case. If the former, then the Rule as a *de facto* categorical bar violates the INA's plain language of requiring a case-by-case analysis. If the latter, then the Agencies' efficiency rationale is a chimera, as there will not be any reduction in the time it takes adjudicators to assess the claims.

The Rule also justifies several changes to the definition of commonly used terms in asylum applications, such as persecution (Provision 2.5), by claiming that the new definitions will "provide clarity for adjudicators." 85 Fed. Reg. at 80,286. This rationale does not survive scrutiny. Those tasked with the day-to-day operation of the asylum system also directly contradict the Agencies' "clarity" and "efficiency" rationales. The Agencies assert that the "animating principles" of the Rule include "provid[ing] guidance to adjudicators regarding a number of thorny issues that have created confusion and inconsistency." *Id.* at 80,284–80,285. But the same group

of former immigration judges discussed *supra* also explained that, in their decades of collective experience, the Rule will do the exact opposite. The "clarity" rationale offered by the Agencies makes no sense at all in the context of upending a system in place for decades.

The foregoing are but a few examples of the countless ways in which the Rule's individual Provisions are inconsistent with the INA, insufficiently supported under the APA, or both. Even if the Agencies had authority to promulgate the Rule (which they did not), and even if they had properly engaged in the notice-and-comment rulemaking process (which they did not), the Rule would nonetheless be unlawful on its merits, as it is comprised of Provisions that cannot be squared with applicable law. Accordingly, the Plaintiff is likely to succeed on its claim.

## II.     The Other Preliminary Injunction Factors Are Readily Met

### A.     The Rule Inflicts Irreparable Harm on Plaintiff

The Rule will irreparably frustrate Human Rights First's mission to serve asylum seekers and advocate for meaningful access to the asylum system. *See* Ex. B, Breen Decl. ¶ 10. Because the litany of changes the Rule implements will make it substantially more difficult for individuals fleeing persecution to qualify for asylum, Human Rights First will likely face a drastic reduction in the number of clients it can serve. *Id.* And as a result of the higher standards imposed by the Rule, Human Rights First will have to spend more time preparing each impacted client for the various steps of their proceedings, which will further limit the number of clients the organization will be able to assist. *Id.* ¶ 11. Additionally, Human Rights First is expending significant resources in developing new materials and re-training its nationwide network of pro bono attorneys to operate in a more complex legal environment. *Id.* ¶ 14. To do so, the organization is diverting staff and resources, further reducing the number of clients that Human Rights First will have the capacity to serve. *Id.* This reduction in clients served will not only severely impair Human Rights First's ability to fulfill its mission, but also its financial health. *Id.* ¶ 24.

**B.       The Balance of Equities and Public Interest Weigh in Favor of an Injunction**

Where, as here, "the Government is the opposing party," the final two preliminary injunction factors "merge." *Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 920 F.3d 1, 10 (D.C. Cir. 2019) (per curiam) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)), *cert. denied*, 140 S. Ct. 789 (2020).  The balance of equities and public interest favor enjoining the Rule.

For the asylum seekers that Human Rights First represents, the stakes could not be higher—the risk of *refoulement* is, quite literally, a risk of persecution, torture, and even death.  The Supreme Court has recognized that "the public interest has an interest in . . . preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm."  *Nken*, 556 U.S. at 436; *see also P.J.E.S. v. Wolf*, No. 1:20-cv-2245, 2020 WL 5793305, at *18 (D.D.C. Sept. 25, 2020) (citation omitted) (collecting citations and noting that "the public has an interest in ensuring that we do not deliver aliens into the hands of their persecutors.").  Moreover, the public interest will be damaged if the United States abrogates its treaty obligations and undermines the system of asylum that has been in place for decades.  *Liuksila v. Turner*, No. 16-cv-00229, 2018 WL 6621339, at *2 (D.D.C. Dec. 18, 2018).

On the other side of the ledger, the Agencies have no cognizable interest in carrying out a policy that violates federal law.  *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016); *District of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 45 (D.D.C. 2020).  To be sure, the public generally has an interest "in efficient administration of the immigration laws at the border."  *Landon v. Plasencia*, 459 U.S. 21, 34 (1982).  But the Agencies have failed to provide reasoned analysis supporting their assertion that the Rule's changes will in fact increase—rather than frustrate—efficiency.  And the public also has "an interest in ensuring that 'statutes enacted by [their] representatives' are not imperiled by executive fiat," which weighs clearly against allowing the Rule to go into effect.  *E. Bay*, 932 F.3d at 779 (quoting *Maryland v. King*, 567 U.S.

1301, 1301 (2012)).  Finally, enjoining implementation of the Rule would simply preserve the status quo, and the Agencies identify no imminent, irreparable injury that will occur from maintaining the current, statutorily-prescribed system.

## III.    The Court Should Enjoin the Entire Rule

With respect to Plaintiff's claims that the Rule is *ultra vires*, that Chad Wolf was improperly serving, and that the Agencies failed adequately to consider the cumulative effect of the Rule on the availability of asylum and thus, in turn, on its obligations under international agreements, the only appropriate remedy is to enjoin the entire Rule.  With respect to Plaintiff's arguments that specific provisions were arbitrary and capricious or inconsistent with the statutory text, severance is inappropriate under the circumstances.  To be sure, not all of the Rule's provisions violate the plain text of the INA.  But the Agencies' failure to act within the scope of their authority and failure to provide sound rationale for the changes infects the entire regulation.

Even if the Court were to find that one or two provisions somehow survive review, it should enjoin the whole Rule.  In a recent decision, another district court put it well:  "a decision to leave standing isolated shards of the Rule that have not been found specifically infirm would ignore the big picture:  that the rulemaking exercise here was sufficiently shot through with glaring legal defects as to not justify a search for survivors*." New York v. U.S. Dep't of Health & Human Servs*., 414 F. Supp. 3d 475, 577–78 (S.D.N.Y. 2019).  The D.C. Circuit has also declined to sever invalid portions of a larger rule when doing so "would severely distort the [Agency's work] and produce a rule strikingly different from" the one the Agency promulgated.  *MD/DC/DE Broads. Ass'n v. FCC*, 236 F.3d 13, 23 (D.C. Cir. 2001); *see also Nat. Res. Def. Council v. EPA*, 489 F.3d 1250, 1261 (D.C. Cir. 2007).  As in these cases, the Rule at issue here would be virtually unrecognizable as the one promulgated by the Agencies if its (many) facially defective provisions were excised.

## IV.    Nationwide Injunctive Relief Is Warranted

Under the APA, circuit precedent, and the facts of this case, a nationwide preliminary injunction is the appropriate remedy here.  The scope of a district court's equitable powers "is broad, for breadth and flexibility are inherent equitable in remedies."  *Brown v. Plata*, 563 U.S. 493, 538 (2011) (citation omitted); *see also Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1408 (D.C. Cir. 1998).  As the D.C. Circuit has held, this broad discretion includes the authority to issue injunctions that are nationwide in scope.  *See Nat'l Mining Ass'n*, 145 F.3d at 1408–09.  Indeed, "[w]hen a reviewing court determines that agency regulations are unlawful, the *ordinary result* is that the rules are vacated—not that their application to the individual petitioners is proscribed."[43]  *Id.* at 1409 (alteration in original) (quoting *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989)).  Numerous courts in this district have "enjoin[ed] improper agency action on a nationwide basis" where "the challenged policy is found to be arbitrary and capricious or otherwise facially unlawful."  *Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Servs.*, -- F. Supp. 3d --, 2020 WL 5232076, at *43 (D.D.C. Sept. 2, 2020) (collecting cases).

The preliminary posture of this case does not alter the presumption that nationwide relief is appropriate to remedy the Agencies' unlawful action.  *See U.S. Dep't of Agric.*, 444 F. Supp. 3d at 48 (noting that § 705 of the APA, which governs preliminary relief, "authorize[s] relief from agency action for any person otherwise subject to the action, not just as to plaintiffs"); *see also Gomez v. Trump*, -- F. Supp. 3d --, 2020 WL 5367010, at *37 (D.D.C. Sept. 4, 2020) (rejecting the argument that *National Mining* does not apply to preliminary injunctions).  Moreover, nationwide

---

[43] The text of the APA confirms that nationwide relief is warranted if an agency action is found to be contrary to law:  under § 706, a reviewing court "*shall* . . . hold unlawful and set aside agency action" that is arbitrary and capricious or in excess of statutory authority.  5 U.S.C. § 706(2) (emphasis added); *see also*, *e.g.*, *Innovation Law Lab v. Wolf*, 951 F.3d 1073, 1094 (9th Cir. 2020) ("There is a presumption . . . in APA cases that the offending agency action should be set aside in its entirety rather than only in limited geographical areas.").

relief is particularly appropriate where, as here, the challenged regulation governs immigration policy.  *See Texas v. United States*, 809 F.3d 134, 187–88 (5th Cir. 2015), *aff'd by equally divided court*, 136 S. Ct. 2271 (2016).  Enjoining the Rule only as to Plaintiff or in a limited geographic area would result in "a fragmented immigration policy [that] would run afoul of the constitutional and statutory requirement for uniform immigration law and policy."  *Washington v. Trump*, 847 F.3d 1151, 1166–67 (9th Cir. 2017) (per curiam); *Gomez v. Trump*, -- F. Supp. 3d --, 2020 WL 5367010, at *37 (D.D.C. Sept. 4, 2020), *amended in part*, 2020 WL 5886855 (D.D.C. Sept. 14, 2020) (recognizing the importance of uniformity in immigration policy in granting a nationwide preliminary injunction).  Because Plaintiff is likely to succeed in demonstrating that the Rule violates the APA, the INA, and the Constitution, this Court should issue a preliminary injunction barring its implementation nationwide.

## CONCLUSION

For the foregoing reasons, Plaintiff urges the Court to enter a preliminary injunction to halt implementation of the Rule.

Dated:  December 22, 2020                    Respectfully submitted,

                                               /s/  Ana C. Reyes
                                             Ana C. Reyes (D.C. Bar No. 477354)
                                             Melinda K. Johnson (D.C. Bar No. 1620229)
                                             Emma J. Nino[*]
                                             WILLIAMS & CONNOLLY LLP
                                             725 Twelfth Street, NW
                                             Washington, DC 20005
                                             Tel: (202) 434-5000
                                             Fax: (202) 434-5029
                                             areyes@wc.com

---

[*] Practice supervised by D.C. Bar members pursuant to D.C. Court of Appeals Rule 49(c)(8), and certification to practice pursuant to LCvR 83.2(g) to be submitted.

## **CERTIFICATE OF SERVICE**

I hereby certify that on December 22, 2020, I caused true and correct copies of the Plaintiff's Complaint, Civil Cover Sheet, Motion for Preliminary Injunction, Memorandum of Points and Authorities in Support of Motion for Preliminary Injunction, and all supporting papers to be filed via ECF and, in addition, to be delivered by hand to the Defendants in the above-captioned action, and to the U.S. Attorney for the District of Columbia, at the following addresses:

WILLIAM P. BARR,
as Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530;

CHAD F. WOLF,
as Acting Secretary of the Department of Homeland Security
U.S. Department of Homeland Security
245 Murray Lane, S.W.
Washington, D.C. 20528;

KENNETH T. CUCCINELLI,
as Acting Director of United States Citizenship and Immigration Services
U.S. Citizenship and Immigration Services
20 Massachusetts Avenue, N.W.
Washington, D.C. 20529;

ANDREW J. DAVIDSON,
as Asylum Division Chief, U.S. Citizenship and Immigration Services
20 Massachusetts Avenue, N.W.
Washington, D.C. 20529

MICHAEL R. SHERWIN,
as Acting United States Attorney for the District of Columbia
555 4th Street, N.W.
Washington, DC 20530

Dated:  December 22, 2020                       Respectfully submitted,


                                           _/s/ Ana C. Reyes_____
                                           Ana C. Reyes (D.C. Bar No. 477354)