# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

<table>
<tr><td>

**HUMAN RIGHTS FIRST,**

           **Plaintiff,**

    **v.**

**CHAD F. WOLF, *et al.*,**

           **Defendants.**

</td>
<td>

**Civil Action No. 1:20-cv-3764 (TSC)**

</td></tr>
</table>

<u>**EXPERT REPORT OF JAMES C. HATHAWAY**</u>

## I.  ASSIGNMENT

1.  I have been retained by Williams & Connolly LLP on behalf of Plaintiffs to provide expert opinions in the above-captioned matter.

2. I have been asked to opine on whether the Rule announced in the Federal Register, "Procedures for Asylum and Withholding of Removal; Credible Fear and Reasonable Fear Review," 85 Fed. Reg. 80,274 (December 11, 2020) (the "Rule"), is consistent with the United States' obligations to refugees under international law.

3.  In arriving at the opinions contained in this report, I have considered my training, knowledge, basic texts and principles, experience in the relevant international and migration law disciplines, as well as the materials cited herein.  I reserve the right to supplement my conclusions if additional information is provided or if additional work leads me to conclude that supplementation is necessary.

4.  For reasons set out below, it is my view that implementation of the Rule would put the United States in breach of its international refugee protection obligations in material and significant ways.

## II.  BACKGROUND AND QUALIFICATION

5.  My names is James Curtis Hathaway.

6.  I am the James E. and Sarah A. Degan Professor of Law at the University of Michigan, where I serve as Director of the Program in Refugee and Asylum Law.  I am also Distinguished Visiting Professor of International Refugee Law at the University of Amsterdam.  I previously held the positions of Dean and William Hearn Chair of Law at the University of Melbourne, and Professor of Law and Associate Dean at the Osgoode Hall Law School in Toronto as well as visiting professor at the universities of Cairo, California, Macerata, San Francisco, Stanford, Toronto, and Tokyo. I am the author of two leading treatises on international and comparative refugee law, *The Rights of Refugees under International Law* (2005; 2nd edition forthcoming 2021) ("*Refugee Rights*") and *The Law of Refugee Status* (2nd edition 2014, with Michelle Foster) ("*Refugee Status*").  I am also founding editor of *Cambridge Asylum and Migration Studies* and sit on the editorial boards of the *Journal of Refugee Studies* and the *Immigration and Nationality Law Reports*.

7.  My work on refugee law has been relied upon by leading courts around the world, including the British House of Lords and Supreme Court, the High Court of Australia, the Supreme Court of Canada, and the Supreme Court of New Zealand.

8.  My complete *curriculum vitae* is attached to this report as Attachment 1.

9.  I am being compensated at my usual and customary hourly rate of $500 plus reimbursement of reasonable business expenses.  My compensation is not contingent upon the outcome of this

litigation or the opinions I reach.

10.  In the past four years, I have not given oral testimony as an expert at trial or by deposition in any litigation.

## III.  GENERAL CONSIDERATIONS

11.  The United States is a party to the United Nations Protocol relating to the Status of Refugees (1967) ("Protocol") which incorporates by reference the definition of a refugee (Art. 1) and the rights of refugees (Arts. 2-34) set out in the United Nations Convention relating to the Status of Refugees (1951) ("Convention").

12.  Neither the Convention nor the Protocol sets any specific procedural requirements for the assessment of refugee status.  The Convention and Protocol rather provide that any person who meets the mandatory and non-derogable definition[1] of a "refugee" set by Art. 1(A)(2) of the Convention must be afforded in practice and on the terms defined by the Convention each of the rights set by Arts. 2-34.  It is for each state party to decide how best to realize that duty of result.

13.  Critically, "[a] person is a refugee within the meaning of the 1951 Convention as soon as he fulfils the criteria contained in the definition.  This would necessarily occur prior to the time at which his refugee status is formally determined."[2]

14.  It follows that a state party's asylum procedures can give rise to a breach of its duties under the Protocol if they fail accurately to recognize the refugee status of persons who are in fact refugees at international law or if refugees (including persons claiming refugee status) are not in practice afforded the rights to which they are entitled under international law.[3]

---

[1]  Convention, at Art. 42(1).

[2]  UNHCR, *Handbook on Procedures and Criteria for Determining Refugee Status* (1979, reissued 2011), at para. 28.  The understanding that refugee status recognition is declaratory has been affirmed by the Inter-American Court of Human Rights (*Pacheco Tineo Family v. Bolivia*, (2013) (Ser. C) No. 272 (IACtHR, Nov. 25, 2013), at para. 147, and is codified in European Unioin law (EU Qualification Directive, [2011] OJ L 337/9 ("EU Qualification Directive"),  at Preamble, para. 21).

[3]  In contrast to most other human rights treaties, refugee rights are not all owed immediately to any refugee coming under a state party's jurisdiction, but rather arise on the basis of a sophisticated structure of levels of attachment.  Nor is the nature of refugee rights generally defined in absolute terms; the content of most entitlements is instead contingent on what a particular host country provides to a specified group of non-refugees under its jurisdiction.  These two features – the incremental acquisition of rights and the definition of many rights on the basis of contingent standards of compliance – are critical means of taking account of legitimate host state concerns that might otherwise arise from the core obligation to protect all persons coming under

15.  One of Congress' "primary purposes" in passing the *Refugee Act of 1980*, which amended the *Immigration and Nationality Act*, was "to bring United States refugee law into conformance with the 1967 United Nations Protocol relating to the Status of Refugees."[4]  This Congressional mandate can only be realized if the United States operates a mechanism (or combination of mechanisms) that ensures that every refugee defined by Art. 1 of the Convention receives all of the rights guaranteed by Arts. 2-34 of the Convention.[5]

16.  Perhaps most important, any person who meets the Art. 1 refugee definition is entitled by virtue of Art. 33 of the Convention to be protected against *refoulement* to any country in which s/he faces the risk of being persecuted for reasons of race, religion, nationality, membership of a particular social group or political opinion (see generally paras. 62-64 below).

17.  Contrary to this Congressional mandate, the Rule does not align United States practice with its duties under the Protocol.  First, the Rule in many respects *exacerbates pre-existing breaches* of the duty to recognize refugee status on the terms mandated by Art. 1 of the Convention.  Second, the Rule establishes *new unlawful restrictions on the duty to recognize* refugee status in line with Art. 1.  Third, implementation of the Rule would give rise to *new breaches of US obligations to refugees*, in particular those set by Arts. 25, 31, and 33 of the Convention.  These three categories of concern are analyzed below at Parts IV, V, and VI respectively.

## IV.  THE RULE EXACERBATES PRE-EXISTING BREACHES OF THE INTERNATIONAL LEGAL DUTY TO RECOGNIZE REFUGEE STATUS

18.  <u>Persecution:</u> The central criterion of refugee status at international law is the existence of a forward-looking risk of "being persecuted."[6]  The dominant approach of state parties is to assess the requisite gravity of harm by reference to core norms of international human rights law.[7]  Canadian jurisprudence, for example, defines a risk of being persecuted as requiring the showing of a "sustained or systemic denial of basic human rights demonstrative of a failure of state

---

their jurisdiction who meet the international refugee definition.  See generally Hathaway, *Refugee Rights*, at 154 ff.

[4]  *INS v. Cardoza-Fonseca*, 480 U.S. 421, 436 (1987).

[5]  *See generally* Hathaway and Foster, *Refugee Status*, at 462-598.

[6]  *See generally id.* at 183-186.  In short, the Convention was conceived as a response to the needs of persons who face a risk of the predicament of "being persecuted," ie. those facing a form of serious harm *and* unable to access effective state protection against same.

[7]  *See generally id.* at 193-208.

protection."[8]  European Union law has also adopted the human rights approach, providing that an "act of persecution" is one that is "sufficiently serious by its nature or repetition as to constitute a severe violation of basic human rights, in particular the rights from which derogation cannot be made" or an "accumulation of various measures, including violations of human rights.'"[9]  This is an understanding grounded in the context, object, and purpose of the Convention, as required by the Vienna Convention on the Law of Treaties.[10]  As the United Nations High Commissioner for Refugees ("UNHCR") has noted, the "strong human rights language" in the Refugee Convention's Preamble confirms that "the aim of the drafters [was] to incorporate human rights values in the identification and treatment of refugees, thereby providing helpful guidance for the interpretation, in harmony with the Vienna Convention, of the provisions of the 1951 Convention."[11]

19.  United States courts, in contrast, have taken a highly subjective, case-by-case approach to the definition of persecution.[12]  In practice, the US approach has led to the recognition of a risk of persecution mainly where the harm faced is extreme if not lethal – a standard that is substantially more narrow than the human rights-based approach based on the context, object and purpose of the Convention refugee definition. Put simply, other state parties rightly take account of risk to *all* basic human rights – not just of a highly selective subset of such rights.[13]  The Rule exacerbates the problems with the United States' approach by codifying an unreasonably narrow interpretation of persecution as "an extreme concept involving a severe level of harm that includes actions so severe that they constitute an exigent threat."[14]  That strained definition – materially more narrow than even the approach historically taken by the United States – is in my view inconsistent with the context, object and purpose of the Convention and Protocol.

---

[8]  *Canada v. Ward*, [1993] 2 SCR 689 (Can. SC).  This formulation has been widely adopted by senior courts throughout the English-speaking world: see Hathaway and Foster, *Refugee Status*, at 185 n.18.

[9]  EU Qualification Directive, Art. 9.

[10]  Vienna Convention on the Law of Treaties, 1155 UNTS 331 ("Vienna Convention"), Art. 31(1).  The Vienna Convention's rules on treaty interpretation are generally understood to codify relevant customary international law.  It follows that a purely literal or textual interpretation of the Convention is impermissible as a matter of international law.  *See* Hathaway and Foster, *Refugee Status*, at 5-12.

[11]  UNHCR, "The International Protection of Refugees: Interpreting Article 1 of the 1951 Convention relating to the Status of Refugees," 20(3) *Refugee Survey Quarterly* 77, 78 (2001).

[12]  *See* Hathaway and Foster, *Refugee Status*, at 186-190.

[13]  *See generally id.* at 208-287, showing that dominant state practice is to recognize the relevance of both civil and political and social and economic rights related to physical security, liberty and freedom, and autonomy and self-realization.

[14]  85 Fed. Reg. 80,274, 80,395.

20.  The Rule's specific insistence that persecution does not include "the generalized harm that arises out of civil, criminal, or military strife in a country..."[15] cannot be reconciled to the requirements of the Convention and Protocol.   International law requires that claims to refugee status arising *in any context* – including "strife" – be assessed on their merits by reference to the criteria set by Art. 1 of the Convention.[16]  Because the Convention does not exclude claims arising from war or other "strife," there is a risk of being persecuted any time that the risk amounts to a sustained or systemic risk to basic human rights demonstrative of a failure of state protection (see para. 18 above).  As the UNHCR has long highlighted, "... persons become refugees when they flee or remain outside a country for reasons pertinent to refugee status, whether these reasons arise in a civil war situation, in an international conflict or in peace time."[17]

21.  Nexus: Because "being persecuted" is properly understood to describe a predicament rather than simply an act,[18] it has two essential elements:  serious harm *and* failure of state protection.  As such, an individual is at risk of the predicament of "being persecuted" only if s/he is both at risk of serious harm *and* the home government cannot or will not offer countervailing protection.  Other state parties thus correctly understand that a risk of being persecuted is for reasons of ("on account of" in US language) a Convention ground if *either* of the two essential elements is causally connected to one of the five grounds.  For example, someone at risk of assault for unknown or non-Convention reasons but who is denied state protection against that risk because of race or political opinion *would* be understood to be at risk of being persecuted for a Convention reason, and hence recognized as a refugee.[19]

22.  United States nexus jurisprudence – focused as it is on only the reason for the immediate infliction of harm[20] – fails to honor the "being persecuted" language of the Convention and Protocol.  At least as important, it is inconsistent with the context, object and purpose of the Convention.  As observed by Justice Hale (who later became Chief Justice of the United

---

[15]  *Id.*

[16]  *See generally* Hathaway and Foster, *Refugee Status*, at 174-181.

[17]  UNHCR, "International Protection," UN Doc. A/AC.96/750 (Aug. 27, 1990), at para. 16. See also UNHCR, "Information Note on Article 1 of the 1951 Convention" (Mar. 1, 1995), at para. 8:  "[T]here is nothing in the definition itself which would exclude its application to persons caught up in civil war."

[18]  *See supra* note 6.

[19]  *See generally* Hathaway and Foster, *Refugee Status*, at 373-382.  This approach is, for example, codified in European Union law: EU Qualification Directive, Art. 9(3).

[20]  The seminal precedent is *I.N.S. v. Cardoza Fonseca*, 502 U.S. 478 (1992).  Though this decision is routinely interpreted to limit nexus to the immediate persecutor's intentions, this is arguably an incorrect interpretation of the decision even as a matter of US domestic law: see the dissenting opinion of Ferguson J. in *Tecun Florian v. INS*, 207 F.3d 1107 (USCA9, 2000).

Kingdom):

> The necessary discriminatory element may be supplied by the non-state agents who
> perpetrate the maltreatment or it may be supplied by the state which fails to protect
> the victims... [T]he discriminatory practice of the state is at least as important as the
> discriminatory practice of the attackers... If there are thugs about perpetrating
> serious acts against the population as a whole, but the state offers protection to
> some of its citizens, and not to others, in my view those citizens are being
> persecuted in just the sort of way that merits the surrogate protection of other states
> under the Convention.[21]

23.  The Rule not only fails to correct the highly partial US approach to nexus, but dramatically
exacerbates the disparity between US practice and the requirements of the Convention and
Protocol.  It does so by mandating an interpretation of nexus under which authorities "will not
favorably adjudicate the claims of aliens who claim persecution based on the following list of non-
exhaustive circumstances," including eg."disagreement" or "resistance" to guerillas or gangs.[22]  In
taking this extreme approach, the Rule completely disregards the possibility that a person subject to
immediate risk for even a non-Convention ground might well be denied state protection for a
protected ground – such as race or political opinion – and hence as a matter of international law
would be entitled to protection as a refugee.  The Rule is thus inconsistent with US obligations
under the Protocol.

24.  The Rule's stipulation that refugee claims grounded in "interpersonal animus or retribution"
are to be denied unless there is evidence that the persecutor has "targeted, or manifested an animus
against, other members of an alleged particular social group in addition to the member who has
raised the claim" is especially problematic.[23]  In addition to raising the general concern noted above
at para. 23, there is no legal basis to adopt a *sui generis* understanding of nexus applicable only to
claims based on membership of a particular social group.  To the contrary, the "for reasons of"
("on account of") clause is common to all five Convention grounds and is thus to be applied
consistently to each of them.[24]  There is also no legal reason to disregard a risk that arises for a
Convention reason just because other persons so described are not also at risk; to do so would be
tantamount to suggesting, for example, that an anti-Semitic attack was not for reasons of religion
absent evidence that other Jews were also threatened or attacked by the persecutor.  The only
relevant question is whether a Convention ground is "one central reason"[25] that *this* applicant faces

---

[21] *Horvath v. Secretary of State for the Home Department*, [2000] Imm. A.R. 205 (Eng.
CA, 1999).

[22]  85 Fed. Reg. 80,836.

[23]  *Id.*

[24]  *See generally* Hathaway and Foster, *Refugee Status*, at 362-367.

[25]  INA §208(b)(1)(B)(I).  *See generally* Hathaway and Foster, *Refugee Status*, at 382-390.

the risk of being persecuted.

25.   Internal relocation: While the notion of internal flight/relocation/protection is not expressly included in the Convention, there is widespread agreement that persons able to secure the protection of their home state by moving to a different region of that country are in most cases not to be recognized as refugees.[26]   The most obvious textual home for this requirement is the explicit caveat in Art. 1 of the Convention that even a person able to show a well-founded fear of being persecuted for a Convention reason does not qualify as a refugee unless also able to show that s/he "is unable or, owing to such fear, unwilling to avail himself of the protection *of that country* (emphasis added)."   As noted by the 11th Circuit Court of Appeals,

> The [refugee definition] speak[s] consistently in terms of the geopolitical unit, "country."   Moreover, where the alleged persecutors are not affiliated with the government, it is not unreasonable to require a refugee who has an internal resettlement alternative in his own country to pursue that option before seeking [protection] in the United States... [A] government may expect that an asylum-seeker be unable to obtain protection anywhere in his own country before he seeks the protection of another country.[27]

26.   While a state may thus logically deny asylum to an individual who already has access to national protection in his or her home country, the United States has long misapplied this principle. It has turned what should be an exception into a duty on the applicant affirmatively to demonstrate "country-wide persecution;"[28] expected applicants to relocate in order to entrust their well-being to non-state actors;[29] and framed the inquiry to be whether an applicant "could avoid persecution"[30] rather than whether there is meaningful access to affirmative protection, thus effectively requiring applicants to hide from their persecutors.

27.   The Rule, however, goes beyond continuation of historical misunderstandings of when the Refugee Convention and Protocol require applicants to seek the internal protection of their own country.   In so doing, it gives rise to new breaches of international law.

28.   First, the Rule eliminates the previous instruction that decision-makers should consider such factors as "administrative, economic, or judicial infrastructure" in assessing the reasonableness of

---

[26]   *See generally* Hathaway and Foster, *Refugee Status*, at 332-341.

[27]   *Mazariegos v. I.N.S.*, 241 F.3d 1320, 1327 (11th Cir. 2001).

[28]   *Re C-A-L*, 21 I.&N. Dec. 754, 757 (BIA, 1997); *see also Matter of AB*, 27 I.&N, Dec. 316, 320 (2018).

[29]   *See eg. Awale v. Ashcroft*, 384 F.3d 527, 532 (8th Cir. 2004), canvassing whether the applicant could be sent back to a clan.

[30]   8 CFR §208.13(b)(2)(ii).

internal relocation.[31]  In the proposed Rule, the government justified this deletion on the ground that such factors "do not have a clear relevance in assessing the reasonableness of internal relocation in many cases."[32]  To the contrary, since the relevant question is whether the national government is positioned to protect the applicant in the proposed site of relocation such infrastructure is inherently relevant.  The final Rule retains the deletion of the instruction, but provides no justification for doing so.

29.  Second, the Rule establishes a presumption in non-state persecutor cases "that internal relocation would be reasonable"[33] rather than leaving internal relocation to be assessed impartially based on the facts found.  There is no empirical basis for such a presumption given the extent of state protection failures around the world.  As a matter of principle, this aspect of the Rule exacerbates the foundational error that the internal relocation doctrine imposes a duty on the applicant rather than providing asylum states with the opportunity to show that the applicant's *prima facie* need for protection (based on his or her showing of a well-founded fear of being persecuted for a Convention reason) can be remedied locally rather than through asylum abroad.

30.  <u>Firm resettlement:</u> State parties to the Protocol may not lawfully add cessation or exclusion clauses to the authorized list in Arts. 1(C)-(F) of the Convention.[34]  Yet the United States has long denied protection to persons deemed to have been "firmly resettled" in another country – a notion not included in the non-derogable definition of a refugee in Art. 1 of the Convention.  Art. 1(E) of the Convention comes closest to the notion of "firm resettlement," but requires the effective assimilation of the refugee to the population of the country in which he or she has taken residence, including continuing and durable guarantees of rights at a very high level.[35]  Even as traditionally understood, US law falls seriously short of compliance with Art. 1(E) as it excludes *prima facie* refugees from protection based simply on an offer of status having been made to that person rather than on the basis of actually holding status abroad, and most egregiously applies to persons with highly insecure status in another country, including even persons whose re-entry is not authorized. "Firm resettlement" as interpreted is thus a misnomer as it requires neither "resettlement" nor indeed any "firm" status.  Self-evidently "firm resettlement" does not meet Art. 1(E)'s "*de facto* nationality" standard, which is predicated on a subsisting right to enter and remain in another country with clear guarantees of rights that bespeak true assimilation to the nationals of that state.

31.  The Rule takes the United States even farther away from compliance with international law by

---

[31]  85 Fed. Reg. 36,282 (proposed Rule); *see* Fed. Reg. 80,387.

[32]  85 Fed. Reg. 36,282 (proposed Rule); *see also* 85 Fed. Reg. 80,281 (explaining the government's position that the Rule adopts "a more streamlined presentation... of the most relevant factors").

[33]  85 Fed. Reg. 80,387.

[34]  Convention, Art. 42(1).

[35]  *See* Hathaway and Foster, *Refugee Status*, at 500-509.

amending the "firm resettlement" notion to exclude *prima facie* refugees "who could have applied for and obtained"[36] status in a third country regardless of whether the alien applied for or was offered... status" in another country – an effective penalty clause that has no connection to the surrogate protection purpose of Art. 1(E) (see para. 30 above).  The Rule also provides that "[t]he firm resettlement of an alien's parent(s) shall be imputed to the alien if the resettlement occurred before the alien turned 18...,"[37] thus unlawfully discriminating against a child on the basis of the alleged failings of his or her parent and ignoring the international legal right of children independently to establish refugee status.[38]

## V.  THE RULE ESTABLISHES NEW UNLAWFUL RESTRICTIONS ON THE DUTY TO RECOGNIZE REFUGEE STATUS

32.  In addition to exacerbating the scope or depth of pre-existing US non-compliance with the duty to recognize refugee status as regards the notions of persecution, nexus, internal relocation, and firm resettlement, the Rule gives rise to several *new and unlawful restrictions* on the duty to recognize the refugee status of any person who meets the standard set by Art. 1 of the Convention (see paras. 12-14 above).  It does so by mandating impermissibly narrow understandings of the requirements of Art. 1 as regards the notions of well-founded fear, nationality, political opinion, membership of a particular social group, and exclusion from refugee status.

33.  Well-founded fear: Beyond taking account of the evidence of the applicant and any witnesses, the investigation of "well-founded fear" at international law requires state parties to bring all relevant country of origin information to bear on the assessment of the claim.  Other state parties have largely concurred with the view of the US Supreme Court that the meaning of the well-founded fear test is that "so long as the objective situation is established by the evidence, it need not be shown that the situation will probably result in persecution, but it is enough that persecution is a reasonable possibility."[39]

34.  There is no requirement at international law that the risk be extant or immediate for it to adjudged a reasonable possibility.  To the contrary, the relevant question is whether the risk is reasonably foreseeable rather than speculative.[40]  The logic of this approach follows from the Convention's goal of enabling persons to *avoid* the risk of being persecuted, not simply to assist

---

[36]  85 Fed. Reg. 80,283.

[37]  *Id.* at 80,388.

[38]  *See generally* J. Pobjoy, *The Child in International Refugee Law* (2017).

[39]  *INS v. Cardoza-Fonseca*, 480 U.S. 421, 440 (1987), quoting in part from *I.N.S. v. Stevic*, 467 U.S. 407, 424-425 (1984).  The international evolution of this evidentiary test is discussed in Hathaway and Foster, *Refugee Status*, at 110-115.

[40]  *See* Hathaway and Foster, *Refugee Status*, at 113-115.

those who have already suffered.

35.  In this context, the provision in the Rule that "[t]he existence of laws or government policies that are unenforced or infrequently enforced do not, by themselves (sic), constitute persecution, unless there is credible evidence that those laws or policies have been or would be applied to an applicant personally"[41] is likely to result in non-compliance with US duties under Art. 1 of the Convention.  The existence of relevant laws or policies is not, of course, most accurately characterized as relevant to whether the harm feared amounts to persecution; such laws or policies are instead factors that speak mainly to the existence (or absence) of an evidentiary basis for the claim (that is, to "well-founded fear").  It is true that laws or policies that truly "are unenforced" do not establish a serious possibility of whatever persecutory consequences might in theory ensue from enforcement of such laws or policies.  But it is inconsistent with international law to force decision-makers to ignore evidence of "infrequently enforced" laws in assessing whether, despite the absence of a routine practice, there is nonetheless a "reasonable possibility" of enforcement with persecutory consequences.[42]  Nor is there any legal justification to exempt from this evidentiary exclusion only applicants able to adduce "personal" evidence of enforcement; to the contrary, both international and US law sensibly recognize that the well-founded fear test may not be interpreted to require evidence of targeting or singling out for persecution.[43]

36.  A second and related concern arises from the Rule's stipulation that "[p]ersecution does not encompass the generalized harm that arises out of civil, criminal, or military strife in a country."[44] While nexus to a Convention ground must of course be established in these and all other types of claim, there is no international legal basis to exclude the clearly grave harms arising in war or similar situations from the scope of "persecution."  To the contrary, such risks commonly satisfy even the (inappropriately demanding) "extreme concept involving a severe level of harm that includes actions so severe that they constitute an exigent threat"[45] test set by the Rule itself (see para. 19 above).  It must therefore be presumed that this part of the Rule in substance seeks to import an unlawful singling out or targeting requirement (see para. 35 above) through the back door, giving rise to a failure to respect the well-founded fear requirement set by Art. 1 of the Convention.

37.  A third way in which the Rule introduces inconsistency with the well-founded fear requirement set by Art. 1 of the Convention is its opaque stipulation that "evidence promoting cultural stereotypes of countries or individuals, including stereotypes based on race, religion, nationality, and gender, to the extent those stereotypes are offered in support of an alien's claim," is

---

[41]  85 Fed. Reg. 80,395.

[42]  *See* Hathaway and Foster, *Refugee Status*, at 128-130.

[43]  *See id.* at 174-176; and 8 C.F.R. §208.13(b)(2)(iii).

[44]  85 Fed. Reg. 80,395.

[45]  85 Fed. Reg. 80,386.

barred from consideration.[46]  To the extent that the "stereotype" is based on an unjustifiable impression or attitude it would of course not meet the long-settled international and domestic legal rules that the only evidence admissible to show a well-founded fear is evidence that is credible.[47] But if the "stereotype" is factually grounded it may be determined by the decision-maker to be credible and hence relevant to the assessment of well-founded fear.  There is no international legal authority to justify circumscribing the intentionally broad ambit of country of origin information that may inform the assessment of a well-founded fear.

38.  <u>Nationality</u>: In providing that "status as an alien returning from the United States"[48] is not to be treated as membership of a particular social group, the Rule erroneously casts doubt on the legal viability of claims to refugee status based on actual or perceived foreignness.  For example, European Union law recognizes, "the concept of nationality shall not be confined to citizenship or lack thereof but shall, in particular, include membership of a group determined by [*inter alia*]... its relationship with the population of another State."[49]

39.  <u>Political opinion</u>:  At international law, a political opinion is an opinion about the nature, policies, or practices of a state or of an entity that has the capacity, legitimately or otherwise, to exercise societal power or authority.[50]  The Rule misconstrues the international legal meaning of risk for reasons of "political opinion" in several respects.

40.  First, the Rule deviates from the intentionally broad meaning of "political opinion" by limiting it to "an ideal or conviction in support of the furtherance of a discrete cause related to political control of a State or a unit thereof."[51]  There is no basis whatsoever in international law for a "discrete cause" qualifier; broadly framed views such as being "pro-democracy" or "against tyranny" are inherently political opinions.  Nor is there any basis to deem an opinion not to be "political" simply because it does not speak to "control of a state or a unit thereof."  To the contrary, practice across state parties routinely recognizes political opinion claims that are more generally framed in terms of how power is distributed and exercised in a particular society – for example, advocating for human rights or opposing the unfair distribution of food or other

---

[46]  85 Fed. Reg. 80,281.

[47]  *See generally* Hathaway and Foster, *Refugee Status*, at 118-122.

[48]  85 Fed. Reg. 80,385.

[49]  EU Qualification Directive, Art. 10(1)(c).

[50]  *See generally* Hathaway and Foster, *Refugee Status*, at 405-407; and Seventh Colloquium Participants, "The Michigan Guidelines on Risk for Reasons of Political Opinion," 37 Mich. J. Int'l. L. 234, 236 (2016) 37 Mich. J. Int'l L. 234, at para. 8.

[51]  85 Fed. Reg. 80,385.

essentials.[52]

41.  Second, the Rule presumptively excludes from the scope of "political opinion" risks that arise from "generalized disapproval of, disagreement with, or opposition to criminal, terrorist, gang, guerilla, or other non-state organizations."[53]  Given the immense political power frequently wielded by such groups, this provision is inconsistent with even the Rule's own cribbed understanding of political opinion as encompassing risks based on views about "control of a state or a unit thereof" (see para. 40 above).  More fundamentally, this exclusion flies in the face of both the ordinary meaning of "political opinion" (see paras. 39-40 above) and the intention of the drafters of the Convention to embrace under the political opinion rubric "individuals victims of campaigns of persecution arising out of political upheaval."[54]

42.  Third, the Rule's only exception to the unlawful exclusion of political opinions involving disagreement with non-state actors is itself unlawful.  Specifically, the Rule deviates from the clear language of the Convention refugee definition – which speaks of risk for reasons of political "opinion," not political "actions" – by providing that this subset of political opinion claims is "cognizable" only if there is "expressive behavior in furtherance of a cause."[55]  To the contrary, there is no such requirement at international law, with claims to be recognized where the simple holding of the opinion engenders the risk of being persecuted.[56]  Indeed, the long-standing recognition in the United States and abroad of claims based on *imputed* (rather than actual) political opinions makes clear that refugees need not intend to further a cause in order to be at risk for reasons of political opinion.[57]

43.  <u>Membership of a particular social group:</u> There is no authority under international law to deem a group defined by an innate or immutable characteristic to fall outside the scope of a "particular social group."  To the contrary, all such groups – based on the *ejusdem generis* principle first adumbrated in US asylum law and subsequently embraced by other state parties[58] – are within the scope of this Convention nexus ground. The Rule's codification of the view taken in recent decisions of the Board of Immigration Appeals and some courts that otherwise qualifying particular social groups may be excluded on the basis of super-added notions of "defined with particularity" and "socially distinct in the society in question" thus breaches the duty to recognize as refugees all

---

[52]  *See* Hathaway and Foster, *Refugee Status*, at 413-415.

[53]  85 Fed. Reg. 80,385.

[54]  UN Doc. E/AC.7/SR.173 (Aug. 12, 1950), at 5, per Mr. Henkin of the United States.

[55]  85 Fed. Reg. 80,385.

[56]  *See* Hathaway and Foster, *Refugee Status*, at 407-409.

[57]  *See id.* at 409-413.

[58]  *See* Hathaway and Foster, *Refugee Status*, at 423-436.

persons entitled to such recognition at international law.  Indeed, the Rule not only codifies this jurisprudential error, but builds on it to impose additional and specific unjustified exclusions from the ambit of "membership of a particular social group."

44.  First, in a truly ironic twist, the Rule bars the granting of protection on particular social group grounds to some persons at risk because of their perceived social class ("perceptions of wealth or affluence"[59]) – generally agreed to be precisely the kind of particular social group that led the Convention's drafters to add the fifth "membership of a particular social group" category to the Art. 1 enumeration of grounds.[60]

45.  Second, the Rule unlawfully excludes particular social groups based on "past or present criminal activity or association,"[61] even though groups defined by one's past are clearly defined by an immutable characteristic (and indeed even though the group of former criminals can both be "defined with particularity" and is in many countries "socially distinct").  The Rule even excludes particular social groups defined by "being the subject of a recruitment effort by criminal, terrorist, or persecutory groups."[62]  These exclusions from the particular social group definition are not only legally unwarranted, but are socially dangerous deterrents for individuals to aid law enforcement by disengaging from,  informing on, or opposing such groups.  Nor can this intrusion on the internationally agreed scope of the particular social group ground be seen as warranted as a means to deny protection to persons who are themselves serious criminals, since such persons are already subject to exclusion where the requirements of Art. 1(F) of the Convention[63] are satisfied.

46.  Third and most egregious, the Rule purports generally to eliminate "gender" as a cognizable form of particular social group.[64]   The rationalization for this move suggested by the explanatory note in the proposed Rule[65] (though omitted from the final Rule) is the fact that groups defined by

---

[59]  85 Fed. Reg. 80,386.

[60]  *See* Hathaway and Foster, *Refugee Status*, at 452-454.  As observed by the Supreme Court of Canada, the drafters were especially concerned about persecution that "was imposed upon the capitalists not because of their contemporaneous activities but because of their past status as ascribed to them by the Communist leaders."  *Ward v. Canada*, [1993] 2 SCR 689 (Can. SC, 1993), at 729.

[61]  85 Fed. Reg. 80,394.

[62]  *Id.*

[63]  *See* Hathaway and Foster, *Refugee Status*, at 537-586.

[64]  *See* 85 Fed. Reg. 80,395 (providing that, in general, claims of persecution based on, *inter alia*, gender, will not be favorably adjudicated).

[65]  85 Fed. Reg. 36,281 (proposed Rule), citing *Niang v. Gonzales*, 422 F.3d 1187, 1199-1200 (10th Cir. 2005) for the view that "[o]ne may be reluctant to permit, for example, half a

gender are not small and could require the recognition of refugee status in relation to a large number of women. This reasoning is flawed in two key ways. First and most fundamentally, mere membership of the particular social group does not make one a refugee, but must rather co-exist with a relevant well-founded fear of being persecuted. Second and in any event, all Convention grounds (in particular, race, religion, and nationality) that form part of a common class with membership of a particular social group are also large. This is so because the Convention's drafters intended to limit refugee status to persons at risk for socially significant reasons reflected in non-discrimination principles[66] – a notion that clearly embraces claims based on gender. As Justice Kirby of the High Court of Australia observed in a leading case that recognized gender as defining a particular social group,

> The Minister conceded in argument that the number of persons potentially involved in a "particular social group" would not itself put an applicant otherwise within the group outside the Convention definition. This must be correct. After all, there were six million Jews who were incontestably persecuted in countries under Nazi rule.[67]

47.  Exclusion: The Rule adds new and internationally unlawful grounds to deny refugee status to persons able to show a well-founded fear of being persecuted for a Convention ground. Under the mandatory and non-derogable (see para. 12 above) Art. 1 Convention definition of a refugee, however, the reasons for denying refugee status – whether because protection is no longer needed ("cessation") or because the individual does not deserve such status ("exclusion") – are comprehensively set out in Arts. 1(C)-(F). No state party may lawfully add to this list.[68]

48.  Each of the Rule's "three factors that adjudicators must consider when determining whether an applicant merits the relief of asylum as a matter of discretion"[69] fails to conform with the requirements of Art. 1(C)-(F) of the Convention. As such, a decision to withhold protection on any of these grounds is internationally unlawful.

49.  Two of the Rule's "specific factors" – "unlawful entry or unlawful attempted entry" and "use of fraudulent documents to enter the United States"[70] – are not only impermissible exclusion

---

nation's residents to obtain asylum on the ground that women are persecuted there."

[66]  See Hathaway and Foster, *Refugee Status*, at 390-391.

[67]  *Minister for Immigration and Multicultural Affairs v. Khawar*, (2002) 210 CLR 1 (Aus. HC, 1997), at 43.

[68]  The "cessation" clauses are analyzed in detail in Hathaway and Foster, *Refugee Status*, at 462-523; the "exclusion" clauses are addressed *id.* at 524-598.

[69]  85 Fed. Reg. 80,282.

[70]  *Id.*

grounds under Art. 1, but raise an issue of US non-compliance with the duty of non-penalization under Art. 31 of the Convention (discussed below at paras. 56-61).

50.   The third factor – authorizing exclusion for failure to seek asylum en route to the United States[71] – is also at odds with Art. 1.[72] A state party may lawfully share responsibility to protect with another state party, including a country through which a refugee has passed, but only where access to Convention rights is demonstrably provided there.[73]  But this principle simply provides state parties with an alternative means by which to ensure that refugees receive their rights rather than imposing an international legal duty on a refugee to seek protection in any particular country.[74] As such there is self-evidently no basis at international law to deny protection because asylum was not solicited elsewhere.

51.   In addition to the three mandatory discretionary factors, the Rule enumerates a further nine factors which, if applicable, normally require that asylum not be granted: stay of more than 14 days in a country that provides asylum, transit through more than one country, reversal or modification of a conviction falling short of an acquittal, more than one year unlawful presence in the US, outstanding US tax liability, denial of two or more prior asylum claims, withdrawal or abandonment of an asylum claim, failure without exceptional reasons to attend an asylum interview, and having been subject to a removal order that was not reopened.[75]  None of these additional grounds maps onto the requirements of Arts. 1(C)-(F) of the Convention, meaning that reliance on any of them to withhold protection is internationally unlawful; some also put the United States in breach of obligations under Art. 31 (see para. 61 below).

## VI.  THE RULE GIVES RISE TO NEW BREACHES OF THE RIGHTS OF REFUGEES

52.   Article 25:  As important as it is to insist that persons claiming to be refugees are both identified and provisionally treated as entitled to the protection of the Convention (see paras. 12-13 above), the practical reality is that refugees are often unable to enforce their rights without assistance.  Art. 25's "duty of administrative assistance" recognizes this fact, and requires each state party to conceive an administrative mechanism that enables all refugees (provisionally including

---

[71]  *Id.*

[72]  The only vaguely comparable provisions are Arts. 1(D) and 1(E) of the Convention, relating respectively to access to UN (other than UNHCR) protection or assistance, and access to protection as a *de facto* national of a country of former residence.  The requirements of neither are satisfied by mere passage through another country.

[73]  *See* Hathaway and Foster, *Refugee Status*, at 30-49.

[74]  *See* UNHCR Executive Committee Conclusions on International Protection Nos. 15 (1979) and 58 (1989).

[75]  85 Fed. Reg. 80,282.

persons claiming refugee status[76]) in its territory to be recognized as refugees able to exercise their Convention rights.  While the provision of relevant documentation is explicitly addressed by Art. 25(2), the precise means by which a state implements the more general duty to assist refugees to secure their rights in practice is not set out in the Convention.[77]

53.   Despite the absence in Art. 25 of a list of the precise steps that are to be taken to assist refugees, the fact that the Rule moves in the opposite direction – withdrawing or limiting the assistance traditionally available – is clearly at odds with the object and purpose of Art. 25.  Two specific forms of retrogression make clear the Rule's inconsistency with the affirmative mandate of Art. 25.

54.   First, the Rule's new "pretermission" procedure allows a judge to deny protection without even conducting an interview if she or he is of the view that the applicant "has not established a prima facie case for relief or protection under applicable law."[78]  Particularly because this authority applies even to those who have no legal or other assistance to frame their claim, there is a very serious risk that the United States will reject persons who could in a proper hearing establish their refugee status.  The Rule's truncation of procedures is thus clearly at odds with Art. 25's goal of ensuring that refugees are assisted to claim their rights.  Importantly, even the governments (including the US government) which are members of the UNHCR's Executive Committee (EXCOM) have never countenanced such an egregious departure from basic procedural fairness. The only claims which EXCOM authorizes states summarily to reject are those adjudged "manifestly unfounded" – that is, "those which are clearly fraudulent or not related to the criteria for the granting of refugee status."[79]  The Rule's pretermission procedure, in contrast, seems to allow a judge to refuse protection on the basis of a perceived insufficiency of evidence which has never been heard.[80]

---

[76]   The text of Art. 25 grants "refugees" without qualification the right to a state's administrative assistance. *See also* E. Lester, "Article 25," in A. Zimmermann ed., *The 1951 Convention Relating to the Status of Refugees and its 1967 Protocol: A Commentary* 1129 (2011), at 1137 ("Given that refugee status is a declaratory status, the provision may also be taken to apply to asylum seekers entering or seeking to enter a refugee status determination procedure and to prima facie refugees in situations of mass influx").

[77]   *See generally* Hathaway, *Refugee Rights*, at 635-642.

[78]   85 Fed. Reg. 80,397.

[79]   UNHCR Executive Committee Conclusion No. 30, "The Problem of Manifestly Unfounded or Abusive Applications for Refugee Status or Asylum" (1983), at para.(d).  *See generally* Hathaway, *Refugee Rights*, at 159-160.

[80]   "... [A]n immigration judge shall, if warranted by the record, pretermit and deny any application... if the alien has not established a prima facie case for relief or protection under applicable law.  An immigration judge need not conduct a hearing prior to pretermitting and denying an application under this paragraph (e)(1) but must consider any response to the motion

55.  Second, the Rule arbitrarily imposes on applicants – whether legally represented or not – the duty accurately to frame the precise contours of any claim based on membership of a particular social group.  By providing that anyone who fails to do so at the immigration judge stage "waive[s] any such claims for all purposes under the Act, including on appeal,"[81] the Rule *penalizes* applicants for failing to anticipate the legal framing of the group that will find traction with a given decision-maker – the opposite of *assisting* refugees to vindicate their entitlements.  In truth, as a matter of international refugee law it is the duty of each state party to recognize refugee status where warranted on the facts and law, whether the claim was perfectly framed or otherwise.  As succinctly observed by the Supreme Court of Canada,

> It is not the duty of a claimant to identify the reasons for the persecution.  It is for the examiner to decide whether the Convention definition is met.[82]

56.  Art. 31: States do not normally provide visas to individuals allowing them lawfully to cross borders in order to claim protection as refugees, meaning that most refugees of necessity arrive unlawfully – either because they disguise their true motives for entry in order to secure some non-refugee visa or other authorization or because they arrive without legal authorization of any kind.  As noted by the Constitutional Court of South Africa,

> Asylum seekers do not arrive only where they should, nor do they always have the opportunities and agency to claim what they should.  This, both international refugee law and international human rights law recognize.[83]

57.  Specifically, so long as the individual comes forward in good faith and explains the reasons that his or her quest for protection led to breach of immigration or other laws,[84] Art. 31 of the Convention prohibits the imposition of "penalties, on account of their illegal entry or presence" on such refugee claimants.  As framed in the English High Court, "[s]elf-evidently, [the purpose of Art. 31] was to provide immunity for genuine refugees whose quest for asylum reasonably

---

before making a decision."  85 Fed. Reg. 80,397.

[81]  85 Fed. Reg. 80,385.

[82]  *Ward v. Canada*, [1993] 2 SCR 689 (Can. SC, 1993), at 745.  Similarly, the Full Federal Court of Australia has correctly noted that "the scope [of the decision-maker's]... task is not limited by the case articulated by an applicant.  The Tribunal must look at all the evidence and material that it has not rejected and give consideration to a case which it might reasonably raise, notwithstanding that such a case might not have been contended for by the applicant": *W396/01 v. Minister for Immigration and Multicultural Affairs*, (2002) 68 ALD 69 (Aus. FFC, 2002), at para. 35.

[83]  *Alex Ruta v. Minister of Home Affairs*, [2018] ZACC 52 (SA CC, 2018), at para. 50.

[84]  *See generally* Hathaway, *Refugee Rights*, at 388-412.

involved them in breaching the law."[85]  This exemption from penalization inheres in any refugee claimant who meets two requirements.

58.  First, it requires good faith on the part of refugees: they must "present themselves without delay to the authorities," giving rise to a duty to come forward in a timely way and submit to the asylum state's procedure for regularization of status.[86]  As noted by the Supreme Court of Norway,

> The protection objective behind Article 31... indicates [the need for] a more concrete assessment of what constitutes "without delay" in each individual case.  In this assessment, one must take into account not only the refugee's circumstances, objectively speaking, but also how the refugee, given his or her capacities and background, had reason to perceive such circumstances...[87]

59.  The second and more complex requirement is that the refugee must be "coming directly from a territory where their life or freedom was threatened in the sense of Article 1" and "show good cause for their illegal entry or presence."  While these clauses have traditionally been analyzed separately, it is increasingly recognized that the two notions are deeply intertwined and hence most sensibly treated as setting a single requirement: that exemption from penalties is a function of whether the refugee is reasonably seen to have breached ordinary immigration rules because of the urgency of flight.[88]  Importantly, the requirement that refugees be "coming directly" was included to exclude only those who had "found asylum"[89] –  that is, those who had chosen to give up a secure (even if not permanent) home[90] – not those who had failed to seek protection.

---

[85]  *R v. Uxbridge Magistrates Court, ex parte Adimi*, [1999] 4 All ER 520 (Eng. HC, 1999), per Simon Brown LJ at 527.

[86]  *See* Hathaway, *Refugee Rights*, at 390-392.

[87]  *A v. Public Prosecuting Authority*, Case No. 2014/220, HR-2014-01323-A, (Nor. SC, 2014), at para. 14.

[88]  These requirements are analyzed in Hathaway, *Refugee Rights*, at 392-402.

[89]  "In order to illustrate his own point, [the French representative] would give a concrete example – that of a refugee who, having found asylum in France, tried to make his way unlawfully into Belgium. It was obviously impossible for the Belgian government to acquiesce in that illegal entry, since the life and liberty of the refugee would be in no way in danger at the time": Statement of Mr. Colemar of France, UN Doc. A/CONF.2/SR.13, July 10, 1951, at 14–15.

[90]  "The delegates were particularly preoccupied with secondary movements of refugees once they reached safety":  G. Noll, "Article 31," in A. Zimmermann ed., The 1951 Convention Relating to the Status of Refugees and its 1967 Protocol: A Commentary 1243 (2011), at 1249.  On the other hand, the Irish Court of Appeal sensibly determined that "... a sojourn of eighteen months (such as occurred in the present case) in another safe country such as the United Kingdom is an entirely different matter":  *MIF v. International Protection Appeals Tribunal*, [2018] IECA 36 (Ir.

60.  Taking into account the meaning of a "penalty" as a "loss, disability, or disadvantage" inflicted for breach of a law or rule,[91] Art. 31 denies governments the right to subject qualifying refugees to any detriment for reasons of their unauthorized entry or presence in the asylum country.[92]

61.  The Rule, in contrast, imposes serious procedural penalties on refugees for their unauthorized entry or presence.  Specifically, it establishes several "significant adverse discretionary factors that a decision-maker shall consider... in determining whether an alien merits a grant of asylum" including "unlawful entry or unlawful attempted entry into the United States"; "use of fraudulent documents to enter the United States"; spending "more than 14 days in any one country"; and "transit[] through more than one country."[93]  While each of these penalties is subject to some constraints, the Rule's caveats do not map onto the requirements of Art. 31 – for example, while persons "in immediate flight from persecution in a contiguous country" are exempted from the penalty for unlawful entry, neither "immediate" flight nor flight from a "contiguous country" features in the requirements to benefit from Art. 31 protection (see paras. 58-59 above).

62.  <u>Article 33</u>: The core duty of *non-refoulement* requires state parties to the Convention and Protocol not to "expel or return a refugee in any manner whatsoever" to any place in which the refugee faces the risk of being persecuted.  As a matter of international law, Art. 33 protection inheres in all persons who are in fact Convention refugees as defined by Art. 1, and applies as soon as such persons come under the effective jurisdiction of a state party.[94]  The Art. 33 duty moreover binds the United States not simply itself to avoid the return of a refugee directly to the place of persecution, but to ensure that such return does not occur "in any manner whatsoever" – including, for example, by return to an intermediate non-persecutory state from which there is the foreseeable

---

CA, 2018), at para. 26.

[91]  Oxford English Dictionary (2nd ed., 1989), Vol. XIII, at 461.

[92]   A broad reading of the notion of a "penalty" in Art. 31 is moreover consistent with the approach of the UN Human Rights Committee, which has determined that "[w]hether the word 'penalty' … should be interpreted narrowly or widely, and whether it applies to different kinds of penalties, 'criminal' and 'administrative,' … must depend on other factors. Apart from the text … regard must be had, inter alia, to its object and purpose": *Van Duzen v. Canada*, HRC Comm. No. 50/1979, UN Doc. CCPR/C/15/D/50/1979, decided Apr. 7, 1982, at para. 10.2.  The Committee has since affirmed this basic understanding of a "penalty," noting in particular that the "terms and concepts in the Covenant are independent of any national legal system and that... [they have] an autonomous meaning": *Sayadi and Vinck v. Belgium*, HRC Comm. No. 1472/2006, UN Doc. CCPR/C/94/D/1472/2006, decided Oct 22, 2008, at para. 10.11.

[93]  85 Fed. Reg. 80,377.

[94]  *See* Hathaway, *Refugee Rights*, at 302-307.

risk of forcible return to the place of persecution.[95]  This clear prohibition of indirect *refoulement* has been neatly explained by the House of Lords:

> Suppose it is well-known that country A, although a signatory to the Convention, regularly sends back to its totalitarian and oppressive neighbour, country B, those opponents of the regime in country B who are apprehended in country A following the escape across the border. Against that background, if a person arriving in [a state party] from country A sought asylum as a refugee from country B, assuming he could establish his well-founded fear of persecution there, it would, it seems to me, be as much a breach of Article 33 of the Convention to return him to country A as to country B. The one course would effect indirectly, the other directly, the prohibited result, i.e. his return "to the frontiers of territories where his life or freedom would be threatened."[96]

63.  Art. 33 may be infringed by "any measure, whether judicial or administrative, which secures the departure of an alien."[97]  Implementation of procedures established by the Rule, in particular the subjection of refugees to a new "pretermission" procedure (see para. 54 above), the arbitrary imposition on applicants the duty accurately to frame the precise contours of any claim based on membership of a particular social group (see para. 55 above), and the internationally unlawful exercise of "discretion" to deny protection on the basis of transit and related issues (see para. 61 above) will infringe Art. 33 of the Convention in this fashion.

64.  Art. 33 may also be breached by the failure properly to recognize refugee status, knowing that such a refusal leaves the refugee exposed to removal on general immigration grounds.[98]  The Rule

---

[95]  The relevant issue was said to be the foreseeability of the ultimate consequences of the initial expulsion. Statement of Mr. Larsen of Denmark, UN Doc. A/CONF.2/SR.16, July 11, 1951, at 9–10.

[96]  *R v. Secretary of State for the Home Department, ex parte Bugdaycay*, [1987] AC 514 (UK HL, 1987), per Lord Bridge of Harwich at 532D. This approach has been affirmed in *R v. Secretary of State for the Home Department, ex parte Yogathas*, [2002] UKHL 36 (UK HL, 2002).

[97]  G. Goodwin-Gill, *The Refugee in International Law* (1996) at 122, adopted in *Re S*, [2002] EWCA Civ 843 (Eng. CA, 2002).  The same language is contained in G. Goodwin-Gill and J. McAdam, *The Refugee in International Law* (2007), at 206.

[98]  *See eg.* UNHCR Executive Committee Conclusion No. 6, "Non-Refoulement" (1977), at [(c)]: "The Executive Committee … [r]eaffirms the fundamental importance of the observance of the principle of *non-refoulement* … of persons who may be subjected to persecution if returned to their country of origin irrespective of whether or not they have been formally recognized as refugees." *See also* UNHCR Executive Committee Conclusions Nos. 79, "General Conclusion on International Protection" (1996), at [(j)] and 81, "General Conclusion on International Protection" (1997), at [(I)], insisting that the duty of *non-refoulement* inheres "whether or not they have been formally granted refugee status."

gives rise to *refoulement* of this kind in two distinct ways.  First, it *exacerbates pre-existing failures* properly to identify Convention refugees, specifically as regards the notions of persecution, nexus, internal relocation, and firm resettlement (see paras. 18-31 above).  And second, the Rule gives rise to several *new breaches* of the duty to recognize the refugee status of any person who meets the standard set by the Convention by adding additional unlawful restrictions on the scope of Art. 1 as regards the notions of well-founded fear, nationality, political opinion, membership of a particular social group, and exclusion from refugee status (see paras. 32-51 above).

## VII.  THE RULE VIOLATES OBLIGATIONS OF THE UNITED STATES UNDER THE REFUGEE PROTOCOL

65.  Multiple specific provisions of the Rule contravene obligations assumed by the United States under the United Nations Protocol relating to the Status of Refugees.  The sheer breadth of the Rule's disregard for international legal duties – mandating non-compliance with nine distinct aspects of the mandatory Art. 1 Convention refugee definition and breach of three foundational refugee rights – is in my experience without precedent.

Respectfully submitted,

*James Hathaway*

**LIST OF ATTACHMENTS**

1. Curriculum Vitae of James C. Hathaway

# ATTACHMENT 1

### Curriculum Vitae:  James Curtis Hathaway

**University of Michigan Law School**
**625 S. State Street**
**Ann Arbor, Mich. 48103**
**Telephone:  (734) 764-2359**
**Electronic Mail Address: jch@umich.edu**

**CAREER**

University of Michigan Law School:  1998-present: James E. and Sarah A. Degan Professor of Law and founding Director, Program in Refugee and Asylum Law.  Research and teaching interests in the fields of international refugee law, international human rights law, and public international law.

University of Amsterdam:  2010-present: Distinguished Visiting Professor of International Refugee Law.

University of Tokyo: 2016, 2002:  Visiting Professor, Faculty of Law.

Stanford University:  2013-2014:  Visiting Professor, Center for International Security and Cooperation.  Co-Chair, Stanford Working Group on Responding to Refugees.

University of San Francisco:  2013-2014:  Visiting Distinguished Scholar.

University of Toronto:  2010-2011: Distinguished Visiting Professor of Law

Universidad Internacional Menéndez Pelayo:  2005-2010: President, Cuenca Colloquium on International Refugee Law.

University of Melbourne:  2008-2010: Dean of Law and William Hearn Professor, Melbourne Law School; 2010-2015:  Professorial Fellow; 2011, 2007: Senior Fellow, Faculty of Law.

Università degli Studi di Macerata:  2007: Visiting Professor, Facoltà di Giurisprudenza e di Scienze Politiche.

American University in Cairo:  2004: Distinguished Visiting Professor, School of Humanities and Social Sciences and Forced Migration and Refugee Studies Program.

Osgoode Hall Law School of York University: l984-1998: Professor of Law  (l996-1998) and Co-Director of the Osgoode Hall Intensive Program in Immigration and Refugee Law (1990-1998). Formerly Associate Professor of Law (l988-l996) and Assistant Professor of Law (1984-1988).  Walter L. Gordon Research Professor, York University (1994-1995).   Founding Director, Refugee Law Research Unit, York University Centre for Refugee Studies (l988-l996).  Associate Dean of Law (l989-l99l).  Director of Clinical Education (l984-l989).

Hastings College of the Law, University of California: 1996-1997: Visiting Fromm Professor of International and Comparative Law.

Boalt Hall School of Law, University of California:  1991-1992:  Fulbright Senior Scholar.

Department of Justice, Government of Canada:  1983-1984:  Consultant on Special Legal Assistance for the Disadvantaged.  Designed and performed evaluations of departmental programs intended to improve access to the justice system for indigenous peoples.

Université de Moncton:  1980-1983:  Professeur adjoint de droit.  Offered courses in the fields of poverty law, law reform, consumer law, and oral advocacy.  Established and directed a multidisciplinary community clinical education program for the law, social work, and psychology faculties.

Fasken & Calvin, Barristers and Solicitors (Toronto):  1979-1980:  Completed articles of clerkship.

**EDUCATION**

Columbia University:  1981-1982:  Doctorate in Law (J.S.D.) and Master of Laws (LL.M.).  W.B. Cutting Fellow in International Law; Mackenzie King Traveling Scholar; Doctoral Fellow, Social Sciences and Humanities Research Council of Canada.

Osgoode Hall Law School of York University:  1976-1979:  Bachelor of Laws (LL.B.)  (Honors).  John Delatre Falconbridge Memorial Entrance Scholar.

McGill University:  1974-1976:  Two years study in Honors International Political Economy.  J.W. McConnell Memorial Scholar; Alexander Mackenzie Scholar in Political Science.

**HONORS**

Universiteit van Amsterdam:  2017: Doctorate, *honoris causa*.

Université catholique de Louvain:  2009: Doctorate of Laws, *honoris causa.*

**BOOKS**

The Michigan Guidelines on the International Protection of Refugees (edited collection): University of Michigan Press, 2020.

The Law of Refugee Status:  2nd Edition (with M. Foster):  Cambridge University Press, 2014.  Reviews: (2015) 109(4) American Journal of International Law 908-917 (Maryellen Fullerton); (2015) 33 Australian Year Book of International Law 180-182 (Radha Govil and Alexandra McDowal); (2015) 93 Canadian Bar Review 567-569 (Angus Grant); (2015) 14(3) Chinese Journal of International Law 649-651 (Benoit Mayer); (2015) 2 European Journal of Comparative Law and Governance 269-275 (Tom DeBoer); (2015) 26(2) European Journal of International Law 564-567 (Rosemary Byrne); (June 2015) Free Movement (Mark Symes); (2017) 39(1) Human Rights Quarterly 220-226 (Audrey Macklin); (2015) 27(2) International Journal of Refugee Law 348-360 (Hugo Storey); (2017) 30(4) Journal of Refugee Studies 638-640 (Robert Barsky); (2015) 31(2) Refuge (Douglas Cannon); [2015] Zeitschrift für Ausländerrecht (Harald Dörig).

Human Rights and Refugee Law (edited collection):  Edward Elgar Publishing Ltd.,2013.  Review: (2015) 27(2) International Journal of Refugee Law 396-403 (Satvinder Juss).

Transnational Law:  Cases and Materials (with T. Dickinson, M. Reimann, and J. Samuels):  West Academic Publishing, 2013.

The Rights of Refugees under International Law:  Cambridge University Press, 2005.  Winner, American Society of International Law Certificate of Merit, 2007.  Translated and republished in Japanese (2014, abridged version) and Chinese (2017, abridged version).  Reviews: (2008) 102

American Journal of International Law206-211 (Pene Mathew); (2006) 12 Auckland University Law Review 220-221 (David Dickinson); (2006) 27 Australian Bar Review 251 (Geoff Lindsay); (2006) 37 Cambrian Law Review 123-124 (Dina Hadad); (2005) 43 Canadian Yearbook of International Law 673-675 (Krista Daly); [2006] 1 European Human Rights Law Review 99 (Nicola Rogers); (2006) 8 European Journal of Migration and Law (Catriona Jarvis); (2007) 7(2) Human Rights Law Review 433-435 (Catherine Phuong); (2007) 8(4) International Journal of Discrimination and the Law 295-296; (2006) 18 International Journal of Refugee Law 722-725 (Kay Hailbronner); (2006) 13 International Journal on Minority and Groups Rights 99-112 (Marjoleine Zieck); [Aug. 2006] Law Society Journal 98 (Nicholas McNally); (2007) 24(1) Refuge 145 (Lorne Waldman);  (2005) 26 Refugee Reports 11-13 (Merrill Smith); (2007) 2 Revue critique de droit international privé 481-485 (Jean-Yves Carlier); (2006) 37(4) Victoria University of Wellington Law Review 643-645 (Helen Sims).

Reconceiving International Refugee Law:  Kluwer Law International, 1997.  Reviews: (1998) 92(4) American Journal of International Law 785-788 (Walter Brill); (1998) 47 International and Comparative Law Quarterly 729-731 (Michael Byers); (1999) 12(1) Journal of Refugee Studies 91-73 (Khalid Koser); (1998) 23(1) Yale Journal of International Law 604-606 (Ralph Wilde).  Response Essays:  Deborah Anker, Joan Fitzpatrick, and Andrew Shacknove, "Crisis and Cure: A Reply to Hathaway/Neve and Schuck," (1998) 11 Harvard Human Rights Journal 295-310; Satvinder Juss, "Toward a Morally Legitimate Reform of Refugee Law: The Uses of Cultural Jurisprudence," (1998) 11 Harvard Human Rights Journal 311-354; Jim Rice, "International Refugee Law: Misconceiving Reconceptions," (1998) 17(4) Refuge 38-45; Colin Harvey, "Talking About Refugee Law," (1990) 12(2) Journal of Refugee Studies 101-134.

The Law of Refugee Status:  Butterworths and Co., 1991.  Translated and republished in Japanese (2008) and Russian (2008).  Reviews: (1993) 87(2) American Journal of International Law 348-351 (David Martin); (1992) 71 Canadian Bar Review 408-412 (Davies Bagambiire); (1993) 25 Canadian Ethnic Studies 110-111 (Diane Pask); (1992) l4(l) Human Rights Quarterly l45-l46 (Mark Gibney); (1994) 8(2) Immigration and Nationality Law and Practice 34-35 (Maryan Samimi); (l992) 7.1 Interights Bulletin 20 (Stefanie Grant); (l99l) 3(4) International Journal of Refugee Law 802-803 (Andrew Schoenholtz); (l992) International Migration Review l0l4-l0l5 (Daniel Turack); (l99l) 4(3) Journal of Refugee Studies 29l-293 (Andrew Shacknove); (l992) 37(l) McGill Law Journal 3l7-324 (François Crépeau); (l99l) 2 Mas Alla Del Derecho l25-l28 (Robert Volterra); (1991) 23(2) Ottawa Law Review 717-719 (Warren Creates); (l99l) l0(3) Refugee Abstracts 72-74 (Gervase Coles).

**MONOGRAPHS**   Interpretation of the Definition of 'Refugee' under Art. 1(A)(2) of the Convention relating to the Status of Refugees, with a view to the elaboration of a Community instrument to guide the application of the Refugee Convention pursuant to Art. 63(1)(c) of the Treaty of the European Communities: European Commission, 2001 (67 pages).

Refugee Rights: Report on a Comparative Survey (with J. Dent): York Lanes Press, 1995 (82 pages).

Toward a Contextualized  System of Family Class Immigration: Government of Canada and the Centre for Refugee Studies, 1994 (two volumes, 42 pages).

Rebuilding Trust: Report of the Review of Fundamental Justice in Information Gathering and Dissemination at the Immigration and Refugee Board: Government of Canada, 1994 (88 pages).

Legal Aid in New Brunswick:  An Empirical Evaluation (with J. Richardson):  Government of Canada, 1983 (285 pages).

**ARTICLES**     Foreword, in M. Vera-Espinoiza et al eds., *Latin America and Refugee Protection: Regimes, Logics, and Challenges* (forthcoming).

"The Architecture of the UN Refugee Convention and Protocol," in C. Costello et al eds., *Oxford Handbook on International Refugee Law* (forthcoming).

"Assigning Protection: Can Refugee Rights and State Preferences be Reconciled?," (2019) 175(1) Journal of Institutional and Theoretical Economics 33-45.

"The Global Cop-Out on Refugees," (2018) 30(4) International Journal of Refugee Law 591-604.

"Review Essay: Alexander Betts and Paul Collier, *Refuge: Transforming a Broken Refugee System*," (2018) 30(1) International Journal of Refugee Law 173-178.

"Dialog About a New Asylum System," (with J. Shapendonk), (2018) 2 Asiel & Migrantenrecht 61-68.

"The Michigan Guidelines on Refugee Freedom of Movement," (2017) 39(1) Michigan Journal of International Law 1-4.

"Afterword," in B. Mayer ed., *Research Handbook on Climate Change, Migration and the Law* (2017) 467-470.

"What is the Meaning of State Protection in Refugee Law?: A Debate," (with H. Storey), (2016) 28(3) International Journal of Refugee Law 480-492.

"Should We Presume State Protection?" (with A. Macklin), (2016) 32(3) Refuge 49-53.

"A Global Solution to a Global Refugee Crisis," (2016) 1(1) European Papers 93-99.

"The Michigan Guidelines on Risk for Reasons of Political Opinion,"(2016) 37(2) Michigan Journal of International Law 229-241.

"*Non-Refoulement* in a World of Collective Deterrence" (with T. Gammeltoft-Hansen), (2015) 53(2) Columbia Journal of Transnational Law 235-284; republished in Chinese (2016) 16 Peking University International and Comparative Law Review.

"Prosecuting a Refugee for 'Smuggling' Himself," (2014) 15(81) Immigration and Citizenship Law eJournal.

"Food Deprivation:  A Basis for Refugee Status?," (2014) 81(2) Social Research International Quarterly 327-339.

"The Michigan Guidelines on the Exclusion of International Criminals," (2013) 35(1) Michigan Journal of International Law 1-13.

"Supervising the Refugee Convention" (with A. North and J. Pobjoy), (2013) 26(3) Journal of Refugee Studies 323-330.

"Refugees and Asylum," in B. Oppeskin, R. Perruchoud, and J. Redpath-Cross, *Foundations of International Migration Law* (Cambridge University Press, 2012), at 177-204.

"Queer Cases Make Bad Law" (with J. Pobjoy), (2011) 44(2) New York University Journal of International Law and Politics 315-388.

"EU Accountability to International Law:  The Case of Asylum," (2011) 33(1) Michigan Journal of International Law 1-8.

"Leveraging Asylum," (2010) 45(3) Texas International Law Journal 503-545.

"La protection contre l'arbitraire," (2009) 69(2) Annales de droit de Louvain 217-223.

"The Value of Year Books of International Law," (2008) 27 Australian Year Book of International Law i-ii.

"The Human Rights Quagmire of 'Human Trafficking,'" (2008) 49(1) Virginia Journal of International Law 1-49; republished in M. Segrave ed., *Human Trafficking* (2013).

"The Michigan Guidelines on Protection Elsewhere," (2007) 28(2) Michigan Journal of International Law 207-221.

"Forced Migration Studies: Could We Agree Just to 'Date'?," (2007) 20 Journal of Refugee Studies 349-369 and 385-390 (with response pieces authored by each of Roberta Cohen, Howard Adelman/Susan McGrath, and Josh DeWind).

"Refugee Solutions, or Solutions to Refugeehood?," (2007) 24 Refuge 3-10.

"Why Refugee Law Still Matters," (2007) 8 Melbourne Journal of International Law 89-103.

"Are Trafficked Persons Convention Refugees?," in International Association of Refugee Law Judges, *Forced Migration and the Advancement of International Protection* (2006), at 97-102.

"The False Panacea of Offshore Deterrence," (2006) 28 Forced Migration Review 56-57.

"Is There a 'Subjective Element' in the Refugee Convention's Requirement of 'Well-Founded Fear'?" (with W. Hicks), (2004) 26(2) Michigan Journal of International Law 505-562.

"The Michigan Guidelines on Well-Founded Fear," (2004) 26(2) Michigan Journal of International Law 491-503.

"The Right of States to Repatriate Former Refugees," (2004) 20(1) Ohio State Journal on Dispute Resolution 175-216; reprinted in (2006) 26 Immigration and Nationality Law Review.

"Review Essay: N. Nathwani, *Rethinking Refugee Law*," (2004) 98(3) American Journal of International Law 616-622.

"A Forum for the Transnational Development of Refugee Law: The IARLJ's Advanced Refugee Law Workshop," (2003) 15(3) International Journal of Refugee Law 418-421.

"Claims to Refugee Status Based on Voluntary but Protected Actions" (with R. Haines and M. Foster), (2003) 15(3) International Journal of Refugee Law 430-443.

"The Role of State Protection in Refugee Analysis" (with P. Mathew and M. Foster), (2003) 15(3) International Journal of Refugee Law 444-460.

"The Causal Connection ("Nexus") to a Convention Ground" (with M. Foster), (2003) 15(3) International Journal of Refugee Law 461-476.

"Membership of a Particular Social Group" (with M. Foster), (2003) 15(3) International Journal of

Refugee Law 477-491.

"Internal Protection/Relocation/Flight Alternative as an Aspect of Refugee Status Determination" (with M. Foster), in E. Feller et al eds., *Refugee Protection in International Law* 353-420 (2003); republished as "La possibilité de protection interne / réinstallation interne / fuite interne comme aspect de la procédure de determination du statut de réfugié" in E. Feller et al eds., *La protection des réfugiés en droit international* 403-473 (2008).

"What's in a Label?," (2003) 5 European Journal of Migration and Law 1-21.

"The Michigan Guidelines on Nexus to a Convention Ground," (2002) 23(2) *Michigan Journal of International Law* 207-221.

"Who Should Watch Over Refugee Law?," (2002) 14 Forced Migration Review 23-26; reprinted in International Association of Refugee Law Judges, *Stemming the Tide or Keeping the Balance – The Role of the Judiciary* 393-400 (2002).

"Refugee Law is Not Immigration Law," (2002) *Proceedings of the Canadian Council on International Law* 134-157, edited version reprinted in (2002) World Refugee Survey 38-45.

"Framing Refugee Law in the New World Disorder" (with C. Harvey), (2001) 34(2) Cornell International Law Journal 257-320; reprinted in (2002) 22 *Immigration and Nationality Law Review* 191-254.

"Why Supervise the Refugee Convention?", (2001) 3-5 Talk Back 12-13.

"Temporary Protection: Challenge or Solution?" in J. Handmaker, L. de la Hunt, and J. Klaaren eds., *Perspectives on Refugee Protection in South Africa* (2001).

"The Single Superpower and the Future of International Law," (2000) *Proceedings of the 94th Annual Meeting of the American Society of International Law* 67-69.

"The International Refugee Rights Regime," in (2000) 8(2) *Collected Courses of the Academy of European Law* 91-139.

"Refugee Rights Are Not Negotiable" (with A. Cusick), (2000) 14(2) Georgetown Immigration Law Journal 481-539.

"America, Defender of Democratic Legitimacy?," (2000) 11(1) European Journal of International Law 121-134.

"The Michigan Guidelines on the Internal Protection Alternative," (1999) 21(1) Michigan Journal of International Law 131-141.

"The Relationship Between Human Rights and Refugee Law: What Refugee Law Judges Can Contribute," in International Refugee Law Judges ed., *The Realities of Refugee Determination on the Eve of a New Millennium: The Role of the Judiciary* 80-90 (1999).

"Crisis in International Refugee Law," (1999) 39(1) Indian Journal of International Law 4-31.

"Making International Refugee Law Relevant Again:  A Proposal for Collectivized and Solution-Oriented Protection" (with A. Neve), (1997) 10 Harvard Human Rights Journal 115-211.

"The Meaning of Repatriation," (1997) 9(4) International Journal of Refugee Law 551-558; also

published in European University Institute ed., *Legal and Policy Issues Concerning Refugees from the Former Yugoslavia* 4-11 (1997).

"Fundamental Justice and the Deflection of Refugees from Canada" (with A. Neve), (1997) 34(2) Osgoode Hall Law Journal 213-270.

Review of R. Barsky, *Constructing a Productive Other*, (1996) International Migration Review.

"Is Refugee Status Really Elitist?  An Answer to the Ethical Challenge," in J.-Y. Carlier and D. Vanheule eds., *Europe and Refugees:  A Challenge?* 79-88 (1997).

"Can International Refugee Law Be Made Relevant Again?," [1996] World Refugee Survey 14-19.

"Refugee Claims Arising from Generalized Oppression," in G. Alfredsson and P. Macalister-Smith eds., *The Living Law of Nations* 61-67 (1996).

"The Need for a New Vision of International Refugee Law," in [1996] Canadian Council of International Law Proceedings 177-183.

"Toward the Reformulation of International Refugee Law," (1996) 15(1) Refuge 1-5.

"The Legal Condition of the Refugee" (with J. Dent), in K. Kerameus ed., *General Reports presented to the XIVth International Congress of Comparative Law* 653-695 (1995).

"New Directions to Avoid Hard Problems: The Distortion of the Palliative Role of Refugee Protection," (1995) 8(3) Journal of Refugee Studies 288-294; also published in Australian Council of Churches ed., *Proceedings of the Conference on Challenges to Refugee Protection, University of Sydney,* 1994 16-22 (1995).

"Root Causes as Refugee Protection: A Chimerical Promise?," in S. Perrakis ed., *Immigration  and European Union: Building on a Comprehensive Approach* 117-121 (1995).

"Three Critical Questions about the Study of Immigration Control," in W. Cornelius et al eds., *Controlling Immigration: A Global Perspective* 49-51 (1995).

"Preface to Symposium on the Human Rights of Refugees," (1994) 7(1) Journal of Refugee Studies 79-81.

Review of L.B. Sohn and T. Buergenthal eds., *The Movement of Persons Across Borders,* (1994) 88(3) American Journal of International Law 564-565.

"Harmonizing for Whom?  The Devaluation of Refugee Protection in the Era of European Economic Integration," (1993) 26(3) Cornell International Law Journal 719-735.

"Labelling the 'Boat People': The Failure of the Human Rights Mandate of the Comprehensive Plan of Action for Indochinese Refugees," (1993) 15(4) Human Rights Quarterly 686-702.

"The Threat of European Integration," (1993) (May/June) Compass 15-17.

Review of V. Muntarbhorn, *The Status of Refugees in Asia*, (1993) 12(1) Refugee Abstracts 69-70.

"The Emerging Politics of Non-Entrée," (l992) 9l Refugees 40-4l; also published as "L'émergence d'une politique de non-entrée," in F. Julien-Laferrière ed., *Frontières du droit, Frontières des droits* 65-67 (1993).

"The Conundrum of Refugee Protection in Canada: From Control to Compliance to Collective Deterrence," (l992) 4(l) Journal of Policy History 7l-92; also published in G. Loescher ed., *Refugees and the Asylum Dilemma in the West* 71-92 (1992).

"Fear of Persecution and the Law of Human Rights", (1992) 9l/l United Nations Bulletin of Human Rights 98-l23.

"Re-Interpreting the Convention Refugee Definition in the Post-Cold War Era," in P. Baehr and G. Tessenyi eds., *The New Refugee Hosting Countries: Call for Experience-Space for Innovation 38-44 (1991).*

"Reconceiving Refugee Law as Human Rights Protection," (1991) 4(2) Journal of Refugee Studies ll3-l3l; also published in V. Gowlland and K. Samson eds., *Problems and Prospects of Refugee Law* 9-30 (l992); in K. Mahoney and P. Mahoney eds., *Human Rights in the Twenty-First Century:  A Global Challenge* 659-681 (1993); and in M. Crock ed., *Ashgate International Library of Essays on Rights* (2014).

"A Reconsideration of the Underlying Premise of Refugee Law," (1990) 31(1) Harvard International Law Journal 129-183; abstracted in (1991) 10(1) Refugee Abstracts 12; republished in H. Lambert ed., *International Refugee Law* 65-119 (2010); and in V. Chetail ed., *International Law and Migration* (2015).

"Selective Concern:  An Overview of Refugee Law in Canada," (1988) 33(4) McGill Law Journal 677-715 and 34(2) McGill Law Journal 354-357; abstracted in (1989) 8(2) Refugee Abstracts 12.

"'Irregular' Asylum Seekers:  What's All The Fuss?," (1988) 8(2) Refuge 1-2.

"International Refugee Law:  Humanitarian Standard or Protectionist Ploy?," in A. Nash ed., *Human Rights and the Protection of Refugees Under International Law* l83-l88 (1988).

"The Humane and Just Alternative for Canada,"  (1987) 7(1) Refuge 10-11.

"Mainstream Goals, Dynamic Teaching:  The New Clinical Legal Education," (1987) 25(2) Osgoode Hall Law Journal 293-256; also published under the title of "A Structured Approach to Clinical Legal Education" in R. Matas ed., *Legal Education in Canada* 389-403. (l987).

"Poverty Law and Equality Rights:  Preliminary Reflections," (1985) 1 Journal of Law and Social Policy 1-16.

"Native Canadians and the Criminal Justice System:  A Critical Examination of the Native Courtworker Programme," (1985) 49(2) Saskatchewan Law Review 201-237.

"Compassion and Pragmatism in Refugee Law," (1985) 5(1) Refuge 9-10.

"The Evolution of Refugee Status in International Law: 1920-1950," (1984) 33 International and Comparative Law Quarterly 348-380; abstracted in (1985) 4(4) Refugee Abstracts 1293.

"The Mythical Meritocracy of Law School Admissions," (1984) 34(1) Journal of Legal Education 86-96.

"Persecution by Economic Proscription:  A New Refugee Dilemma" (with M. Schelew), (1980) 28 Chitty's Law Journal 190-193; reprinted in (1981) 1(5) Refuge 1-3; abstracted in (1986) 5(1) Refugee Abstracts 1383.

"Certificates of Analysis in Prosecutions under the Narcotics Control Act," (1980) 58 Canadian Bar Review 390-394.

**COMMENTARY**   "Acquiescing in *Refoulement*," Verfassungsblog (Germany), Sep. 12, 2019; republished in reflaw.org, Sep. 13, 2019.

"UNHCR's Uncourageous Vision," European Council on Refugees and Exiles Weekly Bulletin, March 8, 2019.

"Dropping the Ball on Asylum," New York Times, November 21, 2018.

"Is there a Global Solution to Refugee Protection?," Talking Migration (podcast), August 9, 2018.

"Refugees in Orbit - Again!," Verfassungsblog (Germany), June 11, 2018.

"There is a Workable Alternative to Australia's Asylum Policy" (with D. Ghezelbash), The Guardian, May 31, 2018.

"A Terrible Signal that International Law can be Flaunted without Consequence," Verfassungsblog (Germany), Feb. 1, 2017.

"Executive (Dis)order and Refugees:  The Trump Policy's Blindness to International Law," Just Security, Feb. 1, 2017; republished in reflaw.org, Feb. 2, 2017.

"A Really, Really Bad Month for Refugees," Verfassungsblog (Germany), Oct. 2, 2016.

"Three Legal Requirements for the EU-Turkey Deal," Verfassungsblog (Germany), Mar. 9, 2016.

"Responding to the Refugee Crisis," OpenDemocracy.net, Feb. 29, 2016; republished in reflaw.org, Feb. 29, 2016; republished in Verfassungsblog (Germany), Mar. 1, 2016.

"Interview with Professor James C. Hathaway," (2016) 1(1) International Affairs Forum 9-20.

"Moving Beyond the Asylum Muddle," EJILTalk!, Sep. 14, 2015; republished in reflaw.org, Sep. 15, 2016.

"The Conundrum of Concealment," (2014) reflaw.org, September 15, 2014; republished in Australian High Court Blog, November 2014.

"Why the Resistance to Refugee Law?," UNHCR Global Views, May 23, 2014.

"In Defence of Human Smuggling," The National Post (Canada), Sept. 13, 2010.

"Unlawful Transport of Refugees is a Policy Outcome," Australian Financial Review, June 20, 2009; republished in R. Rothfield ed., *The Drownings' Argument* (2014) 53-56.

"We Can All Help Lift the Refugee Burden," The Age (Melbourne), June 20, 2009.

"It Took a Boy to Expose Our Cuban Dilemma," Los Angeles Times, April 21, 2000.  Reprinted in Dallas Morning News, April 24, 2000; Cleveland Plain Dealer, April 25, 2000.

"Elián Must Finally Be Heard," Chicago Tribune, April 20, 2000.

"America's Apostasy," (1999) 42(3) Law Quadrangle Notes 10-11.

"Better System Needed for Handling a Refugee Crisis," The Boston Globe, April 8, 1999.

"The Immigration Reform That Wasn't," (1994) 3(3) Canada Watch 38-39.

"Elitist, Mean, and Naive: The Decision of the United States Supreme Court in *Elias-Zacarias*," Los Angeles Times, January 29, l992.

"Deterrents and Detention:  An Ill-Conceived Afterthought" (with W. Angus),  (1987) 7(1) Refuge 8-9; reprinted in Toronto Globe and Mail.

"Something Short of Justice:  A Comment on the Refugee Determination Process," (1982) 1(7) Refuge 2; reprinted in Toronto Globe and Mail.

**ELECTRONIC PUBLICATIONS**

Refugee Caselaw Site (www.refugeecaselaw.org), Director, 1999-2014.  Included in the Computerworld Smithsonian Collection of the National Museum of American History.

Faculty advisor, reflaw.org, 2015-present.

**EDITORSHIPS**

Georgian Yearbook of International Law, Editorial Board Member, 2020-present.

Contours (MIT Knowledge Futures Group), Board of Consultants Member, 2020-present.

Cambridge Asylum and Migration Studies, Editor, 2016-present.

Melbourne Journal of International Law, Honorary Member of Advisory Board, 2010-present.

Immigration, Refugee and Citizenship Law Abstracts, Legal Scholarship Network of the Social Science Research Network. Advisory Board member, 2000-present.

Immigration and Nationality Law Reports, Consulting Editor, 1997-present.

Journal of Refugee Studies, Oxford University Press, International Editorial Advisory Board Member, 1987-present.

Refuge, Editorial Board Member, 1982-1983, 1987-1988, 2001-2013.

Australian Year Book of International Law, Editorial Board member, 2009-2010.

Revue québécoise de droit international, Comité de Lecture, 1998-2008.

Journal of Law and Social Policy, Editorial Board Member, 1986-1989.

**RESEARCH GRANTS**

Australian Research Council, 2010-2013 (to undertake a comparative study of the refugee definition under international law, with Michelle Foster).

European Commission, 2001 (to prepare a comprehensive study on the scope of the Convention refugee definition to serve as the basis for the European Union's directive on harmonization of substantive refugee law).

United Nations High Commissioner for Refugees, 2001, 1985 (most recently, to prepare study for Global Consultations on International Protection on the internal protection alternative; earlier grant to conduct historical research in UNHCR archives on the evolution of involuntary migration regimes).

Social Sciences and Humanities Research Council of Canada, 1997-2000, 1994-1995, 1993-1996, 1988, 1985 (most recently, to prepare a study of the international refugee rights regime, with a focus on meeting the challenges of emerging regimes of temporary protection; earlier grants to produce a comparative study of the human rights of refugees in thirty countries, and to promote critical thinking on the conceptual scope of refugee status).

John D. and Catherine T. MacArthur Foundation, 1995-1997 (to facilitate dissemination and international discussion of proposal to establish sub-global regimes of collectivized responsibility toward involuntary migrants).

Walter L. Gordon Research Fellowship, 1994-1995 (full release time award to engage in comparative study of the human rights of refugees).

Ford Foundation, 1993-1996 (to establish an international and interdisciplinary consortium of migration and human rights scholars to design a new model of international refugee protection, in cooperation with the official, intergovernmental, and non-governmental communities).

Fulbright Senior Scholar, 1991-1992 (to support interdisciplinary research on principles for a reconceived system of international refugee law).

Immigration and Refugee Board (Canada), 1989-1991 (to engage in comparative research on the scope of the Convention refugee definition).

Immigration Appeal Board (Canada), 1988 (to complete research on the scope of the Convention refugee definition in Canadian law).

Canadian Law Information Council, 1984-1987 (to research the evolution and interpretation of the Convention refugee definition).

Department of Justice (Canada), 1984-1985, 1981-1983 (most recently, to evaluate programs of access to justice for indigenous peoples; previously study of federally funded legal aid systems).

**MEDIA INTERVIEWS**  The Age (Melbourne); Al Jazeera America; Associated Press; Atlantic Magazine; The Australian; Australian Broadcasting Corporation; American Prospect; Bergens Tidende; British Broadcasting Service; Canadian Broadcasting Corporation; Caixin Media (China); Canadian Press; CPAC, Canada's Political, Channel ("Talk Politics"); Capitol Radio (Madrid); CTV Television; Calgary Herald; Chicago Tribune; Christian Science Monitor; Czech National Television; Dagens Naeringsliv (Oslo); Dagbladet Information (Denmark); Daily Beast; Daily Signal; Dallas Morning News; Delo (Slovenia); Der Standard (Vienna); Detroit Free Press; de Volkskrant (Amsterdam); Deutsche Welle; Devex; Dispatch Times; Dnevnik (Slovenia); Ecuador Public Radio; El Confidencial (Madrid); Embassy, Canada's Foreign Policy Newsweekly; Ethics Centre (Sydney); Fast Company; Financial Review (Australia); Finnish Broadcasting Company (YLE); Foreign Policy; Frankfurter Allgmeine Sonntagszeitung; Frankfurter

Allgemeine Zeitung; L'Evangeline (Moncton); Global Television; Globe and Mail (Toronto); The Guardian; Helsingin Sanomat (Helsinki); HVG (World Economy Weekly) (Budapest); Huffington Post; The Independent; Inverse.com; IRIN News; Justinian Magazine (Australia); La Libre Belgique; Kathmandu Post; Los Angeles Times; Lusa (Lisbon); Macleans Magazine; Mainichi Newspaper (Japan); Medill News; Mint Press News; Mother Jones; McClatchy Newspapers; National Law Journal; National Public Radio ("Marketplace," "Talk of the Nation," "The Takeaway," "This American Life"); NRC Handelsblad (Netherlands); NTB (Norwegian News Service) (Oslo); New York Times; New York Times Magazine; New Yorker; Now Magazine (Toronto); Ontario Lawyers Weekly; Ottawa Citizen; På Høyden; Phnom Pen Post; POLITICO; POLITICOPro; PolitiFact; Radio Canada; Rolling Stone Magazine; San Jose Mercury News; Saturday Night Magazine; Talk Media News; The Telegraph (Delhi); This Morning (Seoul); Toronto Star; Trouw (Amsterdam); United Church Observer (Toronto); Univision; Veja (São Paulo); U.S. News and World Report; Vecer (Slovenia); Verfassungsblog (Berlin); VICE News; The Voice (Melbourne); Wall Street Journal; Washington Post; WILS Radio (Lansing); Windsor Star; The Wire (Auckland); WJLA (Washington, D.C.); Xtra (Toronto); 168 Ora (Budapest).

**EXTERNAL CONSULTING**

Australia, Department of Immigration and Ethnic Affairs, 1996 (refugee law).

Asylum Access Ecuador, 2016 (refugee law).

Asylum Access Tanzania, 2015 (refugee law).

Australia, Human Rights and Equal Opportunity Commission, 1995 (refugee law).

Australia, New South Wales, Legal Aid Commission of New South Wales, 1994 (refugee law).

Australia, Norfolk Island, 1985 (international civil and political rights).

Camerini/Robertson Filmmakers (New York), 1993-2000 (educational film series on involuntary migration produced for PBS).

Canada, Department of Citizenship and Immigration, Refugees Branch, 2004 (international refugee law and policy).

Canada, Department of Citizenship and Immigration, Legislative Review Advisory Group, 1997 (refugee law).

Canada, Department of Citizenship and Immigration, 1994 (convened and co-chaired national consultation on reform of family class immigration).

Canada, Department of Citizenship and Immigration, 1993 (convened and co-chaired consultative process on gender equity in migration programs).

Canada, Department of Foreign Affairs, 1987-1990 (assisted in design of a mechanism to incorporate human rights criteria in foreign aid allocations).

Canada, Deputy Ministers' Committee on Justice, Security, and Human Rights, 2005 (terrorism and human rights protection).

Canada, Family Allowances Act Review Committee, 1986 (panel chair).

Canada, Immigration and Refugee Board, 1993-1994 (commissioned to conduct independent review of Board's compliance with principles of fundamental justice.)

Canada, Pay Equity Hearings Tribunal, 1988 (educational methodology).

Canada, Plaut Commission on Refugee Determination, 1984-1985 (refugee law).

Canadian Broadcasting Corporation, 1987 (social welfare law).

Canadian International Development Agency, 1997 (assessment of the viability of reform of the Cuban legal and judicial system).

Canadian International Development Agency and Queen's University International Migration in Southern Africa Project, 1995-1998  (comparative survey of migration laws and policies, advised on viability of regional migration law regime.)

European Council on Refugees and Exiles, 1998 (refugee law).

European Union and Greek Council for Refugees, 2000 (moderator for educational video series on refugee law).

Fulbright Specialist Roster, 2016-present.

Hotline for Refugees and Migrants (Tel Aviv), 2016, 2018 (refugee law).

Leigh Day Solicitors (London), 2018 (refugee law).

Netherlands, Advisory Committee on Aliens' Affairs, 2006 (refugee status determination procedures).

Netherlands, Ministry of Security and Justice, 2017 (refugee law).

New Zealand, Crown Law Office, 2010 (refugee and human rights law).

New Zealand, Department of Labour, 2005 (design and facilitate a series of interdepartmental workshops on refugee rights).

New Zealand, Department of Labour, 2005 (advice on duties of non-penalization and non-refoulement).

Refugee Advice and Casework Service (Australia), 1995 (refugee law).

South Africa, Department of Home Affairs, and the Institute for Democracy in South Africa, 1997-1999 (development of a national and regional refugee protection system).

Sweden, Migration Board, 2001 (overview of challenges in application of refugee definition).

Switzerland, Federal Office for Refugees Legal Services and International Affairs Division, 1997-1998 (refugee law).

United States Department of State:  Jacob L. Martin Fellow, 2012.

University of British Columbia, 2009 (evaluation of the Faculty of Law).

University of Victoria, Faculty of Law, 1990 (clinical legal education).

**EXTERNAL LECTURES**

Amnesty International: London, 2011, 2006, 2004, 2003, 2001, 2000, 1999, 1998, 1997, l996, and l99l; Kingston, l989.

Asylum Access:  Quito, 2015; San Francisco, 2017, 2014; Kuala Lumpur, Malaysia, 2014; Bagamayo, Tanzania, 2014.

Atkinson College Department of Social Science: Toronto, 1994, 1993.

Australian Department of Immigration and Ethnic Affairs: Canberra, Melbourne, Sydney, 1995.

Australian National University, Faculty of Law: Canberra, 2007, 2008.

Australian Refugee Review Tribunal, Melbourne, Sydney, 2014, 2008, 2007, 1995.

Boalt Hall School of Law, University of California: Berkeley, 1992.

Canadian Department of External Affairs: Ottawa, l988, l987.

Centre for National Security Studies: Kingston, 1994.

Centre for Refugee Studies Summer Course: Toronto, 2006, 1996, 1995, 1994, 1993.

Chuo University Law Summer School: Melbourne, 2009.

Danish Refugee Council: Copenhagen, l992.

European Council on Refugees and Exiles: Berlin, 2016; Madrid, 2012; Budapest, 2007; Belgrade, 2006; Valencia, 2005; Warsaw, 2004; Portoroz, 2003; Sintra, 2002; Sarajevo, 2001; Berlin, 2000; Budapest, 1999; Paris, 1998; Dublin, 1997; Sintra, 1997; Lisbon, 1996; Rome, 1995; Athens, 1994; Oxford, 1993; Barcelona, 1992.

European Judicial Training Network: 6-week online course, 2019.

European University Institute, Eighth Session of the Academy of European Law:  Florence, 1997.

Federal Court of Canada: Montebello, l992.

Finnish Refugee Advice Centre: Helsinki, 2003, 1993.

Freedom House, Lawyers for Human Rights, and ProBono.org:  Johannesburg:  2012.

Freie Universität of Berlin: 2016.

Greek Council for Refugees: Athens, 1995.

Harvard Law School: Boston, 2005, 1997, 1996, 1995, 1994, 1993, l992, l99l, l990, l989.

Hong Kong Law Society:  Hong Kong, 2020, 2016, 2014.

Hungarian Helsinki Committee and UNHCR: Budapest, 2001.

Immigration and Refugee Board of Canada: Calgary, Cornwall, Kingston, Montreal, Ottawa, Toronto, Vancouver, Victoria, 2014, 1993, l992, l99l, 1990, l989.

Immigration Appeal Board of Canada: Ottawa, l987.

International Association of Refugee Law Judges, Africa Chapter:  Mombasa, 2012.

International Association of Refugee Law Judges: Head of Faculty for first Advanced Workshop on Refugee Law:  Auckland, 2002.

Irish Refugee Legal Service: Dublin, 2001.

Israeli Immigration Appeals Tribunal:  Tel Aviv, 2015.

Israeli Judges' Institute:  Neve Ilan, 2015.

Japan Association for Refugees: Tokyo, 2005.

Jewish Immigrant Aid Society: Montreal, l990.

Korean Bar Association and UNHCR:  Seoul, 2014.

Kyoto University Faculty of Law: Kyoto, 2002.

Lahore University of Management Sciences, Faculty of Law: Lahore, 2017.

Law Society, Immigration Law Committee Advanced Workshop in Refugee Law: London, 2009, 2006, 2005, 2004, 2003.

Malaysian Bar Council:  Kuala Lumpur, 2014.

Malta Office of the Refugee Commissioner: Valletta, 2011.

Memorial Association for Refugee Protection: Moscow, 1999.

National Law School of India University: Bangalore, 1998.

Nauru, Department of Multicultural Affairs: Nauru and Brisbane, 2018.

Newfoundland Continuing Legal Education Programme: St. John's, l989.

New Zealand Law Society: Auckland, 2015.

New Zealand Refugee Status Appeals Authority and Refugee Status Branch: Auckland, 2015, 2005.

Northwestern University, Center for Forced Migration Studies: Chicago, 2011.

Norwegian Directorate of Immigration: Oslo, 2016, 2012, 2003, 2007.

Norwegian Immigration Appeals Board: Oslo, 2012, 2010.

Norwegian Organization for Asylum Seekers: Oslo, 1993.

Ontario Legal Aid Plan: Toronto, l990.

Organisation suisse d'aide aux réfugiés: Zurich, 2014.

Oxford University Refugee Studies Programme: Oxford, 2007, 2006, 2005, 2004, 2003, 2001, 2000, 1999, 1998, 1997, 1996, 1995,  1994, 1993, l991, l990.

Queen's University Belfast and the Law Centre of Northern Ireland:  Belfast, 2011.

Refugee Status Advisory Committee of Canada: Montebello, l987.

Social Assistance Review Board of Ontario: Toronto, l987.

Southwestern University School of Law Summer Program in International and Comparative Law: Vancouver, 2006, 2005.

Stanford University Geospatial Center:   Palo Alto, 2014.

Swedish Administrative Court: Gothenburg, 2017.

Swiss Council for Refugees: Bern, 2000.

United Nations High Commissioner for Refugees, London Branch Office: Oxford, 1998.

United Nations High Commissioner for Refugees, Sarajevo Branch Office, Regional Thematic Seminar on Integration and Rights of Refugees: Skopje, 2005.

Universidad Internacional Menéndez Pelayo: Cuenca, Spain, 2006, 2005.

University of Addis Ababa: Addis Ababa, Ethiopia: 2019.

University of Amsterdam, Faculty of Law: Amsterdam, 2019, 2018, 2017, 2016, 2015, 2014, 2013, 2012, 2010, 2009, 2007, 2006.

University of Helsinki: Helsinki: 2017.

University of Ljubljana: Ljubljana: 2018.

University of Melbourne: Melbourne, 2015, 2014, 2013, 2012, 2011, 2007.

University of Michigan, Knight-Wallace Journalism Program: Ann Arbor, 2017, 2015.

University of the South Pacific: Port Vila: 2017.

University of Tokyo, Human Mobility Studies Program: Tokyo: 2011, 2010.

University of Toronto, Faculty of Law: Toronto, l988, l987, l986.

Vanderbilt University, Law School and College of Arts and Science, Nashville: 2017.

**SPEECHES**       European Asylum Support Office, Thematic Conference on "Membership of a Particular Social Group": Valleta, Malta, January 2020: "The Interpretive Muddle of Membership of a Particular Social Group."

Swiss Institute of Comparative Law, Conference on Comparative Migration Law: Methodological Challenges and Future Horizons: Lausanne, December 2019: "Comparative Refugee Law as International Refugee Law."

Case Western Reserve University School of Law: Cleveland, November 2019:  "The Global Cop-Out on Refugees."

University of Michigan, International Refugee Assistance Project: Ann Arbor, November 2019: "Making Sense of Refugee Law in the 21st Century."

Association québecoise des avocats et avocates en droit de l'immigration: Montreal, October 2019: "Enjeux récents en droit des réfugiés."

UNHCR United Nations Office: New York, September 2019: "The Global Cop-Out on Refugees."

New York City Bar Association: New York, September 2019: "Genocidal Intent and the Rohingya Refugee Crisis."

University of Beirut, Issam Fares Institute: Beirut, May 2019: "The Global Cop-Out on Refugees: Why the World Needs a Bold Plan to Save Refugee Protection."

University of Addis Ababa, Centre for Human Rights: Addis Ababa, May 2019: "The Architecture of International Refugee Law."

University of Namibia, Faculty of Law: Windhoek, April 2019: "The Global Cop-Out on Refugees: Why the World Needs a Bold Plan to Save Refugee Protection."

University of Cape Town, Faculty of Law: Cape Town, April 2019:  "Current Developments and Challenges in International Refugee Law."

National University of Singapore, Centre for International Law: Singapore, April 2019: "The False Panacea of 'Thin' Protection: Why We Need a Bold Plan to Save Refugee Protection."

National Chengchi University School of Law: Taipei, April 2019: "The Architecture of International Refugee Law."

University of Chicago, Keynote Address to the Society of Fellows' Weissbourd Conference: Chicago, April 2019:  "The False Panacea of 'Thin' Protection: Why We Need a Bold Plan to Save Refugee Protection."

Ghent University, Conference on "Families Beyond Borders: Migration with or without Private International Law": Ghent, March 2019: "Reconciling Refugee Autonomy to Private International Law."

Emory University, Keynote Address to the Emory International Law Journal Symposium: Atlanta, February 2019: "The False Panacea of 'Thin' Protection: Why We Need a Bold Plan to Save Refugee Protection."

University of Michigan, Donia Human Rights Center: Ann Arbor, November 2018: "Detaining Refugee Children: What's at Stake?"

University of Manitoba Faculty of Law, Robson Hall Distinguished Visitors Lecture Series: Winnipeg, September 2018: "Why We Need a Bold Plan to Save Refugee Protection."

Max Planck Institute for Research on Collective Goods, 36th International Seminar on the New Institutional Economics: Florence, June 2018: "Without Money: Making Refugee Responsibility-Sharing a Reality."

Utrecht University: Middelburg, May 2018: "The Role of Local Authorities in Protecting Refugees."

University of London School of Advanced Studies: London, May 2018: "The UN's Comprehensive Refugee Response Framework: Actually a Contingent Refugee Assistance Project."

University of Ljubljana: Ljubljana, May 2018: "The UN's Comprehensive Refugee Response Framework: Actually a Contingent Refugee Assistance Project."

Federal Court of Australia: Melbourne, May 2018: "Is There a Duty to Avoid Risk?"

Australian Administrative Appeals Tribunal: Sydney, May 2018: "Making the Rule of Law Matter in Asylum Adjudication."

Vanderbilt Law School:   Nashville, October 2017:   "Making International Refugee Law Relevant Again: How to Move Beyond Crisis Thinking."

Finnish Center for Human Rights and Parliament of Finland: Helsinki, September 2017:   "Meeting the Global Refugee Challenge."

Le club de droit international: Den Hague, May 2017: "Fixing the Global Refugee System."

Hague Institute for Global Justice and the Meijers Committee, Conference on "A Human Act or Devil´s Pact?": Den Hague, May 2017: "A New Way Forward for International Refugee Law."

University College London, Roundtable on Queer Migration, Diaspora, and Asylum: London, May 2017: "Is Refugee Law Really Friendly to Queer Asylum Claims?"

Asylum Access Conference on Refugee in Tanzania: Dar es Salaam, May 2017: "Toward the Economic Empowerment of Refugees."

Lahore University of Management Sciences, Shaikh Ahmad Hassan School of Law, Khalid Ishaque Distinguished Lecture: Lahore, May 2017: "Fixing the Global Refugee System."

University of the South Pacific School of Law: Port Vila, Vanuatu, April 2017: "Fixing the Global Refugee System."

Kappa Alpha Pi Professional Pre-Law Fraternity: Ann Arbor, March 2017: "Engaging the Global Refugee Crisis."

Center of Analysis and Public Affairs, Conference on Asylum and the Interamerican System for the Protection of Human Rights: Bogotá, Colombia, October 2016: "Moving Refugee Protection onto the Interamerican Agenda."

University of Waterloo Centre for International Governance Innovation, Conference on Canadian Leadership Opportunities: Ottawa, August 2016: "Canadian Leadership at the September UN Refugee Summit and Beyond."

Graduate Institute of International and Development Studies Global Migration Lecture: Geneva, June 2016: "Fixing the International Refugee System."

European Fundamental Rights Agency Conference on Rights, Respect, and Reality, Keynote TedX Address: Vienna, June 2016: "Fixing the International Refugee System."

University of Tokyo, 50th Transnational Law Seminar:  Tokyo, May 2016: "Fixing the International Refugee System."

Waseda University, Institute of Comparative Law: Tokyo, May 2016: "Responding to the Crisis in International Refugee Protection."

International Association of Refugee Law Judges, European Chapter: Oslo, May 2016: "Protection Within the Meaning of Art. 1(A)(2) of the Refugee Convention."

European Society of International Law and European Law Students' Association: Amsterdam, May 2016: "Fixing the Refugee System."

Harvard University, Keynote Speech to the Conference on Shifting Landscapes of Asylum in North America:  Boston, May 2016: "Thinking Globally About Refugee Protection."

Ottawa Immigration Law Conference, Keynote Speech to Annual Conference: Ottawa, April 2016: "State Protection: Questioning the Presumption."

American Bar Association Annual Meeting: New York, April 2016: "Asylum Law's Enigma: Particular Social Group."

Amnesty International, Michigan Branch: Ann Arbor, April 2016: "Policies on the Refugee Crisis: A Conversation with Professor James C. Hathaway."

Columbia University, Global Policy Initiative Conference on a Global Framework on a Global Framework for Large-Scale Refugee Movements: New York, April 2016: "Towards a Global Framework on Responsibility Sharing."

Duke Law School, Law and Markets Workshop: Durham, March 2016: "Models for Sharing Refugee Burdens and Responsibilities."

Amnesty International, International Secretariat Workshop on Global Refugee Reform: London, February 2016: "A Five-Point Plan to Fix the Refugee Protection System."

University of Michigan, Kappa Mega Alpha: Ann Arbor, November 2015: "Understanding the European Refugee Crisis."

University of Michigan, International Institute: Ann Arbor, November 2015: "Making Sense of the Migration Crisis in Europe."

Griffith Law School: Brisbane, Australia, September 2015: "Moving Beyond Good Intentions: The Road to Refugee Rights."

Humboldt University: Berlin, May 2015: "Moving Beyond Good Intentions: The Road to Refugee Rights."

Tel Aviv University, Faculty of Law: Tel Aviv, May 2015: "Moving Beyond Good Intentions: The Road to Refugee Rights."

University of Auckland, Faculty of Law: Auckland, April 2015: "Moving Beyond Good Intentions: The Road to Refugee Rights."

Stanford University, Keynote Speech to Stanford Association for International Development Conference on Forced Migration: Palo Alto, April 2015: "Moving Beyond Good Intentions: The Road to Refugee Rights."

American Society of International Law, Annual Meeting: Washington, D.C., April 2015: Moderator and Commentator for "New Voices: International Refugee Law and Displacement."

University of California, San Diego, Speakers' Series on Seeking Asylum in North America: La Jolla, January 2015: "What Makes a Political Refugee 'Political'?"

Michigan Law School, Center for International and Comparative Law, Workshop Series: Ann Arbor, November 2014: "International Refugee Law: An Introduction to a System that Makes Human Rights Real."

Lund University and Uppsala University, Migration Law Symposium: Lund, Sweden, October 2014: Commentator on Matthew Scott, "Observations from the pilot study on the practice and perspectives of lawyers in the United Kingdom and Sweden regarding protection from environmentally related arm in an era of climate change."

International Commission of Jurists, Expert Roundtable on Asylum Claims Based on Sexual Orientation and/or Gender Identity: London, October 2014: "Membership of a Particular Social Group: How Good Intentions Made a Mess of Something Simple."

University of Nottingham, International Law Association Seminar Series: Nottingham, October 2014: "What Makes a Political Refugee 'Political'?"

Legal Aid Ontario, Keynote Speech to Conference Celebrating the 20th Anniversary of the Refugee Law Office: Toronto, June 2014: "Why Presume State Protection?"

Stanford University, Center on Democracy, Development, and the Rule of Law: Palo Alto, June 2014: "The Challenge of Knowledge Production for Refugee Protection Decision-Making."

European University Institute: Fiesole, Italy, May 2014: "Is the Dublin Regulation Really Legal?"

European University Institute, Robert Schuman Centre for Advanced Studies: Fiesole, Italy, May 2014: Commentator on J. Fernandez-Huertas Moraga, "Tradable Refugee Admissions Quotas in EU Asylum Policy."

Sichuan University, Center for Tibetan Studies:  Chengdu, China, May 2014:  "Thoughts on a Solution to the Tibetan Refugee Crisis."

Sichuan University, School of Law:  Chengdu, China, May 2014:  "Understanding the Value of Refugee Law."

International Detention Coalition and Asia Pacific Refugee Rights Network Conference on Implementing Alternatives to Immigration Detention:  Kuala Lumpur, Malaysia, April 2014:  "Strategic Litigation:  A Useful Means to Challenge Wrongful Detention?"

Notre Dame Law School:  South Bend, Indiana, April 2014:  "Emancipating International Refugee Law."

Stanford University, Freeman Spogli Institute for International Studies Working Group on Responding to Refugees:  Palo Alto, January 2014:  "Juxtaposing Refugee Rights and Responsiveness:  Is There a Conflict?"

University of San Francisco School of Law:  San Francisco, January 2014:  "Seeking Creative Answers to the Crisis in Refugee Law."

International Association of Refugee Law Judges:  Götheburg, Sweden, November 2013:  "Considering Credibility."

University of Melbourne, School of Graduate Research:  Melbourne, November 2013:  "The Meaning of Leadership in the Academic Community."

Bergen University Faculty of Law, Inaugural Atle Grahl-Madsen Memorial Address:  Bergen, Norway, May 2013:  "Atle Grahl-Madsen:  Celebrating the Work of the Founder of the Academic Discipline of International Refugee Law."

UNESCO Center on Law and Migration:  Rabat, Morocco, May 2013:  "Moving Towards North African Participation in the International Refugee Regime."

University of Amsterdam Conference on the Practice of Shared Responsibility in International Refugee Law:  Amsterdam, May 2013:  Commentator on M. den Heijer, "Territorial Refugee Protection," and N. Franzen, "Extraterritorial Refugee Protection."

Asylum Access and Thai Committee for Refugees Expert Seminar:  Bangkok, May 2013:  "Why Refugee Law?"

Melbourne Law School Global Law Students' Association:  Melbourne, April 2013:  "Thinking Globally."

New School Conference on Food and Immigrant Life:  New York, April 2013:  "Food Deprivation as the Basis for Refugee Status."

U.S. Department of State, Jacob L. Martin Fellowship Address:  Washington, D.C., November 2012:  "Changing the Way We Protect Refugees."

University of Michigan International Law Workshop:  Ann Arbor, November 2012:  "Is the European Union's Refugee Regime Really Legal?"

International Association of Refugee Law Judges, Africa Chapter, Keynote Address: Mombasa, Kenya, October 2012: "Finding Global Solidarity in Refugee Law."

Cambridge University and University of Michigan Roundtable on the Future of Refugee Convention Supervision: Cambridge, September 2012: "Moving Towards Meaningful Accountability under the Refugee Convention."

Immigrant Services Society of British Columbia and Centre for Refugee Studies of York University Conference on Canada and Refugee Resettlement: Research and Innovation for the 21st Century, Keynote Address: Vancouver, June 2012: "Making Resettlement Matter."

UNHCR Headquarters, Food for Thought Seminar: Geneva, May 2012: "Protection Elsewhere: What the Refugee Convention Allows (and Requires)."

UNHCR Third Academic Network Seminar, Keynote Address: Istanbul, May 2012: "What is an Urban Refugee? And Does it Matter?"

Queen's University, Faculty of Law: Kingston, Ontario, October 2011: "Saving International Refugee Law."

London Migration Research Group, London School of Economics and Political Science: London, October 2011: "Queer Cases Make Bad Law."

University of Melbourne, Public Seminar: Melbourne, September 2011: "Is the Malaysia Solution Legal?"

Maltese Ministry for Justice and Home Affairs, Celebration of the 60th Anniversary of the Refugee Convention: Valletta: June 2011: "Saving International Refugee Law."

Trinity College Dublin and the Irish Refugee Council, Celebration of the 60th Anniversary of the Refugee Convention: Dublin: June2011: "Keeping Faith with the Refugee Convention."

University of Amsterdam Law School Expert Seminar on Shared Responsibility in International Refugee Law, Keynote Address: Amsterdam: May 2011: "Responsibility Sharing: What the Refugee Convention Requires (and Allows)."

Nordic Asylum Law Seminar, Keynote Address: Copenhagen: May 2011: "Rebuilding International Refugee Law: The Next Nordic Legacy?"

Institute of Advanced Legal Studies: London: May 2011: "Why the Dublin Regulation is Illegal."

Tribhuvan University and Nepal Bar Association: Kathmandu, Nepal: May 2011: "Accession, Domestication, or a Continued Legal Patchwork: Thoughts on Nepal's Future Legal Relationship to Refugees."

UNHCR Community Forum: Chandragadi, Nepal: May 2011: "Learning from the Protection of Bhutanese Refugees in Nepal."

Melbourne Law School Guest Lecture Series: Melbourne: May 2011: "Why Refugee Law is the Best."

Research Workshop on Critical Issues in International Refugee Law, York University Centre for Refugee Studiers, Keynote Address: Toronto: April2011: "Saving International Refugee Law."

Inaugural Professorial Fellow Lecture: Melbourne: December 2010: "Constraints on the Choice of a Country of Asylum."

Refugee Law Procedures Workshop: Toronto: October 2010: "What Does International Law Require of a Refugee Status Determination Procedure?"

University of Toronto Faculty of Law, Constitutional Law Workshop: Toronto: October 2010: "The Lawfulness of Refugee Boat Arrivals."

University of Toronto Faculty of Law, Globalization Workshop: Toronto: September 2010: "Dictating Asylum: What Does International Law Allow?"

University of Tokyo Human Security Symposium, Keynote Address: Tokyo: September 2010: "Saving International Refugee Law."

Norwegian Directorate of Immigration, Annual Public Forum, Keynote Address, Oslo: June 2010: "Constraints on the Choice of Country of Asylum."

Harvard Law School and New York Law School Conference on the Future of Legal Education, New York: April 2010: "The Influence of U.S. Legal Education Paradigm on Legal Education Abroad."

Refugee and Immigrant Legal Centre, Annual General Meeting, Melbourne: November 2009: "Taking the Proactive Path: The Need for Refugee Advocates to Advance a Protection Alternative."

Australian Academy of Law, Sydney:  November 2009: "The Forgotten Freedom – Freedom from Fear: A Response to Chief Justice James Spigelman."

Refugee Council of Australia, Melbourne: November 2009: "Australian Cooperation in Southeast Asia: Opportunity or Disaster?"

Humanitarian Crisis Hub Launch, Melbourne: November 2009:  "Do We Really Believe in Human Rights?"

Cuenca Colloquium on International Refugee Law, Cuenca, Spain: September 2009: "The Risks of Regionalism in Refugee Law."

Victorian Foundation for Survivors of Torture Annual Oration, Melbourne: June 2009:  "Making International Refugee Law Relevant Again."

Faculty of Law, University of Leiden, Netherlands: April 2009:  "Why *Non-Refoulement* is Resisted by States, and What We Can Do About It."

Australian National University College of Law, Canberra: March 2009: "Our Dirty Little Not-So-Secret: Thoughts on the Economics of Legal Education in Australia."

Law Institute of Victoria, Melbourne: March 2009: "Well-Founded Fear - The Challenge of Refugee Status Determination."

Université catholique de Louvain, Louvain, Belgium: March 2009: "La protection contre l'arbitraire."

Université libre de Bruxelles, Belgium: March 2009: "Making International Refugee Law Relevant Again."

AUSAID, Canberra: February 2009: "Does it Really Make Sense to Fight 'Human Trafficking'?"

Annual Human Rights Day Lecture, Mallesons Stephen Jaques, Melbourne: December 2008: "Whatever Happened to the Fight to End Slavery?"

Australian National University, Canberra: November 2008: "The Human Rights Quagmire of 'Human Trafficking.'"

Human Rights and Civil Law Conference, Victoria Legal Aid, Melbourne: November 2008: "Assessing the Prospects for Australian Compliance with International Refugee Law."

Auckland University Faculty of Law, Auckland, September 2008: "Leveraging Asylum."

Chuo University Law School, Tokyo, April 2008: "Charting the Future Course of International Refugee Law."

Hong Kong Refugee Advice Center,  Benefactors' Luncheon, Hong Kong, April 2008: "Refugee Law: Human Rights Made Real."

Australian National University, Canberra: March 2008: Keynote Speech at launch of Vol. 26 of the Australian Yearbook of International Law.

Council of Australian Administrative Tribunals, Melbourne: March 2008: "The Future of Asylum Law: Lessons from the Saga of the *Tampa*."

Council of Australian Law Deans, Sydney: February 2008: "Challenges for Australian Legal Education in a Globalized World."

Australian Migration Review Tribunal and Refugee Review Tribunal Member Conference, Melbourne: February 2008:  "The Muddled State of 'Membership of a Particular Social Group.'"

Federal Court of Canada: November 2007, Ottawa: "Why Refugee Law Still Matters."

University of Michigan Law School, International Law Workshop: September 2007,  Ann Arbor: "What's All the Fuss About Human Trafficking?"

Centre for International and European Union Law, Università degli Studi di Macerata, Macerata, Italy: May 2007: "A Modern Positivist Understanding of the Sources of International Law."

Institute for Legal Education, Università degli Studi di Macerata, Macerata, Italy: May 2007: "Metodologie di Insegnamento del Diritto del Sistema Universitario degli Stati Uniti."

Westminster Abbey Seminar Series: April 2007, London: "Why Refugee Law Still Matters."

Central European University: April 2007, Budapest: "Resisting the Slide Into Legal Ambiguity."

Centro de Estudios Politicos y Constitucionales: April 2007, Madrid: "Understanding Refugee Law as Human Rights Protection."

New York University School of Law, International Law Workshop: March 2007, New York: "What's All the Fuss About Human Trafficking?"

University of Sydney Faculty of Law: February 2007, Sydney: "Refugee Solutions, or Solutions to Refugeehood?"

University of Melbourne Faculty of Law, Conference on Protection Elsewhere: International Law and the Offshore Processing and Protection of Refugees: February 2007, Melbourne: "Effective Protection is Neither."

University of Melbourne Faculty of Law 25th Allen Hope Southey Memorial Lecture: February 2007, Melbourne: "Why Refugee Law Still Matters."

Stanford University Law School, International Law Workshop: February 2007, Palo Alto: "What's All the Fuss About Human Trafficking?"

International Association of Refugee Law Judges Biennial Meeting: November 2006, Mexico City: "When Does Human Trafficking Raise Refugee Protection Concerns?"

London School of Economics and Political Science Centre for the Study of Human Rights; Heythrop Institute for Religion, Ethics and Public Life; and Jesuit Refugee Service: October 2006, London: "Refugee Solutions, or Solutions to Refugeehood?"

International Association for the Study of Forced Migration, 10th Biennial Conference: June 2006, Toronto: "Forced Migration Studies: Could We Agree Just to 'Date'?"

International Refugee Rights Conference: June 2006, Toronto: "Resisting the Slide Into Legal Ambiguity."

Immigration Law Teachers' Workshop: May 2006, Las Vegas: "Is International Refugee Law Relevant to U.S. Asylum Law?"

Centro de Estudios Politicos y Constitucionales: April 2006, Madrid: "The False Logic of Extraterritorial Deterrence."

United Nations University: December 2005, Tokyo: "Making Refugee Rights Meaningful: The Challenge for East Asia."

Tulane University Law School Symposium on Human Trafficking: April 2005, New Orleans: "Protecting the Victims of Human Trafficking."

European Journal of International Law and University of Michigan Center for International and Comparative Law Symposium:  May 2004, Florence: "Europe's Role in Refugee Protection."

University of Ottawa Faculty of Law, Gordon Henderson Lecture: March 2004, Ottawa:  "Human Trafficking, Smuggling, and the Protection of Human Rights through Refugee Law."

University of Arizona James E. Rogers College of Law, Academic Enrichment Program: February 2004, Tucson:  "Human Trafficking, Smuggling, and the Protection of Human Rights through Refugee Law."

University of Washington School of Law, Ted. L. Stein Distinguished Lecture: January 2004, Seattle: "Human Trafficking, Smuggling, and the Protection of Human Rights through Refugee Law."

University of British Columbia Faculty of Law Workshop on Illegal Migration and Globalization:  January 2004, Vancouver: "The Causal Nexus Requirement as a Challenge to the Protection as Refugees of the Victims of Trafficking and Smuggling."

Ohio State University Moritz College of Law Conference on Post-Conflict Dispute Resolution and Nation-Building: January 2004, Columbus: "The Conceptual Incoherence of Voluntary Repatriation."

Yale University Center for International and Area Studies: April 2003, New Haven: "Refugee Policy in Canada and the United States Post-9/11."

University of Michigan Law School Agora on Operation Iraqi Freedom: April 2003, Ann Arbor:  "Was the Cost to Collective Security Just Too High?"

Queen's University Faculty of Law: March 2003, Kingston, Ontario: "The Lawfulness of Interdicting Refugees in International Spaces."

International Association of Refugee Law Judges: October 2002, Wellington:  "The Underlying Agenda of the Global Consultations on International Supervision of Refugee Law."

International Association of Refugee Law Judges: October 2002, Wellington: "Establishing a Transnational Judicial Conversation on Refugee Jurisprudence: An Introduction to the Refugee Caselaw Site."

High Court of New Zealand: October 2002, Auckland: "The Role of Appellate Judges in the International Protection of Refugees."

International Law Association of New Zealand and Faculty of Law, University of Auckland: October 2002, Auckland: "Lessons Learned from the Voyage of the *Tampa*."

Centre for International and European Law on Immigration and Asylum of the University of Konstanz and Human Rights Centre of the University of Potsdam Conference on A Single, Fair and Efficient Asylum Procedure: June 2002: Potsdam, "What's In a Label?"

University of Tokyo Faculty of Law: April 2002, Tokyo: "The Potential for the Sharing the Burdens and Responsibilities of Refugee Protection in Asia"

International Council of Voluntary Agencies Global Consultation on International Refugee Protection: December 2001, Geneva: "Taking Oversight of Refugee Law Seriously"

National Workshop for District Court Judges: November 2001, San Diego: "The Discriminatory Impact on Non-Citizens of the USA-Patriot Act"

Canadian Council on International Law: October 2001, Ottawa: "Refugee Law is Not Immigration Law."

United Nations High Commissioner for Refugees Global Consultations on International Protection Expert Roundtable: September 2001, San Remo, Italy: "The Internal Protection/Relocation/Flight Alternative as an Aspect of Refugee Status Determination."

European Commission and Swedish Migration Board Conference on International Protection Within a Single Asylum Procedure: April 2001, Norrköping, Sweden: "Understanding Refugee Protection as Human Rights Protection."

International Association for the Study of Forced Migration: January 2001, Johannesburg:  "Protecting Refugees for the Duration of Risk."

International Association of Refugee Law Judges: October 2000, Bern: "The Internal Protection Alternative."

Supreme Court of Canada 125th Anniversary Symposium: September 2000, Ottawa: "The Challenge of Justifying Migration Control"

American Society of International Law: April 2000, Washington, D.C.: "Can Refugee Law Survive the End of the Cold War?"

University of British Columbia Research Workshop on Migration From China: March 2000, Vancouver: "Migration, Human Rights, and Security Issues."

United Nations Day Observance: October 1999: Ann Arbor: "Why the U.S. Needs the U.N.: Beyond an Appeal to Idealism."

Georgetown University Law Center Conference on the Supreme Court and Immigration and Refugee Law: October 1999: Washington, D.C.: "Refugee Rights Are Not Negotiable: A Critique of the Legacy of the Decisions in *I.N.S. v. Stevic* and *I.N.S. v. Cardoza-Fonseca*."

Carnegie Endowment for International Peace: October 1999: Washington, D.C.: "The Uneasy Relationship Between U.S. and International Refugee Law."

European Journal of International Law and University of Michigan Center for International and Comparative Law Symposium on the Role and Limits of Unilateralism in International Law: September 1999: Ann Arbor: "America, Defender of Democratic Legitimacy?"

United Nations Association - USA: May 1999: Ann Arbor: 'Refugees and Kosovo.'

Fulbright Association of Southeast Michigan:  April 1999: Ann Arbor: "Beyond Kosovo -- Coming to Grips with the International Refugee Crisis."

International Association for the Study of Forced Migration: December 1998: Jerusalem:  "Resuscitating the Right to Seek and to Enjoy Asylum."

International Association of Refugee Law Judges: October 1998: Ottawa: "Human Rights and the Refugee Convention:  Stocktaking on the 50th Anniversary of the Universal Declaration of Human Rights."

Belgian Commissioner General for Refugees Conference on The Geneva Convention at the Dawn of the 21st Century: September 1998: Brussels: "Refugee Law is Worth Saving."

Lawyers for Human Rights Conference on Refugees in the New South Africa: March 1998:  Pretoria: "The Issue of Temporary Protection."

Oxford University Refugee Studies Programme Conference on the Growth of Forced Migration: March 1998: Oxford: "The Virtues of Modesty: Why the Refugee Regime Ought Not Lose its Focus."

Jadavpur University Centre for Refugee Studies: February 1998: Calcutta: "Developing Perspectives on Refugee Studies."

Indian Society of International Law: February 1998: New Delhi: "Collectivized and Solution-Oriented Protection as an Answer to the Current Crisis in International Refugee Law."

University of Michigan Law School Legal Theory Workshop: January 1998: Ann Arbor: "Why Refugee Law Matters."

Department of Justice Immigration Law Group: January 1998: Toronto: "How Can Canada Promote the Reform of International Refugee Law?"

Canadian Council of Churches Forum on Uprooted People: October 1997: Toronto: "Global Causes and International Responses to Forced Migration."

Palais de Nations: October 1997: Geneva: "Making International Refugee Law Relevant Again: A Proposal for Collectivized and Solution-Oriented Protection."

Ethiopian Community Development Council Conference on the African Refugee Crisis: September 1997, Washington, D.C.: "New Approaches to Managing Refugee Crisis Situations in Africa."

Danish Centre for Human Rights Conference on the Reception of Refugees: October 1996, Copenhagen: "Temporary Protection: Challenge or Solution?"

European University Institute: June 1996, Florence: "The Meaning of Repatriation."

Canadian International Development Agency Roundtable on Legal and Judicial Cooperation: April 1996, Meech Lake, Quebec: "Should Cultural Relativism Inform Programs of Legal and Judicial Cooperation?"

University of Windsor and the Refugee Office, Diocese of London Conference: April 1996, Windsor, Ontario: "The Proposed Canada-U.S. Asylum Sharing Agreement: What Will It Mean?"

York University Walter Gordon 1995-1996 Research Lecture: February 1996, Toronto: "Reconceiving International Refugee Law."

Canadian Council for Refugees Interdiction Workshop: February 1996, Toronto: "A Critical Analysis of the Proposed Canada-U.S. Memorandum of Agreement."

Canadian Bar Association, Ontario Branch: November 1995, Toronto: "Claims by Gay Men and Lesbians to Convention Refugee Status."

European Task Force on Canadian Studies Conference on Migration Policy and Practice: November 1995, Berg en Dal, Netherlands: "Fundamental Justice and the Deflection of Refugees from Canada."

Canadian Council on International Law: October 1995, Ottawa: "Globalism and Regionalism: The Challenge of Migratory Flows."

Sydney University Law School: August 1995, Sydney: "Is Refugee Status Really Elitist? An Answer to the Ethical Challenge."

Council on Foundations: July 1995, Minneapolis: "Immigrants and Refugees: When Global Becomes Local."

Conference on Europe and Refugees: April 1995, Antwerp: "The Notion of Refugee: A Legal Point of View."

XIVth World Congress of Comparative Law: July 1994, Athens: "General Report: The Legal Condition of the Refugee."

American Association of Law Librairies: July 1994, Seattle: "Asylum-Seekers: Navigating the Changing Environment."

European Commission Conference on Immigration and the European Union: June 1994, Athens: "Root Causes as Refugee Protection: A Chimerical Promise?"

Australian Council  of Churches Conference on Challenges to Refugee Protection: February 1994, Sydney; "The Fallacy of the `Right to Remain' as Human Rights Protection."

United Nations Forum on New Imperatives in International Development and Global Migration: February 1994, Toronto: "A New Vision of International Refugee Law."

Heald  Lecture in Administrative Law, College of Law, University of Saskatchewan: September 1993, Saskatoon: "Fundamental Justice, International Comity, and the Deflection of Refugees from Canada."

University of Cambridge Research Centre for International Law: May 1993, Cambridge: "Thoughts on a Communitarian Vision of Refugee Law."

Harbourfront Centre Public Affairs Forum: April 1993, Toronto: "When Refugees Come Calling: New Questions, New Voices."

Centre for U.S. - Mexican Studies Conference on Controlling Illegal Immigration: March 1993, San Diego: "The Compatibility of International Refugee Law and Migration Control."

Cornell International Law Journal Symposium on Political and Legal Barriers to Asylum: February 1993, Ithaca, N.Y.: "Harmonizing for Whom? The Devaluation of Refugee Protection in the Era of European Economic Integration."

Harvard Law School Workshop on New Issues in Asylum and Refugee Determination: February 1993, Boston: "The Reconceptualization of 'Persecution' as Risk to Basic Human Rights Resulting from a Failure of State Protection."

Conference on Migration, Human Rights, and Economic Integration in North America: November 1992, Toronto:  "Harmonizing for Whom?  The Devaluation of Refugee Protection in the Era of Supranational Integration."

Colloquium on the Comprehensive Plan of Action:  October 1992, Manila:  "Substantive Compliance with International Refugee Law: Migrants or Refugees?"

Seventh Annual Conference on Computers and Legal Education: June l992, Toronto: "Database Developments in Refugee Law."

Child Sexual Abuse Workshop: June l992, St. John's, Newfoundland: "Under Challenge: The Services Delivery Dilemma."

Harvard Law School Ford Fellowship Program in Public International Law: April l992, Boston: "Of Conflicts Between Refugee Law and the Concept of Community."

Colloque sur le statut juridique de la zone internationale: April l992, Paris: "The Emerging Politics of Non-Entrée."

Roberts Centre Seminar on Forced Migration: December l99l, Oxford: "Refugees or Economic Migrants?"

Boalt Hall Human Rights Law Group: November l99l, Berkeley: "Supranational Protection of Human Rights: Situating the Prospects for the Interamerican System."

Interamerican Legal Services Association: November l99l, Bogotá: "Canada and the Interamerican Human Rights System: What Contribution to Expect?"

Graduate Institute of International Studies and United Nations High Commissioner for Refugees Colloquium on Problems and Prospects of Refugee Law: May 1991, Geneva: "Reconceiving Refugee Law as Human Rights Protection."

Department of Justice Conference on Immigration Law: May 1991, Toronto: "The Fragile State of International Refugee Law: Time for a New Initiative?"

International Seminar on Refugees and Displaced Persons in New Host Countries: April 1991, Budapest: "Re-Interpreting the Convention Refugee Definition in the Post-Cold War Era."

Oxford University International Research and Advisory Panel Conference: January 1991, Oxford: "Reconceiving Refugee Law as Human Rights Protection."

Human Rights in the Twenty-First Century Conference: November 1990, Banff, Alberta: "Reconstruction of Refugee Law on a Human Rights Foundation."

York University Centre for Refugee Studies Conference on Canadian and United States Refugee Policy: May 1990, Toronto: "The Leading Edge of Persecution."

Canadian Bar Association Continuing Legal Education Seminar on Refugee Claims: December 1989, Toronto: "The Determination of Refugee Claims Grounded in Generalized Oppression."

Osgoode Hall Law School Centennial Celebration: September 1989, Toronto: "Facing the Future: The Challenge for Legal Education at Osgoode."

Canadian Council for Refugees: November 1988, Toronto: "Irregular Asylum-Seekers: What's All the Fuss?"

Atkinson College Outreach Program to the Hispanic Community: November 1988, Toronto: "Recent Change in Canadian Refugee Law."

Netherlands Conference of Legal Clinics: May 1988, Leeuwarden, Netherlands: "Toward A Strategic Practice of Poverty Law."

Canadian Council for Refugees: March 1988, Kingston: "Promoting the Critical Appraisal of Refugee Law."

Canadian Human Rights Foundation Conference on Human Rights and the Protection of Refugees Under International Law:  Montréal, December 1987:  "International Refugee Law:  Humanitarian Act or Protectionist Ploy?"

Canadian Council for Refugees:  Toronto, November 1987:  "The Principle of Safe Third Country in Refugee Law."

International Commission of Jurists and Canadian Bar Association:  August 1987, Ottawa:  "Canada's Treatment of Refugees."

Canadian Bar Association (Ontario) Advanced Immigration Law Seminar:  June 1987, Toronto:  "Recent Developments in Refugee Determination Procedures."

University Centre for European Studies Colloquium on the Right of Internal Asylum or Sanctuary:  June 1987, Montreal:  "International Law and the Obligation to Protect Asylum Claimants."

Ontario Institute for Studies in Education Colloquium on Cooperative Legal Education:  June 1987, Toronto:  Commentator on L. Taman, "Cooperative Legal Education."

Canadian Association of Law Teachers:  May 1987, Hamilton:  Commentator on L. Taman, "Cooperative Legal Education."

York University Community Relations Department:  April 1987, Toronto:  "Refugees and the Third World."

Canadian Council for Refugees:  March 1987, Toronto:  "International Law and the Return of Refugee Claimants to Countries of Sojourn."

York University Dean of Graduate Studies Seminar Series:  February 1987, Toronto:  "Refugees and the Law:  Comparative Perspectives."

York University Law and Society Colloquium:  November 1986, Toronto:  "A Critical Appraisal of the Role of Refugee Law."

Osgoode Hall Law Journal Faculty Seminar Series:  October 1986, Toronto:  "Mainstream Goals, Dynamic Teaching:  The New Clinical Legal Education."

Oxford University Conference on the Rights and Obligations of Refugees in Africa:  September 1986, Oxford:  "The Obligation of Western Nations to Share the Burden of the African Refugee Crisis" (abstracted in (1987) 6(1) Refugee Abstracts 1758).

AIDS Awareness Week:  June 1986, Toronto:  "Public Health and Individual Rights."

Canadian Association of Law Teachers:  May 1986, Winnipeg:  "A Structured Approach to Clinical Legal Education".

Standing Conference of Canadian Organizations Concerned for Refugees:  May 1986, Toronto:  "Canada and the United Nations High Commissioner for Refugees."

First International Conference on Conflict Resolution and Peace Studies:  January 1986, University of the South Pacific, Fiji:  "A Reconsideration of the Underlying Premise of Refugee Law" (abstracted in J. Mass et al., Toward a World of Peace (1986) 398).

Association des juristes d'expression française de l'Ontario:  November 1985, Toronto:  "L'education juridique en français dans les facultés de 'common law' du Canada."

Federation of Law Societies' Conference on Legal Education:  October 1985, Winnipeg:  "A Structured Approach to Clinical Legal Education."

International Youth Conference:  August 1985, Toronto:  "An Introduction to Refugee Law".

Refugee Week, York University:  February 1985, Toronto:  "Refugee Law and State Protectionism."


**LAW REFORM**     Open Letter from Prominent Canadians to the Prime Minister of Canada on the Protection of Refugees in during the Covid-19 Crisis, May 2020.

*Amicus curiae* brief in *Al Otro Lado v. Wolf* (USCA 9th), February 2020.

*Amicus curiae* brief in *RSF v. Barr* (USCA 9th), February 2020.

Expert Affidavit in *Canadian Council for Refugees et al v. Minister of Immigration* (Federal Court of Canada), June 2018.

*Amicus curiae* brief in *Garcia Garcia v. Sessions* (USSC), February 2018.

*Amicus curiae* brief in *Martinez Cazun v. Sessions* (USSC), February 2018.

*Amicus curiae* brief in *Garcia v. Sessions* (USCA 7th), February 2018.

*Amicus curiae* brief in *Cazun v. Sessions* (USCA 3rd), July 2017.

*Amicus curiae* brief in *Duress Exception to Persecutor Bar* (US BIA), July 2017.

*Amicus curiae* brief in *Garcia and Garcia v. Sessions* (USCA 1st), July 2017.

*Amicus curiae* brief in *Castro v. U.S. Department of Homeland Security* (USCA 3rd), January 2017.

*Amicus curiae* brief in *Negusie v. Holder* (USBIA), November 2016.

*Amicus curiae* brief in *Jennings v. Rodriguez* (USSC), November 2016.

*Amicus curiae* brief in *Perez Guzman v. Lynch* (USCA 9th), September 2016.

University of British Columbia and University of Michigan, Expert Workshop on Reforming Refugee Law as Shared Responsibility: Vancouver, July 2016 (co-chair).

European Legal Network on Asylum:  Amsterdam, May 2013:  "Mobilizing to Challenge Refugee Law Decisions Before the Court of Justice of the European Union."

Non-Governmental Workshop on the Future of Asylum Law in Nepal: Kathmandu, Nepal: May 2011: "Common Principles for Advancing a Refugee Protection Framework."

Canadian Deputy Ministers' Committee on Justice, Security, and Human Rights: October 2005, Ottawa: "Challenges and Vision for Future Reform of Refugee Protection."

Gordon Henderson Roundtable Discussion: March 2004, Ottawa: "The Future of Canada's Refugee Status Determination System."

European Commission *Ad Hoc* Meeting of Legal Experts on Asylum: March 2001, Brussels: "Elaboration of a Community Instrument to Guide Application of the Refugee Convention Pursuant to Art. 63(1)(c) of the Treaty of the European Communities."

Ad Hoc Committee of Experts on the Legal Aspects of Asylum (CAHAR) of the Council of Europe: September 1999, Strasbourg, France: "The Legal Protection of Persons in Case of Massive and Sudden Influx."

Interamerican Commission on Human Rights: October 1996, Washington, D.C.: "The Role for Sub-Global Organizations in Implementing a Collectivized and Solution-Oriented Response to Involuntary Migration."

Canada, Standing Committee on Citizenship and Immigration of the House of Commons: March 1996, Ottawa: "Study of the Preliminary Draft Agreement Between Canada and the United States of America Regarding Refugee Claims."

Canada, Standing Committee on Citizenship and Immigration of the House of Commons: March 1995, Ottawa: "Study of Gender-Based Claims to Convention Refugee Status."

Canada, Legislative Committee on Bill C-86 of the House of Commons: August l992, Ottawa: "Bill C-86, An Act to Amend the Immigration Act."

Canada, Standing Committee on Legal and Constitutional Affairs of the Senate: March 1988, Ottawa: "Bill C-55, An Act to Amend the Immigration Act, 1976."

Canada, Standing Committee on Legal and Constitutional Affairs of the Senate: October 1987, Ottawa: "Bill C-84, The Deterrents and Detention Act, amending the Immigration Act, 1976.

Canada, Legislative Committee on Bill C-55 of the House of Commons: September 1987, Ottawa: "Bill C-55, An Act to Amend the Immigration Act, 1976."

Ontario, Standing Committee on the Administration of Justice: February 1986, Toronto: "Sexual Orientation and Equality Rights."

Canada, Consultation on Refugee Determination in Canada: September 1984, Toronto: "Refugee Status Determination in Canada."

**TEACHING MATERIALS**       "Comparative Asylum Law" (2015, 2013, 2011, 2003, 2000, 1999).

"Emerging Responses to Forced Migration" (2001, 1999).

"Frameworks for the Study of Law" (1997, 1995).

"Intensive Programme in Immigration and Refugee Law" (1998, 1996, 1994, 1993, 1991, 1990).

"International Human Rights Law: Readings, Problems, and Clinical Exercises" (1995, 1993, 1992, 1989, 1988, 1987, 1986).

"International Refugee Law" (2019, 2018, 2017, 2016, 2015, 2014, 2013, 2012, 2011, 2010, 2009, 2007, 2006, 2005, 2003, 2002, 2001, 2000, 1999, 1998, 1997).

"Law and Poverty: Readings, Problems, and Clinical Exercises" (1989, 1988, 1987, 1986).

"Refugee Rights Workshop" (2019, 2018, 2016, 2007, 2006, 2005).

"Status relatifs au droit des consommateurs" (1980).

"Why Have Borders?" (2014, 2001).


**SERVICE**       University of Michigan, 1998-present:  Director, Program in Refugee and Asylum Law, 1998-present; Global Affairs Committee, 2011-present; Graduate Programs and Foreign Affiliations, 2010-2012; 2015-2016; Advisory Board,  Center for International and Comparative Law, 1998-2008; Academic Standards Committee, 2005-2008; Co-moderator, International Law Workshop, 1999-2003; Technology Committee,  2000-2001 (chair); Journals and Symposia Committee (2000-2001); Research Committee (2000-2001);  Admissions and Financial Aid Committee, 1999-2000 (chair); Clinics Committee, 1998-1999.

University of Melbourne, 2008-2010:  Dean of Law (2008-2010); University Senior Executive Committee (2008-2010); University Advancement Committee (2008-2010); University "Towards 2011" Commission (2009-2010); Law School Faculty Council (chair, 2008-2010); Law School Executive Committee (chair, 2008-2010); Law School Budget Committee (2008-2010); Law School Faculty Recruitment Committee (2008-2010); Law School Equality Committee (2009-2010).

Osgoode Hall Law School of York University, 1984-1998:  Academic Policy Committee, 1989-1991; 1992-1993 (chair, 1992-1993); Administrative Council, York University Centre for Refugee Studies, 1992-1996; Admissions Advisory Committee, 1984-1988 (chair, 1986-1987, 1987-1988); Associate Dean of Law, 1989-1991; Centre for Race and Ethnic Relations of York University Advisory Board, 1987-1989; Centre for Refugee Studies, Director of Refugee Law Research Unit, 1988-1996; Clinical Education Committee, 1984-1989; Curriculum Review Committee, 1988-1989; Director of Clinical Education, 1984-1989; Equality Committee, 1990-1991; Faculty Recruitment Advisory Committee, 1990-1991, 1995-1996; Graduate Studies Committee, 1997-1998, 1995-1996; Merit Pay Committee, 1989; Osgoode Hall Law School Faculty Association (President, 1995-1996); Parkdale Community Legal Services Board of Directors, 1984-1987; Presidential Advisory Committee on H.I.V., 1989-1991; Priorities and Finance Committee, 1993-1994 (chair, 1993-1994); Refugee Documentation Project Advisory Committee, 1984-1988 (chair, 1986-1987); Research Advisory Committee, 1993-1994, 1989-1991 (chair, 1989-1991); Senate of York University, 1993-1996; Senate Committee on Research, 1993-1994; Senate Committee on Teaching and Learning, 1986-1989; Student Awards Committee, 1989-1991; Student-Faculty Relations Committee, 1989-1991; Teaching Project Advisory Committee, 1997-1998; York Community Connection Board of Directors, 1984-1985; York University Centre for International and Strategic Studies Administrative Council, 1995-1996; York University Discipline Tribunal, 1995-1996.

**GRADUATE SUPERVISION**     Hilary Evans Cameron, S.J.D., University of Toronto, "When in Doubt: The Law of Fact-Finding in Canadian Refugee Status Determination" (2016, examining committee member).

Vladislava Stoyanova, Ph.D., Lund University, "'Human Trafficking, Slavery, Servitude and Forced Labor:  Conceptual Limits and States' Positive Obligations" (2014, external opponent).

Heko Scheltema, Ph.D., European University Institute, "The Application of Public International Law by the European Court of Human Rights: A Legal Empirical Analysis" (2014, examining committee member).

Nicholas McGeehan, Ph.D., European University Institute, "The Marginalization of Slavery in International Law" (2013, examining committee member).

Lieneke Slingenberg, Ph.D., Vrije Universiteit, Amsterdam, "Between Sovereignty and Equality:  The Reception of Asylum Seekers under International Law" (2011-2012, examining committee member).

Kees Wouters, Ph.D., Faculty of Law, University of Leiden: "International Legal Standards for Protection from *Refoulement*" (2009, examining committee member).

Jason Pobjoy, LL.M. by thesis, Melbourne Law School, "Ministerial Discretion under the Migration Act" (2008-2009, co-supervisor).

Ifeoma Okwuje, Ph.D., University of Michigan Department of Political Science and School of Public Policy, "International Human Rights Conventions: Compliance and the Convention-Making Process" (2002-2005, supervisory committee member).

Michelle Foster, S.J.D., University of Michigan Law School: "Refuge from Deprivation:  Forced Migration and Economic and Social Rights in International Law " (2001-2004, supervisor).

Gerry Simpson, S.J.D., University of Michigan Law School: "Great Powers and Outlaw States in International Law: Unequal Sovereigns" (2000-2002, supervisory committee member).

Catherine Dauvergne, Ph.D., Australian National University: "Border Law: Migration and Identity in Immigrant Nations" (2000, examining committee member).

James Tieman, LL.M, Osgoode Hall Law School.:  "Whither Refugee Protection?  An Ethical Analysis of the 'Right to Remain'" (1997-1998, supervisor).

Marjoleine Zieck, Ph.D., Faculty of Law, University of Amsterdam:  "Voluntary Repatriation of Refugees:  A Legal Analysis" (1997, examining committee member).

Elizabeth Adjin-Tettey, D. Jur., Osgoode Hall Law School: "A Feminist Analysis of the Definition of the Convention Refugee Definition" (1993-1996, supervisor).

Jeanne Donald, LL.M., Osgoode Hall Law School: "Refugee Claims Based on the Criminalization of a Fundamental Human Right: Prosecution or Persecution? (1993-1996, supervisory committee member).

Michael Barutciski, LL.M., Osgoode Hall Law School: "The Reinforcement of Non-Entrée and the Subversion of UNHCR: Displacement and International Assistance in Bosnia-Herzegovina" (1993-1995, supervisor).

Pierre Lizée, Ph.D., York University Department of Political Science: "Building Peace: The Challenges and Contradictions of the Cambodian Peace Process" (1995, examining committee member).

Suzanne Egan, LL.M., Osgoode Hall Law School: "The Right of Asylum and the Principle of *Non-Refoulement* in International Law: State Practice at the Global Level" (1987-1991, supervisor).

Maureen Smith, M.A., York University Faculty of Arts: "The Concept of Safe Third Country in Refugee Protection" (1987-1992, supervisor).

Marilyn Dolmage, M.S.W, York University Faculty of Social Work: "Social Work for Social Justice" (1989, examining committee member).

Alexandra Lo, LL.M. candidate, Osgoode Hall Law School: "The Right to Food: A Survey of the Path to an International Food Convention" (1986-1991, supervisor).

Gary Stein, LL.B./M.E.S., Osgoode Hall Law School: "Legal Process and the Impact of Popular Education" (1985-1988, supervisory committee member).

**RESEARCH SUPERVISION**

Human Rights Law: Ravi Jain and Tashia Jithoo (2000); Randi Zlotnik (1989), Darrell Doxtdator (1988).

International Human Rights Law: Malcolm Rogge (1998), Tamara Levy (1995-1996), Payam Akhavan (1989), Sydne Conover-Taggart (1987).

International Refugee and Migration Law: Xun Yuan (2016); Cari Carson (2015); Jonah Eaton (2010); Jason Pobjoy (2008); Alla Karagodin (2006); Bill Hicks (2004); Bridgette Carr (2002); Michelle Foster (2001); Mark Beougher (2000); Michael Kagan (1999-2000); Clea Stanton (1999-2000); Anne Cusick (1999); Ravi Jain (1999); Jonathan Chudler (1999); James Tieman (1997), Jeanne Donald (1993), Michael Barutciski (1993), Jeffrey Meade (1987), David Petrasek (1986), Steven Tress (1985).

Research Scholars: Constantin Hruschka, Max Planck Institute (2019); Niamh Kinchin, University of Wollongong (2019); Tadesse Kassa Woldetsadik, Addis Ababa University (2019); Max Cherem, Kalamazoo College, Michigan (2018); Mirjam Streng, Tel Aviv University (2018); Lauren Nishimura, Oxford University (2016-2018); Rabah Aynaou, Mohammed 1st University, Morocco (2017); Ender Kuzu, Ministry of Foreign Affairs, Turkey (2017); Ulf Stückemann, European University Viadrina (2017); Moritz Baumgartel, Université libre de Bruxelles (2016); Salvo Nicolosi, Ghent University (2016); Anna Lise Purkey, McGill University (2016); Galya Ruffer, Northwestern University (2016); Lili Song, East China University of Politics, Science and Law (2016); Stephanie Motz, University of Lucerne (2015); Kate Ogg, Australian National University (2015); Vladislava Stoyanova, Lund University (2015); Zelalem Teferra, Graduate Institute of International and Development Studies (2014); Cristiano d'Orsi, Graduate Institute of International and Development Studies (2013); Tim Braimah, Middlesex University (2013); Huang Yunsong, Sichuan University (2012-2013); Julian Lehmann, Dresden University of Technology (2012); Samo Bardutzky, University of Ljubljana (2012);Emanuela Parisciani, Scuola Superiore Sant'Anna (2012); Thomas Gammeltoft-Hansen, Danish Institute for International Studies (2011); Simone Alt, University of Konstanz (2010); Mehreen Afzal, European University Institute (2007); Nora Markard, Humboldt University (2007); Hoon Koo Yeo, Korean Judiciary (2006); Martin

Jones, Osgoode Hall Law School (2006); Michelle Foster, University of Melbourne (2005); Jenn Bedlington, Government of Australia, retired (2004); Catherine Phuong, University of Newcastle (2004); Michael Barutciski, Canterbury University (2003-2004); Pene Mathew, Australian National University (2003); Luis Peral, Carlos III University of Madrid (2003); Siang-Soo Kim, Korean Judiciary (2002-2003); Jacques Mangala, Université catholique de Louvain (2001-2003); Erik Röxstrom, University of Bergen (1998-1999).

Michigan Journalism Fellows: Pam O'Toole, BBC World Service (2004); Thao Hua, Los Angeles Times (1998-1999).

|                       |                                                                                                                                                             |
|-----------------------|-------------------------------------------------------------------------------------------------------------------------------------------------------------|
| **COMMUNITY SERVICE** | AIDS Committee of Toronto: Board of Directors, 1987-1989 (Vice-Chair, 1988-1989).                                                                          |

Asylum Access: Senior Advisor, 2013-present; Founding Patron, 2008-present; Board of Directors, 2005-2008.

Amnesty International (Canada): Refugee Policy Committee, 1984-1985.

Australian Academy of Law (ex officio member), 2008-2010.

Canadian Association of Law Teachers: National Executive Committee, 1987-1988; Chair of Clinical Education Section, 1985-1986.

Canadian Human Rights Foundation: National Council, 1988-1998.

Council of Australian Law Deans, 2008-2010.

European Council on Refugees and Exiles:  Counsel on Strategic Litigation, 2012-2013.

Expedited Removal Monitoring Project and Study (Harvard Law School and University of California, Hastings College of the Law):  Advisory Board, 1997-2001.

Inland Refugee Society, Vancouver: Volunteer English as Second Language Instructor: 2010.

International Association for the Study of Forced Migration: Vice-President: 1998-2001.

International Refugee Law Mooting Competition, Budapest: Chief Justice: 2007.

Laskin Memorial Moot Court Competition: Judge, 1986-1988.

Max Planck Institute for Social Anthropology: Advisory Board Member to VULNER Research Project, 2019-date.

Right to Privacy Committee: Steering Committee, 1985-1988.

Sri Lanka Campaign for Peace and Justice: Advisory Council, 2009-2012.

Technische Universitat Chemnitz, Critical Evaluation of the Common European Asylum System: Advisory Board, 2017-present.

United States Committee for Refugees and Immigrants: Board of Directors, 2006-2008; Counsel on International Protection, 2008-present.

University of Amsterdam, Research Project on Shared Responsibility in International Law:  Advisory Board, 2011-2016.

Utrecht University, Research Project on Cities of Refuge:  Scientific Board Member, 2016-present.

Victorian College of the Arts, Centre for Cultural Partnerships: Advisory Committee: 2008-2010.

**PROFESSIONAL ACCREDITATION**    Called to the Bars of  New Brunswick (1982) and Ontario (1986).

Completed course of study at the International Institute of Human Rights and the International Center for University Human Rights Teaching, Strasbourg, France, 1985.

**ASSOCIATIONS**    American Society of International Law, Amnesty International, International Association for the Study of Forced Migration, International Association of Refugee Law Judges.

**LANGUAGES**    Excellent knowledge of French and Spanish.

**CITIZENSHIP**    Canada and the United States of America.