# EXHIBIT B

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

|   |   |
|---|---|
| **HUMAN RIGHTS FIRST,** | **Civil Action No. 1:20-cv-3764 (TSC)** |
| **Plaintiff,** | |
| **v.** | |
| **CHAD F. WOLF, *et al.*,** | |
| **Defendants.** | |

**<u>DECLARATION OF MICHAEL BREEN</u>**

**INTRODUCTION**

I, Michael Breen, declare under penalty of perjury as prescribed in 28 U.S.C. § 1746:

1.      The facts contained in this declaration are known personally to me and, if called as a witness, I could and would testify competently thereto under oath. I submit this sworn declaration in support of Plaintiffs' Motion for Temporary Restraining Order, which seeks to enjoin the implementation of the Rule entitled "Procedures for Asylum and Withholding of Removal; Credible Fear and Reasonable Fear Review" ("Rule"), 85 Fed. Reg. 80,274 (Dec. 11, 2020).

2.      I am president and chief executive officer of Human Rights First, plaintiff in this action. In this role, I articulate the mission and define the strategic direction of the organization to effect lasting change in the human rights sphere through a combination of advocacy and direct service.  I oversee all facets of the organization, including our advocacy campaigns, legal representation of asylum seekers, finances, operations and personnel, compliance, and government relations work. I also oversee the organization's public policy agenda, including its advocacy for an asylum system that respects human rights and the rule of law.

3.      Human Rights First is a 501(c)(3) nonprofit, nonpartisan international human rights organization with offices in Washington, D.C.; New York, New York; and Los Angeles, California.

4.      Founded in 1978, we challenge America to live up to its ideals and foster U.S. leadership to advance the universal values of human rights around the world. Human Rights First focuses on three primary areas: 1) promoting and protecting the rights of refugees and asylum seekers; 2) advancing U.S. foreign policies that uphold human rights; and 3) advocating for U.S. national security policies that respect human rights. Our efforts to protect refugees and asylum seekers—one of the United States' most fundamental human rights commitments—are

deeply aligned with our mission. For over 40 years, we have provided legal assistance to individual asylum seekers while pushing for fair and humane U.S. asylum laws and policies to help refugees become engaged members of American society and bring about sustained, positive change in laws and policies toward refugees.

5.      Through the Refugee Representation program, Human Rights First operates one of the largest programs for pro bono legal representation of asylum seekers in the nation, working in partnership with volunteer lawyers at leading law firms to provide legal representation, without charge, to asylum applicants unable to afford paid counsel. In addition to our work in partnership with volunteers from leading law firms, Human Rights First's in-house attorneys also represent asylum seekers in immigration-related proceedings, focusing on asylum and other protection-based forms of immigration status. Human Rights First serves asylum seekers across the country, via its three offices. Over the last 40 years, Human Rights First has helped tens of thousands of individuals who arrived in the United States fleeing persecution, torture, and threats of death. In 2019, Human Rights First's pro bono partners donated over 100,000 hours of in-kind support.

6.      Asylum applications and applications for other forms of humanitarian protection, including protection under the Convention Against Torture and statutory withholding of removal, represent a vital component of Human Rights First's mission and account for much of the representation services that we provide.

7.      Human Rights First is highly successful in its work, because it takes care to vet cases thoroughly before taking them and ensures that its clients have the best possible legal representation.  In 2019, over 97 percent of Human Rights First's clients were granted immigration relief.

8.    Through its Refugee Protection research and advocacy program, Human Rights First advocates for policies that protect and advance the rights of refugees and asylum seekers, while endeavoring to hold the United States government accountable to its international and domestic legal obligations. Human Rights First does this by engaging policy makers, conducting on-the-ground research and reporting, and analyzing policies and issues impacting asylum seekers and refugees.

9.    Below we provide examples of just some of the ways in which the Rule harms Human Rights First and our ability to represent our clients, individuals seeking refugee protection in the United States.

**I.      The Rule Irreparably Harms Human Rights First**

10.    Absent an injunction, the Rule will irreparably harm Human Rights First in multiple ways. The Rule irreparably frustrates Human Rights First's mission to represent asylum seekers and advocate for meaningful access to the asylum system. The Rule will cause a drastic reduction in the number of clients we are able to serve, not only impairing our ability to achieve our organizational mission to protect refugees, but also harming our organization's financial health. As of the date of this Declaration, Human Rights First is already experiencing harm— including diverted staff and resources—directly traceable to the Rule's imminent implementation. These harms will likely compound when the Rule goes into effect.

11.    The Rule will make it considerably more time-consuming and resource-intensive to represent asylum seekers.  It will also make those representations far less likely to succeed, as it effectively eliminates asylum eligibility for broad swaths of asylum seekers—including most of our clients—substantially reducing the number of clients for whom we are able to secure protection.  I asked my staff to analyze the potential impact of the Rule on Human Rights First

clients.  We determined that, if the Rule were to go into effect, it is likely that more than 80 percent of our clients' cases would be negatively impacted by the Rule.

### A. Human Rights First Is Already Facing Harm as a Result of the Rule's Publication

12.     Human Rights First is having to analyze and interpret the Rule—which alters almost every aspect of the asylum system, under which Human Rights First has represented its clients for over 40 years—to determine which clients and attorneys need specialized information or training on the impacts of the Rule and advise them accordingly.  Separately, Human Rights First is having to create and provide new and separate trainings and materials for pro bono lawyers handling asylum matters in which asylum seekers are likely impacted by the Rule.  In particular, Human Rights First will need to analyze how the Rule's changes to the credible fear interview process will impact the claims of those who receive a negative determination and must request review by an immigration judge. As of the date of this declaration, our staff is already spending significant time and resources to prepare analysis and guidance for use by our staff and volunteer pro bono attorneys, including drafting "Frequently Asked Questions" resources explaining the intricacies of the Rule for those whose clients will be affected, as well as attending and planning webinar trainings related to the Rule. As the Rule's effective date approaches, the volume of Rule-related inquiries from and counseling for volunteer attorneys and clients will likely increase significantly, in turn, further taxing staff time and mentoring.

13.     Between the date of this declaration and the effective date of the Rule, we anticipate Human Rights First staff will spend approximately 300 hours analyzing and responding to the Rule's impact on our cases, and drafting training materials to use in the event the Rule goes into effect. This time will include review of every aspect of the Rule, including

provisions ranging from changes to the credible fear interview process, to interviews before

asylum officers, to hearings before immigration judges and judicial review.  Over the first three

months after the Rule takes effect, we estimate staff will spend approximately 600 additional

hours responding to the Rule's impacts on cases.  These are estimates based on the work

Human Rights First is already having to undertake.  These numbers will increase if, as seems

likely, the Rule's drastic changes to the asylum system cause confusion and delay in the system.

14.     The burden placed on Human Rights First by having to plan for a complete

overhaul of the asylum system is exacerbated by the Agencies' decision to make the Rule

effective only 30 days after publication.  This is insufficient time to put together all the

materials needed to prepare for the Rule's effective date, particularly as it falls over the winter

holidays.  The limited timeframe forced Human Rights First to call on an overseas legal

contractor to help analyze the effect of the Rule on Human Rights First's work.

Human Rights First has asked that contractor to focus on the Rule's effects for the foreseeable

future, thereby diverting her from her normal work of mentoring pro bono attorneys handling

our asylum cases.

15.     With an injunction in place, Human Rights First would have to divert fewer

resources, and could better plan for the resources it will have to later expend, if any.

### B.  The Rule Will Materially Reduce the Number of Clients Human Rights First Can Assist

16.     The more stringent standards imposed by the Rule will require

Human Rights First to spend substantially more time preparing each impacted client for the

various steps of their proceedings. Each asylum representation will now take more time to

handle because our staff will exert more time and energy trying to hurdle the higher bars on the

path to asylum.  The more time we spend on one case translates into less time we can spend on another.  This will independently curb the number of clients the organization can assist.

17.     For the same reasons, the Rule also will make it more difficult, time consuming, and resource-intensive for Human Rights First to conduct its work. To serve those clients who remain eligible for relief under the Rule, Human Rights First is re-training staff as well as developing new training materials and presentations for the pro bono attorneys whom we mentor. We will need to conduct significant outreach to our pro bono network to assure that our pro bono partners know of the Rule and are making the necessary strategic adjustments to effectively serve their clients. The organization is, thus, already forced to divert significant staff time in anticipation of this Rule and its implementation.

18.     For instance, under the Rule, Human Rights First will be required to spend more time and resources on preparing individual applications for relief where derivative relief would have otherwise been available, absent the Rule. Many of the parents Human Rights First serves would be found ineligible for asylum under the Rule, such that their children and spouses would no longer be deemed derivative recipients of asylum, under the asylum application of the parent. For example, for a family comprised of a parent and four children, Human Rights First would, under the Rule, be forced to prepare five individual applications for relief, whereas, absent the Rule, Human Rights First would have prepared one primary application—which, if successful, could have secured derivative relief for the four children. Human Rights First would be required to divert additional resources to preparing separate cases, including separate legal analysis, evidence, and legal briefs, for each family member given the absence of derivative asylum eligibility, significantly increasing the total time and resources that must be spent on each client family's case. Furthermore, the increased time and

resources required to serve a single-family unit may reduce the incentive for volunteer attorneys to take on these matters, compounding the diversion of Human Rights First staff resources to represent these cases in-house. Human Rights First and volunteer attorneys will also need to dedicate additional time and resources to counseling clients through the family-separation consequences of the Rule, as well.

19.     Also, because the Rule aims to block much of the country conditions evidence Human Rights First typically gathers and presents in an asylum case by claiming that such evidence "promotes cultural stereotypes," Human Rights First would now have to adduce evidence that ostensibly does not run afoul of the Rule—an expert affidavit or report, for example.  Doing so places an additional strain on our finances and staff. It would allow us to take on fewer cases.  Up until now, experts are typically not necessary in most affirmative and many defensive cases if there is enough evidence to demonstrate dangerous country conditions.  Experts do not often provide opinions pro bono, and their fees per case typically run into the thousands of dollars.

20.     Human Rights First's ability to serve clients in proceedings before the Asylum Office also will be substantially reduced under the Rule. Human Rights First represents approximately 40 percent of its clients, especially children, before the Asylum Office in non-adversarial interviews. The Rule, however, requires Asylum Officers to consider "mandatory discretionary factors" as a negative factor in assessing asylum eligibility on new grounds, including, for example, those who crossed the southern border after traveling through a "third country" in which they did not apply for asylum protection.  About 42 percent of Human Rights First's current clients are from Northern Triangle countries, the overwhelming majority of whom did not apply for asylum in third countries en route to the United States.

Under the Rule, many previously-eligible asylum applicants will attend interviews before the Asylum Office, where cases subject to the Rule will be interviewed but then referred to the immigration court for adjudication, instead of receiving an asylum grant during a non-adversarial interview.  While this will now be the case for any asylum applicant who, under the Rule, no longer satisfies the refugee definition, this is also true for all cases in which any new or pre-Rule asylum bar applies. This is because the Asylum Office does not have jurisdiction to grant any person relief from removal in the form of withholding of removal under the Immigration and Nationality Act or protection under the Convention Against Torture, which are alternative forms of protective relief available to individuals who are barred from asylum.

21.     Thus, because of the Rule, our staff will be required to fully prepare evidence and testimony for a futile interview before the Asylum Office, only to later prepare a second round of evidence and testimony for an adversarial hearing before the immigration court. As non-detained immigration court proceedings typically take years to reach a decision on the merits, Human Rights First staff will now spend, on average, an additional two to four years representing cases that would have otherwise been resolved at the Asylum Office without a need for trial.  Thus, Human Rights First staff will be able to represent far fewer clients than they do currently, again, affecting both the organization's mission to protect refugees and its funding.

22.     For each fear-based case of a child on which Human Rights First serves as attorney or mentoring organization, our staff would now need to spend significantly more time preparing themselves or pro bono volunteers and the client for a trial rather than an interview. At the trial stage, Human Rights First staff would be forced to allocate significantly more time and resources briefing eligibility issues for each case of an asylum seeker subject to the Rule.

23.     Human Rights First also serves clients who have been granted asylum in their requests for family reunification, adjustment of status to legal permanent resident, and accessing benefits. Those of Human Rights First's clients who are subject to provisions of the Rule that will result in an asylum denial would become ineligible for these benefits, which are only available to asylees rather than recipients of withholding of removal or protection under the Convention Against Torture. As a result of the Rule, the number of clients to whom we are able to provide post-asylum-grant services will reduce significantly.

### C.  The Rule Will Imperil Human Rights First's Funding and Pro Bono Legal Support

24.     The reduction in the number of clients we can serve will, in turn, not only severely impair Human Rights First's ability to fulfill its mission of protecting refugees, but also harm its financial health. First, if Human Rights First places fewer clients with law firms due to the reduction in the number of clients we can serve and the more complicated nature of each case, Human Rights First risks its current level of law firm-derived funding, which is often tethered to how many Human Rights First-mentored asylum cases a law firm has on its pro bono docket. The Rule will significantly complicate the legal work involved in securing relief for affected clients, increasing the time and resources volunteer attorneys would need to dedicate to each matter. Furthermore, because the attendant benefits to the client (including family reunification and a pathway to citizenship) are fewer and the required work more onerous, the volunteer attorneys with whom we work are often disincentivized from taking on the case of an individual who is eligible only for withholding of removal, as opposed to asylum. Taken together, these changes independently will likely reduce the number of law firm attorneys willing to represent our clients. Without these sustainable relationships with law firm partners, which provide both in-kind and monetary donations, Human Rights First's financial

support from law firms will suffer.

25.     Second, Human Rights First now risks receiving less funding from state and local government funding sources.  Human Rights First receives funding from state and local grants where the amount of funding is directly tied to the number of clients the organization agrees to serve during the grant term. If we are forced to serve fewer clients because each case now takes longer and requires more resources than before the Rule went into effect, we will, correspondingly, receive less from those grants.  That per-client funding cannot be recouped by providing more or different services to a smaller number of clients.

### D. The Rule Will Materially Reduce the Number of Human Rights First Clients Who Will Obtain Asylum

26.     The Rule will drastically reduce the number of our clients who will be able to obtain asylum.  If the Rule had been in place previously, many of Human Rights First's clients, who are now asylees, would have been denied asylum or permanently separated from their families. The Rule will likely result in the deportation of our *bona fide* refugee clients who face grave violations of their human rights and qualify for asylum under the Immigration and Nationality Act. Those clients, who would otherwise be protected in the United States, would be forced to return to places where they would likely be murdered, tortured, or otherwise persecuted.

27.     The Rule redefines the elements of eligibility for asylum, while also creating new procedures for the adjudication of asylum claims. Under these new standards, most of our asylum-seeking clients—who under the current regulations are eligible for and would likely be granted asylum—will likely be ineligible for or denied asylum.  Below, we provide just some examples of the negative impact of the Rule when it goes into effect.  Because the Rule touches on almost every aspect of the asylum system, we do not provide an exhaustive list of

its effects here but can do so if necessary.  As discussed above, the harder it is to serve our clients because of these new hurdles, the fewer clients Human Rights First can serve, which impacts both our mission of protecting refugees and our funding.

28.     To start, under the Rule, many refugees, like our clients, will be deprived of the opportunity to present their application for asylum to an immigration judge or an asylum officer because they will be more likely to fail their preliminary screenings.

29.     Under the Rule, at those screenings, immigrants seeking withholding of removal and Convention Against Torture protection must meet a higher standard to establish the requisite fear. The new standard, a "reasonable possibility," is more onerous than the current "significant possibility" standard. Furthermore, the Rule requires screening officers to assess any potentially relevant asylum bars at the credible-fear screening stage. If the officer determines that the asylum seeker is subject to a bar, then the asylum seeker must meet the even higher standard by showing a "reasonable possibility" of persecution or torture.

30.     Many individuals fleeing serious harm and persecution will struggle to meet these higher burdens because they must meet them in a preliminary interview that takes place at or near a port of entry or border, only days after what is often a long and traumatic journey. As a result of the Rule, these individuals may never reach the interior of the United States where they would have the opportunity to engage Human Rights First's legal assistance, which will also negatively impact the number of clients Human Rights First will be able to serve.

31.     The following are just some examples of Human Rights First clients who were granted asylum prior to the Rule, but whom the government would be able to contend, for various reasons, are ineligible for asylum under the Rule once it goes into effect:

a. Ms. OM fled El Salvador after suffering years of domestic violence. Her partner beat her, strangled her, threatened her with a knife, and even beat their young child. She eventually fled to Guatemala, where she lived without permanent legal status, but in relative safety for years. She married and tried to move on with her life, but her former partner discovered this and tried to kill her. She sought police protection, but her former partner was never prosecuted. Eventually, he hired hitmen to break into her home and try to kill her. The police refused to protect her. With no other recourse, Ms. OM first tried to flee to Mexico, but she was sexually assaulted and robbed, forcing her to seek asylum instead in the United States. She entered the United States without inspection and was later granted asylum. If the Rule had been in place at the time her claim was adjudicated, Ms. OM would have faced significant barriers to receiving humanitarian relief. The Rule imposes a near-categorical exclusion of claims founded on gender-based particular social groups and persecution based on domestic violence. *See* 85 Feg. Reg. at 80,386; 80,395. The government would also likely contend that Ms. OM was firmly resettled, and therefore barred from asylum. *See* 85 Fed. Reg. at 80,397. Moreover, the government would fault Ms. OM for the fact that she was forced, for financial and geographic reasons, to pass through another country en route to the United States. *See* 85 Fed. Reg. at 80,387–80,388; 80,396. Her manner of entry would have also constituted a negative discretionary factor weighing against favorable adjudication. *See* 85 Fed. Reg. at 80,387. Under the Rule, Ms. OM would likely have been forced to return to a country where her life is in danger.

b. Mr. R is a gay man from Azerbaijan who fled his home country after suffering

significant physical, sexual, and verbal abuse on account of his sexual orientation. Mr. R experienced significant physical and sexual abuse throughout his childhood, from members of his household. In adulthood, he remained closeted and feared his sexual orientation being discovered, as he knew others who were beaten, raped, and even killed in Azerbaijan. He eventually met a man he met online, but soon discovered that it was a sting operation set up by the police to arrest him on false pretenses because of his sexual orientation. While in custody, the police beat and interrogated him. The police called a family member and outed him before he was released. Mr. R feared that the rest of his family would discover his sexual orientation and kill him. Soon thereafter, he fled to the United States and was granted asylum. Like Ms. OM, Mr. R's claim likely would have been thwarted by the Rule. The government may have rejected Mr. R's claim on nexus grounds, characterizing the claim as one of personal animus, or penalized Mr. R for failing to prove his persecutors showed animus toward all gay men. *See* 85 Feg. Reg. at 80,386; 80,395. In other words, the Rule's narrowing of what constitutes nexus may have resulted in Mr. R's forcible return to Azerbaijan and the violence he suffered on the basis of his sexual orientation.

c. Ms. GH, a transgender woman from Honduras, fled her home country after suffering horrific physical, sexual, and verbal abuse at the hands of gangs, family members, teachers, members of society, and members of the military and police. For years, she was targeted for her sexual orientation and gender identity. She tried reporting the violence, but the police mocked her and refused to allow her to report any violence against her. After she was nearly drowned and threatened with

decapitation by a local gang, she fled to Mexico to seek protection. While in

Mexico, she received humanitarian protection and legal status, but she continued

experiencing physical harm and threats from members of society and gangs. She

was robbed and assaulted, hit with a machete, and suffered an attempted sexual

assault. After several months in Mexico, Ms. GH decided that she could not safely

remain in Mexico.  So, she sought protection at the U.S. border. She sought

assistance twice, but was turned away. She entered the United States without

inspection and sought legal assistance. Due to ineffective assistance of counsel, she

missed her one-year filing deadline, but she subsequently found new counsel and

her application for asylum was granted. In addition to facing the gender- and

animus-based nexus obstacles discussed above, Ms. GH would have faced an

additional obstacle if the Rule were in place: her brief and treacherous stay in

Mexico likely would have been considered "firm resettlement" under the Agencies'

redefinition of the term, and her application would have been barred. *See* 85 Fed.

Reg. at 80,388; 80,397. Further, her manner of entry would have been considered a

negative discretionary factor weighing against a grant of protection. *See* 85 Fed.

Reg. at 80,387.

d. Ms. MH and her minor child from El Salvador fled their home country and sought

asylum after being targeted by the police and a rival gang because of her former

partner's alleged gang membership. Police believed that Ms. MH's former partner

and father of her child committed a crime, and they came to the family home,

threatening to kill Ms. MH and her child. When Ms. MH and the child were not

home, uniformed police officers abducted Ms. MH's father-in-law and brother-in-

law. They were later discovered, dead in a field. Fearing for her life, Ms. MH fled

to the United States, traveling by land from El Salvador, through Guatemala and

Mexico, before entering the United States without inspection. She was

subsequently granted asylum. In addition to Ms. MH's manner of entry weighing

against a grant of relief, as discussed above, she would have been subject to the

third-country transit bar. *See* 85 Fed. Reg. at 80,391; 80,399. The Rule also leaves

open the possibility that, depending on the specifics of the threat, even a serious

threat alone will not qualify as persecution, meaning that an individual like Ms.

MH would need to be physically harmed before she could claim persecution. *See*

85 Fed. Reg. at 80,386; 80,395.

e.  Ms. M fled Honduras with her minor son after her husband, who was a member of

an anti-gang community watch group, was murdered by gang members for his

activism. Her husband and the other members of the citizen's watch group patrolled

the neighborhood, supported by local police, to protect the community from the

takeover of gangs. As a result of their anti-gang activism, each of the members was

systematically murdered. The gang members then began targeting the watch group

members' families. After her husband's murder, the police offered Ms. M and her

family no meaningful protection. Because of her husband's activism, the gang

began terrorizing Ms. M and her son, shooting up their household and threatening

to kill the family. With no opportunities for protection from the gang, Ms. M and

her son flew from Honduras to Mexico, before entering the United States without

inspection. She was subsequently granted asylum. Had the Rule been in effect, Ms.

M's manner of entry and travel through Mexico would have weighed against a

favorable adjudication, as discussed above. Given her persecutors would be considered "private actors," the Rule would have also created nexus issues and a presumption of internal relocation. *See* Fed. Reg. at 80,386, 80,387. Taken together, these factors would have likely barred Ms. M from relief.

f.   Ms. A, a young woman from Saudi Arabia, fled her home country after she had been locked in her home for over six months and beaten by her father. Despite growing up in a conservative Islamic family, she does not regard herself as a Muslim because she disagrees with the religious rules and customs in Saudi Arabia, including forbidding music and requiring women to be covered. She loves music, and she posted music videos produced by herself on YouTube, where she did not wear a covering and appeared with a male actor. She also criticized the crown prince on Twitter for failing to change the male guardian system in Saudi Arabia. She flew through UAE on her way to the United States. She was subsequently granted asylum in the United States. Under the Rule, Ms. A's persecution would be dismissed as "private actor" harm. In addition, she would likely be unable to introduce evidence of views of women in Saudi society to support her claim, *see* 85 Fed. Reg. at 80,386; 80,395, and her political opinion would likely fall outside the scope of the Rule's narrow definition, *see* 85 Fed. Reg. at 80,385; 80,394. But her case also highlights another injustice in the Rule: the potentially deadly consequences of an indirect flight.  Ms. A would have been "lucky" in that her flight path involved transit through only one additional country and UAE has not signed the Refugee Convention.  *See* 85 Fed. Reg. at 80,387; 80,396. But if Ms. A had happened to make two stops through signatory countries instead, the

adjudicator would only be able to grant her application in "extraordinary circumstances." *See* 85 Fed. Reg. at 80,388; 80,397. The fact that the number of transit stops can convert a meritorious application into a near-automatic denial demonstrates the absurdity of the Rule.

32.     These individuals with valid asylum claims—claims that were, in fact, successful—would nonetheless face near-insurmountable hurdles under the Rule. The Rule's disparagement of gender-based claims, penalization of asylum seekers for the route by which they fled, minimization of threats constituting persecution, nonsensical interpretation of what it means to be firmly resettled, illogical narrowing of qualifying political opinions, and improper exclusion of relevant evidence would likely have thwarted their meritorious claims. This is the very definition of *refoulement*.

33.     Human Rights First would have needed to expend significantly more resources on these cases, which ultimately would likely have failed. Countless future applicants with similar and equally valid claims may now be unsuccessful due to the Rule. In this way, the Agencies will achieve their admitted effect and likely goal: "fewer grants of asylum."  For the reasons stated above, this will negatively impact Human Rights First's mission of protecting refugees in a concrete way and its funding.

## II.     The Agencies Improperly Deprived Human Rights First of a Meaningful Opportunity to Comment on the Rule

34.     The Rule's lack of an adequate notice-and-comment period also irreparably compromised Human Rights First's Refugee Protection program's critical advocacy objectives, which are anchored in our mission of ensuring meaningful access to an asylum system that complies with domestic and international legal obligations. This represents such an inadequate opportunity—30 days during a global pandemic—to provide Human Rights First's

expertise on asylum in opposition to a proposed Rule whose changes to the asylum system amount to a complete overhaul of the system, that it impaired our ability to achieve our mission of advocating for meaningful access to asylum. It limited Human Rights First's ability to inform the Government of the substantial harms—both to the organization and its clients— that the proposed Rule would create. Commenting on rules and regulations is an important part of Human Rights First's mission to safeguard the lives of refugees and to protect meaningful access to the asylum system. Human Rights First frequently comments on rules and regulations related to protecting the interests of asylum seekers, and it often leads the efforts of civil society to analyze and advocate for regulations that protect access to asylum. On July 15, 2020, Human Rights First submitted a comment in opposition to the Rule, noting its "changes are so sweeping that any one provision would require longer than a 30-day comment period. To give the public only 30 days to respond meaningfully to this unprecedented rule, especially during a global pandemic, will essentially deprive the public of the right to comment on the NPRM." Had Human Rights First been given an adequate opportunity to inform the government of the myriad harms this Rule will create, its comment would have been more comprehensive.

35.     In sum, the Rule would irreparably harm Human Rights First. The Rule frustrates Human Rights First's fundamental organizational mission to serve and protect refugees, and advocate for meaningful access to the asylum system. It is forcing a significant diversion of organizational resources presently and will further materially reduce volunteer capacity and funding upon its effective date. The number of clients Human Rights First is able to serve will shrink significantly under the Rule, both because fewer clients would be eligible for asylum relief and because the organization would have to spend more of its limited

resources on each individual case to apply for additional forms of relief such as withholding of

removal or protection under the Convention Against Torture. The Rule also forces

Human Rights First to divert scarce resources away from other important programs to

compensate for the additional time, procedures, and staff required to continue serving clients

under the Rule. The reduction in the number of clients Human Rights First will be able to

serve will also harm the organization financially, by jeopardizing funding streams, including

those tied directly and indirectly to the number of clients we serve.

36.     The relief requested in Plaintiffs' Complaint would properly address the injuries

to Human Rights First as described above. If Plaintiffs prevail in this action,

Human Rights First would be better equipped to fulfill its organizational mission of protecting

refugees and devote its staff time and resources to more clients than if the Rule were in effect.

37.     Human Rights First has no plain, adequate, or complete remedy at law. It would

suffer immediate and irreparable injury under the Rule, if not enjoined.

I declare under penalty of perjury that the foregoing is true and correct.


Dated: December 21, 2020

Washington, D.C.

Michael Breen