## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

HUMAN RIGHTS FIRST,

Plaintiff,

v.

CHAD F. WOLF, *et al.*,

Defendants.

Civil Action No. 1:20-cv-3764-TSC

## <u>MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO THE MOTION FOR PRELIMINARY INJUNCTION</u>

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... ii

INTRODUCTION .................................................................................................................... 1

LEGAL BACKGROUND ........................................................................................................ 3

STANDARD OF REVIEW ...................................................................................................... 8

ARGUMENT ........................................................................................................................... 8

    I.   Plaintiff's Claims Are Not Justiciable. ........................................................................ 9

        A.  Plaintiff Does Not Have Standing. ..................................................................... 9

        B.  Plaintiff Is Not Within the INA's Zone of Interests. ....................................... 12

        C.  Plaintiff Cannot Challenge the Rule's Changes to Credible Fear Process. ............... 13

    II.  Plaintiff's Claims Are Not Likely to Succeed on the Merits. ........................................ 15

        A.  The Rule Is Not Ultra Vires. ............................................................................ 15

                1.  Chad Wolf had authority to promulgate the Rule. ................................. 15

                2.  The Rule is a valid exercise of the Departments' statutory authority. ................. 18

        B.  The Rule Is Not Arbitrary or Capricious. ......................................................... 22

                1.  The Departments adequately responded to comments. ......................... 22

                2.  The Departments considered the costs and benefits. ............................ 24

                3.  The Departments did not fail to consider obvious alternatives. ................ 26

                4.  Thirty days was sufficient for the comment and publication periods. ................. 26

                5.  The Departments' reasoning is sound. ................................................... 28

                6.  The Rule supports the rationales provided for it. .................................. 32

        C.  The Rule Is Valid Under the INA. .................................................................... 35

    III. Considerations of Irreparable Harm and the Equities Favor the Government. ................. 41

    IV. Any Relief Must Be Sharply Limited. .......................................................................... 42

CONCLUSION ....................................................................................................................... 45

# TABLE OF AUTHORITIES

## Cases

*Abbott Labs. v. Gardner*,
  387 U.S. 136 (1967).................................................................................................. 43

*Abdille v. Ashcroft*,
  242 F.3d 477 (9th Cir. 2001) ................................................................................... 35

*Adams v. Vance*,
  570 F.2d 950 (D.C. Cir. 1978).................................................................................. 42

*AILA v. Reno*,
  18 F. Supp. 2d 38 (D.D.C. 1998)............................................................................. 21

*AILA v. Reno*,
  199 F.3d 1352 (D.C. Cir. 2000)........................................................................... 14, 45

*Air Transp. Ass'n of Am. v. FAA*,
  169 F.3d 1 (D.C. Cir. 1999)...................................................................................... 27

*Al-Fara v. Gonzales*,
  404 F.3d 733 (3d Cir. 2005) ........................................................................ 23, 33, 38

*Ariz. Christian Sch. Tuition Org. v. Winn*,
  563 U.S. 125 (2011).................................................................................................. 11

*Ariz. Pub. Serv. Co. v. EPA*,
  211 F.3d 1280 (D.C. Cir. 2000)........................................................................... 40, 41

*ASPCA v. Feld Entm't, Inc.*,
  659 F.3d 13 (D.C. Cir. 2011)............................................................................... 10, 11

*Assoc. Dog Clubs of N.Y., Inc. v. Vilsack*,
  75 F. Supp. 3d 83 (D.D.C. 2014).............................................................................. 32

*Barr v. Am. Ass'n of Political Consultants, Inc.*,
  140 S. Ct. 2335 (2020).............................................................................................. 43

*Batalla Vidal v. Wolf*,
  Nos. 16-CV-4756 (NGG) (VMS) & 17-CV-5228 (NGG) (RER),
  2020 WL 6695076 (E.D.N.Y. Nov. 14, 2020) ........................................................ 18

*Cal. Ass'n of Private Postsecondary Sch. v. DeVos*,
  344 F. Supp. 3d 158 (D.D.C. 2018).......................................................................... 42

*California v. Azar*,
  911 F.3d 558 (9th Cir. 2018) .................................................................................... 44

*Camp v. Pitts*,
    411 U.S. 138 (1973).............................................................................................. 28

*Campos v. INS*,
    62 F.3d 311 (9th Cir. 1995) ................................................................................ 13

*Capital Area Immigrants' Rights Coal. v. Trump*,
    No. 1:19-cv-02117-TJK, 2019 WL 3436501 (D.D.C. July 24, 2019)................................. 42

*Casa de Md. v. Wolf*,
    No. 8:20-cv-02118-PX, 2020 WL 5500165 (D. Md. Sept. 11, 2020) ................................. 18

*Cazun v. Att'y Gen.*,
    856 F.3d 249 (3d Cir. 2017) ................................................................................ 21

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
    467 U.S. 837 (1984)................................................................................... 2, 19, 40

*Cigar Ass'n of Am. v. U.S. Food & Drug Admin.*,
    No. 1:16-CV-01460 (APM), 2020 WL 4816459 (D.D.C. Aug. 19, 2020)........................... 24

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
    401 U.S. 402 (1971)............................................................................................ 27

*City of Brookings Mun. Tel. Co. v. FCC*,
    822 F.2d 1153 (D.C. Cir. 1987)........................................................................... 26

*City of Portland, Or. v. EPA*,
    507 F.3d 706 (D.C. Cir. 2007)............................................................................. 22

*CityFed Fin. Corp. v. Office of Thrift Supervision*,
    58 F.3d 738 (D.C. Cir. 1995)............................................................................... 42

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013)............................................................................................ 11

*Clarke v. Sec. Indus. Ass'n*,
    479 U.S. 388 (1987)............................................................................................ 12

*Cordon-Garcia v. INS*,
    204 F.3d 985 (9th Cir. 2000) .............................................................................. 40

*Dep't of Commerce v. New York*,
    139 S. Ct. 2551 (2019)........................................................................................ 25

*E. Bay Sanctuary Covenant v. Trump*,
    950 F.3d 1242 (9th Cir. 2020) ............................................................................ 13

*Entergy Corp. v. Riverkeeper Inc.*,
   556 U.S. 208 (2009) ...................................................................................................... 24

*Espinosa-Cortez v. Att'y Gen*,
   607 F.3d 101 (3d Cir. 2010) ................................................................................. 39, 40, 41

*Fair Empl. Council of Greater Washington, Inc. v. BMC Mktg.*,
   28 F.3d 1268 (D.C. Cir. 1994) ...................................................................................... 10

*FAIR v. Reno*,
   93 F.3d 897 (D.C. Cir. 1996) ......................................................................................... 13

*FBME Bank Ltd. v. Mnuchin*,
   249 F. Supp. 3d 215 (D.D.C. 2017) .......................................................................... 23, 24

*Food & Water Watch, Inc. v. Vilsack*,
   808 F.3d 905 (D.C. Cir. 2015) ......................................................................................... 8

*Gill v. Whitford*,
   138 S. Ct. 1916 (2018) ............................................................................................... 9, 43

*Grace v. Barr*,
   965 F.3d 883 (D.C. Cir. 2020) ................................................................... 20, 33, 34, 44

*Havens Realty Co. v. Coleman*,
   455 U.S. 363 (1982) .......................................................................................... 9, 10, 11, 12

*Immigrant Legal Research Ctr. v. Wolf*,
   No. 20-cv-05883-JSW, 2020 WL 5798269 (N.D. Cal. Sept. 29, 2020) ............................... 18

*In re Grand Jury Investigation*,
   916 F.3d 1047 (D.C. Cir. 2019) ...................................................................................... 17

*Initiative & Referendum Inst. v. Walker*,
   450 F.3d 1082 (10th Cir. 2006) ...................................................................................... 12

*Innovation Law Lab v. McAleenan*,
   924 F.3d 503 (9th Cir. 2019) .......................................................................................... 42

*INS v. Aguirre-Aguirre*,
   526 U.S. 415 (1999) ................................................................................................. passim

*INS v. Cardoza-Fonseca*,
   480 U.S. 421 (1987) ...................................................................................... 4, 5, 23, 29

*INS v. Elias-Zacarias*,
   502 U.S. 478 (1992) ................................................................................................. 39, 40

*INS v. Legalization Assistance Project*,
    510 U.S. 1301 (1993) ........................................................................................................... 13

*INS v. Stevic*,
    467 U.S. 407 (1984) ....................................................................................................... 4, 28

*J.E.F.M. v. Lynch*,
    837 F.3d 1026 (9th Cir. 2016) ............................................................................................. 9

*Kisor v. Wilkie*,
    139 S. Ct. 2400 (2019) ...................................................................................................... 16

*Las Americas Immigrant Advocacy Ctr. v. Wolf*,
    No. 19-cv-3640 (KBJ), 2020 WL 7039516 (D.D.C. Nov. 30, 2020) .................................... 21

*Madsen v. Women's Health Ctr., Inc.*,
    512 U.S. 753 (1994) .......................................................................................................... 43

*Make the Road N.Y. v. Wolf*,
    962 F.3d 612 (D.C. Cir. 2020) ...................................................................................... 14, 15

*Mandebvu v. Holder*,
    755 F.3d 417 (6th Cir. 2014) ............................................................................................. 41

*Marroquin-Ochoma v. Holder*,
    574 F.3d 574 (8th Cir. 2009) ............................................................................................. 40

*Maryland v. King*,
    567 U.S. 1301 (2012) ........................................................................................................ 41

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
    567 U.S. 209 (2012) .......................................................................................................... 13

*Morton v. Ruiz*,
    415 U.S. 199 (1974) .......................................................................................................... 19

*Munaf v. Geren*,
    553 U.S. 674 (2008) ............................................................................................................ 8

*Nat'l & Telecomm. Ass'n v. Brand X Internet Servs*,
    545 U.S. 967 (2005) .......................................................................................................... 36

*Nat'l Immigration Project of Nat'l Lawyers Guild v. EOIR*,
    456 F. Supp. 3d 16 (D.D.C. 2020) ..................................................................................... 10

*Nat'l Lifeline Ass'n v. FCC*,
    921 F.3d 1102 (D.C. Cir. 2019) ......................................................................................... 26

*Nat'l Mining Ass'n v. U.S. Army Corps of Engineers,*
145 F.3d 1399 (D.C. Cir. 1998).............................................................. 44

*Nat'l Shooting Sports Found. v. Jones,*
716 F.3d 200 (D.C. Cir. 2013)................................................................ 26

*Neb. Dep't of Health & Human Servs. v. Dep't of Health & Human Servs.,*
435 F.3d 326 (D.C. Cir. 2006)............................................................... 44

*NLRB v. SW Gen., Inc.,*
137 S. Ct. 929 (2017).......................................................................... 18

*NRDC v. SEC,*
606 F.2d 1031 (D.C. Cir. 1979)............................................................. 26

*NTEU v. United States,*
101 F.3d 1423 (D.C. Cir. 1996)............................................................. 10

*NWIRP v. U.S.C.I.S.,*
No. 19-cv-3283, 2020 WL 5995206 (D.D.C. Oct. 8, 2020)........................... 16, 17

*Omar v. McHugh,*
646 F.3d 13 (D.D.C. 2011) .................................................................... 5

*Patchak v. Zinke,*
138 S. Ct. 897 (2018)........................................................................... 15

*PETA v. U.S. Dep't of Agric.,*
797 F.3d 1087 (D.C. Cir. 2015)............................................................... 9

*Petry v. Block,*
737 F.2d 1193 (D.C. Cir. 1984).............................................................. 26

*Pub. Citizen, Inc. v. FAA,*
988 F.2d 186 (D.C. Cir. 1993)................................................................ 23

*Quintanilla-Ticas v. INS,*
783 F.2d 955 (9th Cir. 1986) ................................................................. 31

*Reytblatt v. U.S. Nuclear Regulatory Comm'n,*
105 F.3d 715 (D.C. Cir. 1997)................................................................ 23

*Rosenberg v. Yee Chien Woo,*
402 U.S. 49 (1971)............................................................................... 36

*Ryan v. United States,*
136 U.S. 68 (1890)............................................................................... 17

*Saldarriaga v. Gonzales,*
    402 F.3d 461 (4th Cir. 2005) .................................................................. 39, 40

*Sangha v. INS,*
    103 F.3d 1482 (9th Cir. 1997) ................................................................ 39, 41

*Smith v. Janey,*
    664 F. Supp. 2d 1 (D.D.C. 2009) ................................................................... 37

*Spokeo, Inc. v. Robins,*
    136 S. Ct. 1540 (2016) ..................................................................................... 9

*Sung Kil Jang v. Lynch,*
    812 F.3d 1187 (9th Cir. 2015) ...................................................................... 36

*Sure-Tan, Inc. v. NLRB,*
    467 U.S. 883 (1984) ...................................................................................... 12

*Thompson v. Clark,*
    741 F.2d 401 (D.C. Cir. 1984) ..................................................................... 23

*Tilija v. Att'y Gen. U.S.,*
    930 F.3d 165 (3d Cir. 2019) ......................................................................... 37

*Time Warner Entm't Co. v. FCC,*
    240 F.3d 1126 (D.C. Cir. 2001) ................................................................... 25

*Trump v. Hawaii,*
    138 S. Ct. 2392 (2018) .................................................................................. 43

*U.S. Ass'n of Reptile Keepers, Inc. v. Jewell,*
    106 F. Supp. 3d 125 (D.D.C. 2015) ............................................................. 44

*U.S. Ass'n of Reptile Keepers, Inc. v. Zinke,*
    852 F.3d 1131 (D.C. Cir. 2017) ................................................................... 44

*United States v. Bahena-Cardenas,*
    411 F.3d 1067 (9th Cir. 2005) ...................................................................... 30

*US Ecology, Inc. v. U.S. Dep't of Interior,*
    231 F.3d 20 (D.C. Cir. 2000) ....................................................................... 12

*Va. Soc'y for Human Life v. Fed. Election Comm'n,*
    263 F.3d 379 (4th Cir. 2001) ....................................................................... 43

*Velasquez v. Sessions,*
    866 F.3d 188 (4th Cir. 2017) ................................................................... 4, 33

*Velasquez-Valencia v. INS*,
    244 F.3d 48 (1st Cir. 2001) ................................................. 40

*Vt. Yankee Nucl. Power Corp. v. NRDC*,
    435 U.S. 519 (1978) ......................................................... 27

*Warth v. Seldin*,
    422 U.S. 490 (1975) ........................................................... 9

*Wash. All. of Tech. Workers v. U.S. DHS*,
    892 F.3d 332 (D.C. Cir. 2018) ............................................ 27

*White Stallion Energy Ctr. v. EPA*,
    748 F.3d 1222 (2014) (D.C. Cir. 2014) ................................ 24

*White v. Abrams*,
    495 F.2d 724 (9th Cir. 1974) .............................................. 37

*Winter v. NRDC*,
    555 U.S. 7 (2008) ......................................................... 8, 43

*Zetino v. Holder*,
    622 F.3d 1007 (9th Cir. 2010) ............................................ 34

*Zhiqiang Hu v. Holder*,
    652 F.3d 1011 (9th Cir. 2011) ....................................... 40, 41

## Administrative Decisions

*Matter of A-B-*,
    27 I. & N. Dec. 316 (A.G. 2018) ........................................ 30

*Matter of A-C-A-A-*,
    28 I. & N. Dec. 84 (A.G. 2020) .......................................... 30

*Matter of Acosta*,
    19 I. & N. Dec. 211 (BIA 1985) ......................................... 31

*Matter of A-G-G-*,
    25 I. & N. Dec. 486 (BIA 2011) ......................................... 35

*Matter of A-R-C-G-*,
    26 I. & N. Dec. 388 (BIA 2014) ......................................... 30

*Matter of C-V-T-*,
    22 I. & N. Dec. 7 (BIA 1998) ............................................ 29

*Matter of D-A-C-*,
    27 I. & N. Dec. 575 (BIA 2019) ......................................... 29

*Matter of Mendez*,
  21 I. & N. Dec. 296 (BIA 1996) ................................................................. 29

*Matter of M-E-V-G-*,
  26 I. & N. Dec. 227 (BIA 2014) ............................................................ 4, 33

*Matter of Mogharrabi*,
  19 I. & N. Dec. 439 (BIA 1987) ................................................................. 32

*Matter of Pula*,
  19 I. & N. Dec. 467 (BIA 1987) ........................................................... 28, 29

*Matter of W-G-R-*,
  26 I. & N. Dec. 208 (BIA 2014) ................................................................. 33

## Federal Statutes

15 U.S.C. § 633(b)(1) ................................................................................. 17

28 U.S.C. § 1331 ................................................................................. 14, 15

38 U.S.C. § 304 ........................................................................................... 17

40 U.S.C. § 302(b) ...................................................................................... 17

42 U.S.C. § 902(b)(4) ................................................................................. 17

5 U.S.C. § 3345 ........................................................................................... 18

5 U.S.C. § 3346(a)(1) ............................................................................ 17, 18

5 U.S.C. § 3347(a)(1) ................................................................................. 18

5 U.S.C. § 553 ...................................................................................... 26, 27

5 U.S.C. § 702 ............................................................................................. 12

5 U.S.C. § 702 ............................................................................................. 15

5 U.S.C. § 702(1) ........................................................................................ 43

5 U.S.C. § 703 ............................................................................................. 43

5 U.S.C. § 705 ...................................................................................... 43, 44

5 U.S.C. § 706(2) ........................................................................................ 43

5 U.S.C. § 801(a)(3) .................................................................................... 27

5 U.S.C. § 804(2) ........................................................................................... 27

5 U.S.C. § 805 ................................................................................................ 27

6 U.S.C. § 112 .................................................................................................. 6

6 U.S.C. § 113 .................................................................................................. 5

6 U.S.C. § 113(g)(1) ....................................................................................... 17

6 U.S.C. § 113(g)(2) ................................................................................. passim

8 C.F.R. § 1240.8(d) ...................................................................................... 36

8 U.S.C. §  1158(a)(2) ...................................................................................... 4

8 U.S.C. §  1158(b)(2) ...................................................................................... 4

8 U.S.C. §  1225(b)(1)(B)(iii)(III) .................................................................... 5

8 U.S.C. § 1101(a)(42) ..................................................................................... 4

8 U.S.C. § 1103(a) ........................................................................................... 2

8 U.S.C. § 1103(a)(1) .......................................................................... 1, 19, 21

8 U.S.C. § 1103(a)(3) ............................................................................... 1, 20

8 U.S.C. § 1103(g) ........................................................................................... 2

8 U.S.C. § 1103(g)(2) ............................................................................ 1, 20, 21

8 U.S.C. § 1158 ............................................................................................. 4, 5

8 U.S.C. § 1158(a)(1) ....................................................................................... 4

8 U.S.C. § 1158(b) ........................................................................................... 4

8 U.S.C. § 1158(b)(1)(A) ..................................................................... 4, 20, 28

8 U.S.C. § 1158(b)(1)(B) .................................................................................. 4

8 U.S.C. § 1158(b)(1)(B)(i) ....................................................................... 4, 36

8 U.S.C. § 1158(b)(1)(B)(iii) ......................................................................... 31

8 U.S.C. § 1158(b)(2)(A) ............................................................................... 21

8 U.S.C. § 1158(b)(2)(A)(vi) ......................................................................... 35

8 U.S.C. § 1158(b)(2)(C) ................................................................................ 21

8 U.S.C. § 1158(d)(4)(A) ................................................................................ 12

8 U.S.C. § 1158(d)(7) ..................................................................................... 13

8 U.S.C. § 1225 ........................................................................................ 4, 19

8 U.S.C. § 1225(a)(1)(B)(iii)(III) .................................................................... 32

8 U.S.C. § 1225(b) .......................................................................................... 14

8 U.S.C. § 1225(b)(1) ........................................................................... 5, 14, 15

8 U.S.C. § 1225(b)(1)(A)(i) ............................................................................... 5

8 U.S.C. § 1225(b)(1)(A)(ii) .............................................................................. 5

8 U.S.C. § 1225(b)(1)(B)(ii) ............................................................................ 19

8 U.S.C. § 1225(b)(1)(B)(v) .............................................................................. 5

8 U.S.C. § 1225(b)(1)(C) ................................................................................... 5

8 U.S.C. § 1229a(a)(1) ............................................................................... 36, 37

8 U.S.C. § 1229a(c)(4)(C) ............................................................................... 31

8 U.S.C. § 1231 Note(b) ................................................................................... 5

8 U.S.C. § 1231(b)(3)(A) ................................................................................... 5

8 U.S.C. § 1252 ......................................................................................... 13, 14

8 U.S.C. § 1252(a) ......................................................................................... 12

8 U.S.C. § 1252(a)(2) ..................................................................................... 14

8 U.S.C. § 1252(a)(2)(A) ................................................................................ 15

8 U.S.C. § 1252(a)(2)(A)(ii) ........................................................................... 15

8 U.S.C. § 1252(a)(2)(A)(iii) ............................................................................ 5

8 U.S.C. § 1252(a)(2)(A)(iv) ........................................................................... 15

8 U.S.C. § 1252(a)(5) ................................................................................... 9, 12

8 U.S.C. § 1252(b)(9) .............................................................................. 9, 10, 12

8 U.S.C. § 1252(e) ......................................................................................................... 14

8 U.S.C. § 1252(e)(1) ..................................................................................................... 44

8 U.S.C. § 1252(e)(2) ................................................................................................ 5, 12

8 U.S.C. § 1252(e)(3) ....................................................................................... 2, 14, 15, 44

8 U.S.C. § 1252(e)(3)(A) ............................................................................................... 14

8 U.S.C. § 1252(e)(3)(B) ............................................................................................... 14

8 U.S.C. § 1252(f) ......................................................................................................... 44

Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. No. 105-277,
   Div. G, Title XXII, § 2242, 112 Stat. 2681-822 (1998) ......................................... 5

## Federal Regulations

8 C.F.R. § 1003.42(f) ...................................................................................................... 5

8 C.F.R. § 1208.13(b)(3) ............................................................................................... 31

8 C.F.R. § 1208.13(e) ............................................................................................... 36, 37

8 C.F.R. § 1208.16(b) ...................................................................................................... 5

8 C.F.R. § 1208.16(b)(3) ............................................................................................... 31

8 C.F.R. § 1208.16(c)(2) .................................................................................................. 5

8 C.F.R. § 1208.18(a) ...................................................................................................... 5

8 C.F.R. § 1240.10(d) .................................................................................................... 38

8 C.F.R. § 1240.11(c)(3) ................................................................................................ 38

8 C.F.R. § 208.13(b)(3) ................................................................................................. 31

8 C.F.R. § 208.16 ............................................................................................................. 5

8 C.F.R. § 208.16(b)(3) ................................................................................................. 31

8 C.F.R. § 208.16(c)(2) .................................................................................................... 5

8 C.F.R. § 208.17 ............................................................................................................. 5

8 C.F.R. § 208.18 ............................................................................................................. 5

8 C.F.R. § 208.18(a) ........................................................................................................ 5

8 C.F.R. § 208.30(e)(3) ............................................................................................... 5

8 C.F.R. § 212.5(d) .................................................................................................... 28

*Procedures for Asylum and Withholding of Removal; Credible Fear and Reasonable Fear Review*,
   85 Fed. Reg. 36,264 (June 15, 2020) ........................................................... 1, 7, 29

*Procedures for Asylum and Withholding of Removal; Credible Fear and Reasonable Fear Review*,
   85 Fed. Reg. 80,274 (Dec. 11, 2020) ................................................................ passim

## Miscellaneous

81 Fed. Reg. 90,667 (Dec. 9, 2016) ............................................................................. 6

Amicus Brief for Nicholas Bagley and Samuel L. Bray,
   *Trump v. Pennsylvania*, No. 19-454, 2020 WL 1433996, at *11-17 (2017) (Mar. 9, 2020) ........................................................................................................ 43

H.R. Rep. No. 1980, 79th Cong., 2d Sess. 42 (1946) ................................................ 44

Merriam-Webster Dictionary, available at https://www.merriam-webster.com/ ......... 39

S. Rep. No. 105-250 (1998) ........................................................................................ 18

S. Rep. No. 752, 79th Cong., 1st Sess. 26 (1945) ...................................................... 44

## INTRODUCTION

Plaintiff's motion seeks to halt on a universal basis an important and well-supported rulemaking effort, issued jointly by the Department of Justice and the Department of Homeland Security (DHS) that implements critical reforms for seeking asylum and related protection in this country and provides much-needed and long-awaited guidance on how to interpret undefined and ambiguous terms in the Immigration and Nationality Act (INA). *Procedures for Asylum and Withholding of Removal; Credible Fear and Reasonable Fear Review*, 85 Fed. Reg. 80,274 (Dec. 11, 2020) (Rule). Although the current rulemaking effort commenced with the publication of a proposed rule in June 2020, the Rule is in actuality the culmination of an effort to revise the asylum regulations that dates back more than 20 years. As explained below, the Rule is within the Departments' broad authority to implement the immigration laws, is consistent with the INA, and complies with the rulemaking requirements of the Administrative Procedure Act (APA). The Court accordingly should reject Plaintiff's sweeping request to enjoin the Rule.

Congress indisputably granted the Attorney General and DHS Secretary significant authority to implement the nation's immigration laws. The INA states that the Attorney General and the Secretary "shall establish such regulations" as they determine to be "necessary" for carrying out their authority under the INA, including administering the asylum laws. 8 U.S.C. § 1103(a)(3), (g)(2). And the INA provides "[t]hat determination[s] … by the Attorney General with respect to all questions of law shall be controlling." 8 U.S.C. § 1103(a)(1).

The Departments have carried out their foregoing responsibilities by issuing these regulations to streamline the system for seeking asylum and related protection to "better screen out non-meritorious claims and focus limited resources on claims much more likely to be determined to be meritorious," *Procedures for Asylum and Withholding of Removal; Credible Fear and Reasonable Fear Review*, 85 Fed. Reg. 36,264, 36,271 (June 15, 2020) (NPRM), as well as to provide guidance and clarity on the requirements for asylum, withholding of removal, and protection under the Convention Against Torture (CAT), *id.* at 36,278, 36,281-86. Plaintiff, on the other hand, asks the Court to stop the Rule from applying to anyone, despite the Rule's legitimate

objectives and its rational proposals to meet those objectives, and notwithstanding that Plaintiff is an organization that is not even regulated by it. This Court should deny that extraordinary request.

*First*, Plaintiff's claims are not justiciable. Plaintiff is an organization that lacks standing because it has not shown that the Rule is in direct conflict with its mission and that it must expend resources to counteract that injury. Additionally, Plaintiff lacks prudential standing because legal services organizations, like Plaintiff, are not within the zone of interests of the INA. And to the extent Plaintiff challenges the Rule's credible fear provisions, such claims brought by organizational plaintiffs are outside the Court's jurisdiction under 8 U.S.C. § 1252(e)(3).

*Second*, Plaintiff's various challenges to the merits of the Rule fail. Contrary to the Plaintiff's contention, Chad Wolf was properly designated Acting Secretary and properly delegated signatory authority to Chad R. Mizelle. Plaintiff's remaining arguments about the scope of the Departments' authority under the INA misunderstand the Rule. In addition to the express rulemaking authority delegated by Congress under 1103(a) and (g) quoted above, Congress left many key INA terms undefined, and under *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842-844 (1984), the Departments—and in particular the Attorney General—have the authority to interpret those terms. Plaintiff's disagreement with these interpretations does not create a separation of powers issue or establish that the Departments acted ultra vires. And the Departments' interpretations do not "read asylum out of our law," as Plaintiff alleges.

*Third*, Plaintiff cannot show that the Rule is arbitrary and capricious under the APA. Mot. 22-32, 36-41. The agencies explained the basis for the Rule and supported their judgments with a robust administrative record: the Rule aims to, inter alia, better align the screening process for asylum and related protection to the relief or protection sought, streamline proceedings to adjudicate meritorious claims more quickly, discourage fraudulent applications, and codify long-standing case law and create signposts to guide adjudicators and achieve more uniformity. 85 Fed. Reg. at 80,276-84. The Rule addresses a very real problem given the very low percentage of applicants who ultimately receive asylum, and the significant benefit provided by the filing of an unmeritorious application. Plaintiff disagrees with the Executive's considered judgments on these

issues, but those disagreements provide no basis for invalidating the Rule: arbitrary-and-capriciousness review is not a vehicle for a court to second-guess the conclusions of the Departments. Furthermore, the Departments considered more than 87,000 comments and responded over the course of almost 100 pages. 85 Fed. Reg. at 80,286-80,383. Plaintiff's dissatisfaction with the answer, *see* Mot. 23-27, does not mean the Departments failed adequately to respond. Further, Plaintiff's assertions that various aspects of the Rule were unjustified or are contrary to the Rule's stated goals are wrong. *See* Mot. 36-41.

*Fourth*, Plaintiff cannot show that the Rule is contrary to the INA. Mot. 32-36. The Rule's definition of "firm resettlement" clarified the term in a way that will result in a more uniform application of the law. The Rule's provision allowing for the pretermission of legally deficient applications does not conflict with the INA's requirement that alien's receive removal hearings. And the Rule's definition of "political opinion" is consistent with the plain text of the INA, as demonstrated by decades of consistent circuit case law.

*Finally*, Plaintiff cannot show that the balance of harms warrants drastic and immediate injunctive relief based on the slim harm allegation that it may need to adapt to a new Rule. Mot. 41-42. The Executive has a paramount sovereign interest in maintaining the integrity of the United States' borders, enforcing the immigration laws, and ensuring that meritorious claims for asylum are adjudicated expeditiously. Against those interests, Plaintiff has not brought before this Court a single individual who claims harm, but alleges only the de minimus harm of adapting to new legal standards. By contrast, the public is severely harmed by enjoining an important rule that substantially improves the asylum system. Last, Plaintiff provided no basis to enjoin the Rule in full. Plaintiff's lead arguments—on the DHS appointment, the INA, and arbitrary and capriciousness—fault only parts of the Rule; such arguments would provide no basis to enjoin the entire Rule. And, in any event, universal relief is not appropriate because bedrock Article III principles require that the relief, if any, should be tailored to remedy the *Plaintiff*'s injury.

## LEGAL BACKGROUND

**A. U.S. Asylum and Protection Law.**   In 1980, Congress enacted the Refugee Act of

1980, Pub. L. No. 96-212, through which Congress established a formal scheme for admitting and resettling people seeking refuge in the United States and specifically, to comply with international obligations undertaken when the United States acceded to the 1967 U.N. Refugee Protocol. *INS v. Stevic*, 467 U.S. 407, 425 (1984); *INS v. Cardoza-Fonseca*, 480 U.S. 421, 436-37 (1987). At a fundamental level, the Refugee Act did not purport to make asylum available to everyone who could arrive at the United States' borders having suffered harm or having reason to fear harm in his or her country. *See Matter of M-E-V-G-*, 26 I. & N. Dec. 227, 234-36 (BIA 2014). "The asylum statute is not a general hardship statute. It was not at all drafted in that way." *Velasquez v. Sessions*, 866 F.3d 188, 198 (4th Cir. 2017) (Wilkinson, J., concurring). And when interpreting our domestic asylum and related protection law, it is domestic law, not international sources, that controls. *See INS v. Aguirre-Aguirre*, 526 U.S. 415, 426-27 (1999); *Cardoza-Fonseca*, 480 U.S. at 439.

Congress has empowered the Attorney General and Secretary of Homeland Security to decide who may be admitted to this country as a refugee. 8 U.S.C. §§ 1101(a)(42), 1158, 1225. Aliens generally have a right to apply for asylum, but a grant of asylum is discretionary and "*may* [be] grant[ed]" if the alien satisfies certain standards and is not subject to an application or eligibility bar, *id.* § 1158(a)(1)-(2), (b)(1)(A)-(B), (b)(2).

Eligibility for asylum is governed by 8 U.S.C. § 1158. Under section 1158, an alien may be granted asylum if (among other requirements) he demonstrates that he is a "refugee" and that he warrants a favorable exercise of discretion. *Id.* §§ 1101(a)(42), 1158(b). A "refugee" is someone who (1) has suffered (or has a well-founded fear of) "persecution" (2) "on account of" (3) one of five protected grounds—"race, religion, nationality, membership in a particular social group, or political opinion[,]" and (4) is "unable or unwilling to avail himself or herself of the protection of[] that country[.]" *Id.* § 1101(a)(42); *see id.* § 1158(b)(1)(B)(i). Fewer than 20 percent of asylum applications are granted after a hearing before an IJ. 85 Fed. Reg. at 80,309.

Although the asylum statute was enacted to bring U.S. law into line with the country's international agreements, it only codifies precatory provisions of the Refugee Convention. *Cardoza-Fonseca*, 480 U.S. at 441. The mandatory "non-refoulement" obligation in the Refugee

Convention has been implemented by providing for withholding of removal under 8 U.S.C. § 1231(b)(3)(A)—not asylum. *See Aguirre-Aguirre*, 526 U.S. at 427; *Cardoza-Fonseca*, 480 U.S. at 429. Eligibility for statutory withholding of removal is generally governed by the same substantive elements as asylum, but with a higher more likely than not proof standard. *See* 8 C.F.R. § 1208.16(b).

Finally, article 3 of the CAT also imposes a non-refoulement obligation, which Congress separately enacted into U.S. law. *See* Pub. L. No. 105-277, Div. G, Title XXII, § 2242, 112 Stat. 2681-822 (1998); *Omar v. McHugh*, 646 F.3d 13, 17 (D.D.C. 2011) (CAT treaty non-self-executing). Congress directed the promulgation of implementing regulations consistent with the United States' "understandings" to the treaty. *See* 8 U.S.C. § 1231 Note(b). The Executive Branch did so in 8 C.F.R. §§ 208.16-18.  To be eligible, applicants must demonstrate that it is more likely than not that they will experience harm that meets the legal definition of "torture." *See* 8 C.F.R. §§ 208.16(c)(2), 1208.16(c)(2); *see also* 8 C.F.R. §§ 208.18(a), 1208.18(a) (defining "torture").

**B.  Expedited Removal.**  Congress has instructed DHS to summarily remove from the United States certain aliens who are arriving in or have recently entered the country and have no basis to remain. *See* 8 U.S.C. § 1225(b)(1). An alien subject to this "expedited removal" shall be "order[ed] ... removed from the United States without further hearing or review unless the alien indicates" a fear of persecution. *Id.* § 1225(b)(1)(A)(i). If an alien so indicates, he shall receive an interview conducted by an asylum officer. *Id.* § 1225(b)(1)(A)(ii);  8 C.F.R. §§ 208.30(e)(3), 235.3(b)(4). During the interview, an asylum officer assesses whether the alien has a "credible fear of persecution or torture," such that the alien has a plausible basis to pursue asylum. 8 U.S.C. § 1225(b)(1)(B)(v); *id.* § 1158. If the asylum officer determines that the alien does not have a credible fear, the alien may seek de novo review of the determination before an immigration judge (IJ). *Id.* § 1225(b)(1)(B)(iii)(I), (III). The INA precludes further review of the credible-fear determination. 8 U.S.C. §§ 1225(b)(1)(C), 1252(a)(2)(A)(iii), 1252(e)(2); 8 C.F.R. § 1003.42(f).

**C.  The Acting DHS Secretary.**  The Homeland Security Act (HAS) authorizes the Secretary to establish an order of succession for the Secretary's office. *See* 6 U.S.C. § 113. The

Act designates two officials to serve if there is a vacancy, then authorizes the Secretary to "designate such other officers of the Department in further order of succession to serve as Acting Secretary." *Id.* § 113(g)(2). This provision, enacted December 23, 2016, applies "[n]otwithstanding chapter 33 of title 5"—*i.e.*, the Federal Vacancies Reform Act (FVRA). *Id.*

In 2016, a previous Secretary of DHS approved an administrative document, the DHS Order of Succession, Delegation No. 00106, with two parts. Part II.A explained the order of succession "is governed by Executive Order 13753," in which the President specified the order of succession before Congress passed the statute granting the Secretary this authority. 81 Fed. Reg. 90,667 (Dec. 9, 2016). Part II.B set delegations of authority in the case of certain emergencies in an "Annex A," pursuant to the Secretary's delegation authority under 6 U.S.C. § 112. *Id.*

On April 9, 2019, then-Secretary Kirstjen Nielsen issued the first succession order under 6 U.S.C. § 113(g)(2), titled "Amending the Order of Succession in [DHS]." *See* Decl. of Juliana Blackwell ¶ 2, Ex. 1, Designation of an Order of Succession for the Secretary (April 9, 2019) (April 2019 Order). That order provided that "[b]y the authority vested in me ... [by] 6 U.S.C. § 113(g)(2), I hereby designate the order of succession for the Secretary of Homeland Security as follows." What followed was a new "Annex A," with a numbered list of 18 officials. The order included and endorsed a memorandum from the General Counsel of DHS to the Secretary, which explained "you have expressed your desire to designate certain officers of [DHS] in order of succession to serve as Acting Secretary" and "[b]y approving the [order] ..., you will designate your desired order of succession for the Secretary of Homeland Security in accordance with your authority pursuant to Section 113(g)(2) of title 6." April 2019 Order at 1. In contrast to Executive Order (EO) 13753, Secretary Nielsen's order made the Commissioner of Customs and Border Protection (CBP), rather than the Administrator of the Federal Emergency Management Agency, the third officer in the order of succession. The following day, April 10, 2019, Secretary Nielsen resigned. The first and second officers in the order of succession were vacant; accordingly, the Senate-confirmed CBP Commissioner, Kevin McAleenan, became Acting Secretary under Nielsen's succession order.

In November 2019, McAleenan revised Nielsen's order of succession. In relevant part, McAleenan changed the order of succession in Annex A to provide that the Under Secretary for Strategy, Policy, and Planning would be fourth in order of succession. Blackwell Decl. ¶ 4. Ex. 3. Amendment to the Order of Succession for the Secretary of Homeland Security (November 8, 2019) (November 2019 Order). Shortly thereafter, McAleenan resigned. The first three offices in the order of succession were then vacant. As a result, the Senate-confirmed Under Secretary for Strategy, Policy, and Planning, Chad Wolf, became Acting Secretary under McAleenan's succession order.

Acting Secretary Wolf was nominated to be Secretary on September 10, 2020. Under EO 13753, the most senior officer in the order of succession on that day was Peter Gaynor, the Administrator of FEMA. On November 14, 2020, Gaynor exercised "any authority" he might possess as Acting Secretary to designate a new order of succession with Wolf as the most senior official, because challenges to Wolf's service as Acting Secretary risk significant "distraction to the mission of the Department of Homeland Security." Decl. of Neal J. Swartz ¶ 8, Order Designating the Order of Succession for the Secretary of Homeland Security" (November 14, 2019) (Gaynor Order).

**D.   The Final Rule.**   On June 15, 2020, the Departments published an NPRM which proposed the following:

> (1) alterations to the credible fear process, including applying asylum bars during the screening process, screening applicants for withholding of removal and CAT protection, placing aliens who are successful on their fear claims into targeted asylum-and-withholding-only proceedings, and clarifying that IJs reviewing fear determinations apply the law of the circuit in which they sit, 85 Fed. Reg. at 36,271-73;
> (2) a definition of a "frivolous" asylum application under 8 U.S.C. § 1158(d)(6), 85 Fed. Reg. at 36,273-77;
> (3) a process for IJs to dismiss legally meritless applications after providing notice to the alien and an opportunity to respond, 85 Fed. Reg. at 36,277;
> (4) definitions of the terms "particular social group," "political opinion," and "persecution," 85 Fed. Reg. at 36,277-81;
> (5) a list of circumstances that will normally not fulfill the "on account of" requirement absent a further showing, 85 Fed. Reg. at 36,281-82;
> (6) a clarified rubric for determining whether relocation within a country is reasonable, 85 Fed. Reg. at 36,282;

(7) factors to consider when determining whether a grant of asylum is warranted as a matter of discretion, 85 Fed. Reg. at 36,282-85;

(8) a revised definition of the phrase "firmly resettled in another country prior to arriving" at 8 U.S.C. § 1158(b)(2)(A)(vi);

(9) revisions to the CAT regulations, 85 Fed. Reg. at 36,286-88; and

(10) revisions to information disclosure regulations, 85 Fed. Reg. at 36,288.

On December 11, 2020, the Departments issued the final version of the Rule, effective January 11, 2021. 85 Fed. Reg. at 80,274. In doing so, the Departments considered over 87,000 individual public comments, including from Plaintiff in this case. *See id.* at 80,284. The final Rule "generally adopts the NPRM with few substantive changes." 85 Fed. Reg. at 80,274.

**E. This Suit.** On December 21, Human Rights First (HRF), an organization that provides services to aliens, filed this complaint raising several legal claims. Plaintiff alleges that "[t]he Rule directly conflicts with [its] mission and will frustrate [its] ability to provide legal services to asylum applicants" and "negatively impact [] funding." Mot. 10-11. Plaintiff will also need to spend "significant time and resources to analyze the Rule." *Id.* Plaintiff moved for a preliminary injunction preventing any part of the Rule from taking effect anywhere, against anyone.

## STANDARD OF REVIEW

A preliminary injunction is "an extraordinary and drastic remedy." *Munaf v. Geren*, 553 U.S. 674, 689 (2008). A party seeking such relief "must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter v. NRDC*, 555 U.S. 7, 20 (2008). Any claims of injury on which standing will be premised must be evaluated "under the heightened standard for evaluating a motion for summary judgment" in "determining whether [] to grant the motion for preliminary injunction." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 912 (D.C. Cir. 2015).

## ARGUMENT

The Court should deny the motion for a preliminary injunction. The sole Plaintiff lacks standing and is not within the INA's zone of interests. Even if Plaintiff could surmount these threshold hurdles, its claims lack merit, the equities are against it, and its requested relief is far too

broad.

## I.     Plaintiff's Claims Are Not Justiciable.

### A.     Plaintiff Does Not Have Standing.

To satisfy establish standing under Article III, the plaintiff must demonstrate it has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). "Foremost among these requirements is injury in fact": "the 'invasion of a legally protected interest' that is 'concrete and particularized.'" *Gill v. Whitford*, 138 S. Ct. 1916, 1929 (2018). Where an organization sues on its own behalf, it must establish standing in the same manner as an individual. *See Warth v. Seldin*, 422 U.S. 490, 511 (1975).

Plaintiff here is an organization that claims to have standing based on potential frustration of its mission and costs it would incur if the Rule were to take effect. Mot. 10-12. That is insufficient.[1] The Supreme Court recognized in *Havens Realty Co. v. Coleman*, 455 U.S. 363, 379 (1982), that an organization may be able to establish standing where it would have suffered some other injury if it had not diverted resources to counteract the problem. But in that case, "[f]ederal law vested [the organization] with a specific legal right to truthful, non-discriminatory housing information, and [defendant's] racially disparate misinformation targeted [the organizational plaintiff] along with the individuals it was aiding." *PETA v. U.S. Dep't of Agric.*, 797 F.3d 1087, 1100 (D.C. Cir. 2015) (Millett, J., dubitante). The INA does the opposite. It channels review of its provisions into removal proceedings—administrative proceedings followed by judicial review in the federal courts of appeals, 8 U.S.C. §§ 1252(a)(5), (b)(9). The INA provides no remedy for an organizational plaintiff and instead repeatedly circumscribes review outside of the process it created for individual review. *See J.E.F.M. v. Lynch*, 837 F.3d 1026, 1033 (9th Cir. 2016) ("Congress intended to channel all claims arising from removal proceedings ... to the federal courts of appeals and bypass the district courts."); *see id.* at 1033-35 (outlining Congress' repeated efforts

---

[1] Plaintiff does not assert standing based on injury to its members.

over several decades to channel review of removal orders through removal proceedings and into courts of appeals); *Nat'l Immigration Project of Nat'l Lawyers Guild v. EOIR*, 456 F. Supp. 3d 16, 29 (D.D.C. 2020) ("Plaintiffs' access-to-counsel and due process claims arise from the course of removal hearings, placing them within § 1252(b)(9)'s broad jurisdictional bar.").

Even putting aside Congress's unmistakable intent to limit review to the paths created in the INA, the D.C. Circuit has imposed a two-part inquiry to determine *Havens* standing: (1) "whether the defendant's allegedly unlawful activities injured the plaintiff's interest in promoting its mission," and, if so, (2) "whether the plaintiff used its resources to counteract that injury." *ASPCA v. Feld Entm't, Inc.*, 659 F.3d 13, 25 (D.C. Cir. 2011). The injury to the mission is a critical element to establishing this type of organizational standing; otherwise, the diversion of resources is a purely self-inflicted injury that will not suffice. *See Fair Empl. Council of Greater Washington, Inc. v. BMC Mktg.*, 28 F.3d 1268, 1276-77 (D.C. Cir. 1994). Plaintiff does not satisfy this test.

To satisfy the first element, the government's conduct must "directly conflict with the organization's mission." *NTEU v. United States*, 101 F.3d 1423, 1430 (D.C. Cir. 1996). Plaintiff states its mission as "1) promoting and protecting the rights of refugees and asylum seekers; 2) advancing U.S. foreign policies that uphold human rights; and 3) advocating for U.S. national security policies that respect human rights." ECF 5-2, Breen Decl. ¶ 4; *see* Mot. 10. Plaintiff claims that the Rule would "conflict with this mission and will frustrate HRF's ability to provide legal services to asylum applicants." Mot. 10. But Plaintiff merely alleges that the Rule may result in fewer clients to serve and some additional administrative efforts to comply with the rule; it does not adequately identify ways in which the Rule would frustrate its mission. *See ASPCA*, 659 F.3d at 25, 27 ("If the challenged conduct affects an organization's activities, but is neutral with respect to its substantive mission," then it is "'entirely speculative' whether the challenged practice will actually impair the organization's activities."); *NTEU*, 101 F.3d at 1434 ("The mere fact that an organization redirects some of its resources to litigation and legal counseling in response to actions or inactions of another party is insufficient."). Importantly, nothing in the rule prevents Plaintiff from continuing to represent asylum-seeking clients or promoting the rights of refugees and

asylum seekers or advocating policies that further human rights, and Plaintiffs do not allege otherwise. Nor does the rule prohibit its clients from applying for asylum, withholding of removal, or CAT protection. The supposed harm may be "a setback to [their] abstract social interests," *Havens*, 455 U.S. at 379, but it is not a cognizable injury for Article III standing. A contrary standard would afford a legal organization standing to challenge any rule that alters the legal landscape, which would eviscerate Article III and turn courts into "Council of Revision, conferring on itself the power to invalidate laws at the behest of anyone who disagrees with them." *Ariz. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 146 (2011).

Even if Plaintiff could meet the first requirement for organizational standing, Plaintiff has failed to demonstrate that it meets the second requirement to "use[] its resources to counteract that injury." *ASPCA*, 659 F.3d at 25. Plaintiff's first claim they will assist fewer clients under the new Rule. Mot. 11. But this concern is speculative and self-inflicted, and thus insufficient to confer standing. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013). According to HRF, the Rule "risks its current level of law firm-derived funding, which is *often* tethered to how many" cases are on a firm's docket and "will *likely* reduce the number of law firm attorneys willing to represent [HRF's] clients" and "[w]ithout these sustainable relationships with law firm partners, which provide" HRF with donations, HRF's "financial support from law firms will suffer." Breen Decl. ¶ 24 (emphasis added). This claim of injury is self-inflicted because it depends on the collaborative arrangements HRF has set up with private firms, and it is speculative given the many contingencies that must happen before there is a financial injury. Plaintiff also claims that the per-client funding they receive from state and local grants will be at risk, without providing details. *Id.* at ¶ 25. But the details are important, and Plaintiff does not explain how clarifying asylum standards will lead to these results (rather than make their work more efficient per client). Nor does Plaintiff address the reality that the demand of aliens seeking help with asylum services far outpaces the supply available from organizations like Plaintiff. Additionally, if Plaintiff's clients have meritorious claims, clarifying the standards and making the process more efficient should meant their clients are able to receive grants of relief more expeditiously. *See* 85 Fed. Reg. at 80,370; *see id.* at 80,284.

These claims therefore fail to demonstrate "concrete and demonstrable injury to the organization's activities," with a "consequent drain on [its] resources" required under *Havens*, 455 U.S. at 379.

Plaintiff also claims that it will need to adapt to the Rule's new requirements by spending more time on their clients' cases and analyzing the new policy. Mot. 10-12. But Plaintiff does not have any judicially cognizable injury simply because it may affect possible asylum seekers who may potentially become the organizations' future clients and then may in turn require legal research. *See Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1093 (10th Cir. 2006). And if spending time reviewing a new rule could give rise to standing, then standing would be established in every such case. *See US Ecology, Inc. v. U.S. Dep't of Interior*, 231 F.3d 20, 25 (D.C. Cir. 2000) (loss of time and convenience not sufficient for standing).

Finally, Plaintiff lacks standing because it is not subject to the Rule and has no legally protected interest in maintaining its current organizational structure or in the rule's application to third parties. Plaintiff has no "judicially cognizable interest" in "enforcement of the immigration laws" against someone else or to challenge the government's provision of benefits to a third party. *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 897 (1984).

### B.     Plaintiff Is Not Within the INA's Zone of Interests.

The APA provides a cause of action only to one "adversely affected or aggrieved by agency action within the meaning of a relevant statute," 5 U.S.C. § 702, meaning "the interest sought to be protected" must "be arguably within the zone of interests to be protected or regulated by the statute ... in question." *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 396 (1987). The INA supplies a cause of action to challenge issues arising from removal proceedings only to aliens, and only through judicial review in the courts of appeals following administrative proceedings, 8 U.S.C. §§ 1252(a), (a)(5), (b)(9), or in the D.C. District Court in narrow circumstances where the action challenges an implementation of expedited removal. 8 U.S.C. § 1252(e)(2). None of these jurisdictional provisions allow for suits by aliens or others not subject to removal proceedings, much less by organizations like Plaintiff. There is a provision at 8 U.S.C. § 1158(d)(4)(A) which says that "[a]t the time of filing an application for asylum, the Attorney General shall ... advise the

alien of the privilege of being represented by counsel and of the consequences ... of knowingly filing a frivolous application for asylum." But that provision on its face protects only the interests of aliens themselves, and a nearby provision states that it creates no "substantive or procedural right ... enforceable by any party against the United States." 8 U.S.C. § 1158(d)(7); *see Campos v. INS*, 62 F.3d 311, 313 (9th Cir. 1995) (holding such language takes claimants outside the INA's "zone of interests"). That other, wholly unrelated provisions discuss aliens' access to counsel does not show (particularly when placed against the statutory scheme at section 1252) that an organization such as HRF is a proper plaintiff to challenge regulations altering the credible fear process and interpreting terms that apply to asylum, withholding, and CAT protection eligibility.

Organizations therefore cannot be within the INA's zone of interests. When confronted with a similar challenge brought by "organizations that provide legal help to immigrants," Justice O'Connor concluded that the relevant INA provisions were "clearly meant to protect the interests of undocumented aliens, not the interests of [such] organizations," and the fact that a "regulation may affect the way an organization allocates its resources ... does not give standing to an entity which is not within the zone of interests the statute meant to protect." *INS v. Legalization Assistance Project*, 510 U.S. 1301, 1302, 1305 (1993) (O'Connor, J., in chambers). The D.C. Circuit has thus held that immigrant advocacy organizations are outside the immigration statutes' zone of interests. *See, e.g.*, *FAIR v. Reno*, 93 F.3d 897, 900-04 (D.C. Cir. 1996).[2] Plaintiff's conclusory assertion that it is within the zone of interests because "its asserted interest in representing asylum seekers easily clears the hurdle," Mot. 12 n.10 (citing *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012)), fails.

### C. Plaintiff Cannot Challenge the Rule's Changes to Credible Fear Process.

To the extent Plaintiff challenges the Rule's provisions altering the credible fear process, such claims are outside the Court's jurisdiction. *See* Mot. 5, 7-9, 39; Compl. ¶¶ 79-118.

Challenges to regulations implementing the expedited removal statute at 8 U.S.C.

---

[2] While the Ninth Circuit held otherwise in *E. Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242, 1270 (9th Cir. 2020), it did not consider *FAIR*, 93 F.3d at 903, which is controlling precedent within this Circuit.

§ 1225(b) may be brought only in a suit filed in this Court within 60 days of the regulation's implementation. 8 U.S.C. § 1252(e)(3)(B). Such a systemic challenge to expedited removal—which includes the credible fear process—is "limited to determinations of—(i) whether [section 1225(b)], or any regulation issued to implement such section, is constitutional; or (ii) whether such a regulation, or a written policy directive, written policy guideline, or written procedure issued by or under the authority of the Attorney General [or Secretary] to implement such section, is not consistent with applicable provisions of this subchapter or is otherwise in violation of law." 8 U.S.C. § 1252(e)(3)(A).

Plaintiff cannot invoke section 1252(e)(3) to challenge the Rule's credible fear provisions. The D.C. Circuit has held that the limits on judicial review in § 1252(e) show that "Congress meant to allow actions only by aliens who have been subjected to the summary procedures contained in § 1225(b) and its implementing regulations." *AILA v. Reno*, 199 F.3d 1352, 1359 (D.C. Cir. 2000). The D.C. Circuit recently affirmed *AILA*'s holding, rejecting "organizational standing" "as a basis to sue under Subsection 1252(e)(3)," and emphasizing that any claim arising from or related to an expedited removal order must be brought "on behalf of individuals directly regulated and affected by the challenged rule." *Make the Road N.Y. v. Wolf*, 962 F.3d 612, 627 (D.C. Cir. 2020). Plaintiff asserts only its own injuries, not the injuries of individuals subject to expedited removal orders, *see* Mot. 10-12, and thus cannot raise any claims under section 1252(e).

Plaintiff does not address section 1252(e)(3) and invokes only 28 U.S.C. § 1331. Compl. ¶ 25. Section 1331 is insufficient when it comes to the challenges to the parts of the Rule relating to section 1225(b) and any changes to the credible fear process because it fails to address section 1252's careful limitations on federal-court jurisdiction.[3] Section 1252(a)(2), titled "Matters not subject to judicial review," provides that, for "[r]eview relating to section 1225(b)(1)," "[n]otwithstanding any other provision of law ... no court shall have jurisdiction to review ... except as provided in subsection (e) [i.e., section 1252(e)(3)]" "a decision by the Attorney General to

---

[3] Plaintiff does not challenge the changes to credible fear proceedings explicitly in its Motion but does in the Complaint. Regardless, because the Court cannot reach that part of the Rule, that aspect of the Rule cannot be enjoined.

invoke the provisions of such section," or "procedures and policies adopted by the Attorney General to implement the provisions of section 1225(b)(1) of this title." 8 U.S.C. § 1252(a)(2)(A)(ii), (iv); *see* 5 U.S.C. § 702 (precluding review under the APA where another statute bars review). Section 1252(a)(2)(A) squarely removes from federal courts any jurisdiction to review issues "relating to section 1225(b)(1)" other than as explicitly permitted by section 1252(e)(3), and thus eliminates section 1331 as a basis for district-court jurisdiction. *See Patchak v. Zinke*, 138 S. Ct. 897, 905 (2018) (phrase "notwithstanding any other provision of law" in jurisdictional provision encompasses 28 U.S.C. § 1331); *Make the Road N.Y.*, 962 F.3d at 619.

## II.     Plaintiff's Claims Are Not Likely to Succeed on the Merits.

### A.     The Rule Is Not Ultra Vires.

#### 1.     Chad Wolf had authority to promulgate the Rule.

Contrary to Plaintiff's claim, Secretary Nielsen's April 2019 order established the order of succession under the Homeland Security Act. *See* Mot. 12-16. By its terms, the order "designate[s] the order of succession for the Secretary of Homeland Security," and expressly does so pursuant to 6 U.S.C. § 113(g)(2), the provision that authorizes the Secretary to designate an order of succession for her office. It establishes the order of succession by revising the list of officials in Annex A, April 2019 Order at 1, and by using the revised list as the new order of succession.

The order and memorandum from the General Counsel of DHS to the Secretary referred five times to changing the order of succession. *Id.* ("Designation of an Order of Succession for the Secretary"); *id.* ("[Y]ou have expressed your desire to designate certain officers of the Department of Homeland Security (DHS) in order of succession to serve as Acting Secretary."); *id.* ("By approving the attached document, you will designate your desired order of succession for the Secretary of Homeland Security"); *id.* at 2 ("Amending the Order of Succession in the Department of Homeland Security"); *id.* (" I hereby designate the order of succession"). They also cite § 113(g) three times, which is the statute governing order of succession. *See id.* at 1-2. The plain text thus confirms that the order created a new order of succession.

The HSA makes clear that the order of succession designated by the Secretary under

6 U.S.C. § 113(g)(2) applies "notwithstanding" the FVRA. 6 U.S.C. § 113(g)(2). Secretary Nielsen's order thus superseded the order of succession previously prescribed by Executive Order 13753 pursuant to the FVRA. McAleenan, the CBP Commissioner, properly became Acting Secretary pursuant to the new order of succession in Secretary Nielsen's order. McAleenan, in turn, issued an order of succession pursuant to which Wolf properly became Acting Secretary.

Plaintiff and some courts are wrong in suggesting that, despite these repeated references to "designat[ing] the order of succession" and express invocation of § 113(g)(2), Secretary Nielsen's order did not alter the order of succession in the event of a vacancy, but instead only revised the order of delegation of authority in the event of a disaster or emergency. *See* Mot. 13 & n.12. This argument ignores the clear context of Secretary Nielsen's actions as well as the express language of her order as laying out an "order of succession." And it ignores the obvious purpose of using "Annex A" – to ensure that the order of succession in the event of vacancy and the order of delegation in cases of emergency would be parallel.  Indeed, on her last day as Secretary, Nielsen announced that McAleenan "will now lead DHS as [] Acting Secretary," and personally swore McAleenan in as Acting Secretary pursuant to the order of succession she issued the prior day. DHS itself also treated McAleenan as the Acting Secretary and identified § 113(g)(2) as the authority for the acting designation in its official notice of his acting service. Even if the order was ambiguous, the agency's contemporaneous understanding and actions would be entitled to significant weight. *Cf. Kisor v. Wilkie*, 139 S. Ct. 2400, 2415-18 (2019).  We note that the only court in this district to address the vacancy issue declined to rule on the basis of an ineffective designation by Secretary Nielsen.  See *NWIRP v. U.S.C.I.S.*, No. 19-cv-3283, 2020 WL 5995206, at *11 (D.D.C. Oct. 8, 2020) (Moss, J.).

Even if the Court agrees with Plaintiff's reading of Ms. Nielsen's order of succession, Ms. Nielsen's authority passed under the FVRA to the head of FEMA, Mr. Gaynor, when the President submitted Mr. Wolf's nomination to the Senate. Gaynor then issued an order of succession under § 113(g)(2) that likewise placed Wolf in the position of Acting Secretary. *See* Gaynor Order.

Plaintiff argues that Acting Secretary McAleenan (or Gaynor, in Plaintiff's erroneous

view) could not alter the succession order in 2019—to designate Wolf as next in line of succession—because he "was not Senate confirmed." Mot. 13 (relying on *NWIRP*, 2020 WL 5995206, at *24). However, *NWIRP* and Plaintiff are wrong on this point. An Acting Secretary has authority to designate an order of succession under § 113(g)(2) because an acting official is vested with all of the authority of the officer for whom he acts. The Supreme Court explained this principle more than a century ago, *Ryan v. United States*, 136 U.S. 68, 81 (1890) ("It is equally clear that, in the absence of the secretary, the authority with which he was invested could be exercised by the officer who, under the law, became for the time acting secretary of war."). The D.C. Circuit recently reaffirmed it, *In re Grand Jury Investigation*, 916 F.3d 1047, 1055 (D.C. Cir. 2019). Congress itself has embraced this principle by regularly designating acting officials by statute, *see, e.g.*, 6 U.S.C. § 113(g)(1); 15 U.S.C. § 633(b)(1); 38 U.S.C. § 304; 40 U.S.C. § 302(b); 42 U.S.C. § 902(b)(4).

It is also incorrect that Congress intended to limit the order-of-succession power to only Senate-confirmed Secretaries because § 113(g)(2) distinguishes between "Secretary" and "Acting Secretary." *See NWIRP*, 2020 WL 5995206, at *24. After all, Congress understands, based on a century of precedent, that acting officials can exercise all the authority of a vacant office, and it expressly allows them to do so. And Judge Moss was incorrect in suggesting that an Acting Secretary could pass power to low level officers – Section 113(a)-(e) lists the specific "other officers" who may be designated as Acting Secretary § 113(g)(2), all of whom are appointed by the President. Plaintiff's reading would lead to bizarre results that would undermine the point of acting service and hamstring governance. Under Plaintiff's theory, an Acting Secretary could not exercise any authority vested in the "Secretary." The Court should reject a reading that leads to such absurd results. Had Congress wanted to limit the order-of-succession power to a Senate-confirmed Secretary, it easily could have done so. It did not.

Plaintiff next argues that McAleenan or Wolf lacked authority to act because "any authority would have expired ... pursuant to the [FVRA]" time limit. Mot. 13-14 (citing 5 U.S.C. § 3346(a)(1)). This is incorrect: because neither McAleenan nor Wolf ever served under the

FVRA, the FVRA's initial 210-day time limit does not apply. The FVRA's initial 210-day limit applies only to a "person serving as an acting officer as described under section 3345." 5 U.S.C. § 3346(a)(1); *see also* S. Rep. No. 105-250, at 17 (1998). An official who serves under an office-specific vacancy statute—such as the HSA—does not serve under 5 U.S.C. § 3345. *See* 5 U.S.C. § 3347(a)(1) (explaining the FVRA is not the exclusive means for acting service when a vacancy arises in an office with an office-specific vacancy statute). The HSA itself contains no express time limit and provides that the Secretary's authority to designate an officer under § 113(g)(2) applies "[n]otwithstanding" the FVRA. Because there is a conflict between the FVRA, which initially limits acting service to 210 days, and the HSA, which does not, the FVRA's initial 210-day limit must give way under § 113(g)(2)'s "[n]otwithstanding" clause. *See NLRB v. SW Gen., Inc.*, 137 S. Ct. 929, 939 (2017) ("The ordinary meaning of 'notwithstanding' is 'in spite of,' or 'without prevention or obstruction from or by.'"). Indeed, each court to decide the issue has concluded the FVRA's initial 210-day time limit is not incorporated in the HSA. *Casa de Md. v. Wolf*, No. 8:20-cv-02118-PX, 2020 WL 5500165, at *19 (D. Md. Sept. 11, 2020); *Immigrant Legal Research Ctr. v. Wolf*, No. 20-cv-05883-JSW, 2020 WL 5798269, at *11 (N.D. Cal. Sept. 29, 2020); *Batalla Vidal v. Wolf*, Nos. 16-CV-4756 (NGG) (VMS) & 17-CV-5228 (NGG) (RER), 2020 WL 6695076, at *6-8 (E.D.N.Y. Nov. 14, 2020).[4]

> **2.**     **The Rule is a valid exercise of the Departments' statutory authority.**

Plaintiff claims the Departments exceeded their authority to administer the INA by all but "ending refugee protection" and that Congress could not have delegated the Departments such authority. Mot. 16-22. In addition to being a talking point rather than a legal argument, Plaintiff's

---

[4] Plaintiff makes various arguments contending that if Gaynor became Acting Secretary under its erroneous theory, Wolf nonetheless still lacked authority to issue the rule even after Gaynor issued the succession order under which Wolf became Acting Secretary. These arguments have no merit. First, Plaintiff contends that the agency cannot "take administrative action in the alternative." Mot. 15 (quoting *Batalla Vidal*, 2020 WL 6695076, at *9). But it is Plaintiff's own theory under which Gaynor became Acting Secretary by operation of law under the FVRA when Wolf was nominated to serve as Secretary on September 10, 2020. There is nothing improper with the official Plaintiff believes is Acting Secretary taking action. For the same reason, there is no "assumption that Mr. Wolf validly occupied the role" of Acting Secretary before being nominated; instead, it is the operation of the FVRA that would have made Gaynor acting Secretary under Plaintiff's erroneous theory. And that Wolf has been nominated to serve as Secretary does not render him "ineligible to serve as Acting Secretary," Mot. 15; his designation was made under the HSA, not the FVRA, and the HSA imposes no such limitation.

argument is based on a faulty premise—the Rule certainly does *not* "end refugee protection."

The Departments' authority to issue the Rule stems from the expressed will of Congress provided in the INA and the gaps Congress left in the statute. Congress has tasked the Attorney General and the Secretary with administering the INA and other laws relating to the immigration and naturalization of aliens. 8 U.S.C. § 1103(a)(1), (g). Furthermore, the INA provides that "determination and ruling by the Attorney General with respect to all questions of law shall be controlling." 8 U.S.C. § 1103(a)(1).

Congress also implicitly delegated many functions to the Attorney General and Secretary. It is well established that "[t]he power of an administrative agency to administer a congressionally created ... program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress." *Chevron*, 467 U.S. at 843 (quoting *Morton v. Ruiz*, 415 U.S. 199, 231 (1974)). The Rule at issue here fills such gaps left by Congress. For example, the expedited removal statute requires that aliens arriving in the United States receive credible fear interviews if they indicate a fear of return to their country, a fear of persecution, or the intent to apply for asylum and that if an alien is found to have a credible fear, "the alien shall be detained for further consideration of the application for asylum," but it does not mandate any particular process or type of proceedings for the consideration of the application. 8 U.S.C. § 1225(b)(1)(B)(ii). The statute thus left this question to the Departments, which they answered in Provisions 1.1 and 1.5 of the Rule. The statute is also silent as to the method for screening aliens for withholding of removal and CAT eligibility during expedited removal proceedings. *See generally* 8 U.S.C. § 1225. The Departments filled the gap in Provision 1.4. Congress left many terms undefined in provisions that comprise just a few succinct statutory sections. The Rule provides definitions for several of these terms, some codifying prior administrative or court interpretations,[5] some clarifying or revising prior interpretations,[6] and one providing an explicit

---

[5] *See* 85 Fed. Reg. at 80,280 (in Provision 2.3, the Departments "codify long-standing standards from case law regarding the cognizability of "particular social groups").

[6] 85 Fed. Reg. at 80,279 (in Provision 2.1, the Departments amend the definition of "frivolous"); 85 Fed. Reg. at 80,281 (in Provision 2.5, the Departments provide a clarifying definition of "persecution"); 85 Fed. Reg. at 80,282-83 (in Provision 2.10, the Departments revise the definition of "firm resettlement").

definition for the first time.[7] *See Aguirre-Aguirre*, 526 U.S. at 424-25 ("judicial deference to the Executive Branch is especially appropriate in the immigration context"). Defining these terms through rulemaking falls comfortably within the Attorney General's authority. *Id.*

Plaintiff claims that "[t]he Rule rewrites the INA" and thus exceeds the Departments' authority. Mot. 16. This is also a talking point, made no more concrete by asserting that the authority to "take actions 'necessary for carrying out' immigration law cannot be read so broadly as to allow the [Departments], unilaterally, to change asylum law at will and in violation of international law." Mot. 17 (quoting 8 U.S.C. § 1103(a)(3), (g)(2)). Again, Plaintiff's premise is wrong. Their argument rests on their speculation that "the Rule will lead to almost all asylum applications being denied" and assertions that former clients who were previously granted asylum would not qualify under the Rule. Mot. 17. But beyond these talking points, Plaintiff does not explain what "numerous, near-insurmountable hurdles" the Rule would have put in their way, Mot. 17, or how it would "require instead that th[eir] application[s] be denied," Mot. 18. Indeed, the general nature of these pleadings and arguments only underscores the problem with reviewing this Rule at the behest of an organization with no identified client who is actually subject to the Rule.

Plaintiff cannot make a concrete case here because, as the Rule repeatedly reiterates, applications for asylum and related protection are considered "case-by-case." 85 Fed. Reg. at 80,288 ("Thus, the NPRM explicitly stated that the rule did not 'foreclose' any claims; the inquiry remains case-by-case."). To the extent the Rule provides lists of situations that "generally" will not meet the requirements set forth in the Rule, the Rule explains that these situations are derived from case law and do not categorically bar any claims. *See* 85 Fed. Reg. at 80,323 (particular social group), 80,329 (nexus); *Grace v. Barr*, 965 F.3d 883, 906 (D.C. Cir. 2020) (holding that the inclusion of qualifying terms like ''in general'' and ''generally'' demonstrated that the government had not enacted a rule that all gang-based asylum claims would fail to demonstrate eligibility for asylum). For the same reason, Plaintiff's claim that 8 U.S.C. § 1158(b)(1)(A) and

---

[7] 85 Fed. Reg. at 80,280 (in Provision 2.4, the Departments define "political opinion").

(b)(2)(A) "do[] not vest the [Departments] with authority to promulgate rules broadly denying asylum eligibility to groups of refugees," Mot. 18, fails.

Plaintiff further asserts that 8 U.S.C. § 1158(b)(2)(C), which allows the Attorney General to establish additional limitations on asylum eligibility that are consistent with the statute "does not authorize the [Departments] to make changes unrelated to ineligibility, such as changing the definition of 'refugee' (Provisions 2.3, 2.4, 2.5, and 2.6); changing the credible fear interview process (Provisions 1.4 and 1.5); or making procedural changes to the conduct of asylum hearings or introducing bars to the same (Provisions 1.1, 1.2, 2.1, 2.2, 2.7, 2.9, and 2.10)." Mot. 18. Plaintiff's argument is a straw man—the Departments do not invoke section 1158(b)(2)(C) as the authority for promulgating this Rule. *See* Mot. 18; 85 Fed. Reg. at 80,274. Instead, the Departments have ample authority to make these interpretive and procedural changes under 8 U.S.C. § 1103(a)(1), (g)(2). As explained, Congress left key terms in the refugee definition to the Departments to define. Similarly, the statute does not provide a procedure for credible fear interviews and thus left that up to the Departments to devise. *See AILA v. Reno*, 18 F. Supp. 2d 38, 56 (D.D.C. 1998), *aff'd*, 199 F. 1352 ("Plaintiffs cannot impose upon the [Secretary] any obligation to afford more procedures than the governing statute explicitly requires or that []he has chosen to afford in h[is] discretion."); *see generally Las Americas Immigrant Advocacy Ctr. v. Wolf*, No. 19-cv-3640 (KBJ), 2020 WL 7039516 (D.D.C. Nov. 30, 2020).

As to asylum hearings, the statute does not require an evidentiary hearing on asylum claims nor does it state that every non-frivolous application must receive an evidentiary hearing. Plaintiff's failure to acknowledge the statutory gaps and ambiguous and undefined terms Congress left the Departments to address dooms this argument. *See Cazun v. Att'y Gen.*, 856 F.3d 249, 259 (3d Cir. 2017) ("Deference to the executive branch is 'especially appropriate in the immigration context' where officials must make complex policy judgments." (citing *Aguirre-Aguirre*, 526 U.S. at 425)). And because the Rule's provisions rest on reasonable interpretations of the statute drawn from precedents from the courts, Board, and Attorney General, Plaintiff's argument that these Rules somehow violate the *separation of powers* is a nonstarter.

Plaintiff further argues that the Rule's interpretation of the INA's grants of authority violates the major questions doctrine. Mot. 20. Plaintiff is again wrong. Plaintiff begins the argument with the incorrect presumption that "[t]he Rule assumes that the [Departments] have been delegated the authority ... to end refugee protection in the United States." Mot. 21. The Rule responded to just such a comment, affirming that it "does not end asylum or refugee procedures, nor does it make it impossible for aliens to receive such statuses. To the contrary, by providing clearer guidance to adjudicators and allowing them to more effectively consider all applications, the rule should allow adjudicators to more efficiently reach meritorious claims." 85 Fed. Reg. at 80,370; *see id.* at 80,284. For the same reason, Plaintiff's claims asserting that the Rule violates international law and the non-delegation doctrine by eliminating the asylum system also fail because they are based on the same faulty premise. *See* Mot. 17, 19-20.

### B.      The Rule Is Not Arbitrary or Capricious.

Plaintiff contends that the Rule is arbitrary and capricious "because it is unsupported by the administrative record." Mot. 22. Specifically, Plaintiff argues that the Departments did not address "serious concerns expressed in the comments," "weigh the Rule's cost and benefits," "support the Rule's purported rationales," address the important problem of the Rule's impact on "the U.S. economy and fisc," "provide facially valid reasons for many of the Rule's provisions," Mot. 23, 36, and "offer specific, compelling reasons for the changes memorialized in the Rule," Mot. 39. But the Rule addresses each of these issues at length and explains the agencies' choices, which is what the APA requires. Plaintiff's claims are meritless and ultimately based on nothing more than its strenuous disagreement with the substance of the Rule—which is not a valid basis for invalidating any part of the Rule, let alone the entirety as Plaintiff seeks.

### 1.      The Departments adequately responded to comments.

Plaintiff's claim that the Departments failed to address serious concerns is false. *See* Mot. 24-26. "The requirement that agency action not be arbitrary or capricious includes a requirement that the agency ... respond to 'relevant' and 'significant' public comments." *City of Portland, Or. v. EPA*, 507 F.3d 706, 713 (D.C. Cir. 2007) (quoting *Pub. Citizen, Inc. v. FAA*, 988 F.2d 186, 197

(D.C. Cir. 1993)). Importantly, "[the APA] has never been interpreted to require the agency to respond to every comment, or to analyse [sic] every issue or alternative raised by the comments, no matter how insubstantial." *Thompson v. Clark*, 741 F.2d 401, 408 (D.C. Cir. 1984). There is also no requirement "that an agency respond to significant comments in a manner that satisfies the commenter." *FBME Bank Ltd. v. Mnuchin*, 249 F. Supp. 3d 215, 222 (D.D.C. 2017). Rather, the agency must only address significant comments "in a reasoned manner," *Reytblatt v. U.S. Nuclear Regulatory Comm'n*, 105 F.3d 715, 722 (D.C. Cir. 1997), that allows a court "to see what major issues of policy were ventilated ... and why the agency reacted to them as it did," *Pub. Citizen*, 988 F.2d at 197. In other words, the Departments' responses must show that their "decision was ... based on a consideration of the relevant factors." *Thompson*, 741 F.2d at 409.

In almost 100 single-spaced, multi-columned pages, the Departments addressed more than 87,000 comments. *See* 85 Fed. Reg. at 80,286-80,383. Plaintiff's claim that the Departments insufficiently responded to a few cherry-picked comments does not prove otherwise. For example, Plaintiff's claim that the Rule offered only a conclusory statement that it is consistent with the Refugee Protocol and Article III of the CAT "in response to the numerous comments that the Rule violates international law," Mot. 24 (citing 85 Fed. Reg. at 80,376), ignores the fact that the Departments explained that these treaties are not self-executing and that they are only enforceable "to the extent they have been implemented by domestic legislation." 85 Fed. Reg. at 80,376 at n.84 (citing *Al-Fara v. Gonzales*, 404 F.3d 733, 743 (3d Cir. 2005)). Because the Rule was issued pursuant to the Departments' authority to administer and interpret the statute under our domestic asylum and protection law, as the Rule explains throughout, it is consistent with the United States' international obligations. *See Aguirre-Aguirre*, 526 U.S. at 427 (stating that the Handbook issued by the United Nations High Commissioner for Refugees "may be a useful interpretative aid, but it is not binding on the Attorney General, the BIA, or United States courts"); *Cardoza-Fonseca*, 480 U.S. at 439, n.22 ("Indeed, the Handbook itself disclaims such force[.]").

Similarly, Plaintiff's second example—relating to the definition of "political opinion"—is also unavailing. Mot. 25-26. Plaintiff appears to fault the Rule for not stating whether examples

given by commenters would fit the Rule's definition of political opinion, Mot. 25, but such a determination depends on the facts of particular cases. Just as the "guiding principles" set forth in the Rule do not preclude any specific circumstances from presenting a political opinion claim, it cannot do the opposite—stating that a specific opinion *will* constitute political opinion.

The other three comments Plaintiff identifies, Mot. 26-27 (citing comments that "the Rule would effectively eliminate the possibility of obtaining asylum in the United states," "would inevitably lead to [] *refoulement*," and "refugees at the border" who do not speak English and are unrepresented will not "understand the Rule's new requirements"), are no different—the agencies responded to each. 85 Fed. Reg. at 80,305-06, 80,374-75. Ultimately, Plaintiff's argument that the Departments failed to address significant comments boils down to Plaintiff's dissatisfaction with the Departments' responses and policy choices. That does not make out a violation of the APA. *See FBME Bank Ltd.*, 249 F. Supp. 3d at 222.

### 2. The Departments considered the costs and benefits.

Plaintiff claims that the Rule fails to provide any factual basis for the Departments' belief "that increases in efficiency and clarity will outweigh the costs to asylum seekers" and therefore failed to weigh the costs and benefits of the Rule, Mot. 28, and that the Rule does not support its efficiency rationale, Mot. 28-29. Plaintiff's arguments are unavailing. At the start, to the extent Plaintiff argues that the cost-benefit analysis violated the INA or any executive order, there is no judicial review of such a claim. *See Entergy Corp. v. Riverkeeper Inc.*, 556 U.S. 208, 222 (2009); *White Stallion Energy Ctr. v. EPA*, 748 F.3d 1222, 1231 (2014) (D.C. Cir. 2014); *Cigar Ass'n of Am. v. U.S. Food & Drug Admin.*, No. 1:16-CV-01460 (APM), 2020 WL 4816459, at *12 (D.D.C. Aug. 19, 2020).

Regardless, the Departments did conduct such an analysis, and its analysis was reasonable. As the Rule states, the Departments "made the decision to include the various changes in this rule because, after weighing the costs and benefits, the Departments determined that the need to provide additional clarity to adjudicators; to enhance adjudicatory efficiencies; and to ensure the integrity of proceedings outweighed the potential costs to applicants, especially since the changes,

particularly those rooted in existing law, would naturally fall more on applicants with non-meritorious claims." 85 Fed. Reg. at 80,372; *see id.* 80,336, 80,350. The Departments also considered, and Plaintiff ignores, the important benefit to aliens in this Rule—it will "allow adjudicators to focus more expediently on meritorious claims." 85 Fed. Reg. at 80,372. As of the second quarter of 2020, the immigration court system had 1,122,697 pending cases. *Id.* at 80,307 n.35. And 120,495 asylum applications were filed during that same time period with the immigration court system alone—that number does not include the number filed affirmatively with USCIS. *Id.* at 80,307 n.36. With such a large number of cases pending, hearings on asylum applications often take years to schedule and complete. And while those applications are pending, an alien's status in this country is uncertain, memories can fade, and the likelihood of satisfying the burden of proof can thus diminish in time. The ability to seek permanent residence—and citizenship—in this country is delayed commensurately. Plaintiff fails to acknowledge this benefit but rather attempts to substitute its own judgment for that of the Departments. *See Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2569 (2019).

Relatedly, Plaintiff is incorrect in asserting that the Rule fails to support its efficiency rationale. *See* Mot. 28-29. To start, the Court "must give appropriate deference to predictive judgments that necessarily involve the expertise and experience of the agency." *Time Warner Entm't Co. v. FCC*, 240 F.3d 1126, 1133 (D.C. Cir. 2001). Whether a given procedure or analysis will create efficiencies is just such a judgment. And neither the Court nor Plaintiff "may [] substitute [its] judgment for that of the [Departments]." *Dep't of Commerce*, 139 S. Ct. at 2569. Plaintiff appears to recognize this and so argues that "those responsible for adjudicating and processing asylum claims have objected that the Rule will not, in practice, achieve the efficiency the [Departments] claim," citing comments made by *former* IJs and the union that represents asylum officers. Mot. 29. But again, commenters—even current and former employees—cannot substitute their own judgment for that of the Departments, especially on such a complex Rule that implicates functions outside of any one Department's authority. *See* 85 Fed. Reg. at 80,371 (citing as a goal of the Rule "to improve the efficiency and integrity of the overall system in light of the

overwhelming number of cases pending"). An opinion based on experiences in one or a few parts of a Department does not provide the comprehensive view that the Departments have when conferring, studying and managing the system, and promulgating regulations.

### 3. The Departments did not fail to consider obvious alternatives.

Plaintiff faults the Departments for not "consider[ing] whether alternatives existed," Mot. 30. "While an agency must consider and explain its rejection of 'reasonably obvious alternative[s],' it need not consider every alternative proposed nor respond to every comment made." *Nat'l Shooting Sports Found. v. Jones*, 716 F.3d 200, 215 (D.C. Cir. 2013) (citation omitted) (quoting *NRDC v. SEC*, 606 F.2d 1031, 1053 (D.C. Cir. 1979)). "Rather, an agency [need] consider only 'significant and viable' and 'obvious' alternatives." *Id.* (quoting *City of Brookings Mun. Tel. Co. v. FCC*, 822 F.2d 1153, 1169 (D.C. Cir. 1987)). Tellingly, Plaintiff does not indicate what significant, viable, and obvious alternative the Departments failed to consider short of not promulgating the regulation at all—which the Departments' more than 100-page justification shows the Departments considered and rejected. Plaintiff's own inability to propose a viable, obvious alternative demonstrates the obvious: there was none.

### 4. Thirty days was sufficient for the comment and publication periods.

Plaintiff's claims that the Departments did not provide sufficient time to comment or satisfy the requirements of the Congressional Review Act (CRA) also fail. Mot. 31-32. As for the 30-day comment period, 5 U.S.C. § 553 sets forth the procedures for informal rulemaking: the agency must provide notice of the proposed rulemaking and "give interested persons an opportunity to participate ... through submission of written data, views, or arguments." As the Rule notes, "the D.C. Circuit has stated that, although a 30-day period is often the 'shortest' period that will satisfy the APA, such a period is generally 'sufficient for interested persons to meaningfully review a proposed rule and provide informed comment,' even when 'substantial rule changes' are proposed." 85 Fed. Reg. at 80,373 (quoting *Nat'l Lifeline Ass'n v. FCC*, 921 F.3d 1102, 1117 (D.C. Cir. 2019)); *see Petry v. Block*, 737 F.2d 1193, 1201 (D.C. Cir. 1984)). Furthermore, the time for comment is left to an agency's reasonable discretion. *See, e.g.*, *Vt. Yankee Nucl. Power Corp. v.*

*NRDC*, 435 U.S. 519, 543 (1978). And it is clear that the 30-day period provided here gave the public sufficient opportunity to comment, given that the Departments received more than 87,000 comments, *see* 85 Fed. Reg. at 80,284; 5 U.S.C. § 553. Notably, Plaintiff cites no case holding 20 days was insufficient. *See* Mot. Furthermore, there was no prejudice to Plaintiff because Plaintiff submitted a comment.[8] And Plaintiff does not state what it would have done had it had more time.

"Executive Order 12866" does not aid Plaintiff, *see* Mot. 31 n.33, because it is "intended only to improve the internal management of the Federal Government and does not create any right or benefit, substantive or procedural, enforceable at law or equity by a party against the United States," EO 12866, § 10. *See Air Transp. Ass'n of Am. v. FAA*, 169 F.3d 1, 9 (D.C. Cir. 1999) (equivalent language in another Executive Order precluded plaintiff from suing for violation of the order or invoking the order's provisions as evidence of arbitrary and capricious agency action).[9]

The Rule's effective date also does not violate the Congressional Review Act as Plaintiff asserts. Mot. 31-32. Section 801(a)(3) requires a "major rule"—that is a rule that would have "an annual effect on the economy of $100,000,000 or more"—to take effect no fewer than 60 days after publication. 5 U.S.C. § 804(2). Plaintiff's claim is not viable for three reasons. First, under 5 U.S.C. § 805, "[n]o determination, finding, action, or omission under this chapter shall be subject to judicial review." *See e.g.*, *Wash. All. of Tech. Workers v. U.S. DHS*, 892 F.3d 332, 346 (D.C. Cir. 2018) (dismissing claim alleging that agency improperly published a rule prior to the passage of the CRA's "mandatory 60-day delay" for major rules). Second, "major rule" conclusion here is reasonable, *see* 85 Fed. Reg. at 80,383, and Plaintiff's cannot rely on evidence outside the administrative record to support their claim that this is a major rule. Mot. 32 (quoting Clements Decl. ¶ 25); *see Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971) (APA review is limited to the "record that was before the Secretary at the time he made his decision");

---

[8] Plaintiff's comment is available at https://www.regulations.gov/document?D=EOIR-2020-0003-6013.

[9] Plaintiff also cites 76 C.F.R. § 3821, but no such Title exists. *See* Mot. 31 n.33. If Plaintiff intended to reference the Federal Register, 76 Fed. Reg. 3,821, it is also unavailing because the Executive Order found there merely "reaffirms the principles … established in Executive Order 12866," and also provides that it "is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person." 76 Fed. Reg. at 3823.

*Camp v. Pitts*, 411 U.S. 138, 142 (1973) (per curiam) (APA review cannot be based on "some new record made initially in the reviewing court").

### 5.      The Departments' reasoning is sound.

Plaintiff claims that the Departments "fail[ed] to provide facially valid reasons for many of the Rule's Provisions" and points to three provisions it believes "are unjustified." Mot. 36-37. To the contrary, the Rule sufficiently explains and justifies each of these provisions, and again Plaintiff's argument ultimately rests only on Plaintiff's own stringent disagreement with them.

Discretion (Provision 2.9). The Rule sets forth a variety of discretionary factors for consideration before granting asylum, 85 Fed. Reg. at 80,396-97, such as the alien's use of fraudulent documents to enter the United States when not in immediate flight from persecution, failing to apply for protection in a third country through which the alien traveled, and the denial of two or more prior asylum applications. Plaintiff argues that the Departments "fail credibly to articulate how" these factors "have any bearing on the merits of an applicant's claim at all." Mot. 38. Plaintiff takes particular aim at two factors—whether the alien spent more than 14 days in any one country on his way to the United States and whether he failed to apply for protection in any third country. Mot. 37-38. Plaintiff's argument fails because it misapprehends the nature of the Departments' discretion, and it is entirely appropriate to set forth factors that may weigh against a favorable exercise of discretion. In short, whether an alien qualifies for asylum is a separate question from whether he merits a grant of asylum as a matter of discretion.

Asylum is a discretionary form of relief and protection. 8 U.S.C. § 1158(b)(1)(A); *Stevic*, 467 U.S. at 423 n.18 (meeting the refugee definition does not guarantee asylum). It is entirely appropriate for the Attorney General by regulation to identify factors to consider in the exercise of this discretion, just as the Board has done through adjudication. *See Matter of Pula*, 19 I. & N. Dec. 467 (BIA 1987). Although it is common to identify factors to consider in exercising discretion under the INA, *see e.g.*, 8 C.F.R. § 212.5(d), but before this Rule the Departments had not issued regulations setting forth factors for adjudicators when exercising discretion for asylum. *See* 85 Fed. Reg. at 36,283. Limited guidance was provided in *Pula*, where the Board set forth a lengthy

list of possible relevant factors. *Id.* at 473-75. The Rule's approach—requiring consideration of three factors as significantly adverse and nine others as adverse—builds upon the considerations provided in *Pula*. 85 Fed. Reg. at 80,341. Under the Rule, any of these factors can be overcome depending on other facts and circumstances presented. *Id.* at 80,397. In turn, the rule expressly superseded *Pula*'s contrary statement that in practice tended to discouraged the full consideration of any discretionary factors. *See id.* at 36,285, 80,342 (superseding *Pula*'s statement that "the danger of persecution should generally outweigh all but the most egregious of adverse factors.").

Plaintiff's argument that these factors do not bear on the merits of an applicant's asylum claim misunderstands the nature of discretion in this context. *See* Mot. 37. Whether an alien qualifies for asylum is necessarily a separate question from the discretionary component—otherwise, asylum would not in fact be discretionary. *See Cardoza-Fonseca*, 480 U.S. at 443 (emphasizing that important role of discretion in the asylum determination, after eligibility is determined). And thus factors bearing on discretion do not need to relate to the merits of the applicant's asylum claim. Instead, "[t]he ultimate consideration when balancing factors in the exercise of discretion is to determine whether a grant of relief, or in this case protection, appears to be in the best interest of the United States." *Matter of D-A-C-*, 27 I. & N. Dec. 575, 578 (BIA 2019) (citing *Matter of C-V-T-*, 22 I. & N. Dec. 7, 11 (BIA 1998) and *Matter of Mendez*, 21 I. & N. Dec. 296, 305 (BIA 1996)).

Plaintiff's assertion that the Departments did not justify the decision to consider as adverse an alien's spending more than 14 days in any one country or transiting through more than one country without applying for protection also fails. *See* Mot. 37-38. Plaintiff misstates the factors—for both, they are only adverse factors if the country or countries allow for asylum, refugee status, or similar protections. 85 Fed. Reg. at 80,387, 80,396. Even so, these two factors are based on the same consideration—that "there is a higher likelihood that aliens who fail to apply for protection in a country through which they transit en route to the United States are misusing the asylum system." 85 Fed. Reg. at 80,346; *id.* at 80,350 ("The Departments believe that an alien should apply for protection at the first available opportunity, but the Departments would not hold an alien

responsible for failure to apply for protection that does not, in fact, exist."). Plaintiff cites nothing contradicting this policy determination or refuting its logic.

      <u>Bar on Stereotype Evidence (Provision 2.7)</u>. The new Rule limits the admission of evidence that supports an asylum claim that promotes "cultural stereotypes about a country, its inhabitants, or an alleged persecutor, including stereotypes based on race, religion, nationality, or gender." 85 Fed. Reg. at 80,28. Plaintiff claims that this provision will prevent applicants from submitting evidence regarding "a country's treatment of women, L[GB]TQIA+ individuals, or religious or racial minorities" and that the prohibition is "unsupported by valid reasoning." Mot. 38. Plaintiff again misconstrues the Rule and its underlying rationale. The Rule generally prohibits such evidence, but allows it to show "that an alleged persecutor holds stereotypical views of the applicant." 85 Fed. Reg. at 80,395. The purpose of the Rule is to prevent "conclusory assertions of countrywide negative cultural stereotypes," which "neither contribute to an analysis of the particularity requirement nor constitute appropriate evidence to support such asylum determinations." *Matter of A-C-A-A-*, 28 I. & N. Dec. 84, 91 n.4 (A.G. 2020) (quoting *Matter of A-B-*, 27 I. & N. Dec. 316, 336 n.9 (A.G. 2018)). For example, the Rule cites a decision where evidence Guatemalans had a "culture of machismo and family violence" was enough to establish a particular social group of "married women in Guatemala who are unable to leave their relationship." *Matter of A-R-C-G-*, 26 I. & N. Dec. 388, 394 (BIA 2014). This example demonstrates that the Rule merely bars conclusory, abstract assertions of stereotypes, which "are not subject to verification and have little intrinsic probative value." 85 Fed. Reg. at 80,336; *United States v. Bahena-Cardenas*, 411 F.3d 1067, 1078 (9th Cir. 2005) ("Refusing to allow expert testimony that would encourage or require jurors to rely on cultural stereotypes is not an abuse of discretion."). Preventing this generalized use while permitting it to address the motive of the persecutor is a reasonable judgment in handing stereotype evidence.

      <u>Internal Relocation (Provision 2.8)</u>. The Rule sets forth factors for adjudicators to consider in determining whether an asylum applicant can internally relocate in his home country. *See* 85 Fed. Reg. at 80,387, 80,396. Plaintiff alleges that the Departments failed to explain how they

decided on these factors and did not provide any sufficient reasoning. Mot. 38-39. To the contrary, the Departments explained why the change was necessary and the reasons for the changes made.

The Rule codifies the factors that adjudicators and federal courts have found, over a series of cases, to be most relevant. 85 Fed. Reg. at 80,339-40. That is eminently reasonable. Further, the Rule does not restrict adjudicators from considering other factors, including those factors listed in the prior regulation. *See* 85 Fed. Reg. at 80,338-39 (stating that the prior regulation "inadequately assess[ed] the relevant considerations[,]" whereas the Rule "facilitate[s] ease of administering these provisions[,]" but noting that the Rule's "approach is not a one-size-fits-all analysis" and that the "test allows adjudicators to consider each case individually[,]" including factors thought relevant by commenters). As the Departments explained, the change will assist with more efficient adjudication of applications, as less time will be spent considering less relevant factors. *See id.*

Additionally, the Rule eliminates the prior regulation's equivocal language, which had specified that listed factors "should" be considered but "may not[] be relevant." 8 C.F.R. §§ 208.13(b)(3), 208.16(b)(3), 1208.13(b)(3), 1208.16(b)(3); *see* 85 Fed. Reg. at 80,340 (reasoning that "[e]quivocal phrases … are almost paradigmatically unhelpful"). Further, to make the internal relocation analysis more uniform and streamlined, the Rule establishes a "totality of a circumstances" analysis. *See* 8 U.S.C. §§ 1158(b)(1)(B)(iii), 1229a(c)(4)(C). Accordingly, as the Departments reasoned, the Rule establishes a clearer, more uniform process for determining whether internal relocation would be reasonable. *See* 85 Fed. Reg. at 80,338-80,340.

Plaintiff argues that the Departments did not adequately justify including a factor relating to the size of the country, Mot. 39, but omission of that factor would make little sense. In determining whether internal relocation is possible and reasonable, adjudicators consider the nature and reach of the persecutor, which inherently requires consideration of country size. *See* 85 Fed. Reg. at 80,387-388, 80,396, 80,398. Indeed, internal relocation law is premised on the concept that applicants must demonstrate that risk of persecution is countrywide. *See Quintanilla-Ticas v. INS*, 783 F.2d 955, 957 (9th Cir. 1986); *Matter of Acosta*, 19 I. & N. Dec. 211, 235 (BIA 1985), *overruled in part on other grounds by Matter of Mogharrabi*, 19 I. & N. Dec. 439 (BIA 1987).

Plaintiff's assertion that some applicants from large countries will be able to show that relocation is unreasonable, Mot. 39, does not establish that the Departments erred in concluding that the factor is relevant to the analysis. *See, e.g.* 85 Fed. Reg. at 80,339; *Assoc. Dog Clubs of N.Y., Inc. v. Vilsack*, 75 F. Supp. 3d 83, 92 (D.D.C. 2014) ("The APA does not . . . require agencies to tailor their regulations as narrowly as possible to the specific concerns that generated them.").

Plaintiff also claims that an applicant's travel history should not be a factor. But, as the Departments explained at length, an applicant's wealth, health, and ability to travel (including travel to the United States) are relevant to whether the applicant could reasonably relocate internally. *See, e.g.*, *id.* at 80,339-40. This is consistent with case law from multiple circuits. *Id.* (citing cases from the Second, Third, and Ninth Circuits that cite travel as a relevant factor).

### 6.    The Rule supports the rationales provided for it.

Finally, Plaintiff claims that the Departments "failed to offer specific, compelling reasons for the changes memorialized in the Rule" and that their "efficiency and clarity" rationales are insufficient because "several of the provisions create new delays and inefficiencies in the process." *See* Mot. 39-41. Plaintiff appears to believe that efficiency of adjudications is the only goal and that it has a better understanding of what will achieve efficiency than the agency that adjudicates these claims. Not only is efficiency not the only goal the Departments cite, 85 Fed. Reg. at 80,277-81 (citing as goals of various provisions providing "clarity" and "uniformity," "avoiding gamesmanship and piecemeal litigation," and "discourag[ing] … patently meritless or false claims"), the examples Plaintiff provides do not support its argument.

The Rule provides that bars to asylum are to be applied during the credible fear process, which does not happen now. Plaintiff claims this provision will not avoid delays because applicants can seek review of the bars' application before an IJ. Mot. 39. It is unusual, to say the least, that Plaintiff believes the ability to seek review before an IJ is a flaw in the system rendering the Rule arbitrary and capricious. In any event, such review is quick by statute—it must occur in one week. 8 U.S.C. § 1225(a)(1)(B)(iii)(III). If a bar cannot be applied, on the other hand, an alien actually barred from asylum would pass the credible fear screening and be placed in full removal

proceedings, which can take years to complete. *See* 85 Fed. Reg. at 36,272. Thus, any additional "work at the credible fear stage," Mot. 39, would be offset many times over.

An important feature of the Rule is a long-needed effort to carefully define what constitutes a "particular social group," a term that has caused confusion and inconsistency since the statute was first enacted and that is universally acknowledged to be ambiguous. *See, e.g.*, *Grace*, 965 F.3d at 888. In addition to coalescing 40 years of law on the meaning of this term, the Rule identifies a list of illustrative groups—such as "past … gang membership"—that "in general," or without further showing, will fail to meet the standard. Plaintiff claims this is an improper categorical bar on asylum for those claimants. This argument is incorrect. First, the Rule acknowledges and adopts the interpretation of this term developed through adjudication over the past 40 years. *See* 85 Fed. Reg. at 80,313-15 (citing *Matter of M-E-V-G-*, 26 I. & N. Dec. 227, and *Matter of W-G-R-*, 26 I. & N. Dec. 208 (BIA 2014)). Second, while the Rule provides examples of groups that normally will not qualify, it repeatedly and explicitly states that these examples are not categorical bars. 85 Fed. Reg. at 80,314 ("[T]he Departments do not entirely foreclose the possibility of establishing an asylum claim on [the bases listed]. Rather, the rule simply lists social groups that, 'without more,' generally will not meet the particularity and social distinction requirements for social group[s]."); *see Grace*, 965 F.3d at 905-06 (finding that the Attorney General's use of the word "generally," coupled with his repeated statement that PSG claims must be analyzed on a case-by-case basis, did not impart a categorical rule barring domestic violence and gang violence PSG claims); *see also* 85 Fed. Reg. at 80,312 n.41 (citing *Grace*, 965 F.3d at 906)). Furthermore, the listed groups are those that most often represent applicants' attempts to shoehorn personal experiences of unfortunate but opportunistic crime and violence into the asylum framework. *See Velasquez*, 866 F.3d at 199 ("The asylum statute is not a general hardship statute. It was not at all drafted that way…. Alleged persecution on account of [groups such as those listed], distressing though it may be, is often nothing more than a manifestation of the general extortion and gang violence that plagues" many countries.) (Wilkinson, J., concurring); *Al-Fara*, 404 F.3d at 740 ("'[G]enerally harsh conditions shared by many other persons do not amount to persecution' ....

[H]arm resulting from country-wide civil strife is not persecution 'on account of' an enumerated statutory factor."); *Zetino v. Holder*, 622 F.3d 1007, 1016 (9th Cir. 2010) ("An alien's desire to be free from harassment by criminals motivated by theft or random violence by gang members bears no nexus to a protected ground.").

The nexus provision also includes a "nonexhaustive list of eight circumstances that generally will not warrant favorable adjudication" based on the nexus requirement, a list that is illustrative and "does not prohibit a favorable adjudication depending on the specific facts and circumstances of the applicant's particular claim." 85 Fed. Reg. at 80,239. Plaintiff asserts this illustration to be categorical, Mot. 39-40, but that is wrong, as the Rule again explicitly states. As the Rule explains, providing an illustrative list is likely to streamline adjudication, and Plaintiff does not identify how the provisions undermine the Departments' goals.

The new Rule similarly defines the ambiguous term "persecution" in a manner consistent with years of case law, while providing "examples of conduct that … do not rise to the level of persecution." 85 Fed. Reg. at 80,327. Plaintiff claims that this new interpretation would not provide clarity and efficiency, but rather would "upend[] a system in place for decades," citing only to a letter written by some former IJs. Mot. 40-41. This claim is wrong. To start, the definition and the examples are consistent with years of case law concluding that the term inherently requires that the harm the applicant experienced or fears was of a severe level. *See Matter of Acosta*, 19 I. & N. Dec. at 222; *see also Grace*, 965 F.3d at 897. The Rule also adds clarity to an inconsistent area of the law. For example, the Rule acknowledges that circuit courts have "adjudicated inconsistently" on some issues, such as how to handle threats of harm. 85 Fed. Reg. at 80,327-28. The Rule provides that "threats would not constitute persecution absent 'an actual effort to carry out the threats.'" *Id.* at 80,327. This "reflects appropriate and reasonable lines drawn from the relevant case law regarding persecution, particularly due to the difficulty associated with assessing the credibility of an alleged threat, especially in situations in which the threat was made anonymously and without witnesses or the existence of other corroborating evidence." *Id.* Plaintiff's argument, untethered to any citation to the standards the Rule allegedly upends, thus does not hold water.

**C.      The Rule Is Valid Under the INA.**

Plaintiff asserts that various provisions of the Rule violate the "plain text" of the INA—specifically the provisions allowing for pretermission of applications and defining "firm resettlement" and "political opinion." Mot. 32. Plaintiff is wrong.

Firm Resettlement (Provision 2.10). Plaintiff claims that the Rule's definition of "firm resettlement" "not only perverts the meaning of the statute; it defies common sense." Mot. 33. Plaintiff is wrong.

The Rule's provisions interpreting the INA's undefined term "firmly resettled" is reasonable. The new definition provides that an alien becomes "firmly resettled" in a third country if, after the events giving rise to the asylum claim, the alien:  (1) received (or could have received) permanent legal immigration status or "any non-permanent but indefinitely renewable legal immigration status" following residence in the third country; (2) voluntarily resided in the third country for a year or more without experiencing persecution; or (3) resided in a third country as a citizen (regardless of whether the alien renounced that citizenship after arriving in the United States). 85 Fed. Reg. at 80,388, 80,397. This is consistent with the INA.

To start, the firm resettlement principle has existed in international and domestic refugee law since the 1940s. *See Matter of A-G-G-*, 25 I. & N. Dec. 486, 489-90 (BIA 2011) (term originated internationally in 1946 and was first codified into U.S. law in 1948); *see also Abdille v. Ashcroft*, 242 F.3d 477, 483 n.4 (9th Cir. 2001) (explaining term's history). Congress codified the principle into asylum law at 8 U.S.C. § 1158(b)(2)(A)(vi), and the Executive Branch supplied a definition through rulemaking, 8 C.F.R. § 208.15, which circuit courts have accepted. *See, e.g.*, *Matter of A-G-G-*, 25 I. & N. Dec. at 495-500. In response to a circuit split, the Board developed a four-part test, *id.*, that has resulted in confusion and inconsistency, despite the Board's efforts. *See* 85 Fed. Reg. at 80,363-65 & n.75. Therefore, the Rule amends the regulatory definition to address the confusion and lack of uniformity in firm resettlement determinations. *See id.* at 80,362-66, 80,388, 80,397-98. The Departments were entitled to change the definition by rule because the statutory term is ambiguous. *See Nat'l & Telecomm. Ass'n v. Brand X Internet Servs*, 545 U.S.

967, 982 (2005); 85 Fed. Reg. at 80,365. Further, the definition helps ensure uniformity that presently does not exist.

The Rule is also reasonable. It aligns the definition of "firmly resettled" with the INA as a whole and its implementing regulatory scheme; for example, the Rule ensures that the applicant bears the burden of proof, as required by 8 U.S.C. § 1158(b)(1)(B)(i) and 8 C.F.R. § 1240.8(d). *See* 85 Fed. Reg. at 80,363, 80,365. The Rule also hews to the original meaning of the concept— to protect those fleeing persecution and exclude those who have "found shelter in another nation and [] begun to build new lives." *Rosenberg v. Yee Chien Woo*, 402 U.S. 49, 56 (1971); *see also id.* at 57 ("the physical presence [necessary for asylum] must be one which is reasonably proximate to the flight" from the country of origin); 85 Fed. Reg. at 80,364; *see also Sung Kil Jang v. Lynch*, 812 F.3d 1187, 1190 (9th Cir. 2015) (purpose of asylum "is not to provide applicants with a broader choice of safe homelands, but rather, to protect refugees with nowhere else to turn") (quotation marks and citation omitted).

Plaintiff argues that the amendment violates the INA because applicants might be barred from asylum after merely "pass[ing] through" a third country. Mot. 33. That is not what the Rule provides—in fact, it precludes a finding of firm resettlement from simply passing through a country. *See* 85 Fed. Reg. at 80,388, 80,397-398; *see also id.* at 80,364. And although Plaintiff argues that a finding of firm resettlement despite a lack of immigration status in a country violates international law and "common sense[,]" Mot. 33, Plaintiff fails to acknowledge, let alone address, the large body of precedent, including Supreme Court precedent, justifying that type of determination. *See Sung Kil Jang*, 812 F.3d at 1190; *Yee Chien Woo*, 402 U.S. at 56-57. Accordingly, Plaintiff has not demonstrated that the Rule is contrary to the INA.

Pretermission (Provision 2.2). The new pretermission provision at 8 C.F.R. § 1208.13(e) permits an asylum application to be denied without a hearing if it fails to make a prima facie claim under applicable law. Plaintiff claims this conflicts with a provision stating that an IJ "shall conduct proceedings for deciding the inadmissibility or deportability of an alien." Mot. 34 (citing 8 U.S.C. § 1229a(a)(1)). Plaintiff is wrong. The Rule does not interfere with the right to apply for asylum

36

in removal proceedings. Instead, the ability to pretermit legally insufficient applications for asylum and related protection provides EOIR with a more efficient means to adjudicate those claims, just like federal courts routinely dismiss claims that lack a legal basis.

The Rule directs IJs to deny applications that do not establish "a prima facie claim for relief or protection under applicable law." 85 Fed. Reg. at 80,397. It permits this decision to be made without a hearing. *Id.* The decision may be made either in response to a motion by DHS or on the IJ's own authority. In either case, the applicant is given an opportunity to be heard on the issue and respond prior to dismissal. *Id.* Furthermore, the IJ must consider any responsive filings made by the applicant before making a decision to pretermit.

This is a process that is very well established in the law. A prima facie case or claim "is one which, if unrebutted, tends to establish the disputed fact." *Smith v. Janey*, 664 F. Supp. 2d 1, 13 (D.D.C. 2009). A prima facie claim represents the amount of evidence "necessary to require [the opposing party] to proceed with his case." *White v. Abrams*, 495 F.2d 724, 729 (9th Cir. 1974). To establish a prima facie claim in the immigration context, the alien "must produce objective evidence that, when considered together with the evidence of record, shows a reasonable likelihood that he is entitled to asylum relief." *Tilija v. Att'y Gen. U.S.*, 930 F.3d 165, 171 (3d Cir. 2019) (quotation omitted).

The Rule only permits dismissal if the asylum request has no legal basis, akin to dismissal as a matter of law or summary judgment. "[A]n [IJ] may only pretermit an application that is legally deficient." 85 Fed. Reg. at 80,306. Therefore, the Rule will not, as Plaintiff asserts, prevent aliens from presenting facts that can establish asylum at a hearing. Instead, it provides EOIR with a critical tool to help address a massive asylum backlog by eliminating unnecessary hearings where the asylum request is legally deficient.

Contrary to Plaintiff's motion, 8 C.F.R. § 1208.13(e) does not violate either the INA. Mot. 34. The INA requires that an IJ "conduct proceedings for deciding the inadmissibility or deportability of an alien." 8 U.S.C. § 1229a(a)(1). The term does not define the nature of "proceedings," nor does it require an evidentiary hearing when the claim is legally deficient. Under

existing rules, evidentiary hearings are held to resolve "factual issues in dispute" regarding the alien's removability and/or eligibility for relief or protection. 8 C.F.R. §§ 1240.10(d) & 1240.11(c)(3).  A decision to pretermit and deny an application would eliminate the need to hold an evidentiary hearing on that application. In other words, if the facts asserted in the application are insufficient to establish eligibility, even when accepted as true, there is simply no need to hold an evidentiary hearing to test the veracity of those assertions. On the other hand, the new Rule does not alter existing rules or practice with respect to other issues in a removal hearing—the decision to pretermit a legally deficient asylum application has no impact on the need to hold an evidentiary hearing when removability is contested or when some other form of relief is at issue.

Finally, Plaintiff's reliance on the Refugee Convention is misplaced. Mot. 34-35. Plaintiff's expert witness, Professor James Hathaway, asserts that the Rule violates Article 25's "duty of administrative assistance." ECF 5-1, Hathaway Decl. ¶ 52. Professor Hathaway admits that "the precise means" for implementing this "general duty to assist" is "not set out in the Convention." *Id.* Not only is the Refugee Convention not self-executing, *Al-Fara*, 404 F.3d at 743, but there is nothing in Articule 25 to indicate that there even is a "general duty to assist" as suggested by Professor Hathaway. Articule 25 only addresses the more limited obligation of "Contracting States" to assist a refugee in the exercise of rights to the extent such exercise would "normally require the assistance of authorities of a foreign country to whom [the refugee] cannot have recourse." Art. 25(1). For example, as set forth in Article 25(2), Contracting States are required to help arrange for the delivery of "such documents or certifications as would normally be delivered to aliens by or through their national authorities." As such, to the extent that the Refugee Convention informs interpretation of the intent of Congress in the INA, Article 25 does not in any way preclude the Rule's implementation.

Political Opinion (Provision 2.4). Plaintiff asserts that the Departments' definition of "political opinion" "contradicts the plain meaning of that term."[10] Mot. 35. This is incorrect,

---

[10] Plaintiff incorrectly summarizes the Rule as requiring that the opinion be "directly related to control of the government." Mot. 36. The Rule instead requires that the opinion be "related to political of a State or unit thereof."

because the Rule codifies the ordinary meaning of "political opinion." Congress did not define this term, and the ordinary meaning relates to an expression about control of a government, as established by the dictionary and by precedent issued over the course of decades. *See* 85 Fed. Reg. at 80,325-326. The Rule adopts this ordinary meaning: an opinion—actual or imputed—of the applicant "which the applicant possesses an ideal or conviction in support of the furtherance of a discrete cause related to political control of a State or a unit thereof." 85 Fed. Reg. at 80,385, 80,394. This is consistent with the dictionary definition of "political," which "relat[es] to government … or the conduct of government … or … the making … of government policy … or … politics," as Plaintiff concedes. *See* Mot. 35-36; Merriam-Webster Dictionary, Definition of "Political," available at https://www.merriam-webster.com/dictionary/political (last visited Dec. 25, 2020); *see* Mot. 35-36; 85 Fed. Reg. at 80,326.

Additionally, Supreme Court decisions and precedent from many circuits support the Rule's interpretation. *See* 85 Fed. Reg. at 80,325 ("incorporates existing case law principles"). For example, in *Elias-Zacarias*, the Ninth Circuit held that any opinion "hostile to the persecutor" was a political opinion, but the Supreme Court disagreed, stating that seemed "untrue" and contrary to the ordinary meaning of the term. *INS v. Elias-Zacarias*, 502 U.S. 478, 481-82 (1992).

Thereafter, multiple circuit courts have reiterated that "political opinion" requires an expression of belief about control of a government, rather than mere opposition to a group or an opinion that is not expressed. *See, e.g.*, *Espinosa-Cortez v. Att'y Gen*, 607 F.3d 101, 109 (3d Cir. 2010) (fear of governmental retaliation, without an expression of political beliefs, was not a political opinion); *Saldarriaga v. Gonzales*, 402 F.3d 461, 467 (4th Cir. 2005) (claims based on "political opinion" require the applicant to take "a position on how governance in that country ought to occur"); *Sangha v. INS*, 103 F.3d 1482, 1489 (9th Cir. 1997) (applicants must generally make a "deliberate and conscious decision" about the political opinion and express the opinion in some way).

---

85 Fed. Reg. 80,385, 80,394.

Further, the Rule's interpretation retains the longstanding understanding that claims may be based on imputed opinion. *See* 85 Fed. Reg. at 80,280. Accordingly, when a guerilla group seeking control of a country targets someone because the group believes the applicant supports the government, courts have found persecution on account of political opinion. *See Espinosa-Cortez*, 607 F.3d at 110-11; *Cordon-Garcia v. INS*, 204 F.3d 985, 992 (9th Cir. 2000); *see also Velasquez-Valencia v. INS*, 244 F.3d 48, 50-51 (1st Cir. 2001) (acknowledging the possibility). But where gangs and criminal entities lack an intent to overthrow the government and seek to harm people for other reasons, including financial, courts have held that opposition to such groups is not a "political opinion." *See Marroquin-Ochoma v. Holder*, 574 F.3d 574, 578 (8th Cir. 2009); *Elias-Zacarias*, 502 U.S. at 481-82. The Rule codifies this distinction. *See* 85 Fed. Reg. 80,325-236.

The Rule thus embodies the plain meaning of the statutory term "political opinion." Even if this Court were to assume that the term is ambiguous, however, the Departments' interpretation is reasonable and entitled to deference. *See Ariz. Pub. Serv. Co. v. EPA*, 211 F.3d 1280, 1287 (D.C. Cir. 2000) (citing *Chevron*, 467 U.S. at 842-43). As the Supreme Court has held, deference to the Departments on immigration issues like this one is particularly important because diplomacy concerns are implicated—such as when interpreting the term "political opinion" because recognition of political entities involves diplomatic considerations. *See Aguirre-Aguirre*, 526 U.S. at 424-25; 85 Fed. Reg. at 80,325.

Plaintiff asserts that the Rule conflicts with the large body of precedent establishing the ordinary meaning of "political opinion," but does not acknowledge the similarities between the Rule and the precedent. *Compare* Mot. 25-26, *with* 85 Fed. Reg. at 80,325. For example, Plaintiff argues that the Rule conflicts with *Saldarriaga* because that case mentioned that "causes" could be encompassed in the term "political opinion," Mot. 25-26, yet that case explicitly clarified that causes are only political in nature if they assert a "position on how governance in that country ought to occur." *Saldarriaga*, 402 F.3d at 466-67. Plaintiff also argues that the Rule conflicts with precedent holding that labor union participation can constitute a political opinion, *see* Mot. 36 n.40 (relying on *Zhiqiang Hu v. Holder*, 652 F.3d 1011, 1018 (9th Cir. 2011)), but Plaintiff fails to

acknowledge that courts still require a connection to governmental control in labor union cases. *See Zhiqiang Hu*, 652 F.3d at 1018 (setting forth that principle and citing cases stating the same).

Further, Plaintiff argues that an expression of opinion through behavior cannot be required, Mot. 36; however, the Rule does not require behavior—it provides that a political opinion be "expressed or imputed," and courts have held that the *expression* of the political opinion is required. Plaintiff fails to address those cases. *See, e.g.*, *Mandebvu v. Holder*, 755 F.3d 417, 429 (6th Cir. 2014); *Espinosa-Cortez*, 607 F.3d at 109; *Sangha*, 103 F.3d at 1489.

Finally, although Plaintiff asserts that the Rule's interpretation violates international law, as alleged by the United Nations High Commissioner for Refugees (UNHCR) in a comment to the NPRM, Mot. 25 n.21, 36, UNHCR's guidance is not binding on the United States. *See Aguirre-Aguirre*, 526 U.S. at 427-28. Further, UNHCR indicated that the term "political opinion" should not retain its original meaning and, instead, should evolve with time. *See* UNHCR, Comments of the United Nations High Commissioner for Refugees on the Proposed Rules from the U.S. Department of Justice (Executive Officer for Immigration Review) and U.S. Department of Homeland Security (U.S. Citizenship and Immigration Services) (July 15, 2020), *available at* https://beta.regulations.gov/comment/EOIR-2020-0003-5471 (last visited Dec. 25, 2020), at p. 35, 37. Statutes enacted by Congress do not evolve with time. Instead, courts consider the meaning and context of the statute at the time of enactment when interpreting statutory terms, as the Departments did in the Rule. *See Ariz. Pub. Serv. Co.*, 211 F.3d at 1287; 85 Fed. Reg. at 80,326 (stating an intent to codify the "original meaning" of the statutory term). Accordingly, Plaintiff has not shown that the Rule's interpretation of "political opinion" is contrary to the INA.

## III.   Considerations of Irreparable Harm and the Equities Favor the Government.

A preliminary injunction would irreparably harm the United States and the public. The requested injunction would preclude the Attorney General from exercising his statutory authority to interpret the INA and frustrate the federal government's "law enforcement and public safety interests." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers). Moreover, the requested "injunctive relief [would] deeply intrude[] into the core concerns of the executive

branch," *Adams v. Vance*, 570 F.2d 950, 954 (D.C. Cir. 1978), including the "efficient administration of the immigration laws at the border," *Innovation Law Lab v. McAleenan*, 924 F.3d 503, 510 (9th Cir. 2019). Against this, "the basis of injunctive relief in the federal courts has always been irreparable harm." *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995). "The D.C. Circuit has set a high standard for irreparable injury. The injury must be unrecoverable; it must be both certain and great; [and] it must be actual and not theoretical." *Cal. Ass'n of Private Postsecondary Sch. v. DeVos*, 344 F. Supp. 3d 158, 170 (D.D.C. 2018) (citations and quotation marks omitted).

Plaintiff attempts to invoke third party harms to non-party aliens as it asserts its own legal rights. Mot. 42. Plaintiff is an organization, and the *only* harms it alleges to itself are speculations about funding and the need of familiarizing attorneys with the new law. Mot. 41; Compl. ¶¶ 26-62. Even if credited, those inconveniences cannot plausibly outweigh the harm imposed by enjoining a federal rule and undermining the "efficient administration of the immigration laws." *Innovation Law Lab*, 924 F.3d at 510; *see Capital Area Immigrants' Rights Coal. v. Trump*, No. 1:19-cv-02117-TJK, 2019 WL 3436501, at *2 (D.D.C. July 24, 2019) (denying injunctive relief where plaintiffs legal organizations alleged similar harms). And certainly none of those harms are imminent enough to warrant enjoining the entire Rule.

## IV.    Any Relief Must Be Sharply Limited.

Even if this Court were to grant relief, nationwide universal relief would be inappropriate, and any relief must be tailored to the specific organizational Plaintiff and to the specific provisions shown to be unlawful. Finally, the Court cannot rely on the FVRA as a basis to enjoin the Rule.

First, Article III and equitable principles require that relief be no broader than necessary to redress the Plaintiff's injuries. Thus, any relief must be limited to the Plaintiff and the specific provisions found likely to be unlawful, as required by the express severability provisions in the Rule itself. *See* 85 Fed. Reg. at 80,284, 80,383, 80,389-90, 80,400. As the Supreme Court recently reiterated, "absent extraordinary circumstances, the Court should adhere to the text of the severability or nonseverability clause." *Barr v. Am. Ass'n of Political Consultants, Inc.*, 140 S. Ct.

2335, 2349 (2020) (plurality). Indeed, Plaintiff concedes that the Rule contains some valid provisions. Mot. 43.

Moreover, under Article III, "[a] plaintiff's remedy must be tailored to redress the plaintiff's particular injury," *Gill*, 138 S. Ct. at 1934 (emphasis added), and the rule in equity is that injunctions "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (emphasis added). Plaintiff bears the burden of showing that something short of the nationwide injunction it seeks will not fully redress its particular injuries, given that it is Plaintiff's burden to demonstrate entitlement to an injunction. *See Winter*, 555 U.S. at 20.

Second, nothing in the APA indicates that a nationwide injunction is appropriate at this preliminary stage. *Cf. Trump v. Hawaii*, 138 S. Ct. 2392, 2425 (2018) (Thomas, J., concurring) ("No statute expressly grants district courts the power to issue universal injunctions."). The APA provides only that a court may "hold unlawful and set aside agency action." 5 U.S.C. § 706(2). But no part of that text specifies whether any action, if found likely to be invalid, should be set aside on its face or as applied to the challenger. In the absence of a clear statement to the contrary, this Court should adopt the reasonable reading of the "set aside" language. *See Va. Soc'y for Human Life v. Fed. Election Comm'n*, 263 F.3d 379, 393 (4th Cir. 2001) ("Nothing in the language of the APA, however, requires us to exercise such far-reaching power."). The APA itself provides that absent a statutory review provision, the proper "form of proceeding" is a traditional suit for declaratory or injunctive relief that is subject to the rules constraining equitable relief limited to determining the rights of the parties before the court. 5 U.S.C. § 703. Consistent with such principles, the APA should be read to limit interim relief to the parties before it. *See* 5 U.S.C. § 705 (relief pending review is appropriate only "to the extent necessary to prevent irreparable injury"). Indeed, the APA's provisions confirm that "equitable defenses may be interposed," *Abbott Labs. v. Gardner*, 387 U.S. 136, 155 (1967); *see* 5 U.S.C. §§ 702(1), 703, reinforcing that Congress did not intend to authorize vacatur beyond the parties unless necessary to provide the parties with full relief or otherwise to depart from longstanding principles of equity. *See* Amicus

43

Brief for Nicholas Bagley and Samuel L. Bray, *Trump v. Pennsylvania*, No. 19-454, 2020 WL 1433996, at *11-17 (2017) (Mar. 9, 2020) (noting APA did not disturb traditional equity practice).

Indeed, the APA's very reference to actions for "declaratory judgments" makes clear that no injunction—much less a nationwide one—is compelled by the APA when agency action is held unlawful. *See* 5 U.S.C. § 705; H.R. Rep. No. 1980, 79th Cong., 2d Sess. 42 (1946) (referring to possibility of suits for declaratory relief to "determine the validity or application of a rule or order"); *see also* S. Rep. No. 752, 79th Cong., 1st Sess. 26 (1945). A different result is not compelled under *Nat'l Mining Ass'n v. U.S. Army Corps of Engineers*, 145 F.3d 1399, 1409 (D.C. Cir. 1998)). That case dealt with a *final* judgment, "where the court had already held that the rule at issue was unlawful and should be vacated." *U.S. Ass'n of Reptile Keepers, Inc. v. Jewell*, 106 F. Supp. 3d 125, 128 (D.D.C. 2015), *aff'd sub nom. U.S. Ass'n of Reptile Keepers, Inc. v. Zinke*, 852 F.3d 1131 (D.C. Cir. 2017). However, in adjudicating a *preliminary* injunction motion, "the Court has not finally determined that the [action] is unlawful," so "the need for narrow tailoring ... is particularly important," and any "injunction should be limited in scope to protect only" parties to the case. *Id.* at 126, 129; *see Neb. Dep't of Health & Human Servs. v. Dep't of Health & Human Servs.*, 435 F.3d 326, 330 (D.C. Cir. 2006) (district court erred by not limiting injunction to plaintiff alone); *accord California v. Azar*, 911 F.3d 558, 584 (9th Cir. 2018) (narrowing a nationwide preliminary injunction to apply "only to the plaintiff[s]" as that would "provide complete relief to them").[11]

Third, even if there were no jurisdiction or standing issues, the INA prohibits the injunction Plaintiff seeks as to provisions of the Rule relating to credible fear. Section 1252(e)(1) expressly precludes such relief. As to section 1252(e)(3), the sole remedy authorized is a "determination[]" on the merits. Section 1252(e)(3), however, does not provide for any interim relief premised on such a determination. And section 1252(f) expressly precludes it. That provision provides that "no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the

---

[11] *Grace* does not require a different result as it only addressed final, not preliminary, relief. 965 F.3d at 887.

operation of … [8 U.S.C. §§ 1221-32] other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated." The proposed injunction runs afoul of this because it would enjoin the operation of expedited and normal removal proceedings (under Section 1225 and 1229a, respectively). But just as Congress authorized litigation "by, and only by, aliens against whom the new procedures had been applied," *AILA*, 199 F.3d at 1360, it also only authorized preliminary relief as to "alien[s] against whom proceedings under *such part* have been initiated," meaning aliens who have been subject to the new credible fear provisions.

Finally, the Rule should not be preliminarily enjoined based on the DHS appointment issue. As Plaintiff and several courts have stated, the DHS order of succession issue is a complex one, and it is not equitable to preliminarily enjoin a major rulemaking and disrupt the status quo based upon what, at most, is a purported drafting error made in a succession document in April 2019. That reasoning would effectively hamstring a critical federal national security agency for a period going back over a year (and in spite of good faith efforts to resolve it by the official who would be in charge under Plaintiffs' erroneous theory), which Congress could not have intended in the various vacancy and succession provisions. Instead, recognizing the critical and time sensitive functions being performed by DHS, Congress gave that agency *more* flexibility to operate during vacancies in excepting it from FVRA requirements, not less. The balance of equities tips sharply against undermining a substantial federal regulatory effort and a cabinet department's operations on this basis, especially when balanced against the miniscule harm alleged by Plaintiff. Further, even if this Court credits the appointment argument, that does not undermine or impact the rule issued by the Attorney General. Instead, because the "determination ... by the Attorney General with respect to all questions of law shall be controlling" under the INA, his rules that set forth the substantive asylum provisions control irrespective of the validity of the DHS rule.

## CONCLUSION

For these reasons, the Court should deny Plaintiff's motion for a preliminary injunction.

Respectfully submitted,

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General

AUGUST E. FLENTJE
Special Counsel

DAVID M. McCONNELL
Director

PAPU SANDHU
Assistant Director

*s/Christina P. Greer*
CHRISTINA P. GREER
Senior Litigation Counsel
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
Tel: (202) 598-8770
Email: Christina.P.Greer@usdoj.gov

Dated: December 30, 2020                    *Attorneys for Defendants*