**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| HUMAN RIGHTS FIRST, | Civil Action No. 1:20-cv-3764 (TSC) |
| *Plaintiff,* | |
| v. | |
| CHAD F. WOLF, *et al.*, | |
| *Defendants.* | |

**PLAINTIFF'S REPLY IN SUPPORT OF ITS
MOTION FOR PRELIMINARY INJUNCTION**

Ana C. Reyes (D.C. Bar No. 477354)
Melinda K. Johnson (D.C. Bar No. 1620229)
Emma J. Nino[*]
Helen E. White[*]
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
Tel: (202) 434-5000
Fax: (202) 434-5029
areyes@wc.com

---

[*] Certification to practice pursuant to LCvR 83.2(g) to be submitted; practice supervised by D.C. Bar members pursuant to D.C. Court of Appeals Rule 49(c)(8).

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ............................................................................................................1

ARGUMENT ..................................................................................................................2

I.      HRF Is Likely to Succeed on the Merits.............................................................2

        A.      This Court Can Adjudicate HRF's Claims ..............................................2

                1.      HRF Has Constitutional Standing..................................................2

                2.      HRF Has Prudential Standing ........................................................4

                3.      This Court Has Statutory Jurisdiction...........................................5

        B.      The Agencies' Promulgation of the Rule Was *Ultra Vires* ...................7

                1.      Chad Wolf Did Not Have Authority to Promulgate the Rule.....7

                2.      The Agencies Exceeded the Scope of Their Delegated Authority ...........11

        C.      The Rule Is Arbitrary and Capricious ...................................................15

        D.      Defendants' Defenses of Specific Provisions Are Flawed ...................20

II.     HRF Will Be Irreparably Harmed If the Rule Is Not Enjoined .......................23

III.    The Rule Must Be Enjoined or Stayed Nationwide..........................................24

CONCLUSION...............................................................................................................25

# <u>TABLE OF AUTHORITIES</u>

Page(s)

## CASES

*Al Otro Lado, Inc. v. McAleenan*, 394 F. Supp. 3d 1168 (S.D. Cal. 2019) .....................................13

*American Immigration Lawyers Association v. Reno*, 199 F.3d 1352 (D.C. Cir. 2000) ................6

*Andrus v. Glover Const. Co.*, 446 U.S. 608 (1980) .............................................................6

*Animal Legal Def. Fund, Inc. v. Perdue*, 872 F.3d 602 (D.C. Cir. 2017).......................................16

*ASPCA v. Feld Ent., Inc.*, 659 F.3d 13 (D.C. Cir. 2011) .............................................................2, 3

*Batalla Vidal v. Wolf*, Nos. 16-cv-4756 & 17-cv-5228, 2020 WL 6695076 (E.D.N.Y. Nov. 14, 2020) .....................................................................................................9, 10

*CAIR Coal. v. Trump*, 471 F. Supp. 3d 25 (D.D.C. 2020)...........................................................2, 4

*Carlson v. Postal Reg. Comm'n*, 938 F.3d 337 (D.C. Cir. 2019) ...............................................15

*Cutler v. HHS*, 797 F.3d 1173 (D.C. Cir. 2015) ..........................................................................3

*DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891 (2020) .....................................................1, 5

*E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742 (9th Cir. 2018).............................................4

*Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117 (2016) .......................................................21

*Epsilon Elecs., Inc. v. Dep't of Treasury*, 857 F.3d 913 (D.C. Cir. 2017)....................................11

*Equal Rights Ctr. vs. Post Props. Inc.*, 633 F.3d 1136 (D.C. Cir. 2011).......................................3

*FAIR v. Reno*, 93 F.3d 897 (D.C. Cir. 1996) ...............................................................................4

*FCC v. Fox TV Stations, Inc.*, 556 U.S. 502 (2009) ...................................................................21

*Grace v. Barr*, 965 F.3d 883 (D.C. Cir. 2020).....................................................................15, 18

*Graham Cnty. Soil & Water Conserv. Dist. v. United States ex rel. Wilson*, 559 U.S. 280 (2010).................................................................................................................14

*Gulf Fishermens Ass'n v. Nat'l Marine Fisheries Serv.*, 968 F.3d 454 (5th Cir. 2020) ...............13

*Gundy v. United States*, 139 S. Ct. 2116, *reh'g denied,* 140 S. Ct. 579 (2019)............................14

*Gustafson v. Alloyd Co.*, 513 U.S. 561 (1995).............................................................................13

*INS v. Cardoza-Fonseca*, 480 U.S. 421 (1987) ...........................................................................19

*INS v. Elias-Zacarias*, 502 U.S. 478 (1992) ..............................................................................23

*INS v. Legalization Assistance Project*, 510 U.S. 1301 (1993) ...................................................4

*J.E.M. Ag Supply v. Pioneer Hi-Bred Int'l*, 534 U.S. 124 (2001) .................................................8

*Kar Onn Lee v. Holder*, 701 F.3d 931 (2d Cir. 2012)..................................................................13

*Kaspersky Lab, Inc. v. DHS*, 909 F.3d 446 (D.C. Cir. 2018) .......................................................7

*Keene Corp. v. United States*, 508 U.S. 200 (1993) ...................................................................5

*King v. Burwell*, 576 U.S. 473 (2015)....................................................................14, 15

*L.M.-M. v. Cuccinelli*, 442 F. Supp. 3d 1 (D.D.C. 2020)..........................................7, 8

*League of Women Voters v. Newby*, 838 F.3d 1 (D.C. Cir. 2016) ..........................23, 24

*Lewelling v. First Cal. Co.*, 564 F.2d 1277 (9th Cir. 1977)..............................7, 11, 13

*Make the Rd. N.Y. v. Wolf*, 962 F.3d 612 (D.C. Cir. 2020).......................................5, 6, 7

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209
      (2012)..............................................................................................................4

*Matter of A-R-C-G-*, 26 I. & N. Dec. 388 (BIA 2014) ................................................21

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) .....................15

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967 (2005) ...................21

*National Lifeline Association v. FCC*, 921 F.3d 1102 (D.C. Cir. 2019)......................................19

*NRLB v. Sw. Gen., Inc.*, 137 S. Ct. 929 (2017)........................................................8, 10, 11

*Nw. Immigrant Rights Project v. U.S. Citizenship & Immigration Servs.*, No. 19-cv-3283,
      2020 WL 5995206 (D.D.C. Oct. 8, 2020) .............................................................9, 10

*O.A. v. Trump*, 404 F. Supp. 3d 109 (D.D.C. 2019) .................................................2, 4

*PETA v. USDA*, 797 F.3d 1087 (D.C. Cir. 2015) .......................................................3, 4

*Reytblatt v. NRC*, 105 F.3d 715 (D.C. Cir. 1997) ......................................................20

*Sierra Club v. FERC*, 867 F.3d 1357 (D.C. Cir. 2017) ..............................................25

*Sorenson Commc'ns. Inc. v. FCC*, 755 F.3d 702 (D.C. Cir. 2014) .............................25

*Tilija v. Attorney Gen.*, 930 F.3d 165 (3d Cir. 2019)................................................22

*United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365 (1988) ................15

*United States v. Smith*, 962 F.3d 755 (4th Cir. 2020) ................................................8

*Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Servs.*, -- F. Supp. 3d --, 2020 WL
      5232076 (D.D.C. Sept. 2, 2020) ..........................................................................25

**STATUTES, LEGISLATIVE MATERIALS, REGULATIONS, AND REGULATORY
MATERIALS**

5 U.S.C. § 551 ............................................................................................................24

5 U.S.C. § 705 ............................................................................................................24

5 U.S.C. § 706 ...............................................................................................9, 11, 24

5 U.S.C. § 3347 .................................................................................................8, 9, 10

6 U.S.C. § 113 ......................................................................................................8, 10

8 U.S.C. § 1103 ..........................................................................................................13

8 U.S.C. § 1158 ..........................................................................................................14

8 U.S.C. § 1225 ..........................................................................................................14

8 U.S.C. § 1229a ..................................................................................................................14, 22

8 U.S.C. § 1252 ....................................................................................................................5, 6, 7

28 U.S.C. § 1331 .........................................................................................................................5

Catholic Charities Community Services, Comment Letter on Proposed Rule, 4 (July 14,
    2020), https://beta.regulations.gov/comment/EOIR-2020-0003-5021 ...................................17

*Comment Letter on Proposed Rule* (July 13, 2020),
    https://beta.regulations.gov/comment/EOIR-2020-0003-4734.................................................20

*Comment Letter on Proposed Rule* (July 15, 2020),
    https://beta.regulations.gov/comment/EOIR-2020-0003-5471.................................................20

IRAP, Comment Letter on Proposed Rule, 5 (July 15, 2020),
    https://beta.regulations.gov/comment/EOIR-2020-0003-5998; ...............................................16

Migration Studies, *Comment Opposing Proposed Rule* (July 7, 2020),
    https://beta.regulations.gov/comment/EOIR-2020-0003-5958.................................................20

Procedures for Asylum and Withholding of Removal; Credible Fear and Reasonable Fear
    Interview, 85 Fed. Reg. 80,274 (Dec. 11, 2020)............................................................ *passim*

S. Rep. No. 105-250 (1998) .........................................................................................................8

## INTRODUCTION

Defendants contend that the Rule is the culmination of twenty years of considered agency review that faithfully applies the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et seq.*  That is a fiction.  It is no coincidence that *every* substantive change the Agencies made—in a regulation spanning 128 three-column pages—makes it substantially more difficult to obtain asylum and related relief in the United States.   In the Refugee Act, a bipartisan Congress intentionally made asylum uniformly available and sought to conform United States practice with international refugee law.  Had the Agencies faithfully applied that Act, the Rule would not make asylum substantially *less* available at every turn and create standards that *violate* international treaties.  Yet that is exactly what the Rule does.

The Rule is instead a final, hurried attempt to complete the Trump Administration's four-year effort to abrogate the Refugee Act.  The Agencies conspicuously provided only thirty days for notice-and-comment during a global pandemic for a rule they concede is "significant."  Despite receiving 87,000 comments—mostly identifying problems with the Rule—the Agencies made almost no substantive changes in response to commenters' concerns.   The Agencies also "decline[d] to respond" to numerous problems commenters identified, including that the Rule violates international law, will negatively impact the economy, and will lead to inefficiency and confusion.  The Agencies flouted statutory requirements by picking an effective date just thirty-one days after the final rule issued, instead of the required sixty days.  The effective date is thus a mere nine days before a new administration takes office.

The Supreme Court cautioned that the Executive must "turn square corners" in issuing regulations.  *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1909 (2020).  Here, the Agencies cut corners instead.  An official without authority promulgated the Rule on behalf of Agencies in excess of their authority under the INA and Constitution.  The Agencies ignored key aspects of

the problem and serious concerns raised by commenters, in violation of the Administrative Procedure Act ("APA").  And individual provisions of the Rule violate the plain text of the INA and the APA.

Defendants' attempt to rehabilitate the Agencies' misguided enterprise is littered with arguments courts have already rejected, and mis-citing some cases and omitting others entirely.  In a headlong rush to justify their rewriting portions of the INA's plain text, Defendants offer no real rebuttal to the fact that the Rule as a whole functionally extinguishes the right to asylum and related relief.  The Agencies, thus, arrogate unto themselves authority not delegated by Congress.

## ARGUMENT

### I.      HRF Is Likely to Succeed on the Merits

#### A.      This Court Can Adjudicate HRF's Claims

##### 1.      HRF Has Constitutional Standing

Under D.C. Circuit precedent, an organization must meet two requirements to establish constitutional standing:  (1) the defendant's allegedly unlawful activities injured plaintiff's interests in promoting its mission, and (2) the plaintiff used its resources to counteract that injury. *See ASPCA v. Feld Ent., Inc.*, 659 F.3d 13, 25 (D.C. Cir. 2011).  Human Rights First ("HRF") easily meets both requirements.  *See CAIR Coal. v. Trump*, 471 F. Supp. 3d 25, 43 (D.D.C. 2020) (holding a similar organization, raising similar claims, had standing); *O.A. v. Trump*, 404 F. Supp. 3d 109, 144 (D.D.C. 2019) (same).

The Rule directly conflicts with HRF's mission of "promoting and protecting the rights of refugees and asylum seekers."  Mot. for Prelim. Inj. ("Mot."), Dkt. 5, Ex. B (Breen Decl.) ¶ 4. Defendants do not rebut the declaration of HRF's CEO that, "if the Rule were to go into effect, it is likely that more than 80 percent of [HRF's] clients' cases would be negatively impacted." *Id.* ¶ 11.  Nor do Defendants rebut his explanation that reducing HRF's caseload has a direct negative

impact on the organization's funding. *Id.* ¶ 25.

Defendants instead contend that the "clarif[ied] asylum standards" and increased "efficien[cy]" the Rule purportedly creates will reduce the amount of time HRF must spend on each case. Defs.' Opp. to Mot. for Prelim. Inj. ("Opp."), Dkt. 8, at 11. This argument, however, improperly presupposes Defendants are correct on the merits. In fact, HRF is owed the opposite presumption instead. *See Cutler v. HHS*, 797 F.3d 1173, 1179–80 (D.C. Cir. 2015). In any event, Defendants' biased, unsupported view that HRF can spend less time representing asylum seekers is irrelevant and wrong. HRF advances its mission and expends resources not by merely offering *pro forma* representation, but by zealously advocating on behalf of asylum seekers. The unrebutted evidence in the record is that its advocacy will be more time-consuming and costly under the Rule, requiring HRF to "use[] its resources to counteract [the] injury" to its mission. *ASPCA*, 659 F.3d at 25.

Defendants separately contend that any harm HRF suffers is "self-inflicted." Opp. 11. Hardly. To start, that exception to organizational standing typically applies only when the plaintiff diverts resources to bring the suit. *See ASPCA*, 899 F.2d at 27; *see also Equal Rights Ctr. vs. Post Props. Inc.*, 633 F.3d 1136, 1140 (D.C. Cir. 2011). That is not the case here. Moreover, the Rule forces HRF to either represent its clients inadequately or lose funding because it serves fewer clients. *See* Breen Decl. ¶¶ 4, 11, 25. When a rule forces a plaintiff to pick a poison, the ensuing illness is not self-inflicted.

Defendants also contend that a third standing requirement exists. To do so, they rely on Judge Millett's separate opinion in *PETA v. USDA*, 797 F.3d 1087 (D.C. Cir. 2015), for the proposition that the statute at issue must also confer a specific benefit to the organizational plaintiff for it to have standing. Opp. 9. But the *PETA* court, Judge Millett included, held the exact

opposite. Judge Millett conceded, in a separate opinion, that the majority opinion identified no such requirement and that the majority opinion's recitation of the *two*-part standing analysis is correct under existing D.C. Circuit precedent. 797 F.3d at 1094–95; *id.* at 1099 (Millett, J., dubitante). Indeed, the court ultimately held that PETA *had* standing because its mission was to protect wildlife, the challenged agency action did not protect wildlife, and PETA had to expend its own resources to counteract that agency action. *Id.* at 1094–95 (panel op.).

### 2.    HRF Has Prudential Standing

HRF also has prudential standing, which, in the APA context, "is not meant to be [an] especially demanding" test. *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012). Defendants contend that because the INA does not regulate or confer benefits to organizations like HRF, it "cannot be within the INA's zone of interests." Opp. 13. That, however, is not the test. The test requires only that "[t]he *interest* [the plaintiff] asserts . . . be arguably within the zone of interests to be protected or regulated." *Patchak*, 567 U.S. at 224 (emphasis added). "Courts 'do not require any indication of congressional purpose to benefit the would-be plaintiff,' and the Supreme Court has 'always conspicuously included the word "arguably" in the test to indicate that the benefit of any doubt goes to the plaintiff.'" *O.A.*, 404 F. Supp. 3d at 144 (quoting *Patchak*, 567 U.S. at 225). Organizations, like HRF, providing legal assistance to refugees protected by the INA fall squarely within that statute's zone of interests. *See, e.g.*, *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 768 (9th Cir. 2018); *CAIR Coal.*, 471 F. Supp. 3d at 43.[1]

---

[1] For the reasons detailed at length in *CAIR Coal.*, 471 F. Supp. 3d at 43–44, Defendants' reliance on *INS v. Legalization Assistance Project*, 510 U.S. 1301, 1302, 1305 (1993) (O'Connor, J., in chambers), and *FAIR v. Reno*, 93 F.3d 897, 900–04 (D.C. Cir. 1996), is misplaced.

### 3.      This Court Has Statutory Jurisdiction

Defendants do not dispute that courts may hear systemic challenges to regulations implementing the INA's expedited removal provisions.[2]  *See* Opp. 13–14.  Nor could they.  The INA funnels those challenges to this District, permits review of questions of law, and requires that challenges be initiated within 60 days of the regulations' implementation.   8 U.S.C. § 1252(a)(2)(A) (stripping courts of jurisdiction over certain challenges related to expedited removal, "*except as provided in subsection (e)*");   *id.* § 1252(e)(3) (allowing for systemic challenges, that raise questions of law within 60 days of implementation).   Where a party brings a challenge that complies with subsection 1252(e)(3)'s requirements, the general grant of jurisdiction in 28 U.S.C. § 1331 for claims presenting federal questions is "preserved."  *Make the Rd. N.Y. v. Wolf*, 962 F.3d 612, 625 (D.C. Cir. 2020).   Because HRF's challenge complies with these requirements, it has properly invoked this Court's jurisdiction under 28 U.S.C. § 1331.[3]

Defendants claim that only individuals, not organizations, can bring challenges under subsection 1252(e)(3).  In fact, section 1252(e)(3)'s text leads to the opposite conclusion: it refers

---

[2] Defendants erroneously contend that preliminary relief is not available in such cases. Opp. 44.   Section 1252(e)(3)(A)'s limitation to "determinations of whether" a challenged regulation is "constitutional" or "otherwise in violation of law" does not impliedly limit courts to ordering relief only on the merits.  Similarly, section 1252(f) does not, as Defendants contend, Opp. 44–45, preclude this Court from enjoining the Rule.  It applies only to enjoining the "operation of the provisions of part IV of this subchapter."  That limitation clearly only applies to injunctions striking down specified *statutory* provisions.  The section does not prevent injunction of *regulations* implementing the statutory provisions.  Notably, elsewhere in section 1252, the statute specifically refers to rules implementing statutes as distinct from the statutes themselves for purposes of the availability of judicial review.  *Compare* 8 U.S.C. § 1252(f) (referring only to statutory provisions) *with id.* § 1252(e)(3)(i) (referring to statutory provisions and "any regulation issued," separately).  Had Congress meant section 1252(f) to apply to regulations and statutes, it would have said so.  *See Keene Corp. v. United States*, 508 U.S. 200, 208 (1993).

[3] Defendants incorrectly invoke the provisions of 8 U.S.C. § 1252(b)(9) and (a)(5) to contend the claims are not justiciable.  Opp. 9–10.  Those provisions apply only where a plaintiff's claims "aris[e] out of" a removal order and are "certainly not a bar where, as here, the parties are not challenging any removal proceedings."  *DHS v. Regents*, 140 S. Ct. at 1907.

to "*any* actions instituted" (emphasis added) to challenge expedited removal procedures, without any reference to who must bring that action.  Defendants' argument thus rests on the premise that, although it wrote "any action" Congress meant "any action except those brought by organizations." Congress does not speak in such code.  Section 1252 is rife with limitations on the availability of judicial review.  *See, e.g.*, 8 U.S.C. § 1252(e)(3); *id.* § 1252(a).  Those express limitations are exhaustive.  *Andrus v. Glover Const. Co.*, 446 U.S. 608, 616–17 (1980).

The D.C. Circuit case on which Defendants chiefly rely, *Make the Rd. N.Y.*, supports HRF's position.  *See* Opp. 14–15 (citing 962 F.3d at 627).  There, the D.C. Circuit held that the "straightforward reading" of section 1252(e)(3) did not limit its scope only to allow for actions initiated by individual plaintiffs or to claims related to individual expedited removal proceedings. *See Make the Rd. N.Y.*, 962 F.3d at 626.  Although the claims raised by *Make the Rd. N.Y.* were made on behalf of its members through a theory of associational standing, the D.C. Circuit did not rely on that fact in reasoning that the statute permitted the organizational plaintiff to pursue its claims pursuant to the procedure in section 1252(e)(3).  *Id.* at 626.

Defendants' reliance on *American Immigration Lawyers Association v. Reno*, 199 F.3d 1352 (D.C. Cir. 2000), is similarly misplaced.  Opp. 14–15.  The *AILA* court did not, as Defendants contend, *id.*, hold that section 1252(e)(3) applies only to suits by individuals.  Rather, as the *Make the Rd. N.Y.* court explained, *AILA* held narrowly that an organization could not assert "third-party organizational standing" on behalf of non-members who could themselves raise their own claims under section 1252(e)(3) directly.  *Make the Rd. N.Y.*, 962 F.3d at 627–28; *see also AILA*, 199 F.3d at 1357.  Neither case held that an organization cannot bring a claim on its own behalf.

Defendants' position is atextual, unsupported by any case, and at odds with the "'well-settled' and 'strong presumption' in favor of judicial review" of administrative action that "[t]he

6

Supreme Court has 'consistently applied to immigration statutes,'" including 8 U.S.C. § 1252. *Make the Rd. N.Y.*, 962 F.3d at 625.  This Court should reject it.

### B.      The Agencies' Promulgation of the Rule Was *Ultra Vires*

#### 1.      Chad Wolf Did Not Have Authority to Promulgate the Rule[4]

Defendants construct a dizzying set of parallel narratives to validate Chad Wolf's purported appointment as Acting DHS Secretary, yet they fail to show why this Court should depart from the chorus of its peers that have found him to be serving unlawfully.  Four courts have already held, either finally or on a preliminary injunction motion, that Mr. Wolf lacked authority to promulgate any regulations as Acting Secretary.  *See* Mot. 14–15 (citing cases); Compl. ¶ 60. Defendants largely ignore these cases, contending that none of the numerous defects to Mr. Wolf's tenure have consequences.  *See* Opp. 15–18.  This contention is contrary to law and reason.

When Mr. Wolf approved the final Rule, he was ineligible to serve as Acting Secretary because he had occupied that role for longer than the 210 days permitted by the Federal Vacancies Reform Act ("FVRA").  The Agencies do not contest the relevant timeline, but argue instead that the FVRA's time limits are inapplicable to Mr. Wolf because he assumed his acting role pursuant to an order of succession issued under the Homeland Security Act ("HSA"), rather than the FVRA. *See* Opp. 17–18.  This argument fails for at least three reasons.

*First*, Defendants' position—that the HSA entirely displaces the FVRA's limitations on acting officials—is inconsistent with the statutory text and purpose.  Because the Constitution

---

[4] The material facts supporting HRF's argument with respect to the legality of Mr. Wolf serving as Acting Secretary are not in dispute, do not require additional factual development, and are susceptible to judicial notice.  *See Kaspersky Lab, Inc. v. DHS*, 909 F.3d 446, 464 (D.C. Cir. 2018).  Thus, if the Court found Mr. Wolf to be serving unlawfully, it could enter summary judgment in favor of HRF invalidating the rule, obviating the need for the Court to perform the four-factor preliminary injunction analysis at this stage only to reach the merits on the same record at a later date.  *See L.M.-M. v. Cuccinelli*, 442 F. Supp. 3d 1, 15 (D.D.C. 2020) (converting a preliminary injunction motion to an expedited motion for summary judgment).

generally requires that individuals serving as officers be constitutionally appointed, Congress has only established statutory workarounds authorizing "the performance of the duty of the superior for a limited time, and under special and temporary conditions." *See L.M.-M.*, 442 F. Supp. 3d at 23 (quoting *United States v. Eaton*, 169 U.S. 331, 343 (1898)). The FVRA provides for a limited exception to its exclusive governance over acting officials, whereby an agency-specific statute can authorize a different succession order to designate individuals to serve "temporarily" in an acting capacity. 5 U.S.C. § 3347(a). The HSA permits the Secretary of DHS to designate an order of succession "notwithstanding" the FVRA, but provides no guidance as to the time period for which such acting officials may serve. 6 U.S.C. § 113(g). Accordingly, there is no conflict between the HSA and FVRA's time limitations, and no cause to displace those limitations. *See J.E.M. Ag Supply v. Pioneer Hi-Bred Int'l*, 534 U.S. 124, 143–44 (2001) ("[W]hen two statutes are capable of coexistence, it is the duty of the courts . . . to regard each as effective."). Defendants' contention that a conflict exists because the HSA "does not" impose a time limit while the FVRA does, Opp. 18, is simply unfounded—statutory silence does not conflict with an independent statutory requirement. *See J.E.M.*, 534 U.S. at 144 (holding that statutes with "different requirements" were consistent and both enforceable).

*Second*, Defendants' reading undermines Congress's purpose in passing the FVRA specifically to address the problem of "indefinite" acting officials. S. Rep. No. 105-250, at 3 (1998). And *third*, interpreting the HSA to permit an Acting Secretary to serve indefinitely would raise serious constitutional concerns amounting to a "circumvention of the Appointments Clause." *United States v. Smith*, 962 F.3d 755, 765 n.3 (4th Cir.), *cert. denied*, 2020 WL 7132617 (U.S. Dec. 7, 2020); *see also NRLB v. Sw. Gen., Inc.*, 137 S. Ct. 929, 935–36 (2017) (detailing the common use of lengthy acting appointments and the "threat [they posed] to the Senate's advice

8

and consent power"). Accordingly, Mr. Wolf is not exempt from the FVRA's restrictions. And because Mr. Wolf was not in compliance with FVRA when he purported to perform the duties of DHS Secretary by approving the Rule, it "shall have no force or effect." 5 U.S.C. § 3348(d)(1).

In addition, even if Mr. Wolf's tenure did not violate the FVRA, he would still be serving in violation of the HSA—an independent reason the Rule is invalid.[5] The courts that decided this issue uniformly held that then-Secretary Nielsen's amendment of DHS's order of succession did not govern the vacancy her resignation created, and that Mr. McAleenan's subsequent amendment to put Mr. Wolf next in line for the acting role was ineffective. *See, e.g.*, *Batalla Vidal v. Wolf*, Nos. 16-cv-4756 & 17-cv-5228, 2020 WL 6695076, at *8–9 (E.D.N.Y. Nov. 14, 2020).[6]

It is perhaps logical that Defendants attempt an "alternative" theory, under which FEMA Administrator Peter Gaynor amended the succession order in November 2020, exercising "any authority" he might have as Acting DHS Secretary pursuant to the FVRA during the pendency of Mr. Wolf's nomination to the Senate. *See* Opp. Ex. 3 (Swartz Decl.) at 9–10 ("Gaynor Order"). But the Gaynor Order also suffers from a fatal flaw—Mr. Gaynor was not the Senate-confirmed DHS Secretary, and therefore he too lacked authority under the HSA to amend the succession order. *See Nw. Immigrant Rights Project v. U.S. Citizenship & Immigration Servs.*, No. 19-cv-3283, 2020 WL 5995206, at *23 (D.D.C. Oct. 8, 2020). Indeed, he was not ever appointed to even the role of Acting Secretary. *See* Opp. 7 (explaining that Mr. Gaynor exercised "any authority" he "*might* possess as Acting Secretary" (emphasis added)).

---

[5] Defendants do not dispute that an action taken after the expiration of the FVRA's 210-day period, if applicable, is *void ab initio* or that an action undertaken by an individual who is unauthorized to serve as Acting Secretary under the HSA is "in excess of . . . authority" and not "in accordance with law" for APA purposes. 5 U.S.C. § 706(2)(C) and (2)(A).

[6] The information contained in the Blackwell and Swartz Declarations, Opp. Exs. 2 & 3, adds nothing new to the records on which those courts determined that the Nielsen and McAleenan amendments were ineffective.

An individual who has not been Senate confirmed as Secretary, nor even appointed as Acting Secretary, lacks authority to amend the succession order under both the FVRA and HSA. The FVRA is the "exclusive means" for designating an acting official unless another statute "expressly authorizes" certain individuals to do so.  5 U.S.C. § 3347(a)(1).  And section 113(g) of the HSA expressly provides that "*the Secretary* may designate such other officers of the Department in further order of succession to serve as Acting Secretary."  6 U.S.C. § 113(g).  Thus, the HSA authorizes only the Secretary—and not the Acting Secretary—to designate an order of succession inconsistent with the FVRA.  This reading "has the additional benefit of avoiding any constitutional concerns" under the Appointments Clause.  *Nw. Immigrant Rights Project*, 2020 WL 5995206, at *23.  Accordingly, Mr. Gaynor, too, lacked the authority to put Mr. Wolf in the role of Acting Secretary.

Moreover, Defendants' contention that the Gaynor Order was effective to designate Mr. Wolf as Acting Secretary is in direct conflict with their stated position that Mr. Wolf was validly serving as Acting Secretary pursuant to the HSA as of Mr. McAleenan's resignation.  If Mr. Wolf was Acting Secretary, Mr. Gaynor could not simultaneously exercise authority as Acting Secretary to change the order of succession.  *See Batalla Vidal*, 2020 WL 6695076, at *9.  Defendants suggest that "it is Plaintiff's own theory under which Gaynor became Acting Secretary," and "[t]here is nothing improper with the official Plaintiff believes is Acting Secretary taking action." Opp. 18 n.4.  That is nonsense.  Either Mr. Gaynor was serving as Acting Secretary or—as is the case—he was not.  Certainly, HRF has nothing to do with that determination.  Congress set forth a detailed statutory scheme for determining who is authorized to lead DHS to ensure accountability and stability, *see Sw. Gen., Inc.*, 139 S. Ct. at 935, and the Agencies' position(s) are utterly inconsistent with that goal.

At bottom, Mr. Wolf had no authority under either the FVRA or any of the series of defective succession orders to assume the role of Acting DHS Secretary, yet he purported to exercise the duties and functions of that office.  This is a far more serious issue than the "drafting error" Defendants awkwardly claim, Opp. 45; it threatens Congress's power to check the President's choice of officers.  *See Sw. Gen., Inc.*, 139 S. Ct. at 935–36.  Any resulting disruption to DHS's work lies squarely at the feet of the Executive, which has failed for over two years to appoint a duly authorized person to occupy the lead role of "a critical federal national security agency."  Opp. 45.  Mr. Wolf's promulgation of the Rule was "in excess of . . . authority" and not "in accordance with law," and the Rule must be enjoined.  5 U.S.C. § 706(2)(A), (2)(C).[7]

### 2.     The Agencies Exceeded the Scope of Their Delegated Authority

Defendants contend—without support—the Rule will not "end asylum" and therefore the Agencies did not overstep Congress's delegation of authority.   Opp. 20–22.   Defendants mischaracterize the Rule's drastic scope.

*First*, the sweeping nature of the Rule is neither a "talking point" nor "speculative," as Defendants dismissively contend.  *See* Opp. 20.  HRF meticulously identified the various ways each Rule provision makes the asylum process more difficult for refugees in its ninety-six page complaint.  And it explained precisely how an individual applying for asylum would find it almost impossible to clear the many hurdles the Rule creates.  Mot. 6–10.  Nor is the point "unsupported"

---

[7] Defendants argue in passing that any defect in the authority of putative Acting Secretary Wolf does not affect the validity of the provisions governing DOJ's implementation of the INA. Opp. 45.  Bifurcating the Rule to allow only the DOJ provisions to go into effect would be unworkable, nonsensical, and flatly inconsistent with the Rule's stated purpose.  The Court need look no further than the Rule itself for confirmation.  As the Agencies put it, "the DHS and DOJ regulations are inextricably intertwined," and therefore one set cannot survive the invalidation of the corresponding set.  85 Fed. Reg. at 80,286; *see Epsilon Elecs., Inc. v. Dep't of Treasury*, 857 F.3d 913, 929 (D.C. Cir. 2017).

as Defendants claim. HRF's CEO provided a declaration detailing the ways the Rule will lead to drastically fewer asylum grants, negatively impacting 80% of HRF's clients. Breen Decl. ¶¶ 11, 31–32. If HRF were incorrect in characterizing each hurdle the Rule creates, Defendants would have readily said so. They did not, because the hurdles the Rule imposes are real. Together they virtually eliminate asylum.

*Second*, Defendants claim that, "Plaintiff does not explain what 'numerous, near-insurmountable hurdles' the Rule would have put in [HRF's clients'] way, Mot. 17 . . . ." Opp. 20. That is egregiously misleading. HRF's CEO identified six prior HRF clients who were granted asylum. For each, he explained with reference to specific provisions how the Rule would have negatively affected their meritorious claims. He then explained:

> The Rule's disparagement of gender-based claims, penalization of asylum seekers for the route by which they fled, minimization of threats constituting persecution, nonsensical interpretation of what it means to be firmly resettled, illogical narrowing of qualifying political opinions, and improper exclusion of relevant evidence would likely have thwarted their meritorious claims. This is the very definition of *refoulement*.

Breen Decl. ¶ 32.

*Third*, the Agencies agree that the Rule will lead to fewer asylum grants. 85 Fed. Reg. at 80,384. And they concede "that the Rule is a significant regulatory action." *Id*. at 80,377. Now Defendants blame HRF for not explaining the effect of the Rule, even though that was the Agencies' job. In any event, HRF did do the Agencies' job as to its own clients. As HRF's CEO explained, based on a review of its caseload, HRF estimated that the Rule would negatively impact 80% of its clients. Breen Decl. ¶ 11. Since HRF's current success rate for clients is 97%, *id.* ¶ 7, a negative impact on 80% of its clients' claims would be staggering, to put it mildly.

*Finally,* none of HRF's delegation arguments relies on the proposition that the Rule will end asylum, though it will do just that for all but very few. Instead, the delegation question is

whether the Executive has authority to overhaul the asylum system in a way that undermines the INA's guarantee to protect refugees or in violation of separation of powers.

Defendants' assertions of authority to enact such a sweeping rule are equally misguided. They invite the Court to reach the extraordinary conclusion that their general section 1103 authority to issue rules necessary to administer and enforce our immigration laws gives them the power to change the refugee definition and asylum system at will.[8]  *See* Opp. 19, 21 (citing 8 U.S.C. § 1103(a)(1) & (3); *id.* § 1103(g)).   This Court should reject this improvident invitation.

*First*, Defendants read the INA's grant of rulemaking authority in isolation, without regard to the many specific provisions of the INA that govern asylum proceedings.  *See* Opp. 19, 21; *Gustafson v. Alloyd Co*., 513 U.S. 561, 569 (1995).   Congress's "general allowance" for the Secretary and the Attorney General to take acts necessary to administer and enforce the statute "cannot entail the authority to rewrite" the INA.  *Al Otro Lado, Inc. v. McAleenan*, 394 F. Supp. 3d 1168, 1211 (S.D. Cal. 2019); *cf. Gulf Fishermens Ass'n v. Nat'l Marine Fisheries Serv.*, 968 F.3d 454, 465 (5th Cir. 2020).   In *Al Otro Lado*, the Government argued that section 1103(a)'s authorization to take necessary actions should be read broadly to authorize the implementation of a metering policy.  *See* 394 F. Supp. 3d at 1209.  The court rejected this broad reading, reasoning that section 1103(a) did not provide a basis for the Secretary to restrict immigration processing at ports of entry because specific INA provisions addressed that processing.  *See id.* at 1210–11.

---

[8] The Agencies also point to 8 U.S.C. § 1103(a)(1), which vests the DHS Secretary with authority to implement the INA, "[p]rovided, however, [t]hat determination and ruling by the Attorney General with respect to all questions of law shall be controlling."  That provision requires that the Executive branch officials who share responsibility for administering immigration laws abide by the Attorney General's legal determinations as between themselves—it does not grant the Attorney General unreviewable authority to interpret the INA however he chooses. *See, e.g*., *Kar Onn Lee v. Holder*, 701 F.3d 931, 936 (2d Cir. 2012) (reviewing Attorney General's interpretation of INA for reasonableness and consistency with the expressed intent of Congress).

Here, too, section 1103 provides no justification for the Agencies to restrict access to the U.S. asylum system, the procedures, standards, and eligibility requirements of which are set forth in the statute. *See, e.g.*, 8 U.S.C. §§ 1158, 1225 & 1229a.

*Second*, the INA's delegation provisions should be read narrowly so as to avoid any Constitutional concern. The reading Defendants urge this Court to adopt would raise significant separation-of-powers questions by granting the Executive nearly unfettered authority to change the will of Congress. *Cf. Gundy v. United States*, 139 S. Ct. 2116, 2126, *reh'g denied,* 140 S. Ct. 579 (2019). Defendants brush aside this serious concern in a mere two sentences by mischaracterizing the Rule's effect as simply filling "statutory gaps." Opp. 21. But that obfuscates the point. The question is not whether there are statutory gaps, but whether the Executive's actions usurp Congress's role. Here, they clearly do, as the Rule rewrites the entire asylum regime to the detriment of the very individuals Congress sought to protect. *See* Mot. 6–10.

*Third*, even assuming *arguendo* Congress could have delegated the authority the Agencies usurp here, Congress needed to make that delegation expressly. *See* Mot. 20–22. It did not. Defendants cherry-pick provisions in the INA they contend are ambiguous to argue that Congress "implicitly delegate[d]" to the Agencies the power to limit substantially the availability of asylum. Opp. 19. But this only proves HRF's point. Congress cannot "implicit[ly] delegate" to agencies the power to answer "a question of deep economic and political significance that is central to the statutory scheme." *King v. Burwell*, 576 U.S. 473, 485–86 (2015). Yet the Agencies' interpretations aim to answer a major question that Congress has reserved for itself, *i.e.*, the scope of refugee protection in the United States.[9] Taken together, they "destabilize" the statute's balance

---

[9] An ambiguity in an isolated provision does not given an agency carte blanche to promulgate regulations at odds with the statutory scheme as a whole. *See Graham Cnty. Soil &*

between avoiding *refoulement* and efficient removal of aliens struck by Congress in these statutes, "and likely create the very" policy problem—i.e. *refoulement* in violation of the United States' international commitments—"that Congress designed the Act[s] to avoid." *See King*, 576 U.S. at 492–93; *see also Grace v. Barr*, 965 F.3d 883, 902 (D.C. Cir. 2020) (IIRIRA and the INA balance the statutory objectives of non-*refoulement* and efficiency). The separation of powers prohibits agencies from wresting the legislative pen from Congress in this manner.

### C.      The Rule Is Arbitrary and Capricious

Defendants' justifications of the Rule are substantively unavailing and procedurally improper. In offering the rationales animating the Rule, the Agencies repeatedly failed to "consider [] important aspect[s] of the problem," "articulate a satisfactory explanation for its action," draw a "rational connection between the facts found and the choice made," and rely only "on factors which Congress has . . . intended [them] to consider." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

The Agencies failed to consider negative effects of diminished access to asylum on the economy, offered overstated and internally inconsistent gains to the system's "efficiency," and grossly understated the increased risk of *refoulement* of refugees—in violation of the United States' binding international commitments and the statutes ensuring compliance with them. Mot. 22–32. Not only were these issues raised in the comments, the Agencies failed to respond meaningfully in the Rule. *See Carlson v. Postal Reg. Comm'n*, 938 F.3d 337, 344 (D.C. Cir. 2019) ("[A]n agency must respond to comments 'that can be thought to challenge a fundamental premise'

---

*Water Conserv. Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 290 (2010) (courts "construe statutes, not isolated provisions"); *see also United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365, 371 (1988) ("A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme . . . because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law.").

underlying the proposed agency decision.").  As these failures go to the Rule's foundation, the appropriate remedy is to enjoin the Rule in full.

*Effect on the Economy and Fisc*.  The Agencies failed to consider altogether the economic and fiscal effects of this sweeping Rule, Mot. 29–30, which, as explained in Michael Clemens's declaration, Mot. Ex. C., will predictably amount to the loss of billions in the short term.  Notably, the Defendants do not even attempt to challenge the accuracy, methodology, or relevance of the Clemens Declaration in any way, or his expertise.  Rather, they urge the Court to ignore the Declaration entirely because it is not part of the administrative record.  Opp. 27.  But the Declaration falls squarely within the D.C. Circuit's express exception for evidence necessary "to determine whether the agency considered all the relevant factors."  *See Animal Legal Def. Fund, Inc. v. Perdue*, 872 F.3d 602, 611 (D.C. Cir. 2017).  HRF submitted the Clemens Declaration precisely for that reason: to show that the economic and fiscal costs of the Rule which the Agencies did not consider is relevant, if not dispositive, to the cost-benefit analysis.

Instead, the only "costs" that the Agencies even mention in the Rule are costs to asylum applicants, 85 Fed. Reg. at 80,349 & 80,372, and "intangible" costs, *id.* at 80,378.  Commenters squarely raised this issue.  The International Refugee Assistance Project ("IRAP") commented that the Rule would shut out people, "who before the Rule would have received asylum and then been able to seek employment, earn an income, and contribute to governmental tax coffers," and noted that the NPRM "provide[d] no analysis" on why this economic impact would not "trigger the major rule designation."[10]  Catholic Charities Community Services highlighted the "accelerated or

---

[10]    IRAP, Comment Letter on Proposed Rule, 5 (July 15, 2020), https://beta.regulations.gov/comment/EOIR-2020-0003-5998; *see also id.* (an increase in detention and removal costs from the Rule, alone, would cost in excess of $100 million).

differential disposition of asylum cases will have other impacts . . . on the economy" which the Agencies failed to address, including loss of immigrant tax contributions.[11]  These well-supported comments called into question the Agencies' dubious claim that any economic costs of the Rule would be non-existent or un-quantifiable.  They required reasoned responses.

*Efficiency*.  The Agencies' efficiency rationale completely falls apart when considered against Defendants' primary defense that asylum is determined on a case-by-case basis and many of the Rule's provisions are only applicable "in general."  Opp. 20.[12]  But they cannot have it both ways.  Either the Rule creates efficiency by streamlining procedures and adding rules designed to be applied uniformly to the detriment of claims, *see* 85 Fed. Reg. at 80,285, or the Rule's provisions must be applied only in the context of a case's full merits, *see* Opp. 20.  If the former, the Rule unacceptably sacrifices *refoulement* at the altar of efficiency.  If the latter, then the Rule's main rationale falls away; the Rule will not be efficient and will still lead to *refoulement*.  Defendants' case-by-case claim as to discretionary factors, for example, ignores how these factors will put a thumb, often an impossibly heavy thumb, on the scale against granting asylum.

Defendants also appear to define "efficiency" only in terms of cost and claims-processing times.  *See* 85 Fed. Reg. 80,371–72.  The most "efficient" system would be to halt asylum processing altogether.  Yet, that would result—as the Rule does—in the *refoulement* of individuals with otherwise meritorious asylum claims in violation of federal statutes and binding United

---

[11]  Catholic Charities Community Services, Comment Letter on Proposed Rule, 4 (July 14, 2020), https://beta.regulations.gov/comment/EOIR-2020-0003-5021.

[12]  The Agencies' efficiency rationale is also undermined by the Agencies' front line employees—immigration judges and asylum officers.  Mot. 29.  Defendants do not argue that those individuals are mistaken.  Instead, they contend that the Agency could ignore these concerns because these commenters did not have as much information as the Agencies.  Opp. 25–26.  That proves too much.  Under that rationale, *any* agency could reject any comments on the basis that it knows more than the commenter.

States' treaty obligations.  *See* Mot. 3–6 (reviewing the United States' statutory and treaty obligations to avoid *refoulement*).  Efficency is not just a question of merely dollars and cents or minutes and hours; the Agencies were required to determine whether the Rule's changes better enable the United States to abide by binding legal obligations.  Non-*refoulement*, not efficiency, is the Agencies' binding legal obligation and should have served as a touchstone for their analysis.  *See Grace*, 965 F.3d at 902 (non-*refoulement* is an important objective of the INA).

*Refoulement*.  In the rare instance in which the Agencies mentioned the risk of *refoulement*, they relied on circular reasoning to explain away that risk.  *See* Mot. 23–28.  Commenters highlighted that the Rule will lead to *refoulement*, Mot. 26–27; Compl. ¶ 229, which Congress passed the Refugee Act to prevent.  The Agencies responded that the Rule could not result in *refoulement* of individuals with "meritorious claims."[13]  But the Rule redefines "meritorious claims" only to include those claims that would be granted under the new Rule, so of course, by this definition, the Rule would not lead to the denial of "meritorious claims."  *See, e.g.*, 85 Fed. Reg. at 80,314, 80,274, 80,378.  The question is whether the Rule's redefinition of a meritorious claim will lead to denials of asylum for persons who have meritorious claims under the refugee standard that Congress created in the INA.  It will.

*Violations of International Law*.  Commenters also highlighted that the Rule's changes with respect to asylum eligibility—and, by extension, eligibility for withholding of removal—violate international law and run counter to guidance from UNHCR.  *See, e.g.*, Compl. ¶ 231. *Accord* Mot. Ex. C.  Defendants' retort, that UNHCR's guidance is not binding, Opp. 23, misses

---

[13] The Agencies claim that the Rule does not violate international law on *refoulement* because withholding of removal is available.  That is small comfort, as the Rule also makes withholding of removal effectively impossible to obtain.  *See* 85 Fed. Reg. at 80,378.

the point:[14]  Congress codified its obligations under the protocol in the Refugee Act, so the Agencies cannot simply ignore the Rule's violation of international law.  For the same reason, Defendants' claim that the Agencies were allowed to ignore international law implications because the *1967 Protocol* is not self-executing, *see id*., is inapposite.  Because Congress passed the Refugee Act to bring the United States into conformance with that protocol, the INA must be read and implemented in a manner that avoids international law violations.  Mot. 33 n.34.

*Procedure*.  At each step of this process, the Agencies prioritized expediency over stakeholders' interests.  In choosing a 30-day comment period[15] and a 30-day implementation period, the Agencies departed from the guidelines established by statute and Executive Order.  *See* Compl. ¶¶ 243–48; Mot. 31–32.  They offered no justification for these departures.  If anything, the fact that the rulemaking took place amidst a global pandemic and touched on a vast array of regulations, the non-arbitrary, non-capricious periods for public comment and implementation are longer, not shorter than usual.  This hasty promulgation was arbitrary, and the Rule should be stayed as a result.[16]

* * * * *

It is not a coincidence that, in the Rule's "almost 100 single-spaced, multi-columned pages," Opp. 23, the Agencies wholly sidestepped the many comments challenging "fundamental

---

[14] The Supreme Court has instructed courts to draw significant guidance from UNHCR. *See* Mot. 25 (citing *INS v. Cardoza-Fonseca*, 480 U.S. 421, 439 & n.22 (1987)).  The same reasoning applies to the Agencies.

[15] Defendants selectively quote *National Lifeline Association v. FCC*, 921 F.3d 1102 (D.C. Cir. 2019).  The D.C. Circuit did not "state[]" that 30-day comment periods were "generally sufficient," *compare* Opp. 26 (quoting 85 Fed. Reg. at 80,373) *with Nat'l Lifeline*, 921 F.3d at 1117.  Instead, the court found that there was an "inability to comment meaningfully within this brief time" and ultimately found the FCC's actions arbitrary and capricious.  *Id.*

[16] In the alternative—and at a minimum—a new, appropriately long notice-and-comment period should be ordered.

premise[s]" of the Rule.  Because those comments so drastically undermined the Agencies' basis

for the rulemaking, it would have been hard to justify promulgating the Rule after engaging with

these comments in the requisite "reasoned manner."   *See Reytblatt v. NRC*, 105 F.3d 715, 722

(D.C. Cir. 1997).  Nor is it a coincidence that, despite their admitted obligation to consider the

many offered alternatives[17] to the chosen rules, Opp. 26 (citing *Nat'l Shooting Sports Found. v.*

*Jones*, 716 F.3d 200, 215 (D.C. Cir. 2013)), they failed to consider a single one.

### D.    Defendants' Defenses of Specific Provisions Are Flawed

Defendants (again) dismiss HRF's legal arguments by mischaracterizing them as policy

disagreements.  Opp. 28.  But HRF made *specific* allegations about how *each* provision violates

the INA and APA in its Complaint, *see* ¶¶ 79–211, and discussed many provisions in even more

detail in its Motion, *see* Mot. 32–41.  Should this Court decline to grant relief on the grounds

discussed *supra*, it should still find each of the Rule's provisions contrary to the INA and APA.

The provision-specific defenses Defendants offer in their opposition are wanting.  In

response to HRF's argument that Provision 2.9—the Rule's new discretionary factors—bears no

rational relationship to the merit of asylum claims, the Defendants say that the "factors . . . do not

need to relate to the merits of an applicant's asylum claim."  Opp. 29.  But then the Agencies and

Defendants were required to explain why these factors are necessary at all.  Instead of doing so,

Defendants point the finger at HRF, faulting it for not refuting the Agencies' unsupported claim

---

[17] *See, e.g.*, Center for Migration Studies, *Comment Opposing Proposed Rule* (July 7, 2020), https://beta.regulations.gov/comment/EOIR-2020-0003-5958 (referring Agencies to peer-reviewed article with recommendations for reform of the asylum system); Roundtable of Former Immigration Judges, *Comment Letter on Proposed Rule* (July 13, 2020), https://beta.regulations.gov/comment/EOIR-2020-0003-4734 (suggesting removal of factors judges must consider in favor of a totality of the circumstances approach to achieve Agencies' stated goal of efficiency); UNHCR, *Comment Letter on Proposed Rule* (July 15, 2020), https://beta.regulations.gov/comment/EOIR-2020-0003-5471 (offering recommendations related to each provision of the Rule).

that "there is a higher likelihood that aliens who fail to apply for protection . . . en route to the United States are misusing the asylum system." *See id*. But HRF (along with *many* commenters) raised concerns about the policy of and logic underlying these discretionary factors. *See, e.g.*, Compl. ¶¶ 193–94; Mot. 37–38. That is not HRF's job; the *Agencies* have the legal obligation to support the claims used to support their changes. *See FCC v. Fox TV Stations, Inc.*, 556 U.S. 502, 515 (2009). And on that score, they offered no evidence to support their speculative assertion.

For Provision 2.7, the Rule's new bar on cultural evidence, Defendants parrot the final Rule's reliance on *Matter of A-R-C-G-*, 26 I. & N. Dec. 388, 394 (BIA 2014). But as HRF explained in its Complaint, the issue in *Matter of A-R-C-G* was the scarcity of the evidence in the record (a partial quotation from a news article), not the use of such evidence generally. Compl. ¶ 177. Defendants ignore this argument entirely. Defendants also leave unanswered one of HRF's primary arguments on Provision 2.8 (internal relocation). HRF argued that the new requirement to consider "demonstrated ability to relocate to the United States" would weigh against *every single asylum seeker* in the United States because each one necessarily made their way here. Mot. 39. Defendants do not, because they cannot, refute this point.

In defending Provision 2.10 (firm resettlement), Defendants point to a case the Agencies sought to rely upon through the final Rule: *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.,* 545 U.S. 967, 982 (2005). But the Agencies' rushed notice-and-comment period and lack of responsiveness to comments discussed *supra* render any deference to the Agencies improper. *See Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016).[18] Moreover, "firmly" is anything but ambiguous, rendering *Brand X* irrelevant. *See* Compl ¶¶ 198–201; Mot. 33.

---

[18] The Agencies' *Chevron* arguments fare no better. *Encino Motorcars*, 136 S. Ct. at 2126 ("An arbitrary and capricious regulation . . . is itself unlawful and receives no Chevron deference").

Alternatively, the interpretation of firm resettlement Defendants offer—whether an individual "could have received . . . non-permanent" status in a third country, Opp. 35—is not reasonable.

In defense of their new provision allowing IJs to decide applications without any hearing (Provision 2.2), Defendants argue that near-instant denial of asylum applications is "well established in the law," Opp. 37. In support, Defendants cite three federal court decisions, only one of which is immigration-related and another of which has been abrogated.[19] Moreover, in *Tilija v. Attorney General*, 930 F.3d 165 (3d Cir. 2019), the one immigration case Defendants cite in this section, the Third Circuit faulted the lower immigration courts for applying an "overly rigorous standard" and reversed, finding that the applicant established a prima facie case. *Id.* at 172, 174. It is difficult to see how that case could possibly support the Agencies' even greater restriction of application adjudication. It certainly does not supplant the statute's plain text: "An immigration judge *shall conduct proceedings* for deciding the inadmissibility or deportability of an alien." 8 U.S.C. § 1229a(a)(1) (emphasis added).

As for their redefinition of political opinion (Provision 2.4), Defendants argue that the Rule simply "codifies the ordinary meaning of 'political opinion.'" Opp. 38–39. But the very definition that the Agencies cite belies this characterization: a political opinion is one that "relat[es] to government," or "the conduct of government," or "the making . . . of government policy," or "politics." *Id.* at 39 (citing Merriam-Webster Dictionary, Definition of "Political," https://www.merriam-webster.com/dictionary/political (last visited Jan. 1, 2021)). This is a *far*

---

[19] Opp. 37 (citing *Smith v. Janey*, 664 F. Supp. 2d 1 (D.D.C. 2009), *aff'd sub nom. Smith v. Rhee*, 2010 WL 1633177 (D.C. Cir. Apr. 6, 2010) (employment discrimination action); *White v. Abrams*, 495 F.2d 724 (9th Cir.), *disapproved of by Lewelling v. First Cal. Co.*, 564 F.2d 1277 (9th Cir. 1977), *and abrogated by Hollinger v. Titan Cap. Corp.*, 914 F.2d 1564 (9th Cir. 1990) (violation of securities laws)).

broader category of opinion than only those "in support of the furtherance of a discrete cause related to *political control* of a State or a unit thereof." 85 Fed. Reg. at 80,385, 80,394 (emphasis added). Defendants have no response to this mismatch, nor do they justify excluding opinions other than those related to political control.[20] *Compare* Mot. 36 *with* Opp. 38–41.

## II.      HRF Will Be Irreparably Harmed If the Rule Is Not Enjoined

HRF has demonstrated irreparable harm. The Rule will "perceptibly impair[] the [organization's] programs" and the Rule "directly conflict[s] with the organization's mission." *League of Women Voters v. Newby*, 838 F.3d 1, 8 (D.C. Cir. 2016). In *Newby*, the D.C. Circuit found irreparable harm where the challenged voter registration requirement would make registration more difficult, reducing the number of voters the plaintiff could register and causing a diversion of resources as a result of the policy. *Id.* at 8–9. HRF asserts the same kind of irreparable harm: it advances its mission by helping individuals obtain asylum, the challenged Rule makes that more difficult, as a result, the organization will help fewer individuals successfully obtain asylum and will be forced to divert resources to do so. *See* Breen Decl. ¶¶ 4, 10–11. In *Newby*, as here, two of the challenged policies had not yet taken effect, but the D.C. Circuit nevertheless found that a failure to enjoin those policies would cause irreparable harm because "a preliminary injunction requires only a *likelihood* of irreparable injury." *Newby*, 838 F.3d at 8–9 ("Damocles's sword does not have to actually fall on all appellants before the court will issue an injunction."). And, just as in *Newby*, "there can be no do over and no redress" because individuals whom HRF cannot help are likely to be ordered removed while this case is pending. *Id.* at 8 (finding harm to organization irreparable because unregistered voters will be unable to register after the registration

---

[20] *INS v. Elias-Zacarias*, 502 U.S. 478 (1992), offers no support for the Agencies' narrow interpretation. That case addressed whether the "political opinion" in question was held by the victim or by the persecutor; it did not purport to limit the meaning of "political." *See id.* at 482.

deadlines for an election pass).

The balance of equities also weighs in favor of an injunction.  Defendants assert only vague "law enforcement and public safety interests" in their favor.  Opp. 41–42.  That hardly seems time sensitive, given that by Defendants' account the Rule has been in consideration for 20 years.  In any event, there is "no public interest in the perpetuation of unlawful agency action." *Newby*, 838 F.3d at 12.  Defendants contend that HRF improperly "invoke[s] third party harms to non-party aliens."  Opp. 42.  But, of course, those harms to members of the public are properly considered part of the public interest and weigh heavily in favor of issuing the injunction.  *See Newby*, 838 F.3d at 12–13 (considering "risk that citizens will be disenfranchised").

## III.    The Rule Must Be Enjoined or Stayed Nationwide

Defendants argue as though Human Right First's request for a nationwide injunction is an extraordinary remedy that is inconsistent with the APA, when it is in fact merely an instantiation of a court's congressionally authorized power to stay the effective date of a regulation pending judicial review.  *See* 5 U.S.C. § 705.  Indeed, the APA goes further and authorizes courts to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." *Id.*

Defendants assert that "[t]he APA provides only that a court *may* 'hold unlawful and set aside agency action,'" Opp. 43 (quoting 5 U.S.C. § 706(2)), when in fact that statute provides that, "[t]he reviewing court *shall* hold unlawful and set aside agency actions . . . found to" violate the APA, 5 U.S.C. § 706(2).  From this misquote, Defendants argue that the APA does not ever allow for preliminary equitable relief that reaches beyond the specific parties to the litigation.  *See* Opp. 43.  Yet the statute allows precisely for that.  *See* 5 U.S.C. § 705.  The "postpone[ment] [of] the effective date of an agency action" necessarily contemplates ordering relief beyond the parties because an "agency action" includes whole rules with nationwide effect.  *Id.* § 551 ("'agency

action' includes the whole or part of an agency rule").   Narrower relief creates unworkable, bifurcated regulatory schema.  For that reason, courts in this district commonly enjoin rules on a nationwide basis.  *See Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Servs.*, -- F. Supp. 3d --, 2020 WL 5232076, at *43 (D.D.C. Sept. 2, 2020) (collecting cases).

HRF's claims require that the entire Rule be enjoined.  The Agencies' failures to appoint officials with authority to act, to act within their statutorily delegated authority, and to abide by the APA's reasoned decision-making requirements on foundational aspects of the Rule all infect the Rule as a whole.  Insofar as the Court rests its decision on the Agencies' failures with respect to specific provisions, Defendants assert only that "any relief must be tailored . . . to the specific provisions shown to be unlawful." Opp. 42.  But Defendants fail to recognize—let alone analyze— the severability doctrines for regulations found to be unlawful under the APA.[21]  *See* Opp. 42–43 (citing only cases pertaining to statutory severability clauses).  Courts may not sever regulations where they are "intertwined" with the unlawful portions.  *See Sierra Club v. FERC*, 867 F.3d 1357, 1366 (D.C. Cir. 2017); *Sorenson Commc'ns. Inc. v. FCC*, 755 F.3d 702, 710 (D.C. Cir. 2014). Because Defendants have "[s]ince the beginning of [the rulemaking]," "treated the project as a single, integrated proposal," neither agency would have approved such a fragmentary rule.  *Sierra Club*, 867 F.3d at 1366–67; *see* 85 Fed. Reg. at 80,285–86 (the Rule's purpose is to "harmonize" the asylum system).

## CONCLUSION

For the foregoing reasons, HRF asks the Court to enter a preliminary injunction to halt implementation of the Rule.

---

[21] Nor did the Agencies.  They justify the inclusion of severability clauses in the Rule by citing only their own "belief" that the regulations operate independently without any analysis of why that is so.  *See* 85 Fed. Reg. at 80,393.

Dated:  January 1, 2021                    Respectfully submitted,


  /s/ Ana C. Reyes
Ana C. Reyes (D.C. Bar No. 477354)
Melinda K. Johnson (D.C. Bar. No. 1620229)
Emma J. Nino<sup>*</sup>
Helen E. White<sup>*</sup>
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
Tel: (202) 434-5000
Fax: (202) 434-5029
areyes@wc.com

---

<sup>*</sup> Practice supervised by D.C. Bar members pursuant to D.C. Court of Appeals Rule 49(c)(8), and certification to practice pursuant to LCvR 83.2(g) to be submitted.